1  JEREMY V. RICHARDS (CA SBN 102300)
   GAIL S. GREENWOOD (CA SBN 169939)
2  PACHULSKI STANG ZIEHL & JONES LLP
   10100 Santa Monica Blvd., 13th Floor
3  Los Angeles, CA  90067
   Telephone: 310/277-6910
4  Facsimile: 310/201-0760
   E-mail:  jrichards@pszjlaw.com
5            ggreenwood@pszjlaw.com

6  Attorneys for Official Committee of Unsecured Creditors
   of Liberty Asset Management Corporation

7

8                **UNITED STATES BANKRUPTCY COURT**

9                 **CENTRAL DISTRICT OF CALIFORNIA**

10                    **LOS ANGELES DIVISION**

| | |
|---|---|
| 11  In re: | Case No.:  2:16-bk-13575-TD |
| 12  LIBERTY ASSET MANAGEMENT CORPORATION, a California corporation, | Chapter 11 |
| 13 | Adv. No. 2:16-ap-01337-TD |
| 14  Debtor and<br>Debtor in Possession. | **DECLARATION OF JEREMY V. RICHARDS IN SUPPORT OF THE COMMITTEE'S MOTION FOR SUMMARY ADJUDICATION OF DEFENDANTS' LIABILITY FOR BREACH OF FIDUCIARY DUTIES AND ACCOUNTING** |
| 18 | |
| 19  OFFICIAL UNSECURED CREDITORS COMMITTEE FOR LIBERTY ASSET MANAGEMENT CORPORATION, | Date:  December 15, 2016<br>Time:  11:00 a.m.<br>Place:  Courtroom 1345<br>          255 E. Temple Street<br>          Los Angeles, CA 90012<br>Judge: Thomas B. Donovan |
| 20 | |
| 21             Plaintiff | |
| 22       vs. | |
| 23  LUCY GAO, an individual, and BENJAMIN KIRK, an individual, | |
| 24 | |
| 25             Defendants | |

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

I, Jeremy V. Richards, declare as follows:

1.      I am an attorney at law duly licensed to practice in all state and federal courts in the State of California, and admitted to practice before this Court.  I am a partner with the law firm of Pachulski Stang Ziehl & Jones LLP, counsel to the Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtor (the "Debtor").

2.      I make this declaration in support of the *Motion for Summary Adjudication of Defendants' Liability for Breach of Fiduciary Duty and Accounting* (the "Motion") filed concurrently herewith.[1]  The facts stated herein are of my own personal knowledge, and if called upon to testify, I could and would competently testify thereto.[2]

3.      My firm was engaged to serve as counsel to the Committee on or about May 4, 2016.  During the course of the representation, I have requested and received certain records from the Debtor's counsel, including certain investor contracts, which I am informed and believe were maintained in the ordinary course of the Debtor's business.  In addition, pursuant to the Court's *Order Granting Renewed Emergency Motion for Turnover of Property of the Estate and Books and Records Relating to Property of the Estate* entered June 24, 2016 [Dkt. No. 147], the Debtor's Chief Restructuring Officer, Lawrence Perkins, gathered the Debtor's remaining books and records and made them available to the parties on an electronic database, bates numbered LAM00000001 *et seq*.  Counsel for Gao (Alexandre Cornelius) and Kirk (David Meadows) have each advised that any books and records of the Debtor within their clients' possession, custody or control have been turned over to Mr. Perkins.

4.      Attached hereto as <u>Exhibit A</u> is a copy of an Investment Contract between the Debtor and Huesing Holdings LLC dated September 9, 2014, entitled Non-Specific Asset Management Contract.

5.      Attached hereto as <u>Exhibit B</u> are true and correct excerpts from the transcript of the Section 341(a) Meeting of Creditors conducted by the United States Trustee's Office on April 25, 2016.

---

[1] Undefined capitalized terms contained in this declaration have the meaning ascribed to them in the Motion.
[2] Personal information, including drivers' license and social security numbers, have been redacted from the exhibits attached to this Declaration.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

6.      Attached hereto as <u>Exhibit C</u> are true and correct excerpts from the transcript of the Court's hearing on June 22, 2016 regarding the Renewed Motion for Turnover of Property of the Estate and Books and Records Relating to Property of the Estate.

7.      Attached hereto as <u>Exhibit D</u> are true and correct excerpts from the transcript of the deposition of Benjamin Kirk on September 18, 2013 in the case of *UN Plaza LLC v. UN Plaza Associates, LP, et al.,* San Francisco County Superior Court, Case No. CGC-12-521738.

8.      Attached hereto as <u>Exhibit E</u> is a true and correct copy of Defendant Lucy Gao's Response to JD Brothers, LLC's First Set of Requests for Admission dated May 16, 2016, served on a member of the Committee in the case of *JD Brothers LLC, et al. v. Liberty Asset Management Corp., et al.,* USDC ND Cal., Case No. 15-cv-01373-VC.

9.      Attached hereto as <u>Exhibit F</u> is a true and correct copy of Defendant Lucy Gao's Response to Plaintiff JD Brothers LLC's First Set of Interrogatories dated May 16, 2016, served on a member of the Committee in the case of *JD Brothers LLC, et al. v. Liberty Asset Management Corp., et al.,* USDC ND Cal., Case No. 15-cv-01373-VC.

10.     Attached hereto as <u>Exhibit G</u> is a copy of a document maintained among the Debtor's books and records, consisting of Biographical and Financial Reports signed by Gao and submitted to the Federal Deposit Insurance Corporation as of November 24, 2012.

11.     Attached hereto as <u>Exhibit H</u> is a copy of a document maintained among the Debtor's books and records, consisting of a financial report signed by Gao on May 22, 2012.

12.     Attached hereto as <u>Exhibit I</u> is an email received from Debtor's counsel dated June 21, 2013 from Gao to Margaret Chiu re "Wire Instructions FMM and Dean."

13.     Attached hereto as <u>Exhibit J</u> is a Borrower's Estimated Settlement Statement from First American Title Company signed by Gao and dated April 1, 2014.

14.     Attached hereto as <u>Exhibit K</u> is a Seller's Estimated Settlement Statement from First American Title Company signed by Gao and dated June 5, 2015.

15.     Attached hereto as <u>Exhibit L</u> are operating agreements maintained among the Debtor's books and records, pertaining to the following Investment Entities managed by Gao:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

- HK Grace Building LLC
- Strong Water Capital Management LLC
- SGCC DTLA 81, LLC, which is solely owned by Huntington Giant Capital Corporation
- Coastline Investments LLC
- Diamond Waterfalls LLC
- Atherton Financial Building LLC
- Pacific View REO Management LLC
- FACDC Azusa LLC
- 1595 17th Street LLC
- 544 San Antonio Road LLC

16.     Attached hereto as <u>Exhibit M</u> are additional operating agreements maintained among the Debtor's books and records, pertaining to the following Investment Entities managed by Gao:

- East Heights LLC
- Bridgestream Management LLC
- Green Oak Asset Management LLC

17.     Attached hereto as <u>Exhibit N</u> is the operating agreement of First American Regional Center LLC and an absolute assignment of interest in American Development and Investment Regional Center LLC, both of which were maintained among the Debtor's books and records and reflect Gao as the holder of all interests.

18.     Attached hereto as <u>Exhibit O</u> are quitclaim deeds signed by Kirk pertaining to the Debtor's real properties at 1020 South Baldwin Avenue in Arcadia, CA, and 415 Huntington Drive in San Marino, CA.

19.     Attached hereto as <u>Exhibit P</u> are signature cards received from Mega Bank and East West Bank pursuant to the Committee's document requests.  The signature cards pertain to the accounts in the name of the Debtor at Mega Bank (xxx0764, xxx0913, xxx1242) and at East West Bank (xxx3418 and xxx3390), and reflect Kirk and Gao as authorized signatories.

20.     Attached hereto as <u>Exhibit Q</u> are signature cards received from Mega Bank pursuant to the Committee's document requests pertaining to accounts of the following Investment Entities: HK Grace Building LLC (xxx1622), Strong Water Capital Management LLC (xxx1408), Diamond

4

Waterfalls LLC (xxx1416), Coastline Investments LLC (xxx1465), Bridgestream Management LLC (xxx1507), and Crystal Waterfalls LLC (xxx1457).

21.     Attached hereto as <u>Exhibit R</u> are monthly account statements, check copies, and wire transfer confirmations received from Mega Bank pursuant to the Committee's document requests. The documents pertain to the account of Investment Entity, HK Grace Building LLC.

22.     Attached hereto as <u>Exhibit S</u> are signature cards received from Mega Bank pursuant to the Committee's document requests regarding accounts in the name of the following purported escrow entities (on which Gao was an authorized signatory):

- Diamond Point Real Estate Corp. dba Skyline Escrow Services
- New Life Real Estate Corp. dba Shoreline Escrow Services
- New Life Real Estate Corp dba Vista Escrow Services
- American Heritage Escrow Services Corp.
- Golden View Horizon LLC dba Horizon Escrow Services

23.     Attached hereto as <u>Exhibit T</u> is a copy of a personal financial statement of Gao maintained among the Debtor's books and records, signed by Gao on or about March 3, 2013 and submitted to Shanghai Commercial Bank.

24.     Based on my review of information received from Mega Bank and East West Bank, all of the known accounts in the name of the Debtor were closed on or before April 3, 2015.

25.     Attached hereto as <u>Exhibit U</u> is a copy of a check payable to North America Asset Management Corp. from the Debtor for $1 million dated July 30, 2013, signed by Kirk, and received from Mega Bank pursuant to the Committee's document requests.

26.     Attached hereto as <u>Exhibit V</u> is a signature card received from Mega Bank pursuant to the Committee's document requests pertaining to the account of North America Asset Management Corporation (xxx1325) and reflecting Kirk as the sole signatory.

27.     Attached hereto as <u>Exhibit W</u> are copies of documents received from Sincere Escrow pertaining to file no. 13665MC / property at 3931 Alemany Boulevard, San Francisco: (a) amended escrow instructions dated March 26, 2013 to Sincere Escrow from the Debtor directing the

5

disposition of funds, and (b) wire confirmations reflecting payments of: $1.8 million to the Debtor, $948,510 to the Debtor, and $200,516.13 to 444 East Huntington LLC.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 1st day of November, 2016 at Los Angeles, California.

_/s/ Jeremy V. Richards_____
Jeremy V. Richards

DOCS_SF:92035.2 52593/002

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT A



# LIBERTY ASSET MANAGEMENT CORPORATION

## NON-SPECIFIC ASSETS MANAGEMENT CONTRACT

This Non-Specific Assets Management Contract ("Contract") is executed on this 9th day of September 2014 by and between Liberty Asset Management Corporation and its respective parent or subsidiary companies and affiliates, ("LAMC"), a California Corporation whose principal place of business is located at 3218 E. Holt Avenue #101, West Covina, CA 91791, and Assets Owner ("Owner") whose name, phone number and address are listed below.

### ASSETS OWNER ("OWNER"):

| | |
|---|---|
| Name: | Huesing Holdings LLC |
| Title: | Margaret Lai, Manager |
| Phone: | (949) 725-9499 |
| Address: | 8 Aristotle, Irvine, CA 92603 |

### PURPOSE

This Agreement sets out the terms and conditions on which LAMC will act for the Owner for the performance of the Contract.

### WHEREAS,

1. The amount of investment shall be $500,000.00.
2. The term of the contract is from September 9, 2014 or on or before October 24, 2014.
3. The investment return shall be 15.00%.
4. The investment and its return for a total of $575,000 can be returned by one (1) of the following two (2) options:
   4.1 Selling proceeds generated from the sale of 68 W. Colorado Blvd., Pasadena, CA 91105. Funds to be dispersed to Huesing Holdings LLC within three (3) weeks. Tiffany and Company is currently the Tenant at these premises.
   4.2 Selling proceeds from the sale of 153 S. Hudson Avenue Unit 101, Pasadena, CA 91101. Funds to be dispersed through escrow.

Liberty Asset Management Corporation

Assets Owner
Huesing Holdings LLC

Benny Ko, Asset Manager     Date

Margaret Lai, Manager     Date

# EXHIBIT  B

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

In re:                          )    **Case No. 2:16-bk-13575-TD**
                                )    Chapter 11
LIBERTY ASSET MANAGEMENT        )
CORPORATION,                    )    April 25, 2016
                                )    Los Angeles, California
        Debtor.                 )    10:00 a.m.
                                )
                                )
_____)

TRANSCRIPT OF

SECTION 341(a) MEETING OF CREDITORS

CONDUCTED BY

QUEENIE NG, UNITED STATES TRUSTEE'S OFFICE.

ATTENDANCE:

| | |
|---|---|
| Debtor's Counsel: | David Golubchik |
| | LEVENE, NEALE, BENDER, YOO & BRILL, LLP |
| | 10250 Constellation Blvd., Suite 1700 |
| | Los Angeles, CA 90067 |
| | (310) 229-1234 |
| Debtor's Responsible Individual/CEO: | Benjamin Kirk |
| | 2648 E. Workman Avenue, #3001-263 |
| | West Covina, CA 91791 |
| Debtor's Proposed Restructuring Officer: | Lawrence Perkins |
| | SIERRA CONSTELLATION PARTNERS |
| | 400 South Hope Street, Suite 1050 |
| | Los Angeles, CA 90071 |
| | (213) 289-9060 |
| For JD Brothers, LLC: | C. Alex Naegele |
| | C. ALEX NAEGELE, A PROFESSIONAL LAW CORPORATIN |
| | 95 South Market Street, Suite 300 |
| | San Jose, CA 95113 |
| | (408) 995-3224 |

```
 1   ATTENDANCE:

 2   For Faith Hope              James S. Yan
     International, et al.:      LAW OFFICES OF JAMES S. YAN
 3                               980 S. Arroyo Parkway, Suite 250
                                 Pasadena, CA  91105
 4                               (626) 405-0872

 5   For PA One, LLC:            Fred A. Wong
                                 WONG & MAK, LLP
 6                               790 E. Colorado Boulevard,
                                    Suite 790
 7                               Pasadena, CA  91101
                                 (626) 795-2880
 8
     For AHA 2012, LLC:          David S. Henshaw
 9                               HENSHAW LAW OFFICE
                                 1871 The Alameda, Suite 333
10                               San Jose, CA  95126
                                 (408) 533-1075
11
     For Northern California     Mark J. Romeo
12   Mortgage Fund:              LAW OFFICES OF MARK J. ROMEO
                                 235 Montgomery Street, Suite 400
13                               San Francisco, CA  94104
                                 (415) 395-9315
14
     For Lucy Gao:               Ian S. Landsberg
15                               LANDSBERG LAW, APC
                                 280 South Beverly Drive, Suite 504
16                               Beverly Hills, CA  90212
                                 (310) 409-2228
17
     Transcription Service:      Kathy Rehling
18                               311 Paradise Cove
                                 Shady Shores, TX  76208
19                               (972) 786-3063

20

21

22

23

24
                    Proceedings recorded by digital sound recording;
25                  transcript produced by transcription service.
```

011

1 | to answer my questions truthfully or accurately today?

2 | MR. PERKINS: No.

3 | MS. NG: Thank you. Can you please state your full
4 | name and the address in the record, please?

5 | MR. PERKINS: Lawrence Russell Perkins, 400 South Hope
6 | Street, Suite 1050, Los Angeles, California 90071.

7 | MS. NG: Thank you. I'm going to ask you two some
8 | questions regarding the Debtor's affairs. If your answers are
9 | the same, then one of you can answer if you have knowledge, but
10 | if your answers are different, then I need separate answers
11 | from you both. Do you understand that?

12 | MR. PERKINS: Yes.

13 | MS. NG: Thank you. Mr. Kirk, what is your role in
14 | the Debtor?

15 | MR. KIRK: I'm the president and CEO of the company.

16 | MS. NG: And how long have you been the president and
17 | CEO of the Debtor?

18 | MR. KIRK: Eight years.

19 | MS. NG: Okay. Is that when the Debtor was first
20 | established?

21 | MR. KIRK: Yes.

22 | MS. NG: Was there at any point any other officer for
23 | the Debtor?

24 | MR. KIRK: No.

25 | THE COURT: So Lucy Gao was never an officer or owner

1 │ of this particular debtor?

2 │      MR. KIRK: No.

3 │      MS. NG: Okay. And so you own 100 percent of Liberty

4 │ Asset?

5 │      MR. KIRK: Yes.

6 │      MS. NG: Okay. And Mr. Perkins, you're the proposed

7 │ CEO, or CRO?

8 │      MR. PERKINS: Correct.

9 │      MS. NG: And when was the effective date of the

10 │ proposed agreement?

11 │      MR. PERKINS: I have to look back, but approximately

12 │ four weeks.

13 │      MS. NG: Okay. And can you just give me a brief

14 │ summary as to why the Debtor filed for bankruptcy in this case?

15 │      MR. KIRK: We have -- owe to all these creditors

16 │ around $60-some million. But because the personal issue with

17 │ me and Lucy, so caused these -- she's not cooperate to dispose

18 │ the asset to return the money to the creditor. So I was forced

19 │ to have to file the bankrupt to dispose of all the asset to

20 │ return the money to creditor.

21 │      MS. NG: Okay. I understood the Debtor had one

22 │ prepetition bank account at Shanghai Bank, and that bank

23 │ account is under the name of one of the special purpose

24 │ entities, Goldstone Project Management, LLC. Is that correct?

25 │      MR. GOLUBCHIK: It's not a Debtor bank account. It's

1           MR. KIRK: Yeah, Liberty, yes.

2           MS. NG: Under Liberty Asset's name?

3           MR. KIRK: Yes.

4           MS. NG: Okay.

5           MR. KIRK: Or under Liberty's -- there's LLCs that --

6 because for doing these acquisitions we have different LLC. So

7 when we buy this one, we may use this LLC. Those are for tax

8 purpose. So when we report tax, that's just that's LLC gain,

9 nobody.

10           MS. NG: And who'd decide whether or not to set up a

11 special LLC to make the purchase?

12           MR. KIRK: I decide.

13           MS. NG: Okay. Only you?

14           MR. KIRK: Yes.

15           MS. NG: Okay. And who formed the special LLC, then?

16           MR. KIRK: We have administration department that form

17 these LLC.

18           MS. NG: Administration department of the Debtor?

19           MR. KIRK: Yeah. We had our own administration staff

20 and then they apply these LLCs.

21           MS. NG: I thought the Debtor had no employees.

22           MR. KIRK: No, before. You were asking before, how we

23 operate, right?

24           MR. GOLUBCHIK: Right now, they don't have --

25           MS. NG: Right.

1    MR. GOLUBCHIK:  The Debtor doesn't have employees, but

2    --

3    MR. KIRK:  Right now, we don't have anybody.

4    MS. NG:  Okay.

5    MR. KIRK:  Right now, we cease operations for two,

6    three years already.

7    MS. NG:  Okay.

8    MR. KIRK:  Yeah.

9    MS. NG:  So who was in that administrative department?

10   MR. KIRK:  We just -- employee.  Many.  Whoever know

11   how to, then they would do that.

12   MS. NG:  Okay.

13   MR. KIRK:  Not like specific.

14   MR. GOLUBCHIK:  It wasn't a small operation with like

15   one person.  They actually were doing a lot of deals.  So they

16   had a whole department that was forming LLCs, doing the

17   administrative stuff associated with it.

18   MS. NG:  Was Lucy Gao part of that group who would

19   form the LLCs?

20   MR. KIRK:  Yes.

21   MS. NG:  Okay.  So was she working for the Debtor at

22   some point?

23   MR. KIRK:  Yes.

24   MS. NG:  When did that happen?

25   MR. KIRK:  That's from 2007 until recently.  Until

1  before filing this bankrupt, maybe two, three months.

2          MS. NG:  So maybe a few months prior to the

3  bankruptcy,  --

4          MR. KIRK:  Yes.

5          MS. NG:  -- she was still working for the Debtor?

6          MR. KIRK:  Okay.  But for the past few years, she's

7  not cooperate with this disposition to return refund to client.

8  So I was no choice to have to file BK because no money can

9  refund to customer.  So I just had to file to dispose all the

10  asset.

11          MS. NG:  So that administrative department who formed

12  the LLCs, do they need your approval to form the LLCs?

13          MR. KIRK:  No.  When -- if immediately just form one

14  and just like a routine.  We buy something, we form one, and

15  then it's under that name, carry the property.  Yeah.

16          MS. NG:  So the property will be owned by that special

17  LLC?

18          MR. KIRK:  Yeah.  It's all owned by Liberty.

19          MS. NG:  Okay.

20          MR. KIRK:  Not belong to that LLC.  And there's

21  sometimes in my name, sometimes Lucy's name, or no matter whose

22  name, but it's belong to Liberty.  We just form that LLC, carry

23  the property for the company.

24          MS. NG:  And who owns those LLCs?

25          MR. KIRK:  LLC was registered under individual's name

1  --

2          MS. NG:  Okay.

3          MR. KIRK:  -- for tax purpose.  But it's all belong to

4  Liberty.

5          MS. NG:  Okay.  When you say individual names, what

6  name would it be?

7          MR. KIRK:  Lucy's name --

8          MS. NG:  Okay.

9          MR. KIRK:  -- or my name or some other's name.  Or

10  sometimes investor's name.

11          MS. NG:  Okay.

12          MR. KIRK:  The really investor's name, because some

13  belong to them.

14          MS. NG:  So was there any sort of agreement in writing

15  that this property is owned by Liberty even though Liberty

16  doesn't have -- doesn't own these special interest entities?

17          MR. KIRK:  No, no agreement.  It's just the -- the

18  only -- was problem right now.  Problem is no written

19  agreement.  Because before was just Lucy and me running these

20  operation.

21          MS. NG:  Was there oral agreement?

22          MR. KIRK:  Yeah, oral.  We all know these is Liberty's

23  property.  Everybody knows that's Liberty's --

24          MS. NG:  When you say, who knows that?

25          MR. KIRK:  Whole company.  Everyone know.

1    MS. NG:   Okay.

2         MR. KIRK:   And then even the investors know these are

3    Liberty's assets, not belong to any individuals.

4         MS. NG:   Did you have an oral agreement with Lucy Gao

5    regarding this arrangement?

6         MR. KIRK:   Yes.   She knows.   She was --

7         MS. NG:   Do you recall when the oral agreement took

8    place?

9         MR. KIRK:   Just from started, 2007.

10        MS. NG:   Okay.   Is there any reason why there was

11   nothing in writing to set forth this arrangement?

12        MR. KIRK:   No.

13        MS. NG:   Okay.   What is the average gross monthly

14   income of this Debtor?

15        MR. KIRK:   Now we don't have any.

16        MR. GOLUBCHIK:   There's no income now.

17        MS. NG:   I thought there's the rental income for the

18   bowling alley, no?

19        MR. PERKINS:   There is the bowling alley.   We haven't

20   received any of the proceeds of that, and they haven't

21   historically received those over the last handful of years.

22        MR. GOLUBCHIK: I think the difference between -- so

23   the way that historically has worked is tenant pays rent into a

24   lockbox with a secured creditor, and I think the difference is

25   maybe two -- is it $2,000 or a few hundred, something small,

1   to maybe some operation.  I don't know.

2         MR. YAN:  So you don't keep track of the money that

3   the clients gave to you?

4         MR. KIRK:  For --

5         MR. YAN:  Liberty?

6         MR. KIRK:  For our structure, I mainly focus on the

7   front and sales.  And then it was Lucy, she handled the funds

8   in back office.  Our structure was like that.  So some of

9   these, I didn't involve these -- with this allocation on these

10  funds.

11        MR. YAN:  Do you have to give any approval or sign on

12  in any transfer of funds?  Or anybody can transfer funds from

13  your company?

14        MR. KIRK:  Not anybody.  It's Lucy or me.

15        MR. YAN:  I see.

16        MR. KIRK:  Yeah.

17        MR. YAN:  So it's either you or Lucy who had

18  transferred the funds out?

19        MR. KIRK:  Yes.

20        MR. YAN:  If that's the case?

21        MR. KIRK:  Yes.

22        MR. YAN:  And do you remember whether you had

23  transferred the funds out?

24        MR. KIRK:  Oh, I didn't transfer any funds.

25        MR. YAN:  So all of the funds were transferred by

1       MR. KIRK:  Thank you.

2       MR. GOLUBCHIK:  Thank you.

3   (Meeting concluded after two hours and forty-three minutes.)

4                          --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                        CERTIFICATE

20       I certify that the foregoing is a correct transcript to
    the best of my ability from the digital sound recording
21   (without log notes) of the proceedings in the above-entitled
    matter.

22
    /s/ Kathy Rehling                        05/23/2016
23   _____    _____

24   Kathy Rehling, CETD-444                    Date
    Certified Electronic Court Transcriber
25

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3                    --oOo--

4  In Re:                    ) Case No. 2:16-bk-13575-TBD
                             )
5  LIBERTY ASSET MANAGEMENT  ) Chapter 11
   CORPORATION,              )
6                            ) Los Angeles, California
          Debtor.           ) Wednesday, June 22, 2016
7  _____ ) 11:00 a.m.

8                            HRG RE RENEWED EMERGENCY
                            MOTION FOR TURNOVER OF
9                            PROPERTY OF THE ESTATE AND
                            BOOKS AND RECORDS RELATING TO
10                           PROPERTY OF THE ESTATE

11              TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE THOMAS B. DONOVAN
12              UNITED STATES BANKRUPTCY JUDGE

13
   APPEARANCES:
14
   For the Creditors' Committee: JEREMY V. RICHARDS, ESQ.
15                               Pachulski, Stang, Ziehl
                                   & Jones
16                               10100 Santa Monica Boulevard
                                 13th Floor
17                               Los Angeles, California 90067
                                 (310) 277-6910
18
   For the Debtor:              DAVID B. GOLUBCHIK, ESQ.
19                               Levene, Neale, Bender, Yoo
                                   & Brill
20                               10250 Constellation Boulevard
                                 Suite 2700
21                               Los Angeles, California 90067
                                 (310) 229-1234
22

23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

1  APPEARANCES:  (Cont'd.)

2  For the Los Angeles County        BARRY S. GLASER, ESQ.
      Treasurer and Tax              Steckbauer Weinhart, LLP
3      Collector:                    333 South Hope Street
                                     36th Floor
4                                    Los Angeles, California 90071
                                     (213) 229-2868
5
    For Benny Kirk:                  DAVID W. MEADOWS, ESQ.
6                                    Suite 1235
                                     1801 Century Park East
7                                    Los Angeles, California 90067
                                     (310) 557-8490
8
    For the Creditors:               DAVID HENSHAW, ESQ.
9                                    Henshaw Law Office
                                     1871 The Alameda
10                                   Suite 333
                                     San Jose, California 95126
11                                   (408) 533-1075

12 For JD Brothers, LLC:             CHARLES A. NAEGELE, ESQ.
                                     C. Alex Naegele, a
13                                      Professional Law Corporation
                                     95 South Market Street
14                                   Suite 300
                                     San Jose, California 95113
15                                   (408) 995-3224

16 For Lucy Gao:                     ROBERT A. LISNOW, ESQ.
                                     Suite 400
17                                   10866 Wilshire Boulevard
                                     Los Angeles, California 90024
18                                   (310) 441-1770

19 For Crystal Waterfalls:           IAN S. LANDSBERG, ESQ.
                                     9300 Wilshire Boulevard
20                                   Suite 565
                                     Beverly Hills, California
21                                      90212
                                     (310) 409-2228
22

23

24

25

| | |
|---|---|
| Court Recorder: | Wanda Toliver |
| | Pat Pennington-Jones |
| | United States Bankruptcy Court |
| | Edward R. Roybal Federal |
| | Building |
| | 255 East Temple Street |
| | Los Angeles, California 90012 |
| | |
| Transcriber: | Jordan R. Keilty |
| | Echo Reporting, Inc. |
| | 4455 Morena Boulevard |
| | Suite 104 |
| | San Diego, CA 92117 |
| | (858) 453-7590 |

*Echo Reporting, Inc.*

I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------|--------|-------|----------|---------|
| Benny Kirk | 22 | 46 | -- | -- |
| Lucy Gao | 65 | -- | -- | -- |
| Samantha Galapin | 69 | 116 | 128 | -- |

*Echo Reporting, Inc.*

1 Q   Okay.  So it's fair to say that at least for the last

2 seven or eight years, the equity portion of Liberty's

3 acquisitions has been funded by third party investors?

4 A   Partial, not all of them.  We have own asset too.

5 Q   Okay.  So --

6 A   We have our own money too.

7 Q   So when Liberty Asset was first formed, how much

8 capital was invested in it by you?

9 A   I don't have actual number, maybe around $2,000,000,

10 two, three million.

11 Q   Okay.  And was Ms. Gao involved in the business from

12 the outset?

13 A   Yes.

14 Q   Okay.  So from 2007 onwards, has your role in the

15 business changed?  Has it been pretty consistent throughout?

16 A   Yes.

17 Q   Can you explain for me what your role in running

18 Liberty Asset Management has been?

19 A   My role would be selling the property and handle the

20 investor selling or buying properties.  It's more focused on

21 investor developing and asset selling.  It's more like sales

22 mostly.

23 Q   Okay.  So it's fair to say that you were primarily

24 involved in bringing investors in, acquiring properties, and

25 selling them?

*Echo Reporting, Inc.*

```
 1  A    Yes.
 2  Q    Okay.  What were Ms. Gao's responsibilities?
 3  A    She was involved acquisition and back office.  It's all
 4  the financing arrangements or mortgage with bank.  Some
 5  assets we acquire need to do some mortgage.  So she will
 6  handle the mortgage and the money arranged to finish the
 7  acquisition on property.
 8  Q    Okay.  Now, is it true that most, if not all, of the
 9  properties were acquired in limited liability companies that
10  were set up for the purpose of the acquisition?  Is that
11  true?
12  A    True.
13  Q    And that generally Liberty Asset did not take assets in
14  its own name, is that also true?
15  A    Very few times is Liberty directly acquire.
16  Q    Okay.
17  A    Most time it's separate holding LLC hold the property.
18  Q    Okay.  And generally was Ms. Gao the sole member, the
19  single member of those limited liability companies?
20  A    Most of the time, especially those assets involved
21  mortgage.  It was set up as she as a single member because
22  the banks, they require to be 100 percent owned by whoever
23  do the mortgage.
24  Q    Okay.  Did she put her own money into those investments
25  or this was all investment money?
```

1  A    No.   It's Liberty's money and investors' money.

2  Q    Okay.   So Ms. Gao was made the sole member to

3  facilitate financing, is that correct?

4  A    Correct.

5  Q    Was there any other reason she was made the sole member

6  of these entities?

7  A    No.

8  Q    So who managed these entities?   Did each of these

9  entities have their own management structure or were they

10 all managed by Liberty's employees?

11 A    All managed by Liberty's employee.

12 Q    Okay.   So in your mind, the books and records that

13 pertained to these limited liability companies are in the

14 possession and the control and the property of Liberty, is

15 that correct?

16 A    Correct.

17 Q    Okay.   And were -- were records kept separately for

18 each of these LLC's?

19 A    Yes.

20 Q    Were separate sets of records maintained?

21 A    Yes.

22 Q    So let's go back to Ms. Gao's role at Liberty.   You

23 said she -- she arranged financing, is that correct?

24 A    Correct.

25 Q    She -- did she set up the LLC's, the special purpose

1 entities that purchased real estate?

2        MR. LISNOW:  Objection, your Honor.  This is
3 really supposed to be as to where the assets are, where --
4 what they're turning over.  This sounds more like a 2004
5 examination than just a pure turnover order and where we
6 find the books, the tax returns, and the bank statements and
7 the legal documents, which Mr. Richards has previously
8 talked about is the reason why he's so frustrated here
9 today.  We're going into a whole background and history of
10 the relation --

11        THE COURT:  I don't want a speech, Mr. Lisnow.
12 Objection I've heard.  Overruled.

13 BY MR. RICHARDS:

14 Q    So Ms. Gao was in charge of financing, correct?

15 A    Correct.

16 Q    In charge of setting up the LLC's for which assets were
17 purchased, correct?

18 A    Correct.

19 Q    Did she -- was part of her responsibility overseeing
20 the accounting functions?

21 A    Yes.

22 Q    Okay.  Was part of her responsibility ensuring that
23 timely tax returns were prepared?

24 A    Yes.

25 Q    Okay.  Was part of her responsibility maintaining the

```
 1 legal files for Liberty?
 2           MR. LISNOW:  Objection.  Vague and ambiguous.
 3           THE WITNESS:  Legal file is --
 4 BY MR. RICHARDS:
 5 Q    I'll clarify the question.  Was Ms. Gao in charge of
 6 maintaining records pertaining to the purchase and sale of
 7 assets?
 8 A    Yes.
 9 Q    Was she in charge of records pertaining to the
10 financing of assets?
11 A    Yes.
12 Q    Was she in charge of records pertaining to the flow of
13 funds from investors?
14 A    Yes.
15 Q    Okay.  Was she helped by a staff?
16 A    Decision making is all by herself without anyone help,
17 but --
18 Q    But she -- I'm sorry.
19 A    -- she apply -- set up the LLC, we have employee do
20 that, helping her.
21 Q    And did she have employees help her with filing?
22 A    Yes.
23 Q    And did she have employees help her with maintaining
24 accounting records?
25 A    Yes.
```

1 Q    Okay.  Were your accounting records maintained on

2 Quickbooks?

3 A    Yes.

4         MR. LISNOW:  Vague and ambiguous as to time.

5 BY MR. RICHARDS:

6 Q    You may answer the question.

7 A    Yes.

8 Q    Okay.  And let's say the period -- well, you separated

9 from -- well, strike that question.

10    Let's say the period around 2012, you were still at the

11 Holt offices, right?

12 A    2012, yes.

13 Q    And who was -- who oversaw the maintenance of the

14 Quickbook records at that time?

15 A    It's Lucy.

16 Q    Okay.  But she was assisted by others, right?

17 A    Yeah, we have accounting employee, and everything they

18 would ask her.

19 Q    Okay.  So at the height, how many employees did Liberty

20 Asset Management have?

21 A    When 2012 around 27 employees.

22 Q    Okay.  And who did they all report to?

23 A    About accounting they report to her.

24 Q    I'm sorry.  Accounting they reported to?

25 A    To her, to Lucy.

1  Q    Okay.  What about people that maintained files, were

2  there physical files maintained in the office?

3  A    Yes.

4  Q    And did -- did the people that maintained those files

5  report to Ms. Gao?

6  A    Yes.

7  Q    Okay.  So, Mr. Kirk, you will recall that in connection

8  with the motion that was filed with the Court, you filed a

9  declaration, is that correct?

10 A    Correct.

11          MR. RICHARDS:  If someone actually has a spare

12 copy, I'd like to put it in front of the witness.  Your

13 Honor, may I approach the witness with a copy of the

14 declaration?

15          THE COURT:  You may.

16          THE WITNESS:  Thank you.

17 BY MR. RICHARDS:

18 Q    Mr. Kirk, I have placed in front of you a copy of your

19 declaration that was filed in connection with the motion

20 that is being heard by the Court today.  Do you recognize

21 your signature at page 18 of the document?

22 A    Yes.

23 Q    And you signed that under penalty of perjury on the

24 20th of June?

25 A    Yes.

*Echo Reporting, Inc.*

1  A     Yes.

2  Q     Did you assign your interest in the building to her?

3  A     No.  I filed this in the bankruptcy filing inside.

4  Q     Okay.  So paragraph 15 refers to your last visit to the

5  Holt property.  So you see that?

6  A     Yes.

7  Q     When was your last visit?

8  A     March.

9  Q     March?

10 A     Yes.

11 Q     And up until then, did you have free access to the

12 building?

13 A     I had free access but I very seldom go there because I

14 go there -- it has a lot of emotion.  So I -- if anything,

15 maybe I will have Sam, Lucy's assistant, bring the document

16 to the hotel, our hotel restaurant.  I will sign there.  I

17 never go into office for maybe around one year.  I only go

18 to hotel restaurant, sign document they need me to sign.  I

19 didn't go to office.

20 Q     And by Sam, you're referring to Samantha Galapin?

21 A     Yes.

22 Q     And do you see her in the courtroom today?  Oh, she's

23 not here.  Did you see her in the courtroom this morning?

24 A     Yeah, I think so.

25 Q     She was with Ms. Gao?

1 A    Yes.

2 Q    So why did you go to the property in March?  What was

3 the reason for your visit?

4 A    My E-mail was -- got deleted.  The whole E-mail account

5 I cannot use.  So I asked my attorney, David, and David told

6 me to go to the office and then call police about this.  So

7 I went to office --

8         MR. GOLUBCHIK:  Your Honor, I'm sorry.  I should

9 probably interject.

10         THE COURT:  We have two Davids.

11         MR. GOLUBCHIK:  I think he's referring to -- to me

12 David, correct?

13         THE WITNESS:  Correct.

14         MR. GOLUBCHIK:  Either one.  If I can mention the

15 attorney-client privilege.  To the extent that, Mr. Kirk,

16 you're testifying about your communications with counsel,

17 don't because it's privileged.  Whatever you know on your

18 own answer, but don't talk about what we discussed or what

19 you discussed with me.

20         THE WITNESS:  Okay.

21         MR. GOLUBCHIK:  Thank you.

22         THE WITNESS:  I went there, and Lucy and Sam, they

23 report police, say I'm not the owner, I cannot access the

24 building, and police come and escort me out.  So I cannot

25 even go to my office because I was trying to get my

1 computer. Since they delete all my E-mail, I want to take
2 my computer, but officer not allow me to go upstairs to my
3 office. So since then, I never went back.

4 Q    Okay. So in -- and were you ultimately able to
5 retrieve the computer?

6 A    Yes.

7 Q    Was --

8 A    Only before too long they can -- but I have like 18
9 months those E-mails.

10 Q    Okay. But you did get that computer eventually?

11 A    Computer is Larry -- officer -- Larry get the computer
12 when they notice Lucy there going to get document. So he
13 get computer and few box of those useless documents.

14 Q    So Mr. Perkins retrieved the computer for you?

15 A    Yeah, and then he had somebody already copy and
16 analyze, organize already.

17 Q    Okay. So the -- the description you give here of the
18 officers, you describe 40 computers, 160 business records.
19 By 160 business records, does that mean groups of records
20 pertaining to each of the special purpose entities?

21 A    Yes.

22 Q    So there were about 160 of them?

23 A    At least.

24 Q    And each of them has records or had records that
25 include company documents, financial information, tax

1 Q    Okay.  And can you explain to the Court the documents
2 you used in preparing the schedules?
3 A    Yes.  I gather all the contracts, having -- the
4 transition have been closed, have been refund, and then I
5 put those into all the filing.
6 Q    So in preparing the schedules, you did not have access
7 to all of the documents and records maintained at Holt, is
8 that correct?
9 A    Correct.
10 Q    Did you ask for access?
11 A    Yes.
12 Q    And what was the -- the response?
13 A    I --
14        MR. LISNOW:  Objection.  Vague and ambiguous as to
15 who he made the request to.
16 BY MR. RICHARDS:
17 Q    Who did you make the request of?
18 A    Lucy.  I cannot go there.  They called police on me.
19 Q    And did you ask her if you could have access for the
20 purpose of preparing the schedules in this case?
21 A    No.
22 Q    Okay.  You didn't ask her because you knew you would be
23 denied access, is that right?
24 A    Yes.
25 Q    Have you seen attached to this -- this pleading there

1        MR. LISNOW:  It goes to the witness's credibility.

2  It goes to the fact that counsel has asked these questions,

3  and I objected to them, and they came in.  So I think I have

4  the right to examine as to whether what he's saying is

5  correct.

6        THE COURT:  Objection sustained.

7        MR. GOLUBCHIK:  Thank you.

8  BY MR. LISNOW:

9  Q    You own 100 percent of Liberty?

10 A    Yes.

11 Q    And how long have you owned 100 percent of Liberty?

12 A    I think from setup, initially setup it's from -- the

13 company setup on the 100 percent.

14 Q    And it's always been that way, you're the 100 percent?

15 A    Yeah, always like that.

16 Q    And Ms. Gao was an employee?

17 A    Not an employee.  She was with me.

18 Q    What does that mean?

19 A    We work on Liberty together, but this register is only

20 under me.

21 Q    So is she -- do you believe her to be an owner or not

22 an owner?

23 A    I believe she's owner.

24 Q    What percentage does she own?

25 A    I never thought about this, maybe 50/50.

1 English language version of documents?

2 A    Yes, but it's not meaning I understand all the
3 language.

4 Q    But you typically don't ask for the documents to be
5 translated into Chinese, correct?

6 A    I review it, I sign it.

7 Q    Okay.  So Mr. Kirk has testified that Liberty Asset
8 Management was formed in about 2007, is that correct?

9         MR. LISNOW:  Objection, your Honor.  My client
10 invokes the right of the Fifth Amendment against self-
11 incrimination and refuses to answer the question.

12 BY MR. RICHARDS:

13 Q    Okay.  Ms. Gao, were you employed with Liberty Asset
14 Management from and after 2007?

15         MR. LISNOW:  Objection, your Honor.  My client
16 invokes the right of the Fifth Amendment and refuses to
17 answer based upon self-incrimination.

18 BY MR. RICHARDS:

19 Q    Ms. Gao, can you describe your job functions on behalf
20 of Liberty Asset Management?

21         MR. LISNOW:  Objection, your Honor.  My client
22 invokes her rights under the Fifth Amendment and refuses to
23 answer the question.

24 BY MR. RICHARDS:

25 Q    Ms. Gao, as part of your responsibilities at Liberty

1 Asset Management, were you in charge of accounting

2 functions?

3          MR. LISNOW:  Objection, your Honor.  My client

4 invokes her rights under the Fifth Amendment and refuses to

5 answer the question.

6 BY MR. RICHARDS:

7 Q   Ms. Gao, is it true that all or substantially all of

8 the assets that were purchased with investors' funds on

9 behalf of Liberty were taken in -- the title was taken in

10 LLCs that name you as the sole member?

11          MR. LISNOW:  Objection, your Honor.  My client

12 invokes her rights under the Fifth Amendment and refuses to

13 answer the question.

14 BY MR. RICHARDS:

15 Q   Ms. Gao, would you mind telling the Court what happened

16 with the proceeds from the sale of 166 Geery (phonetic)?

17          MR. LISNOW:  Objection, your Honor.  My client

18 invokes her rights under the Fifth Amendment and refuses to

19 answer the question.

20          MR. RICHARDS:  Your Honor, I think we've

21 established enough of a record here.

22          MR. LISNOW:  I would agree.

23          THE COURT:  All right.  Thank you.

24          MR. RICHARDS:  Thank you, Ms. Gao.

25          THE COURT:  Thank you, Ms. Gao.

1 need to give us what they have and order what they don't
2 have.

3        THE COURT:  All right.  I'm at a more practical
4 level in my head right now.  It's 10 minutes after 4:00.  We
5 had a long day.  We've accomplished a lot.  Mr. Richards, I
6 agree with your thoughts and your presentation of what
7 developed today and where we are today, where we weren't
8 yesterday.  But the question in my mind right now is what do
9 we do next, and how do we get an order that will do the job
10 and how quickly can we get the order and do we -- and do we
11 need another hearing on this tomorrow or very shortly or do
12 we need an order tomorrow, and is it reasonable to have one.

13        MR. RICHARDS:  Your Honor, I -- part of the issue
14 here I think has been -- because let's -- let's be clear.
15 There has been an attempt to cooperate with the Debtor.  Mr.
16 Perkins did go out and get a handful of documents, but the
17 defining issue as far as the producing part was was a very
18 limited definition of what Liberty Asset Management is.

19        If this Court were to order them to turn over
20 everything in their possession that pertains to Liberty
21 Asset and all of the various affiliated entities, including
22 the ones we've been able to identify, then it would be very
23 clear to them what their obligation is because --

24        THE COURT:  Let me interrupt that thought by
25 saying I believe the evidence today makes it conclusive that

1 that's proper ordering. Mr. Kirk testified that he -- he's
2 sworn under oath a couple of times that he was 100 percent
3 owner, and he testified today that as a matter of fact,
4 really Liberty Asset was 50/50 Lucy Gao and Benny Kirk.
5 That brings Lucy Gao directly into Liberty Asset Management.
6 It seems to me it gives this Court jurisdiction with respect
7 to Ms. Gao. There is no explanation, there has never been
8 an explanation of where the money came from. There's been
9 very little evidence to substantiate either the Liberty
10 Asset position or the Lucy Gao Crystal Waterfalls or any
11 other Lucy Gao position. It seems to me that this Court
12 must assert jurisdiction over Lucy Gao as a beneficial
13 participant in the Liberty Asset enterprise from the outset
14 with Mr. Kirk and with her participation acknowledged by Mr.
15 -- her beneficial participation confirmed today by Mr.
16 Kirk's testimony.

17 MR. RICHARDS: Your Honor, I don't disagree with
18 that, but I think it goes beyond that. I think Ms. Gao was
19 clearly an agent of Liberty. She is and was the custodian
20 of Liberty's documents. She claims ownership to the
21 building in which those records were maintained. We clearly
22 have evidence from Mr. Kirk and Ms. Galapin that Ms. Gao
23 runs that office, and we -- we do know that all of these --
24 this myriad of assets that are scheduled by the Debtor and
25 some that are long since sold, most of them were held in the

1          I certify that the foregoing is a correct

2 transcript from the electronic sound recording of the

3 proceedings in the above-entitled matter.

4

5 /s/Jordan Keilty                    6/24/2016
   Transcriber                        Date
6
   FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
   /s/L.L. Francisco
9 L.L. Francisco, President
   Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT D

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              FOR THE COUNTY OF SAN FRANCISCO

3

4    UN PLAZA, LLC, a California   )
     limited liability company,    )
5                                  )  Case No.
                      Plaintiff,   )  CGC-12-521738
6                                  )
     vs.                           )
7                                  )  Volume I
     UN PLAZA ASSOCIATES, LP,      )
8    a California limited          )  Pages 1 - 223
     Partnership; HILL-UN PLAZA    )
9    ASSOCIATES, INC., a Colorado  )
     corporation, et al.,          )
10                                 )
                      Defendants.  )
11   _____)
     AND RELATED CROSS-ACTION      )    CERTIFIED COPY
12   _____)

13

14                Videotaped Deposition of

15                       BENNY KO

16                  September 18, 2013

17          (PAGES 117, 199 - 220 WERE MARKED AS

18             CONFIDENTIAL AND BOUND SEPARATELY)

19   Reported by:

20   SERENA WONG, CSR# 10250

21   ------------------------------------------------------

22                JAN BROWN & ASSOCIATES

23       WORLDWIDE DEPOSITION & VIDEOGRAPHY SERVICES

24   701 Battery Street, 3rd Floor, San Francisco, CA 94111

25           (415) 981-3498 or (800) 522-7096

                                                          1

LAW00026910

1                        I N D E X

2                                                         Page

3    Examination by Mr. Nussbaum                            6

4    Reporter's Certificate                               223

5              (Confidential testimony bound separately)
                        (Pages 117, 199 – 220)
6

7                     INDEX OF EXHIBITS

8    Defendants'                                          Page

9    Exhibit 103    Recent Acquisitions by Liberty          13
                    AMC, UN08541
10
     Exhibit 104    Domestic Stock Corporation              30
11                  Certificate of Dissolution
                    UN08714 – UN08715
12
     Exhibit 105    e-mail chain, 4/6/11                    49
13
     Exhibit 106    e-mail, 4/8/11, with Principal/         59
14                  Broker Confidentiality Agreement

15   Exhibit 107    e-mail, 4/12/12                         83

16   Exhibit 108    e-mail, 4/21/11                         84

17   Exhibit 109    e-mail chain, 4/21/11                   99

18   Exhibit 110    e-mail, 4/27/11                        110

19   Exhibit 111    e-mail, 4/27/11                        112

20   Exhibit 112    e-mail, 4/27/11                        113

21   Exhibit 113    IRS Letter, UN06315                    154

22   Exhibit 114    e-mail, 5/11/11                        177

23   Exhibit 115    e-mail, 5/13/11                        179

24

25

                                                            2

LAW050026911

| | | | |
|---|---|---|---|
| 11:10:13 | 1 | Q | And these people owned their shares from |
| 11:10:15 | 2 | | the beginning until the date of dissolution? |
| 11:10:17 | 3 | A | Yes. |
| 11:10:19 | 4 | Q | Were you an officer of that company? |
| 11:10:21 | 5 | A | Yes. |
| 11:10:26 | 6 | Q | What position did you have as an officer? |
| 11:10:27 | 7 | A | Operation. |
| 11:10:28 | 8 | Q | I'm sorry? |
| 11:10:29 | 9 | A | Operation. |
| 11:10:30 | 10 | Q | Operation officer? |
| 11:10:31 | 11 | A | Yeah. |
| 11:10:33 | 12 | Q | Were There any other officers? |
| 11:10:34 | 13 | A | Lucy. |
| 11:10:42 | 14 | Q | What was her position? |
| 11:10:45 | 15 | A | She's fi- -- financial officer. |
| 11:10:47 | 16 | Q | Was she the chief financial officer? |
| 11:10:48 | 17 | A | Yes. |
| 11:10:56 | 18 | Q | What other officers, if any? |
| 11:11:00 | 19 | A | No.  There should be two. |
| 11:11:03 | 20 | Q | And were you a director of this |
| 11:11:03 | 21 | | corporation? |
| 11:11:04 | 22 | A | Yes. |
| 11:11:06 | 23 | Q | Were there any other directors? |
| 11:11:11 | 24 | A | Lucy, Steven. |
| 11:11:12 | 25 | Q | Steven Liu? |

17

LAM00026926

1

STATE OF CALIFORNIA )

2                        )
COUNTY OF LOS ANGELES)

3

4

5                    REPORTER'S CERTIFICATION

6

7            I, Serena Wong, Certified Shorthand Reporter in

8    and for the State of California, do hereby certify:

9            That the foregoing witness was by me duly sworn;

10

11           That the proceedings were then taken before me

12   at the time and place herein set forth;

13           That the testimony and proceedings were reported

14   stenographically by me and later transcribed into

15   typewriting under my direction;

16           That the foregoing is a true record of the

17   testimony and proceedings taken at that time.

18

19           IN WITNESS WHEREOF, I have subscribed my name on

20   this date:  9/30/13

21

22   _____

23                    Serena Wong, CSR No. 10250

24

25

                                                  223

LAM00027131

# EXHIBIT E

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
2    Including Professional Corporations
   CHARLES L. KREINDLER, Cal. Bar No. 119933
3  ANTHONY N. MOSHIRNIA, Cal. Bar No. 254253
   333 South Hope Street, 43ʳᵈ Floor
4  Los Angeles, California 90071-1422
   Telephone:  213.620.1780
5  Facsimile:   213.620.1398
   Email:        ckreindler@sheppardmullin.com
6                 amoshirnia@sheppardmullin.com

7  Attorneys for Lucy Gao (erroneously sued
   herein as "Lucy Gao, aka Xiang Xin Gao")
8  and HK Grace Building LLC

9                  UNITED STATES DISTRICT COURT

10        NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

11

12
   JD BROTHERS LLC, a California Limited        Case No. 3:15-cv-01373-VC
13 Liability Company; WEI "WENDY"
   HUANG, an individual; and WEI               **DEFENDANT LUCY GAO'S**
14 "WENDY" HUANG as TRUSTEE of the             **RESPONSE TO JD BROTHERS,**
   GOU/HUANG FAMILY TRUST, a                   **LLC'S FIRST SET OF REQUESTS**
15 California trust,                           **FOR ADMISSION**

16        Plaintiffs,

17        v.

18 LIBERTY ASSET MANAGEMENT
   CORPORATION; BENJAMIN KIRK, aka
19 BENNY KO, aka TZU PING KO; LUCY
   GAO, aka XIANG XIN GAO; SUNSHINE
20 VALLEY LLC; HK GRACE BUILDING
   LLC; and DOES 1-20,
21
          Defendants.
22

23 PROPOUNDING PARTY:       JD BROTHERS, LLC

24 RESPONDING PARTY:        LUCY GAO

25 SET:                     ONE

26

27

28
                                                    Case No. 3:15-cv-01373-VC
   SMRH:476363631.1                     Lucy Gao's Response to JD Brothers, LLC's
                                            First Set of Requests for Admission

## RESPONSE TO REQUESTS FOR ADMISSION

Defendant Lucy Gao hereby responds to Plaintiff JD Brothers LLC's First Set of Requests for Admission (each a "Request," and, collectively, the "Requests").

### REQUEST FOR ADMISSION NO. 1:

Admit that you worked at Liberty Asset Management Corporation.

### RESPONSE TO REQUEST FOR ADMISSION NO. 1:

Ms. Gao objects to this Request on the ground that it is vague and ambiguous with respect to the phrase "at Liberty Asset Management Corporation." Ms. Gao admits that she has worked for Liberty Asset Management Corporation in southern California.

### REQUEST FOR ADMISSION NO. 2:

Admit that you are a part owner of Liberty Asset Management Corporation.

### RESPONSE TO REQUEST FOR ADMISSION NO. 2:

Ms. Gao admits that she holds an equitable interest in the Liberty Asset Management Corporation that operated in West Covina, California, although she is not its legal owner. Ms. Gao denies this Request with respect to the business also called Liberty Asset Management Corporation operated by Benny Kirk in or around Mountain View, California, and the San Francisco Bay Area.

### REQUEST FOR ADMISSION NO. 3:

Admit that you are an officer of Liberty Asset Management Corporation.

### RESPONSE TO REQUEST FOR ADMISSION NO. 3:

Denied.

### REQUEST FOR ADMISSION NO. 4:

Admit that you handled the finances of Liberty Asset Management Corporation.

### RESPONSE TO REQUEST FOR ADMISSION NO. 4:

Ms. Gao objects to this Request on the ground that it is vague and ambiguous with respect to the phrase "handled the finances." Subject to the foregoing objection, Ms. Gao admits that she had some check writing authority with respect to the Liberty Asset Management Corporation that operated in West Covina, California.

-1-

SMRH:476363631.1

Case No. 3:15-cv-01373-VC
Lucy Gao's Response to JD Brothers, LLC's
First Set of Requests for Admission

050

1 **REQUEST FOR ADMISSION NO. 5:**

2      Admit that you had control over the bank accounts of Liberty Asset Management

3 Corporation.

4 **RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

5      Ms. Gao objects to this Request on the ground that it is vague and ambiguous with

6 respect to the term "control." Subject to the foregoing objection, Ms. Gao admits that she

7 had some check writing authority with respect to the Liberty Asset Management

8 Corporation that operated in West Covina, California.

9 **REQUEST FOR ADMISSION NO. 6:**

10      Admit that you had a telephone call with Plaintiff Wei "Wendy" Huang in 2013.

11 **RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

12      Admitted.

13 **REQUEST FOR ADMISSION NO. 7:**

14      Admit that in a telephone call with Plaintiff Wei "Wendy" Huang, you stated that

15 you knew all of the financial transactions of the commercial building at 166 Geary Street,

16 San Francisco, California.

17 **RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

18      Denied.

19 **REQUEST FOR ADMISSION NO. 8:**

20      Admit that you represented to Plaintiff Wei "Wendy" Huang that you and

21 Defendant Benjamin Kirk both owned Defendant Sunshine Valley, LLC.

22 **RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

23      Denied.

24 **REQUEST FOR ADMISSION NO. 9:**

25      Admit that you were the manager of HK Grace Building, LLC.

26 **RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

27      Admitted.

28

-2-

Case No. 3:15-cv-01373-VC
Lucy Gao's Response to JD Brothers, LLC's
First Set of Requests for Admission

051

1 | **REQUEST FOR ADMISSION NO. 10:**

2 |     Admit that you had knowledge of the finances of HK Grace Building, LLC.

3 | **RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

4 |     Ms. Gao objects to this Request on the ground that it is vague and ambiguous with

5 | respect to the phrase "knowledge of the finances." Subject to the foregoing objection, Ms.

6 | Gao admits that she was aware of some, but not all, financial transactions involving HK

7 | Grace Building, LLC.

8 | **REQUEST FOR ADMISSION NO. 11:**

9 |     Admit that you had access to the finances of HK Grace Building, LLC.

10 | **RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

11 |     Ms. Gao objects to this Request on the ground that it is vague and ambiguous with

12 | respect to the phrase "access to the finances." Subject to the foregoing objection, Ms. Gao

13 | admits that she was aware of some, but not all, financial transactions involving HK Grace

14 | Building, LLC.

15 | **REQUEST FOR ADMISSION NO. 12:**

16 |     Admit that you managed HK Grace Building, LLC.

17 | **RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

18 |     Admitted.

19 | **REQUEST FOR ADMISSION NO. 13:**

20 |     Admit that Plaintiff JD Brothers LLC did not manage HK Grace Building, LLC.

21 | **RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

22 |     Admitted.

23 | **REQUEST FOR ADMISSION NO. 14:**

24 |     Admit that Plaintiff Wei "Wendy" Huang did not manage HK Grace Building,

25 | LLC.

26 | **RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

27 |     Admitted.

28 |

-3-

Case No. 3:15-cv-01373-VC
SMRH:476363631.1
Lucy Gao's Response to JD Brothers, LLC's
First Set of Requests for Admission

052

1 | **REQUEST FOR ADMISSION NO. 15:**

2 |     Admit that HK Grace Building, LLC acquired 166 Geary Street, San Francisco,

3 | California in 2012.

4 | **RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

5 |     Admitted.

6 | **REQUEST FOR ADMISSION NO. 16:**

7 |     Admit that HK Grace Building, LLC had rental income in tax year 2012.

8 | **RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

9 |     Admitted.

10 | **REQUEST FOR ADMISSION NO. 17:**

11 |     Admit that HK Grace Building, LLC had rental income in tax year 2013.

12 | **RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

13 |     Admitted.

14 | **REQUEST FOR ADMISSION NO. 18:**

15 |     Admit that HK Grace Building, LLC had rental income in tax year 2014.

16 | **RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

17 |     Admitted.

18 | **REQUEST FOR ADMISSION NO. 19:**

19 |     Admit that HK Grace Building, LLC sold 166 Geary Street, San Francisco,

20 | California in 2014.

21 | **RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

22 |     Admitted.

23 | **REQUEST FOR ADMISSION NO. 20:**

24 |     Admit that you, acting as manager of HK Grace Building LLC, participated in the

25 | selling of 166 Geary Street, San Francisco, California.

26 | **RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

27 |     Admitted.

28 |

Case No. 3:15-cv-01373-VC
SMRH:476363631.1
Lucy Gao's Response to JD Brothers, LLC's
First Set of Requests for Admission

053

1  **REQUEST FOR ADMISSION NO. 21:**

2      Admit that you, acting as manager of HK Grace Building LLC, sold 166 Geary

3  Street, San Francisco, California.

4  **RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

5      Admitted.

6  **REQUEST FOR ADMISSION NO. 22:**

7      Admit that you did not notify Plaintiff JD Brothers LLC before the sale of 166

8  Geary Street, San Francisco.

9  **RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

10      Ms. Gao admits that she was under no obligation to disclose any information

11  relating to the sale of the property located at 166 Geary Street, San Francisco, California to

12  Plaintiff JD Brothers LLC and therefore did not disclose any such information.

13  **REQUEST FOR ADMISSION NO. 23:**

14      Admit that you did not notify Plaintiff Wei "Wendy" Huang before the sale of 166

15  Geary Street, San Francisco.

16  **RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

17      Ms. Gao admits that she was under no obligation to disclose any information

18  relating to the sale of the property located at 166 Geary Street, San Francisco, California to

19  Plaintiff Wei "Wendy" Huang and therefore did not disclose any such information.

20  **REQUEST FOR ADMISSION NO. 24:**

21      Admit that you did not notify Plaintiff JD Brothers LLC after the sale of 166 Geary

22  Street, San Francisco.

23  **RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

24      Ms. Gao admits that she was under no obligation to disclose any information

25  relating to the sale of the property located at 166 Geary Street, San Francisco, California to

26  Plaintiff JD Brothers LLC and therefore did not disclose any such information.

27

28

-5-

054

1 | **REQUEST FOR ADMISSION NO. 25:**

2 | Admit that you did not notify Plaintiff Wei "Wendy" Huang after the sale of 166

3 | Geary Street, San Francisco.

4 | **RESPONSE TO REQUEST FOR ADMISSION NO. 25:**

5 | Ms. Gao admits that she was under no obligation to disclose any information

6 | relating to the sale of the property located at 166 Geary Street, San Francisco, California to

7 | Plaintiff Wei "Wendy" Huang and therefore did not disclose any such information.

8 | **REQUEST FOR ADMISSION NO. 26:**

9 | Admit that 166 Geary Street, San Francisco, CA was sold for $60 million or more.

10 | **RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

11 | Admitted.

12 | **REQUEST FOR ADMISSION NO. 27:**

13 | Admit that the sale of 166 Geary Street, San Francisco, CA resulted in a gain of

14 | over $20 million to HK Grace Building, LLC over the initial investment.

15 | **RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

16 | Ms. Gao objects to this Request on the ground that it is vague and ambiguous with

17 | respect to the alleged transaction at issue and with respect to the phrase "the initial

18 | investment" and therefore denies it.

19 | **REQUEST FOR ADMISSION NO. 28:**

20 | Admit that none of the proceeds from the sale of 166 Geary Street, San Francisco,

21 | California has been provided to JD Brothers LLC.

22 | **RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

23 | Ms. Gao admits that she was under no obligation to provide any of the proceeds

24 | from any sale of the property located at 166 Geary Street, San Francisco, California to JD

25 | Brothers LLC and therefore has not provided any such proceeds.

26 | **REQUEST FOR ADMISSION NO. 29:**

27 | Admit that none of the principal invested by JD Brothers LLC in HK Grace

28 | Building LLC has been returned to JD Brothers LLC.

SMRH:476363631.1

Case No. 3:15-cv-01373-VC
Lucy Gao's Response to JD Brothers, LLC's
First Set of Requests for Admission

055

1  **RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

2      Ms. Gao objects to this Request on the ground that it assumes the truth of an

3  allegation that Ms. Gao denies, i.e., that JD Brothers LLC invested principal in HK Grace

4  Building LLC. On that basis, Ms. Gao denies this Request.

5

6  Dated: May 16, 2016

7                          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

8

9                          By

10                              ANTHONY N. MOSHIRNIA

11                          Attorneys for Lucy Gao (erroneously sued herein
                            as "Lucy Gao, aka Xiang Xin Gao") and
12                          HK Grace Building LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-7-

Case No. 3:15-cv-01373-VC
SMRH:476363631.1
Lucy Gao's Response to JD Brothers, LLC's
First Set of Requests for Admission

056

| | |
|---|---|
| 1 | <div align="center">PROOF OF SERVICE</div> |
| 2 | <div align="center">STATE OF CALIFORNIA, COUNTY OF LOS ANGELES</div> |

1         PROOF OF SERVICE

2         STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3         At the time of service, I was over 18 years of age and **not a party to this action**. I
4 am employed in the County of Los Angeles, State of California. My business address is 333 South Hope Street, 43rd Floor, Los Angeles, CA 90071-1422.

5         On May 16, 2016, I served true copies of the following document(s) described as
6 **DEFENDANT LUCY GAO'S RESPONSE TO JD BROTHERS, LLC'S FIRST SET OF REQUESTS FOR ADMISSION** on the interested parties in this action as follows:

7         **See Attached Service List**

8         **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the
9 document(s) to be sent from e-mail address asotelo@sheppardmullin.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was
10 unsuccessful.

11         **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for
12 collection and mailing, following our ordinary business practices. I am readily familiar with the firm's practice for collecting and processing correspondence for mailing. On the
13 same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope
14 with postage fully prepaid. I am a resident or employed in the county where the mailing occurred.

15

16         I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

17

18         Executed on May 16, 2016, at Los Angeles, California.

19         *Angie Sutle.*

20         Angie Sotelo

21

22

23

24

25

26

27

28

<div align="center">-8-</div>

SMRH:476363631.1      Case No. 3:15-cv-01373-VC
Lucy Gao's Response to JD Brothers, LLC's
First Set of Requests for Admission

1  Joseph W. Cotchett                                    *Attorneys for Plaintiff JD Brothers, LLC*
   Nancy L. Fineman
2  Brian Danitz
   COTCHETT, PITRE & McCARTHY, LLP
3  840 Malcolm Road, Suite 200
   Burlingame, CA 94010
4  Telephone: (650) 697-6000
   Facsimile: (650) 697-0577
5  jcotchett@cpmlegal.com
   nfineman@cpmlegal.com
6  bdanitz@cpmlegal.com

7  C. Alex Naegele                                       *Attorneys for Plaintiff JD Brothers, LLC*
   A PROFESSIONAL LAW
8  CORPORATION
   95 S. Market Street, Suite 300
9  San Jose, CA 95113
   Telephone: (408) 995-3224
10 Facsimile: (408) 890-4645
   alex@canlawcorp.com

11
   Jesse F. Ruiz                                         *Attorneys for Defendants Benjamin Kirk,*
12 Gabriel G. Gregg                                      *Liberty Asset Management Corporation,*
   ROBINSON & WOOD, INC.                                 *and Sunshine Valley, LLC*
13 227 N. 1st Street
   San Jose, CA 95113
14 Telephone: (408) 298-7120
   Facsimile: (408) 298-0477
15 jfr@robinsonwood.com
   ggg@robinsonwood.com
16

17

18

19

20

21

22

23

24

25

26

27

28

SMRH:476363631.1                       Lucy Gao's Response to JD Brothers, LLC's
                                       First Set of Requests for Admission

058

# EXHIBIT F

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
CHARLES L. KREINDLER, Cal. Bar No. 119933
ANTHONY N. MOSHIRNIA, Cal. Bar No. 254253
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
Telephone:   213.620.1780
Facsimile:   213.620.1398
Email:       ckreindler@sheppardmullin.com
             amoshirnia@sheppardmullin.com

Attorneys for Lucy Gao (erroneously sued
herein as "Lucy Gao, aka Xiang Xin Gao")
and HK Grace Building LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| JD BROTHERS LLC, a California Limited Liability Company; WEI "WENDY" HUANG, an individual; and WEI "WENDY" HUANG as TRUSTEE of the GOU/HUANG FAMILY TRUST, a California trust,<br><br>          Plaintiffs,<br><br>     v.<br><br>LIBERTY ASSET MANAGEMENT CORPORATION; BENJAMIN KIRK, aka BENNY KO, aka TZU PING KO; LUCY GAO, aka XIANG XIN GAO; SUNSHINE VALLEY LLC; HK GRACE BUILDING LLC; and DOES 1-20,<br><br>          Defendants. | Case No. 3:15-cv-01373-VC<br><br>**DEFENDANT LUCY GAO'S RESPONSE TO PLAINTIFF JD BROTHERS LLC'S FIRST SET OF INTERROGATORIES** |

PROPOUNDING PARTY:      JD BROTHERS LLC

RESPONDING PARTY:       LUCY GAO

SET:                    ONE

1    **RESPONSE TO INTERROGATORIES**

2        Defendant Lucy Gao hereby responds to Plaintiff JD Brothers LLC's First Set of

3    Interrogatories (each an "Interrogatory," and collectively, the "Interrogatories").

4                    **GENERAL OBJECTIONS**

5        1.    Ms. Gao objects to Plaintiff's definition of the terms "You," "Your," or

6    "Gao," which purports to expand the ordinary meaning of such terms to also include Ms.

7    Gao's "counsel, representatives, and agents." Plaintiff's use of this expansive definition

8    renders many of the Interrogatories unintelligible. Further, the expansive definition

9    compounds and multiplies the number of Interrogatories beyond the amount permitted by

10   the Federal Rules. Accordingly, with respect to each and every response set forth below,

11   Ms. Gao interprets and construes the terms "You," "Your," and "Gao" to mean and refer

12   only to Ms. Gao.

13       2.    Ms. Gao objects to Plaintiff's definition of the terms "describe" and

14   "describing," which purports to expand the ordinary meaning of such terms. Plaintiff's use

15   of this expansive definition transforms the Interrogatories in which the terms appear into

16   multi-part questions that exceed the number of Interrogatories permitted by the Federal

17   Rules.

18       3.    Ms. Gao objects to Plaintiff's definition of the terms "identify" and

19   "identifying," which purports to expand the ordinary meaning of such terms. Plaintiff's

20   use of this expansive definition transforms the Interrogatories in which the terms appear

21   into multi-part questions that exceed the number of Interrogatories permitted by the

22   Federal Rules.

23   **INTERROGATORY NO. 1:**

24       Describe Your relationship with Liberty Asset Management Corporation, including,

25   but not limited to, as a shareholder, member, investor, board member, officer, employee,

26   consultant, manager, and/or agent.

27

28

**RESPONSE TO INTERROGATORY NO. 1:**

Ms. Gao was previously an employee and manager of the Liberty Asset Management Corporation that operated in West Covina, California. She has also held an equitable interest in that entity since its inception, although she is not its legal owner. In approximately 2009, Defendant Kirk began operating a business also called Liberty Asset Management Corporation in or around Mountain View, California, and the San Francisco Bay Area ("NorCal Liberty"). Ms. Gao has never been an employee, manager, or owner of NorCal Liberty.

**INTERROGATORY NO. 2:**

Describe Your relationship with HK Grace Building LLC, including, but not limited to, as a shareholder, member, investor, board member, officer, employee, consultant, manager, and/or agent.

**RESPONSE TO INTERROGATORY NO. 2:**

Ms. Gao is the manager and sole member of HK Grace Building LLC.

**INTERROGATORY NO. 3:**

Describe Your relationship with Sunshine Valley, LLC, including, but not limited to, as a shareholder, member, investor, board member, officer, employee, consultant, manager and/or agent.

**RESPONSE TO INTERROGATORY NO. 3:**

Ms. Gao previously held an ownership interest in Sunshine Valley LLC. It is unclear whether she still holds that interest.

**INTERROGATORY NO. 4:**

Identify each and every meeting (whether in person or by telephone) between You and Wendy Huang, including by Describing the date of the meeting, the reason for the meeting, and by Identifying the Persons attending the meeting.

**RESPONSE TO INTERROGATORY NO. 4:**

Ms. Gao has spoken with someone she understood to be Ms. Huang on one occasion. That encounter was telephonic and occurred in approximately December 2013.

1   To the best of Ms. Gao's recollection, she and Ms. Huang discussed a personal matter

2   involving Benny Kirk and Sonia Chiou.

3   **INTERROGATORY NO. 5:**

4       Identify each and every transfer of money to You by Wendy Huang, including by

5   Describing the amount of the transfer, the means of the transfer (i.e., wire transfer, cashiers

6   check, personal check, cash, etc.), the date of the transfer, the reason for the transfer, and

7   the account or accounts into which each transfer of money was deposited.

8   **RESPONSE TO INTERROGATORY NO. 5:**

9       Wendy Huang has never transferred money to Ms. Gao.

10   **INTERROGATORY NO. 6:**

11       Identify each and every transfer of money to You by J.D. Brothers LLC, including

12   by Describing the amount of the transfer, the means of the transfer (i.e., wire transfer,

13   cashiers check, personal check, cash, etc.), the date of the transfer, the reason for the

14   transfer, and the account or accounts into which each transfer of money was deposited.

15   **RESPONSE TO INTERROGATORY NO. 6:**

16       JD Brothers LLC has never transferred money to Ms. Gao.

17   **INTERROGATORY NO. 7:**

18       Identify each and every transfer of money to You by the Guo/Huang Family Trust,

19   including by Describing the amount of the transfer, the means of the transfer (i.e., wire

20   transfer, cashiers check, personal check, cash, etc.), the date of the transfer, the reason for

21   the transfer, and the account or accounts into which each transfer of money was deposited.

22   **RESPONSE TO INTERROGATORY NO. 7:**

23       The Guo/Huang Family Trust has never transferred money to Ms. Gao.

24   **INTERROGATORY NO. 8:**

25       Identify each and every transfer of money to You by Liberty Asset Management

26   Corporation, including by Describing the amount of the transfer, the means of the transfer

27   (i.e., wire transfer, cashiers check, personal check, cash, etc.), the date of the transfer, the

28

1 reason for the transfer, and the account or accounts into which each transfer of money was
2 deposited.

3 **RESPONSE TO INTERROGATORY NO. 8:**

4      Ms. Gao objects to this Interrogatory on the grounds that it is overly burdensome,
5 overbroad, and improperly seeks discovery of information that is neither relevant to any
6 party's claim or defense nor reasonably calculated to lead to the discovery of admissible
7 evidence. Subject to the foregoing objection, Ms. Gao responds that she received a salary
8 of approximately $5,000 per month from Liberty Asset Management Corporation during
9 the 2010-2012 time period. Ms. Gao does not believe that NorCal Liberty has ever
10 transferred her money.

11 **INTERROGATORY NO. 9:**

12      Identify each and every transfer of money or any other asset to You by HK Grace
13 Building, LLC, including by Describing the amount of the transfer, the means of the
14 transfer (i.e., wire transfer, cashiers check, personal check, cash, etc.), the date of the
15 transfer, the reason for the transfer, and the account or accounts into which each transfer of
16 money was deposited.

17 **RESPONSE TO INTERROGATORY NO. 9:**

18      Ms. Gao objects to this Interrogatory on the ground that it is overbroad and
19 improperly seeks discovery of information that is neither relevant to any party's claim or
20 defense nor reasonably calculated to lead to the discovery of admissible evidence. Subject
21 to the foregoing, Ms. Gao responds that an answer to this Interrogatory may be determined
22 by examining business records that will be produced in response to Plaintiffs' First Set of
23 Production of Documents, and that the burden of deriving or ascertaining an answer will
24 be substantially the same for Plaintiffs as for Ms. Gao.

25 **INTERROGATORY NO. 10:**

26      Identify each and every transfer of money or any other asset to You by Sunshine
27 Valley, LLC, including by Describing the amount of the transfer, the means of the transfer
28 (i.e., wire transfer, cashiers check, personal check, cash, etc.), the date of the transfer, the

1 reason for the transfers, and the account or accounts into which each transfer of money was
2 deposited.

3 **RESPONSE TO INTERROGATORY NO. 10:**

4      Ms. Gao objects to this Interrogatory on the grounds that it is overly burdensome,
5 overbroad, and improperly seeks discovery of information that is neither relevant to any
6 party's claim or defense nor reasonably calculated to lead to the discovery of admissible
7 evidence. Subject to the foregoing objections, Ms. Gao responds that she does not believe
8 that Sunshine Valley, LLC has ever transferred her money.

9 **INTERROGATORY NO. 11:**

10      Identify each and every transfer of money by You to Wendy Huang, including by
11 Describing the amount of the transfer, the means of the transfer (i.e., wire transfer, cashiers
12 check, personal check, cash, etc.), the date of the transfer, the reason for the transfer, and
13 the account or accounts into which each transfer of money was deposited.

14 **RESPONSE TO INTERROGATORY NO. 11:**

15      Ms. Gao has never transferred money to Wendy Huang.

16 **INTERROGATORY NO. 12:**

17      Identify each and every transfer of money by You to J.D. Brothers LLC, including
18 by Describing the amount of the transfer, the means of the transfer (i.e., wire transfer,
19 cashiers check, personal check, cash, etc.), the date of the transfer, the reason for the
20 transfer, and the account or accounts into which each transfer of money was deposited.

21 **RESPONSE TO INTERROGATORY NO. 12:**

22      Ms. Gao has never transferred money to JD Brothers LLC.

23 **INTERROGATORY NO. 13:**

24      Identify each and every transfer of money by You to the Guo/Huang Family Trust,
25 including by Describing the amount of the transfer, the means of the transfer (i.e., wire
26 transfer, cashiers check, personal check, cash, etc.), the date of the transfer, the reason for
27 the transfer, and the account or accounts into which each transfer of money was deposited.

28

1  **RESPONSE TO INTERROGATORY NO. 13:**

2      Ms. Gao has never transferred money to the Guo/Huang Family Trust.

3  **INTERROGATORY NO. 14:**

4      Identify each and every transfer of money by You to Sunshine Valley, LLC,

5  including by Describing the amount of the transfer, the means of the transfer (i.e., wire

6  transfer, cashiers check, personal check, cash, etc.), the date of the transfer, the reason for

7  the transfer, and the account or accounts into which each transfer of money was deposited.

8  **RESPONSE TO INTERROGATORY NO. 14:**

9      Ms. Gao objects to this Interrogatory on the grounds that it is overly burdensome,

10  overbroad, and improperly seeks discovery of information that is neither relevant to any

11  party's claim or defense nor reasonably calculated to lead to the discovery of admissible

12  evidence. Subject to the foregoing objection, Ms. Gao responds that she does not believe

13  that she has transferred money to Sunshine Valley, LLC.

14  **INTERROGATORY NO. 15:**

15      Identify each and every transfer of money by You to HK Grace Building, LLC,

16  including by Describing the amount of the transfer, the means of the transfer (i.e., wire

17  transfer, cashiers check, personal check, cash, etc.), the date of the transfer, the reason for

18  the transfer, and the account or accounts into which each transfer of money was deposited.

19  **RESPONSE TO INTERROGATORY NO. 15:**

20      Ms. Gao does not believe that she has transferred any of her personal money to HK

21  Grace Building, LLC.

22  **INTERROGATORY NO. 16:**

23      Identify each and every transfer of money made in connection with the property

24  located at 166 Geary Street, San Francisco, California.

25  **RESPONSE TO INTERROGATORY NO. 16:**

26      Ms. Gao objects to this Interrogatory on the grounds that it is overly burdensome,

27  overbroad, vague and ambiguous with respect to the phrase "made in connection with,"

28

SMRH:476365571.1    Lucy Gao's Response to JD Brothers LLC's First Set of Interrogatories

066

1 and improperly seeks discovery of information that is neither relevant to any party's claim
2 or defense nor reasonably calculated to lead to the discovery of admissible evidence.

3 **INTERROGATORY NO. 17:**

4     Identify each and every transfer of title made in connection with the property
5 located at 166 Geary Street, San Francisco, California, including by Describing the date of
6 the transfer, the Identity of the transferor, the Identity of the transferee, and the nature of
7 the transfer.

8 **RESPONSE TO INTERROGATORY NO. 17:**

9     Ms. Gao objects to this Interrogatory on the grounds that it is overly burdensome,
10 overbroad, vague and ambiguous with respect to the phrase "made in connection with,"
11 and improperly seeks discovery of information that is neither relevant to any party's claim
12 or defense nor reasonably calculated to lead to the discovery of admissible evidence. Ms.
13 Gao further objects to this Interrogatory on the ground that it is improperly intended to
14 harass her and unduly inflate her litigation expenses as the information sought is publicly
15 available and therefore equally available to Plaintiffs as to her.

16 **INTERROGATORY NO. 18:**

17     Describe each and every transaction Relating To any ownership interest in the
18 property located at 166 Geary Street, San Francisco, California, including by Describing
19 the date of the transaction, the Identities of the Persons involved in the transaction, and the
20 nature of the transaction.

21 **RESPONSE TO INTERROGATORY NO. 18:**

22     Ms. Gao objects to this Interrogatory on the grounds that it is overly burdensome,
23 overbroad, vague and ambiguous with respect to the phrase "any ownership interest," and
24 improperly seeks discovery of information that is neither relevant to any party's claim or
25 defense nor reasonably calculated to lead to the discovery of admissible evidence. Ms.
26 Gao further objects to this Interrogatory on the ground that it is improperly intended to
27 harass her and unduly inflate her litigation expenses as the information sought is publicly
28 available and therefore equally available to Plaintiffs as to her.

1 **INTERROGATORY NO. 19:**

2     Describe each and every transaction Relating To HK Grace Building LLC

3 (including the purchase or sale of HK Grace Building LLC's assets), including by

4 Describing the date of the transaction, the Identities of the Persons involved in the

5 transaction, and the nature of the transaction.

6 **RESPONSE TO INTERROGATORY NO. 19:**

7     Ms. Gao objects to this Interrogatory on the ground that it is overbroad and

8 improperly seeks discovery of information that is neither relevant to any party's claim or

9 defense nor reasonably calculated to lead to the discovery of admissible evidence. Subject

10 to the foregoing, Ms. Gao responds that an answer to this Interrogatory may be determined

11 by examining business records that will be produced in response to Plaintiffs' First Set of

12 Production of Documents, and that the burden of deriving or ascertaining an answer will

13 be substantially the same for Plaintiffs as for Ms. Gao.

14 **INTERROGATORY NO. 20:**

15     Describe in detail your relationship to Sunshine Valley, LLC, including your

16 ownership, control, or management of Sunshine Valley, LLC

17 **RESPONSE TO INTERROGATORY NO. 20:**

18     Ms. Gao objects to this Interrogatory on the ground that it is oppressive and

19 intended to harass because it is duplicative of Interrogatory No. 3.

20 **INTERROGATORY NO. 21:**

21     Describe in detail your relationship to HK Grace Building, LLC, including your

22 ownership, control, or management of HK Grace Building, LLC.

23 **RESPONSE TO INTERROGATORY NO. 21:**

24     Ms. Gao objects to this Interrogatory on the ground that it is oppressive and

25 intended to harass because it is duplicative of Interrogatory No. 2.

26

27

28

1 | **INTERROGATORY NO. 22:**

2       Describe in detail your relationship to the property located at 166 Geary Street, San
3 | Francisco, California, including your ownership, control, or management of the property
4 | located at 166 Geary Street, San Francisco, California.

5 | **RESPONSE TO INTERROGATORY NO. 22:**

6       Ms. Gao objects to this Interrogatory on the ground that it is vague and ambiguous
7 | with respect to the phrase "relationship to the property." Ms. Gao is not "related" to the
8 | property located at 166 Geary Street, San Francisco, California. She is the manager and
9 | sole member of HK Grace Building LLC, which previously owned property located at 166
10 | Geary Street, San Francisco, California.

11 | **INTERROGATORY NO. 23:**

12       Describe the sale of the property located at 166 Geary Street, San Francisco,
13 | California, including by Identifying the date of the transaction, the Identity of the buyer(s),
14 | the Identify of the seller(s), the Identify of the Persons who negotiated the sale, the
15 | purchase price, and Identity of the Persons who received the proceeds from the sale, and
16 | the amounts they received.

17 | **RESPONSE TO INTERROGATORY NO. 23:**

18       Ms. Gao objects to this Interrogatory on the ground that it is overbroad and
19 | improperly seeks discovery of information that is neither relevant to any party's claim or
20 | defense nor reasonably calculated to lead to the discovery of admissible evidence. Ms.
21 | Gao objects to this Interrogatory on the ground that it seeks to infringe upon her and
22 | others' rights of privacy. Ms. Gao objects to this Interrogatory on the ground that it is
23 | improperly intended to harass her and unduly inflate her litigation expenses as the
24 | information sought is publicly available and therefore equally available to Plaintiffs as to
25 | her. Subject to the foregoing, Ms. Gao responds that an answer to this Interrogatory may
26 | be determined by examining business records that will be produced in response to
27 | Plaintiffs' First Set of Production of Documents, and that the burden of deriving or
28 | ascertaining an answer will be substantially the same for Plaintiffs as for Ms. Gao.

Case No. 3:15-cv-01373-VC
SMRH:476365571.1     Lucy Gao's Response to JD Brothers LLC's First Set of Interrogatories

1 **INTERROGATORY NO. 24:**

2     Identify all Persons with whom you communicated regarding the final sale of the

3 property located at 166 Geary Street, San Francisco, California, including by Identifying

4 for each Person, their name, title, address, phone number, the date of each communication

5 with that Person, and the subject of each communication.

6 **RESPONSE TO INTERROGATORY NO. 24:**

7     Ms. Gao objects to this Interrogatory on the ground that it is overbroad and

8 improperly seeks discovery of information that is neither relevant to any party's claim or

9 defense nor reasonably calculated to lead to the discovery of admissible evidence. Ms.

10 Gao objects to this Interrogatory on the ground that it seeks to infringe upon her and

11 others' rights of privacy. Subject to the foregoing, Ms. Gao responds that she

12 communicated with Allen Low (of Perkins Coie) and Kazuko Morgan (of Cushman &

13 Wakefield) throughout the sales process.

14 **INTERROGATORY NO. 25:**

15     Describe the nature of Your relationship, whether business or personal, with

16 Defendant Benjamin Kirk. To the extent the nature of Your relationship with Benjamin

17 Kirk has changed over time, Describe the change.

18 **RESPONSE TO INTERROGATORY NO. 25:**

19     Ms. Gao objects to this Interrogatory on the ground that it improperly infringes

20 upon her right to privacy and seeks discovery of information that is neither relevant to any

21 party's claim or defense nor reasonably calculated to lead to the discovery of admissible

22 evidence. Subject to the foregoing objection, Ms. Gao responds that she has had a

23 personal and business relationship with Mr. Kirk at different times over the past 15 years.

24 At present, she has no relationship with Mr. Kirk.

25

26

27

28

SMRH:476365571.1

Dated: May 16, 2016

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____
ANTHONY N. MOSHIRNIA

Attorneys for Lucy Gao (erroneously sued herein
as "Lucy Gao, aka Xiang Xin Gao") and
HK Grace Building LLC

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

At the time of service, I was over 18 years of age and **not a party to this action.** I am employed in the County of Los Angeles, State of California. My business address is 333 South Hope Street, 43rd Floor, Los Angeles, CA 90071-1422.

On May 16, 2016, I served true copies of the following document(s) described as **DEFENDANT LUCY GAO'S RESPONSE TO PLAINTIFF JD BROTHERS LLC'S FIRST SET OF INTERROGATORIES** on the interested parties in this action as follows:

**See Attached Service List**

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address asotelo@sheppardmullin.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with the firm's practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on May 16, 2016, at Los Angeles, California.

_____
Angie Sotelo

-12-                                                    Case No. 3:15-cv-01373-VC

072

1 | Joseph W. Cotchett            *Attorneys for Plaintiff JD Brothers, LLC*
Nancy L. Fineman
2 | Brian Danitz
COTCHETT, PITRE & McCARTHY, LLP
3 | 840 Malcolm Road, Suite 200
Burlingame, CA 94010
4 | Telephone: (650) 697-6000
Facsimile: (650) 697-0577
5 | jcotchett@cpmlegal.com
nfineman@cpmlegal.com
6 | bdanitz@cpmlegal.com

7
C. Alex Naegele            *Attorneys for Plaintiff JD Brothers, LLC*
8 | A PROFESSIONAL LAW
CORPORATION
9 | 95 S. Market Street, Suite 300
San Jose, CA 95113
10 | Telephone: (408) 995-3224
Facsimile: (408) 890-4645
11 | alex@canlawcorp.com

12 | Jesse F. Ruiz            *Attorneys for Defendants Benjamin Kirk,*
Gabriel G. Gregg           *Liberty Asset Management Corporation,*
13 | ROBINSON & WOOD, INC.     *and Sunshine Valley, LLC*
227 N. 1st Street
14 | San Jose, CA 95113
Telephone: (408) 298-7120
15 | Facsimile: (408) 298-0477
jfr@robinsonwood.com
16 | ggg@robinsonwood.com

17

18

19

20

21

22

23

24

25

26

27

28

-13-

# EXHIBIT G

## FEDERAL DEPOSIT INSURANCE CORPORATION

Notice of Change in Control of

California Business Bank by

The CIC Group

and

Lucy Gao She

Summary Outline of Executive Compensation

Interagency Biographical and Financial Reports of

(and Fingerprint Cards for):

Lucy Gao Seh (with Verification of Deposit)

Helena Cosman (with Verification of Deposit)

Sonia Chiou (with Verification of Deposit)

Vanessa Lavendera (with Verification of Deposit)

Jane Chen

Richard Alanis

Volume 3 of 3 Volumes

Dated as of November 24, 2012

**CONFIDENTIAL TREATMENT REQUESTED BY APPLICANTS**

Correspondence to be addressed to:

Jeffrey A. Tisdale, Esq.
Tisdale & Nicholson, LLP
2029 Century Park East, Suite 900
Los Angeles, CA 90067
Tel: (310) 286-1260

LAM00073821

## Compensation Package :Chairman of the Board of CBB

- ➤ Name: Frank Tu
- ➤ Position: Chairman and active Executive Officer
- ➤ Annual Salary: $ 145,000 ( Working Hours: 30 hours per week)
- ➤ Term: Three years (at will, no written contract)
- ➤ Performance Bonus:
    - ■ ROE and ROA are superior to the average of peer group (UBPR) at the end of the bonus year
    - ■ Subject to the Board of Directors approval

- ➤ General Benefit Package:
    - ■ Medical (Dental): in lieu of the Bank's health insurance package
    - ■ Car Allowance: $ 1,000 per month
    - ■ Vacation: 21 days/per year
    - ■ 401 K matching plan ( the Bank currently has no matching program)

- ➤ Other Benefit:
- ➤ Stock Options: up to 5% of total outstanding shares effective 12 months after assuming the current position, executable price per share and volume will be subject to the Board of Directors Approval after Change of Control.

LAM00073822
076

## Compensation Package : President and CEO of CBB

➢ Name: Tony Lee
➢ Position: President and Chief Executive Officer
➢ Annual Salary: $ 175,000
➢ Term: at will, no written contract
➢ Performance Bonus:
  - ROE and ROA are superior to the average of peer group (UBPR) at the end of the bonus year, and the Bank's CAMELS rating is 2.0 or above
  - Subject to the Board of Directors approval

➢ General Benefit Package:
  - Medical (Dental): in lieu of the Bank's health insurance package
  - Car Allowance: $ 1,000 per month
  - Vacation: 21 days/per year
  - 401 K match plan

➢ Other Benefit:
   Stock Options: up to 3.5% of total outstanding shares effective 12 months after assuming the current position, executable price per share and volume will be subject to the Board of Directors Approval after Change of Control.

LAM00073823
077

## Compensation Package: SVP/Chief Credit Officer

- ➤ Position: Senior Vice President and Chief Credit Officer
- ➤ Annual Salary: $ 140,000 (Annual adjustment based on CPI index)
- ➤ Term: at will, no written contract
- ➤ Performance Bonus:
  - ROE and ROA are superior to the average of peer group (UBPR) at the end of the bonus year
  - Subject to the Board of Directors approval

- ➤ General Benefit Package:
  - Medical (Dental): in lieu of the Bank's health insurance package
  - Car Allowance: $ 800 per month
  - Vacation: first year 15 days
  - 401 K match plan

LAM00073824
078

## Compensation Package : SVP/ Chief Financial Officer

➤ Position: Senior Vice President and Chief Financial Officer
➤ Annual Salary: $ 120,000 (Annual adjustment based on CPI index)
➤ Term: at will, no written contract
➤ Performance Bonus:
   ■ ROE and ROA are superior to the average of peer group (UBPR) at the end of the bonus year
   ■ Subject to the Board of Directors approval

➤ General Benefit Package:
   ■ Medical (Dental): in lieu of the Bank's health insurance package
   ■ Car Allowance: $ 600 per month
   ■ Vacation: 15 days/per year
   ■ 401 K match plan

LAM00073825

**MEGA BANK**
美 加 銀 行

1370 S. Fullerton Road #101    TEL: (626) 839-6060
Rowland Heights,
CALIFORNIA 91748              FAX: (626) 839-9700

October 16, 2012

Lucy Gao Seh
19745 Colima Road #I-221
Rowland Heights CA 91748

To Whom It May Concern:

At the request of our depositor, we hereby verify that the following Account(s) it/are presently maintained with Mega bank at the branch listed above.

Account Name (s)      Lucy Gao Seh

Account Address :     19745 Colima Road #I-221
                      Rowland Heights CA 91748

Type of Account:      Personal Checking Account
                      25000258

Balance as of Date of :    ***$5,451,594.33 ****
This letter:

Date Account Opened:  Nov 10, 2008

Our response is solely a manner of courtesy for which no responsibility is attached to our institution or any of our officers.

Sincerely,

Candace Chu
Asst. Operations Officer

LAM00073826
080



LAM00073827

# INTERAGENCY BIOGRAPHICAL AND FINANCIAL REPORT

This is filed with respect to:

California Business Bank

---

Name of Subject Institution or Holding Company, Location

| **Type of Filing** | | **Position** | |
|---|---|---|---|
| ☐ | Bank or Thrift Charter | ☐ | Organizer |
| ☐ | Bank or Thrift Holding Company | ☒ | Director |
| ☒ | Change in Bank Control | ☐ | Senior Executive Officer |
| ☐ | Change in Senior Executive Officer or Director | ☐ | Title: _____ |
| ☐ | Citizenship Waiver | ☒ | Principal Shareholder |
| ☐ | Charter Conversion | ☐ | Trustee |
| ☐ | Deposit Insurance | ☐ | Manager |
| ☐ | Federal Branch or Agency | ☐ | Manager |
| ☐ | Other _____ | ☐ | Other _____ |

## BIOGRAPHICAL REPORT

### 1. Personal Information

(a) Name   Seh                    Lucy                    Gao
       Last                   First                   (Middle-no initials)

(b) Residence   1001 East Road

                        (Street Address)

     La Habra Heights          CA          90631          USA
       (City)          (State)          (ZIP Code)          (Country)

(c) If at residence less than five years, list addresses and dates occupied for past five years.

| Date From | Date To | Number and Street | State | ZIP Code | Country |
|---|---|---|---|---|---|
| | | | | | |

(d) Date of Birth: Month: March          Day: 04          Year: 1961

(e) Place of Birth:   Kunming                    Yunnan                    China
              (City)          (State)          (Country)

(f) United States Social Security Number:   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

(g) Citizenship   USA                    12/09/1992
        Country                    (Date, if Naturalized)

1

LAM00073828
082

(h) If not a United States citizen, provide:
Passport Number: N/A
Home Country Identification Number: _____
Immigration File Number: _____
Father's full name _____
Mother's full name, including maiden name _____

(i) Telephone and fax numbers where you may be reached during business hours and an e-mail address:

(626) 214-2154
(Area Code, Telephone Number, including Country Code if outside U.S.)

(626) 214-2143                     lucy@libertycmc.com
(Fax Number)                        E-mail Address

(j) List other names you used and the period of time you used them (for example, your maiden name, name by a former marriage, former name, alias, or nickname). If the other name is your maiden name, put "nee" in front of it.

Lucy Gao - Present

2. **Employment Record**

(a) List employment in reverse chronological order for the last five years. The list should include the beginning and ending dates of employment, the employer's name and location (city, state), nature of business, title or position, nature of duties, and reason for leaving.

Dates           Company           Location         Nature         Position
11/11- Pres    Liberty CMC Corp.    West Covina, CA   Portfolio Mgmt President
03/07-11/11    Liberty Asset Mgmt Corp. West Covina, CA Portfolio Mgmt Pres.
04/03-03/07** AMBC Mortgage Corp. West Covina, CA   Mortgage Broker Pres.
** Resigned with AMBC Mortgage to establish and run my own business Liberty
Asset Management.

(b) Have you ever been dismissed or asked to resign from any past employment, including a less than honorable discharge from military service? ☐ Yes ■ No

If "yes," provide the employer's name, address, and telephone number; title or position; date of discharge; and explanation.

2

LAM00073829
083

### 3. Education and Professional Credentials

(a) List each diploma or degree from high schools, colleges, universities, or other schools.

School's Name/Location From _____ To _____ Degree

Yunnan University, China     01/1982 to 06/1984  B.S.
Central TV University, China   11/1978 to,12/1984  A.S.
12th District High School , China 09/1974 to 10/1978  H.S. Diploma

(b) List each professional license or similar certificate you now hold or have held (for example, Attorney, Physician, CPA, NASD or SEC registration).

License Issuing _____ Authority Date _____ Issued Status _____ Expiration _____

Salesperson   CA Department of Real Estate  12/08/1981 to 02/17/2011
Notary Public  California Secretary of State   01/01/1991 to 01/01/2011

### 4. Business and Banking Affiliations

(a) List any company with which you are associated, providing the company name, location, nature or type of business, position held or relationship to the company, ownership percentage, and beginning date of the relationship.

Dates     Company        Location      Nature       Position
12/11-Pres Liberty CMC Corp. West Covina, CA  Portfolio Mgmt  President

See also schedule "C" of Personal Financial Report herein.

(b) List the name of any depository institution or depository institution holding company with which you are or were associated. Also list the location, nature of banking activity, position held or relationship, ownership percentage, and beginning and ending dates of the relationship.

Saigon National Bank, Westminster, CA. Stockholder of 18% common shares outstanding (10 million shares). Date of purchase; December 27, 2011 second largest shareholder of the Bank. Passive investment.

3

LAM00073830
084



# SAIGON NATIONAL BANK

ORGANIZED UNDER THE LAWS OF THE UNITED STATES

THIS CERTIFICATE IS TRANSFERABLE IN CANTON, MA AND NEW YORK, NY



**COMMON STOCK**

**COMMON STOCK**

CUSIP 78709H 10 2

THIS CERTIFIES THAT  LUCY GAO
2218 E HOLT AVENUE  SUITE 100
WEST COVINA CA  91791

\*\*\*\*\*10000000\*\*\*\*\*
\*\*\*\*\*\*10000000\*\*\*\*\*
\*\*\*\*\*\*\*10000000\*\*\*
\*\*\*\*\*\*\*\*10000000\*\*
\*\*\*\*\*\*\*\*\*10000000\*

TRANSFER OF THIS CERTIFICATE
IS RESTRICTED. SEE
LEGEND ON REVERSE SIDE

\*\*TEN MILLION\*\*

is the owner of

FULLY PAID AND NON-ASSESSABLE SHARES OF THE COMMON STOCK, $5.00 PAR VALUE PER SHARE, OF

### SAIGON NATIONAL BANK

hereinafter called the "Bank," transferable only on the books of the Bank by the holder hereof in person or by duly authorized attorney upon the surrender of this Certificate properly endorsed. The amount of the Common Stock of the Bank and the par value of the shares of Common Stock of the Bank are set forth in the Charter of the Bank, as amended or to be amended hereafter, which Charter and any and all amendments thereof are on file at the office of the Bank and are hereby expressly incorporated herein by reference and to all of which the holder by acceptance hereof hereby agrees and assents.

In Witness Whereof, the Bank has caused this Certificate to be signed by its duly authorized officers.

Dated:

27-DEC-2011

_Roy L. Painter_
SECRETARY

PRESIDENT AND CHIEF EXECUTIVE OFFICER

BY:

COUNTERSIGNED AND REGISTERED:
Computershare Trust Company, N.A.
TRANSFER AGENT
AND REGISTRAR

AUTHORIZED SIGNATURE

LAM00073831

085

(c) Are you in the process of being considered for a senior executive officer or director position at another depository institution or depository institution holding company?
☐ Yes ☒ No

If "yes," provide the name of the depository institution or depository institution holding company and the position. If the application has been submitted for regulatory review, provide the name of the regulatory agency.

(d) Are you now or are you proposed to be a "management official" of another insured depository institution or depository institution holding company?    ☐ Yes ☒ No

If "yes," explain either why the potential interlock is not a violation of the Depository Institution Management Interlocks Act (12 U.S.C. §§ 3201-3208) or what action will be taken to prevent a violation.

## 5. Legal and Related Matters

(a) Have you been involved in any of the following filings where the filing was denied, disapproved, withdrawn, or otherwise returned without favorable action by a federal or state regulatory authority or a self-regulatory organization:

  (1) A charter or license application, a depository institution holding company application, or a federal deposit insurance application, in which you were listed as an organizer, director, senior executive officer, or a person that would own or control (either individually or as a member of a group) 10 percent or more of any class of voting securities or other voting equity interest of the institution, or similar position?    ☐ Yes ☒ No

  (2) A merger application in which you were listed as a director, senior executive officer, or similar position?    ☐ Yes ☒ No

4

LAM00073832
086

(3) A notice of change in director or senior executive officer, or similar form, in which you were listed as a director, senior executive officer, or similar position?
☐ Yes ■ No

(4) A notice of change in control for a depository institution or other company, or a similar form, in which you were listed (either individually or as a member of a group) as an acquirer or transferee?
☐ Yes ■ No

(5) Any other application, notice, or other regulatory or administrative request which was filed with a federal or state regulatory authority or a self-regulatory organization in which you were listed in some capacity?
☐ Yes ■ No

(b) Have you or any depository institution or depository institution holding company with which you are or were associated been subject to any supervisory agreement, enforcement action, civil money penalty, prohibition or removal order, or other supervisory or administrative action taken or imposed by any federal or state regulatory authority or other governmental entity?
☐ Yes ■ No

(c) Has any depository institution with which you are or were associated:

(1) Been placed into conservatorship or receivership or otherwise failed?
☐ Yes ■ No

(2) Received financial assistance from a federal agency or instrumentality (for example, FDIC, Resolution Trust Corporation, Federal Savings and Loan Insurance Corporation)?
☐ Yes ■ No

(3) Merged with or been acquired by an institution that received financial assistance from a federal agency or instrumentality in connection with the transaction?
☐ Yes ■ No

(d) Have you or any company with which you are or were associated:

(1) Filed a petition under any chapter of the Bankruptcy Code or had an involuntary bankruptcy petition filed against you or the company?
☐ Yes ■ No

(2) Defaulted on a loan or financial obligation of any sort, whether as obligor, cosigner, or guarantor?
☐ Yes ■ No

(3) Forfeited property in full or partial satisfaction of any financial obligation?
☐ Yes ■ No

5

(4)    Had a lien placed against property for failure to pay taxes or other debts?

       ☐ Yes ☒ No

(5)    Had wages or income garnished for any reason?      ☐ Yes ☒ No

(6)    Failed or refused to pay any outstanding judgments?      ☐ Yes ☒ No

(e)    Have you or any company or depository institution with which you are or were associated been involved in any lawsuit, formal or informal investigation, examination, or administrative proceeding that may result in, or resulted in, any penalty (including, but not limited to, any sanction, fine, order to pay damages, loss of right or benefit, forfeiture of property interest, or revocation of license), agreement, undertaking, consent, judgment, or order imposed by or entered into with any of the following entities:

(1)    Any federal or state court?   See response 6 below.      ☒ Yes ☐ No

(2)    Any department, agency, or commission of the United States government?

       ☐ Yes ☒ No

(3)    Any state, municipal, or foreign governmental entity?      ☐ Yes ☒ No

(4)    Any self-regulatory organization (for example, NASD, FASB, state bar)?

       ☐ Yes ☒ No

(f)    Have you or any company or depository institution with which you are or were associated been arrested for, charged with, indicted for, or convicted of (including a conviction where the record was expunged), or ever pleaded *nolo contendere* to, any criminal matter (other than minor traffic violations)?

       ☐ Yes ☒ No

(g)    If you answer "Yes" to any question in 5(a) through 5(f), provide your explanation by identifying the number of the question, describing the situation in detail, and, where relevant, including the:

- Name and location of any institution, company, party, court, regulatory agency, or self-regulatory organization involved.
- Nature of your association with any institution or company (for example, officer, director, organizer, principal shareholder, or owner).
- Type of any application, notice, or other regulatory or administrative request.
- Nature of any supervisory, enforcement, or administrative action.
- Direct and indirect debt terms, defaulted amount, and creditor regarding any financial obligation.
- Date of any relevant event.
- Nature of any lawsuit, charge, or proceeding.
- Jurisdiction in which any legal proceeding occurred.
- Resolution or disposition of the matter.

6

LAM00073834
088

## 6. Additional Information

Present any other information you believe is important to evaluate your filing. If you are involved in the organization of a new depository institution or depository institution holding company, discuss your specific role.

5. (e)(1): Tenant eviction dispute: Ms. Gao as landlord sought to evict tenant for violation of lease terms. Tenant countered with interference of business allegations. Judgment for Tenant.

5. (e)(3): Two small claims disputes regarding rent owed by tenants.

5.(f): 1985 arrested as bystander to a fist fight between Ms. Gao's boyfriend and third party. All charges droped at police station.

7

LAM00073835

# FINANCIAL REPORT

## FINANCIAL STATEMENT AS OF October 31, 2012

| ASSETS | | LIABILITIES AND NET WORTH | |
|---|---|---|---|
| Cash on hand and in depository institutions | $ 5,300,000 | Accounts payable | $ 40,000 |
| Marketable securities (Schedule A) | 22,400 | Notes payable and other loans (Schedule F) | |
| Notes receivable (Schedule B) | 1,668,658 | Real estate mortgages (Schedule C) | 31,248,600 |
| Real estate (Schedule C) | 64,215,000 | Other liabilities (Schedule G) | |
| Proprietary interests and other securities (Schedule D) | | TOTAL LIABILITIES | 31,288,600 |
| | | Net worth (Total assets less total liabilities) | 40,117,458 |
| Retirement funds and other assets (Schedule E) | 200,000 | | |
| TOTAL ASSETS | $ 71,406,058 | TOTAL LIABILITIES AND NET WORTH | $ 71,406,058 |

8.

LAM00073836
090

## CONTINGENT LIABILITIES

In addition to the liabilities listed on the Financial Statement, have you endorsed, guaranteed, or become otherwise indirectly or contingently liable for the debts of others or through a pending lawsuit?

☐ Yes ■ No

If "yes," complete the following:

| Name and Address of Debtor or Obligor | Name and Address of Creditor or Obligee | Description and Value of Collateral | Date Due | Current Amount |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| TOTAL | | | | $ |

9

## SUPPORTING SCHEDULES

Schedules must agree in total with the appropriate item contained in the Financial Statement on page 8 of this report.

### Schedule A – Marketable Securities

Indicate all debt and equity securities listed on an exchange or otherwise regularly traded in an open market. Separate debt and equity securities. Securities of closely held corporations should be listed on Schedule D—Proprietary Interests. The description should include the name of the issuer, the principal amount or number of shares held, and the interest rate, if applicable. Small holdings may be aggregated and shown as "other" provided that they account for no more than 10 percent of marketable securities.

| Description | Market Value |
|---|---|
| Symbol RIMM | $ 22,400 |
| | . |
| | |
| | |
| | |
| TOTAL | $ 22,400 |

### Schedule B – Notes Receivable

The description should include the name e of the obligor, the note' s maturity and terms of repayment, and a description of any collateral. If the note is payable to you and others jointly, indicate only your beneficial interest under Current Balance.

| Description | Current Balance |
|---|---|
| 13044 Amar Road, Baldwin Park, CA 91706 | $ 392,159 |
| 26841 Calle Hermosa, Capistrano Beach, CA 92624 | 1,276,499 |
| | |
| | |
| | |
| TOTAL | $ 1,668,65 |

10

LAM00073838
092

## Schedule C — Real Estate and Related Loans

List all real estate in which you hold a beneficial interest. Submit year-end financial statements, including profit and loss statements, for the last two years for each investment (exclude residence) in which you have an interest equal to 10 percent or more of your net worth. Also submit a cash flow statement on any investment property valued at 10 percent or more of net worth.
See attached Schedule of Real Estate Holdings

| Description and Location (City and State) | Owner of Property | Percent Owner-ship | Mortgage Holder | Maturity Date | Current Market Value* | Current Balance** |
|---|---|---|---|---|---|---|
| | | | | | $ | $ |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| TOTAL | | | | | $ | $ |

\* Carry TOTAL forward to Assets - Real estate
\*\* Carry TOTAL forward to Liabilities - Real estate mortgages

## Schedule D — Proprietary Interests and Other Securities

List all companies, the shares of which are not listed on a securities exchange or otherwise regularly traded, in which you hold a beneficial interest. (Submit year-end financial statements, including profit and loss and cash flow statements, for the last two years for each business interest in which you have an interest equal to 10 percent or more of your net worth.)

| Name and Address of Company | Legal Form of Company | Nature of Business | Percent Ownership | Current Value |
|---|---|---|---|---|
| | | | | $ |
| | | | | |
| | | | | |
| TOTAL | | | | $ |

11

LAM00073839

Overview and Background of Ms. Gao's Real Estate Experience and Assets.

As Ms. Gao's biographical information reflects, Ms. Gao worked in the residential mortgage brokerage business from April 2003 to March 2007 as the President of AMBC Mortgage. These were boom times in the residential real estate business and Ms. Gao benefitted financially from the hyper activity in California. Ms. Gao succeeded to the point of deciding to start a business of her own which she did in March 2007 with the formation of Liberty Asset Management Corporation now named Liberty CMC Corp. This business provide real estate portfolio management services for clients of Ms. Gao. As a result of the meltdown in the residential real estate market, using her expertise and expanding contacts, she has focused on commercial real estate. Such business includes equity investments for her clients and her business and client commissions from the brokerage of properties. The brokerage service consists of identifying property, negotiating the terms and conditions with the seller(s) and receiving commissions for such sales. As business has evolved, Ms. Gao increased actively looking for commercial real estate investments. The equity investments are typically made by the payment of a down payment coupled with a loan to pay for the purchase price of the property. Such commercial properties are hotels, multifamily projects and some single family projects.

Discussion of the Value of Ms. Gao's Real Estate Holdings Schedule.

Ms. Gao has used her cash resources (the net worth built up through years of business described above) and sale of exiting real estate properties to acquire new properties and then using such properties as collateral for loans that enable her to take advantage of opportunities in the market. Ms. Gao makes investments with her own down payment funds and loans from banks that she has worked with for years. For example, footnote C of the Real Estate Holdings Schedule reflects a line of credit from one lender for only $950,000 which is secured by three properties the aggregate value of which is $6,950,000 based upon purchase prices. This excess amount of collateral has enabled Ms. Gao to seek and obtain lender approval to increase the line of credit and draw down funds beyond the $950,000 to take advantage of new opportunities. The current balance of such line is $950,000 and it is expected that such can be increased with such overcollateralization again and repaid as other properties are sold, all to her advantage. A second example is footnote D which reflects an aggregate collateral value based on purchase prices of $5,150,000 securing a loan of $2,880,000. Investing in commercial real estate rather than residential property, Ms. Gao applies the similar principles that were successful in the residential investments and continues to seek good equity investment projects as well as packaging the acquisition of such property.

In addition to acquiring, Ms. Gao brokers properties. In these situations, Ms. Gao identifies the commercial real estate property opportunities, negotiates the terms and conditions of purchase, arranges a take out loan for the property and simultaneously lines up permanent investors who have financing in order to "take out' the initial loan. Although Ms. Gao usually arranges for the permanent refinancing to occur simultaneously with the time of the real estate purchase's closing through a back to back escrow, occasionally such refinancing takes a few weeks to occur after the initial closing as described in footnote (F) to the schedule of real estate. Thus for a short time, title records show her as the owner but this temporary status changes as quickly as the refinancing takes place. In these transactions, she is paid a commission for such efforts which is negotiated but often is 5% of the purchase price, a very lucrative fee when dealing with these high priced properties.

Capital Strength for the Bank.

Ms. Gao recognizes that if the DFI and the FDIC approve the CIC Group's change in control of California Business Bank ("CBB") of which she will be the largest investor and the largest shareholder of CBB, CBB likely will need additional capital beyond the initial $8 million the Stock Purchase Agreement represents in order to meet regulatory capital standards and also to provide

LAM00073840
094

capital to support the expansion of the Bank's business as reflected in the capital plan submitted in Volume 2 of this filing. She intends to manage her real estate investments in order to stand as a source of capital strength to the Bank. She also understands that this requires liquidity. Her business plan affords such liquidity because the properties listed on the Real Estate Schedule have been acquired for low prices and she is already seeing increased values in her assets as the market gains confidence. While the Schedule does not show significant increases as yet in the fair market values for all of the assets in her Schedule, she has been very conservative in such estimates even though she has been approached already to buy some of her assets at significantly greater prices than she has quoted in the fair market value column. For example, she has been approached on an initial basis with respect to her Property 12 on the Schedule regarding buyers that may be willing to pay in excess of $20,000,000 for this property. Although this evidence is anecdotal rather than representative of an actual transaction, it is indicative of intrinsic values such properties have. Most of such properties have been acquired from commercial banks which had carried such real estate as OREO or from investors needing to sell such properties due to the devaluations in commercial real estate experienced in the Great Recession. However, the cost basis of the properties her LLCs have is such that there has already been appreciation in fair values and the likelihood is that this is only the beginning of a very favorable upward trend.

While Ms. Gao believes the value of these investments is appreciating, she recognizes that her understanding of existing market values may need to be evidenced. Ms. Gao has appraisals on 12 of the scheduled assets which were obtained at the time of purchase and would be willing to submit them if desired. Most of these are 50-100 pages in length so the effort has not been made to copy them at this time due to such volume and the fact that it is believed that since loans made against such values have been made the purchase prices evidence values lenders found supportable. The real value in the portfolio lies in the benefits described above for leveraging such properties and the increased values such real estate properties are experiencing.

Notes to Real Estate Holding Schedules

The Schedule is intended to provide summary profit and loss information from the date of purchase for each of the real estate investments listed.

The balanced sheet following the summary P&L is a summary as of the date stated.

All properties are managed by Reporter.

LAM00073842
096

| | Holding Entity (Ms. Gao owns 100%) | Property List | Ownership Percentage | Transfer Date | APN | Fair Market Value (A) | Purchase Price | Outstanding Loan | Monthly Mortgage | Monthly Income | Note Holder | Other Owners |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Lucy Gao Asset Holding (10/31/2012)** | | | | | | | | | | | |
| 1 | 1595 17th St LLC (B) | 1595 E. 17th Street, Santa Ana, CA | 100% | 9/11/2009 | 396-066-017 | $1,660,000.00 | $1,750,000.00 | $1,650,000.00 | $3,093.75 | $0.00 | Bank SinoPac (B) | None |
| 2 | Progressive Star Management LLC (B) | 415 Huntington Dr., San Marino, CA | 100% | 12/22/2011 | 5323-020-035 | $3,465,000.00 | $3,675,500.00 | $1,650,000.00 | $3,093.75 | $0.00 | Bank SinoPac (B) | None |
| 3 | Avenue 66 Villas LLC (C) | 930 N. Staley Lane, Los Angeles, CA | 100% | 5/25/2010 | 5716-032-008 | $3,750,000.00 | $4,600,000.00 | $316,666.66 | $2,416.78 | $0.00 | Capital Group (C) | None |
| 4 | Azusa Foothills Project LLC (C) | 204 E. Foothill, Azusa, CA (212 E. Foothill Blvd) 640 N. Alameda Avenue, Azusa    632 N. Alameda Avenue, Azusa | 100% | 5/3/2010 5/3/2010 5/3/2010 | 8611-002-035 8611-002-010 8611-002-034 | $1,370,000.00 | $1,370,000.00 | $316,666.66 | $2,416.78 | $0.00 | Investor Capital Group (C) | None |
| 5 | JSK 23 LLC (C) | 842 W Robindale Ave., West Covina, CA (916 Glendora) | 100% | 4/16/2009 | 8469-019-018 | $850,000.00 | $980,000 | $316,666.66 | $2,416.78 | $0.00 | Capital Group (C) | None |
| 6 | Green Oak Asset Management LLC (D) | 409 Santa Barbara, San Clemente, CA | 100% | 6/28/2010 | 933-73-139 | $1,000,000.00 | $700,000.00 | $480,000.00 | $3,323.16 | $0.00 | Shanghai Commercial Bank (D) | None |
| 7 | Green Oak Asset Management LLC (D) | 413 Santa Barbara, San Clemente, CA | 100% | 6/28/2010 | 933-73-137 | $900,000.00 | $700,000.00 | $480,000.00 | $3,323.16 | $3,800.00 | Shanghai Commercial Bank (D) | None |
| 8 | East Heights LLC - 2nd Home (D) | 3808 Hollins Ave., Claremont CA | 100% | 8/3/2009 | 8673-036-009 | $2,550,000.00 | $3,000,000.00 | $960,000.00 | $6,646.32 | $0.00 | Shanghai Commercial Bank (D) | None |
| 9 | East Heights LLC - Primary Home (D) | 1001 East Road, La Habra Heights, CA | 100% | 5/29/2009 | 8266-008-006 | $800,000.00 | $750,000.00 | $960,000.00 | $6,646.32 | $0.00 | Shanghai Commercial Bank (D) | None |
| 10 | 544 San Antonio Rd LLC | 544 San Antonio Road, Mountain View, CA (544 San Antonio Rd) | 100% | 10/28/2014 | 148-16-037 | $2,850,000.00 | $2,850,000.00 | $1,200,000.00 | $8,115.00 | $19,000.00 | Preferred Bank | None |
| 11 | Coastline Investments LLC | 3101 W. Temple Avenue, Pomona, CA | 100% | 5/1/2012 | 8719-002-016 | $8,700,000.00 | $10,500,000.00 | $5,250,000.00 | $34,932.42 | $95,000.00 | First General Bank | None |
| 12 | Crystal Waterfalls LLC | 1211 E. Garvey Street, Covina, CA | 95% (E) | 10/2/2011 | 8447-031-045 8447-031-053 | $14,900,000.00 | $14,800,000.00 | $7,000,000.00 | $43,300.00 | $3,800,000.00 | Commercial Bank & Investor | None |
| 13 | Diamond Waterfalls LLC | 3200 Temple Avenue, Pomona, CA | 100% | 3/26/2012 | 8710-014-043 | $11,500,000.00 | $10,500,000.00 | $5,250,000.00 | $34,932.00 | $125,000.00 | First General Bank | None |
| 14 | JSK 23 LLC | 12454 N Vivienda Ave., Grand Terrace, C | 100% | 9/24/2009 | 1167-261-12 | $120,000.00 | $290,000 | $295,600.00 | $1,810.61 | $1,300.00 | Sterus | None |
| 15 | JSK 23 LLC | 17634 Bellflower Blvd., Bellflower, CA | 100% | 6/18/2010 | 7161-013-081 | $300,000.00 | $475,000 | $0.00 | $0.00 | $0.00 | None | None |

LAM00073843

| # | Holding Entity | Property List | Ownership Percentage | Transfer Date | APN | Fair Market Value | Purchase Price | Outstanding Loan | Monthly Mortgage | Monthly Income | Note Holder | Third Party Owners |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 16 | Greenfield Investments LLC | 3218 E Holt Avenue, West Covina CA | 100% | 9/24/2010 | 8480-003-027 | $3,000,000.00 | $2,000,000.00 | $1,600,000.00 | $13,528.00 | $25,000.00 | Zions Bank | None |
| 17 | SC Project Management LLC | 1906 El Camino Real, Menlo Park, CA | 100% | 12/2/2011 | 060-333-150 060-333-160 | $4,450,000.00 | $7,200,000.00 | $2,753,000.00 | $15,787.49 | $28,000.00 | Bank SinoPac | None |
| 18 | Sunshine Fields LLC | 1916 Los Padres Drive, Rowland Heights, CA | 100% | 11/24/2009 | 8253-006-004 | $325,000.00 | $475,000.00 | $440,000.00 | $4,619.13 | $0.00 | Green Tree | None |
| 19 | Sunshine Fields LLC | 502 W. Bonita Avenue, San Dimas, CA | 100% | 2/1/2010 | 8386-007-087 | $1,600,000.00 | $1,600,000.00 | $0.00 | $0.00 | $2,545.00 | None | None |
| 20 | S.K. Living Trust, Lucy Gao as Trustee | 1008 Torrey Pine Drive, Colton, CA | 100% | 12/6/2006 | 0164-431-51 | $125,000.00 | $330,000.00 | $330,000.00 | $3,368.28 | $1,300.00 | Ocwen | None |
| | Total Properties | | | | | $64,215,000 | $ 66,800,500 | $31,248,599.98 | $193,769.73 | $4,100,945 | | |

| | Lucy Gao Brokered Properties | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Holding Entity | Property List | Ownership Percentage | Transfer Date | APN | Fair Market Value (A) | Purchase Price | Outstanding Loan | Monthly Mortgage | Monthly Income | Note Holder | Third Party Owners |
| 1 | 220 Post SF LLC (F) | 220 Post Street, San Francisco, CA | 0% | 3/16/2012 | Lot 007; Block | $52,000,000.00 | $52,000,000.00 | $28,000,000.00 | $168,726.69 | $205,000.00 | East West Bank (F) | 100% |
| 2 | HK Grace Building LLC (F) | 166 Geary Street, San Francisco | 0% | 3/19/2012 | Lot 10; Block 0309 | $34,000,000.00 | $34,000,000.00 | $18,000,000.00 | $151,302.86 | $225,000.00 | Capital, LLC (F) | 100% |
| | Total Properties | | | | | $86,000,000 | $ 86,000,000 | $46,000,000.00 | $320,029.55 | $430,000 | | |

Footnotes:

(A) Fair market value based on estimates by Ms. Gao.

(B) Property #1 1595 17th St LLC and property #2 Progressive Star Management LLC are being held as collateral for a $3.3MM line of credit from Bank SinoPac.

(C) The properties #3 Avenue 66 Villas LLC, #4 Azusa Foothills Project LLC, and #5 JSK 23 LLC are being held as collateral for a $950,000 loan from Investor Capital Group.

(D) Two properties #6 and #7 Green Oak Asset Managment LLC and two properties #8 and #9 East Hights LLC are being held as collateral for a $2.88MM loan from Shanghai Commercial Bank.

(E) 5% is owned by Golden Bay Investments LLC which is 100% owned by Ms. Gao.

(F) Both properties acquired with downpayment by third party partners in this project and loans obtained by Ms. Gao's LLC; being sold to new owners within 30 days. Broker cash fee of 5% of purchase price to be paid to Ms. Gao's LLC upon sale.

The above is true and correct as of the date of its submission.

By:
Lucy Gao

LAM00073844

# 1595 17th St LLC
# Balance Sheet
## As of October 30, 2012

|  | Oct 30, 12 |
|---|---|
| **ASSETS** |  |
| **Fixed Assets** |  |
| Building -1595 17th St | 1,750,000.00 |
| **Total Fixed Assets** | 1,750,000.00 |
| **TOTAL ASSETS** | 1,750,000.00 |
| **LIABILITIES & EQUITY** |  |
| **Liabilities** |  |
| **Current Liabilities** |  |
| **Other Current Liabilities** |  |
| Bank SinoPac | 1,650,000.00 |
| **Total Other Current Liabilities** | 1,650,000.00 |
| **Total Current Liabilities** | 1,650,000.00 |
| **Total Liabilities** | 1,650,000.00 |
| **Equity** |  |
| Equity | 100,000.00 |
| **Total Equity** | 100,000.00 |
| **TOTAL LIABILITIES & EQUITY** | 1,750,000.00 |

LAM00073845

# Progressive Star Management LLC
## Balance Sheet
### As of October 30, 2012

|  | Oct 30, 12 |
|---|---|
| **ASSETS** | |
| **Fixed Assets** | |
| 415 Huntington Dr | 3,675,500.00 |
| **Total Fixed Assets** | 3,675,500.00 |
| **TOTAL ASSETS** | 3,675,500.00 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Other Current Liabilities** | |
| Bank SincPac | 1,650,000.00 |
| **Total Other Current Liabilities** | 1,650,000.00 |
| **Total Current Liabilities** | 1,650,000.00 |
| **Total Liabilities** | 1,650,000.00 |
| **Equity** | |
| Equity | 2,025,500.00 |
| **Total Equity** | 2,025,500.00 |
| **TOTAL LIABILITIES & EQUITY** | 3,675,500.00 |

LAM00073846
100

# Avenue 66 Villas LLC
# Balance Sheet
## As of October 30, 2012

|  | Oct 30, 12 |
|---|---|
| **ASSETS** | |
| **Fixed Assets** | |
| 930 N. Staley Lane | 4,600,000.00 |
| **Total Fixed Assets** | 4,600,000.00 |
| **TOTAL ASSETS** | 4,600,000.00 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Other Current Liabilities** | |
| Investor Capital Group | 316,666.66 |
| **Total Other Current Liabilities** | 316,666.66 |
| **Total Current Liabilities** | 316,666.66 |
| **Total Liabilities** | 316,666.66 |
| **Equity** | |
| Equity | 4,283,333.34 |
| **Total Equity** | 4,283,333.34 |
| **TOTAL LIABILITIES & EQUITY** | 4,600,000.00 |

LAM00073847

# Azusa Foothills Project LLC
## Balance Sheet
### As of October 30, 2012

|  | Oct 30, 12 |
|---|---|
| **ASSETS** | |
| **Fixed Assets** | |
| 204 E.Foothill Azusa | 342,500.00 |
| 212 E. Foothill Blvd | 342,500.00 |
| 632 N. Alameda | 342,500.00 |
| 640 N. Alameda | 342,500.00 |
| **Total Fixed Assets** | 1,370,000.00 |
| **TOTAL ASSETS** | 1,370,000.00 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Other Current Liabilities** | |
| Investor Capital Group | 316,666.66 |
| **Total Other Current Liabilities** | 316,666.66 |
| **Total Current Liabilities** | 316,666.66 |
| **Total Liabilities** | 316,666.66 |
| **Equity** | |
| Equity | 1,053,333.34 |
| **Total Equity** | 1,053,333.34 |
| **TOTAL LIABILITIES & EQUITY** | 1,370,000.00 |

LAM00073848
102

# JSK 23 LLC
# Balance Sheet
## As of October 30, 2012

|  | Oct 30, 12 |
|---|---|
| **ASSETS** |  |
| **Fixed Assets** |  |
| 12454 N Vivienda | 290,000.00 |
| 17634 Bellflower | 475,000.00 |
| 842 W Robindale/916 Glendora | 980,000.00 |
| **Total Fixed Assets** | 1,745,000.00 |
| **TOTAL ASSETS** | 1,745,000.00 |
| **LIABILITIES & EQUITY** |  |
| **Liabilities** |  |
| **Current Liabilities** |  |
| **Other Current Liabilities** |  |
| Investor Capital Group | 316,666.66 |
| Starus-12454 | 295,600.00 |
| **Total Other Current Liabilities** | 612,266.66 |
| **Total Current Liabilities** | 612,266.66 |
| **Total Liabilities** | 612,266.66 |
| **Equity** |  |
| Equity | 1,132,733.34 |
| **Total Equity** | 1,132,733.34 |
| **TOTAL LIABILITIES & EQUITY** | 1,745,000.00 |

LAM00073849

# Green Oak Asset Management LLC
## Balance Sheet
### As of October 30, 2012

|  | Oct 30, 12 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Checking Account | 11,400.00 |
| **Total Checking/Savings** | 11,400.00 |
| **Total Current Assets** | 11,400.00 |
| **Fixed Assets** | |
| 409 Santa Barbara | 700,000.00 |
| 413 Santa Barbara | 700,000.00 |
| **Total Fixed Assets** | 1,400,000.00 |
| **TOTAL ASSETS** | 1,411,400.00 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Other Current Liabilities** | |
| Shanghai Bank-409 | 480,000.00 |
| Shanghai Bank-413 | 480,000.00 |
| **Total Other Current Liabilities** | 960,000.00 |
| **Total Current Liabilities** | 960,000.00 |
| **Total Liabilities** | 960,000.00 |
| **Equity** | |
| Equit | 440,000.00 |
| Net Income | 11,400.00 |
| **Total Equity** | 451,400.00 |
| **TOTAL LIABILITIES & EQUITY** | 1,411,400.00 |

LAM00073850
104

# East Heights LLC
# Balance Sheet
## As of October 30, 2012

|  | Oct 30, 12 |
|---|---|
| **ASSETS** | |
| **Fixed Assets** | |
| 1001 East Road | 750,000.00 |
| 3808 Hollins Ave | 3,000,000.00 |
| **Total Fixed Assets** | 3,750,000.00 |
| **TOTAL ASSETS** | 3,750,000.00 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Other Current Liabilities** | |
| Shanghai Commercial-1001 | 960,000.00 |
| Shanghai Commercial-3808 | 960,000.00 |
| **Total Other Current Liabilities** | 1,920,000.00 |
| **Total Current Liabilities** | 1,920,000.00 |
| **Total Liabilities** | 1,920,000.00 |
| **Equity** | |
| Equity | 1,830,000.00 |
| **Total Equity** | 1,830,000.00 |
| **TOTAL LIABILITIES & EQUITY** | 3,750,000.00 |

LAM00073851
105

# 220 Post SF LLC
# Balance Sheet
## As of October 30, 2012

|  | Oct 30, 12 |
|---|---|
| **ASSETS** |  |
| **Current Assets** |  |
| **Checking/Savings** |  |
| Checking | 1,742,500.00 |
| **Total Checking/Savings** | 1,742,500.00 |
| **Total Current Assets** | 1,742,500.00 |
| **Fixed Assets** |  |
| Building- 220 Post Street | 52,000,000.00 |
| **Total Fixed Assets** | 52,000,000.00 |
| **TOTAL ASSETS** | 53,742,500.00 |
| **LIABILITIES & EQUITY** |  |
| **Liabilities** |  |
| **Current Liabilities** |  |
| **Other Current Liabilities** |  |
| Loan from East West Bank | 26,000,000.00 |
| **Total Other Current Liabilities** | 26,000,000.00 |
| **Total Current Liabilities** | 26,000,000.00 |
| **Total Liabilities** | 26,000,000.00 |
| **Equity** |  |
| Equity | 24,000,000.00 |
| Net Income | 1,742,500.00 |
| **Total Equity** | 25,742,500.00 |
| **TOTAL LIABILITIES & EQUITY** | 53,742,500.00 |

LAM00073852
106

## 544 San Antonio Rd LLC
## Balance Sheet
### As of October 30, 2012

|  | Oct 30, 12 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Checking Account | 33,240.00 |
| **Total Checking/Savings** | 33,240.00 |
| **Total Current Assets** | 33,240.00 |
| **Fixed Assets** | |
| Building-544 San antonio Rd | 2,850,000.00 |
| **Total Fixed Assets** | 2,850,000.00 |
| **TOTAL ASSETS** | 2,883,240.00 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Other Current Liabilities** | |
| Preferred Bank | 1,102,620.00 |
| **Total Other Current Liabilities** | 1,102,620.00 |
| **Total Current Liabilities** | 1,102,620.00 |
| **Total Liabilities** | 1,102,620.00 |
| **Equity** | |
| Equity | 1,650,000.00 |
| Net Income | 130,620.00 |
| **Total Equity** | 1,780,620.00 |
| **TOTAL LIABILITIES & EQUITY** | 2,883,240.00 |

LAM00073853

# Coastline Investments LLC
# Balance Sheet
## As of October 30, 2012

| | Oct 30, 12 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Checking | 780,405.48 |
| **Total Checking/Savings** | 780,405.48 |
| **Total Current Assets** | 780,405.48 |
| **Fixed Assets** | |
| 3101 W Temple Avenue | 10,500,000.00 |
| **Total Fixed Assets** | 10,500,000.00 |
| **TOTAL ASSETS** | 11,280,405.48 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Other Current Liabilities** | |
| First General Bank | 5,040,405.48 |
| **Total Other Current Liabilities** | 5,040,405.48 |
| **Total Current Liabilities** | 5,040,405.48 |
| **Total Liabilities** | 5,040,405.48 |
| **Equity** | |
| Equity | 5,250,000.00 |
| Opening Balance Equity | 420,000.00 |
| Net Income | 570,000.00 |
| **Total Equity** | 6,240,000.00 |
| **TOTAL LIABILITIES & EQUITY** | 11,280,405.48 |

LAM00073854
108

## Crystal Waterfalls LLC
## Balance Sheet
### As of October 30, 2012

|  | Oct 30, 12 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Checking Account | 4,719,600.00 |
| **Total Checking/Savings** | 4,719,600.00 |
| **Total Current Assets** | 4,719,600.00 |
| **Fixed Assets** | |
| Building - 1211 E.Garvey St | 14,800,000.00 |
| **Total Fixed Assets** | 14,800,000.00 |
| **TOTAL ASSETS** | 19,519,600.00 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Other Current Liabilities** | |
| First Commerical Bank | 7,519,600.00 |
| **Total Other Current Liabilities** | 7,519,600.00 |
| **Total Current Liabilities** | 7,519,600.00 |
| **Total Liabilities** | 7,519,600.00 |
| **Equity** | |
| Equity | 7,800,000.00 |
| Net Income | 4,200,000.00 |
| **Total Equity** | 12,000,000.00 |
| **TOTAL LIABILITIES & EQUITY** | 19,519,600.00 |

LAM00073855
109

# Diamond Waterfalls LLC
# Balance Sheet
### As of October 30, 2012

|  | Oct 30, 12 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Checking | 1,256,292.00 |
| **Total Checking/Savings** | 1,256,292.00 |
| **Total Current Assets** | 1,256,292.00 |
| **Fixed Assets** | |
| Hotel-3200 Temple Avenue | 10,500,000.00 |
| **Total Fixed Assets** | 10,500,000.00 |
| **TOTAL ASSETS** | 11,756,292.00 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Other Current Liabilities** | |
| First Commerical Bank | 5,005,476.00 |
| **Total Other Current Liabilities** | 5,005,476.00 |
| **Total Current Liabilities** | 5,005,476.00 |
| **Total Liabilities** | 5,005,476.00 |
| **Equity** | |
| Equity | 5,250,000.00 |
| Opening Balance Equity | 420,000.00 |
| Net Income | 1,080,816.00 |
| **Total Equity** | 6,750,816.00 |
| **TOTAL LIABILITIES & EQUITY** | 11,756,292.00 |

LAM00073856
110

# HK Grace Building LLC
## Balance Sheet
### As of October 30, 2012

|  | Oct 30, 12 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Checking | 884,384.00 |
| **Total Checking/Savings** | 884,384.00 |
| **Total Current Assets** | 884,384.00 |
| **Fixed Assets** | |
| 166 Geary Street | 34,000,000.00 |
| **Total Fixed Assets** | 34,000,000.00 |
| **TOTAL ASSETS** | 34,884,384.00 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Other Current Liabilities** | |
| Northmarq Capital LLC | 18,000,000.00 |
| **Total Other Current Liabilities** | 18,000,000.00 |
| **Total Current Liabilities** | 18,000,000.00 |
| **Total Liabilities** | 18,000,000.00 |
| **Equity** | |
| Equity | 16,000,000.00 |
| Net Income | 884,384.00 |
| **Total Equity** | 16,884,384.00 |
| **TOTAL LIABILITIES & EQUITY** | 34,884,384.00 |

LAM00073857

# Greenfield Investments LLC
## Balance Sheet
### As of October 30, 2012

|  | Oct 30, 12 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Checking | 137,664.00 |
| **Total Checking/Savings** | 137,664.00 |
| **Total Current Assets** | 137,664.00 |
| **Fixed Assets** | |
| Building-3218 E Holt | 2,000,000.00 |
| **Total Fixed Assets** | 2,000,000.00 |
| **TOTAL ASSETS** | 2,137,664.00 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Other Current Liabilities** | |
| Zions Bank | 1,600,000.00 |
| **Total Other Current Liabilities** | 1,600,000.00 |
| **Total Current Liabilities** | 1,600,000.00 |
| **Total Liabilities** | 1,600,000.00 |
| **Equity** | |
| Equity | 400,000.00 |
| Net Income | 137,664.00 |
| **Total Equity** | 537,664.00 |
| **TOTAL LIABILITIES & EQUITY** | 2,137,664.00 |

LAM00073858
112

## SC Project Management LLC
## Balance Sheet
### As of October 30, 2012

|  | Oct 30, 12 |
|---|---|
| **ASSETS** |  |
| **Current Assets** |  |
| **Checking/Savings** |  |
| Checking Account | 146,550.00 |
| **Total Checking/Savings** | 146,550.00 |
| **Total Current Assets** | 146,550.00 |
| **Fixed Assets** |  |
| Building - 1906 El Camino Real | 7,200,000.00 |
| **Total Fixed Assets** | 7,200,000.00 |
| **TOTAL ASSETS** | 7,346,550.00 |
| **LIABILITIES & EQUITY** |  |
| **Liabilities** |  |
| **Current Liabilities** |  |
| **Other Current Liabilities** |  |
| Bank SinoPac | 2,753,000.00 |
| **Total Other Current Liabilities** | 2,753,000.00 |
| **Total Current Liabilities** | 2,753,000.00 |
| **Total Liabilities** | 2,753,000.00 |
| **Equity** |  |
| Equity | 4,447,000.00 |
| Net Income | 146,550.00 |
| **Total Equity** | 4,593,550.00 |
| **TOTAL LIABILITIES & EQUITY** | 7,346,550.00 |

LAM00073859

## Sunshine Fields LLC
## Balance Sheet
### As of October 30, 2012

|  | Oct 30, 12 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Checking Account | 24,690.00 |
| **Total Checking/Savings** | 24,690.00 |
| **Total Current Assets** | 24,890.00 |
| **Fixed Assets** | |
| Building- 1916 Los Padres | 475,000.00 |
| Building-502 W Bonita Ave | 1,600,000.00 |
| **Total Fixed Assets** | 2,075,000.00 |
| **TOTAL ASSETS** | 2,099,890.00 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Other Current Liabilities** | |
| Green Tree-1916 | 440,000.00 |
| **Total Other Current Liabilities** | 440,000.00 |
| **Total Current Liabilities** | 440,000.00 |
| **Total Liabilities** | 440,000.00 |
| **Equity** | |
| Equity | 1,635,000.00 |
| Net Income | 24,890.00 |
| **Total Equity** | 1,659,890.00 |
| **TOTAL LIABILITIES & EQUITY** | 2,099,890.00 |

LAM00073860
114

# S.K.Living Trust
# Balance Sheet
## As of October 30, 2012

|  | Oct 30, 12 |
|---|---|
| **ASSETS** |  |
| **Current Assets** |  |
| **Checking/Savings** |  |
| Checking | 24,816.00 |
| **Total Checking/Savings** | 24,816.00 |
| **Total Current Assets** | 24,816.00 |
| **Fixed Assets** |  |
| 1008 Torrey Pine | 330,000.00 |
| **Total Fixed Assets** | 330,000.00 |
| **TOTAL ASSETS** | 354,816.00 |
| **LIABILITIES & EQUITY** |  |
| **Liabilities** |  |
| **Current Liabilities** |  |
| **Other Current Liabilities** |  |
| Ocwen | 330,000.00 |
| **Total Other Current Liabilities** | 330,000.00 |
| **Total Current Liabilities** | 330,000.00 |
| **Total Liabilities** | 330,000.00 |
| **Equity** |  |
| Net Income | 24,816.00 |
| **Total Equity** | 24,816.00 |
| **TOTAL LIABILITIES & EQUITY** | 354,816.00 |

LAM00073861

## Schedule E - Other Assets

Include retirement funds (for example, 401K, IRA, Keogh), accounts receivable, merchandise and inventory at lower of cost or market value, machinery and equipment (less depreciation), and life insurance at its cash surrender value.

| Description | Basis for Valuation | Current Value |
|---|---|---|
| New York Life Insurance | Cash surrender value | $ 120,000 |
| Simple IRA | IRA Statement | 30,000 |
| Cadillac Escalade | Kelly Blue Book | 50,000 |
| | | |
| | | |
| | | |
| TOTAL | | $ 200,000 |

12

LAM00073862
116

## Schedule F — Notes Payable and Other Loans

Indicate all loans or notes payable, including loans on life insurance and retirement funds (but not real estate mortgages listed in Schedule C). Loan origination information must include the original date, loan amount, and co-makers, if any, and their percent obligation. Small obligations may be aggregated and shown as "other," provided that they account for no more than 20 percent of other loans and notes payable. Indicate any debt that is contractually delinquent by an asterisk next to the current balance.

| Name and Address of Creditor and Loan Origination Information | Description and Value of Collateral | Maturity Date | Current Balance |
|---|---|---|---|
| | | | $ |
| | | | |
| | | | |
| | | | |
| TOTAL | | | $ |

## Schedule G - Other Liabilities

Include interest and taxes due and unpaid, other debts accrued, and other liabilities.

| Payable To | Description | Maturity Date | Current Balance |
|---|---|---|---|
| | | | $ |
| | | | |
| | | | |
| | | | |
| TOTAL | | | $ |

13

## Cash Flow Statement*

| Sources of Cash | 20___ 10 | 20___ 11 | Projected Current Year 20___ 12 | Projected Next Year 20___ 13 |
|---|---|---|---|---|
| Salaries, wages, commissions, and other employment income | $ 65,000 | $ 111,500 | $ 200,000 | $ 240,000 |
| Rents, royalties, and investments | 38,000 | 51,310 | 60,000 | 65,000 |
| Income from dividends and interest | 2,000 | 3,000 | 5,000 | 7,000 |
| Income and other distributions from partnerships | 110,000 | 150,000 | 180,000 | 205,000 |
| Other sources** | | | | |
| Total cash received | 215,000 | 315,810 | 445,000 | 517,000 |
| **Uses of Cash** | | | | |
| Personal living expenses (rent, household) | 60,000 | 60,000 | 72,000 | 80,000 |
| Fixed obligations*** | | | | |
| Income taxes | 15,000 | 25,000 | 60,000 | 75,000 |
| Capital contributions to partnerships | | | | |
| Other uses** | 50,000 | 75,000 | 75,000 | 85,000 |
| Total cash outlay | 125,000 | 160,000 | 207,000 | 240,000 |
| NET CASH FLOW (deficit) | $ 90,000 | $ 155,810 | $ 238,000 | $ 277,000 |

\* Discuss any significant changes on a separate page.
\*\* Itemize on a separate page any items amounting to 10 percent or more of total cash received or total cash outlay.
\*\*\* Fixed obligations include debt service on all loans and any budgeted capital improvement expenditures for real estate investments. Any loan proceeds or debt service related to this transaction should be included in projections for other sources or uses.

14

LAM00073864
118

## Privacy Act Notice

The solicitation and collection of this information, including a Social Security Number, is authorized by those statutes that require an appropriate federal banking agency to determine the competence, experience, integrity, and financial ability of individuals proposing to serve a federally regulated financial institution in an official capacity – that is, as a director, officer, employee, or principal shareholder. These statutes include: 12 U.S.C. § 27 (national bank charters); 12 U.S.C. § 1464 (federal savings bank charters); 12 U.S.C. § 1815 (federal deposit insurance); 12 U.S.C. § 1817(j) (changes in control of insured depository institutions); and 12 U.S.C. § 1831(i) (agency disapproval of directors and senior executive officers of insured depository institutions or depository institution holding companies). The provision of requested information, including a Social Security Number, is voluntary. However, the failure to provide any requested information may result in denial, disapproval, or delay in the processing of an application or notice.

Depending on the manner in which an appropriate federal banking agency maintains solicited information, some or all of that information may be subject to the Privacy Act of 1974, 5 U.S.C. § 552a. In such instances, disclosures of covered information may be made to: (1) third parties to complete background checks; (2) financial institutions for supervisory purposes; (3) governmental, tribal, self-regulatory, or professional organizations when information is relevant to either a known or suspected violation of law or licensing standard or relevant and necessary to the governmental or self-regulatory organization's regulation or supervision of financial service providers; (4) the Department of Justice, a court, an adjudicative body, a party in litigation, or a witness when relevant and necessary to a legal or administrative proceeding; (5) congressional offices when the information is relevant to an inquiry initiated on behalf of its provider; (6) an agency's contractors or agents; and (7) other third parties when mandated or authorized by statute.

Additionally, while certain of the solicited information is exempt from disclosure under the Freedom of Information Act because disclosure would constitute a clearly unwarranted invasion of personal privacy, other information is not exempt. Nonexempt information will ordinarily include the names of individuals, the financial institutions that they propose to serve, the statutory context in which information has been provided, and prior bank-related employment and affiliation.

## CERTIFICATION

*If a joint financial statement is being submitted, both parties should complete the "Certification."*

I understand that the appropriate regulatory agency may conduct extensive checks into my background, experience, and related matters in conjunction with my application or filing. I certify that the information contained in the biographical report and financial report, including all attachments, has been carefully examined by me and is true, correct, and complete. I acknowledge that any misrepresentation or omission of a material fact constitutes fraud in the inducement and may subject me to legal sanctions provided by 18 U.S.C. §§ 1001 and 1007.

Signed this 16th day of Octo, 2012.

| | |
|---|---|
| Signature Signature* | |
| Lucy Gao | – |
| Print or type name | Print or Type name |
| Title (if applicable) | Title (if applicable) |

15

# EXHIBIT  H

## Interagency Biographical and Financial Report—Continued

i. Telephone and fax numbers where you may be reached during business hours and e-mail address

| (626) 214-2154 | (626) 214-2143 | lucy@libertycmc.com |
|---|---|---|
| (Area Code) Telephone Number, including Country Code if outside U.S. | Fax Number | E-mail Address |

j. List other names you used and the period of time you used them (for example, your maiden name, name by a former marriage, former name, alias, or nickname). If the other name is your maiden name, put "nee" in front of it.

Lucy Fei Gao - Present

2. Employment Record

a. List employment in reverse chronological order for the last five years. The list should include the beginning and ending dates of employment, the employer's name and location (city, state), nature of business, title or position, nature of duties, and reason for leaving.

| Dates | Company | Location | Nature | Position/Duties |
|---|---|---|---|---|
| 11/11 - Present | Liberty CMC Corporation | West Covina, CA | Portfolio Mgmt | President/Daily Operation |
| 03/07 - 11/11 | Liberty Asset Management Corp | West Covina, CA | Portfolio Mgmt | President/Daily Operation |
| 04/03 - 03/07** | AMBC Mortgage Corp | West Covina, CA | Mortgage Broker | President/Daily Operation |

**Resigned with AMBC Mortgage to establish and run my own business Liberty Asset Management.

b. Have you ever been dismissed or asked to resign from any past employment, including a less than honorable discharge from military service?  ☐ Yes  ☒ No

If "yes," provide the employer's name, address, and telephone number; title or position; date of discharge; and explanation.

3. Education and Professional Credentials

a. List each diploma or degree from high schools, colleges, universities, or other schools.

| School Name | Location | From | To | Degree |
|---|---|---|---|---|
| Yunnan University | China | 01/1982 | 06/1984 | B.S. |
| Central TV University | China | 11/1978 | 12/1981 | A.S. |
| High School | China | 09/1974 | 10/1978 | High School Diploma |

b. List each professional license or similar certificate you now hold or have held (for example Attorney, Physician, CPA, NASD, or SEC registration).

| License | Issuing Authority | Date Issued | Status | Expiration |
|---|---|---|---|---|
| Salesperson | CA Department of Real Estate | 12/08/1981 | Expired | 02/17/2011 |
| Notary Public | California Secretary of State | 01/01/1991 | Expired | 01/01/2011 |

LAM00064554

## Interagency Biographical and Financial Report—Continued

4. Business and Banking Affiliations

a. List any company with which you are associated, providing the company name, location, nature or type of business, position held or relationship to the company, ownership percentage, and beginning date of the relationship.

| Business Entity | Location | Type | Position | Interest | Start Date |
|---|---|---|---|---|---|
| JSK 23 LLC | Walnut CA | Real Estate | Member | 90% | 09/2008 |
| Sunshine Fields LLC | Walnut CA | Real Estate | Member | 90% | 06/2009 |
| Golden Fields REO Management LLC | Walnut CA | Real Estate | Member | 100% | 03/2010 |
| Crystal Waterfalls LLC | West Covina CA | Real Estate | Member | 50% | 07/2011 |

b. List the name of any depository institution or depository institution holding company with which you are or were associated.Also list the location, nature of banking activity, position held or relationship, ownership percentage, and beginning and ending dates of the relationship.

c. Are you in the process of being considered for a senior executive officer or director position at another depository institution or depository institution holding company?  ☐ Yes  ☒ No

If "yes," provide the name of the depository institution or depository institution holding company and the position. If the application has been submitted for regulatory review, provide the name of the regulatory agency.

d. Are you now or are you proposed to be a "management official" of another insured depository institution or depository institution holding company?  ☐ Yes  ☒ No

If "yes," explain either why the potential interlock is not a violation of the Depository Institution Management Interlocks Act (12 USC §§ 3201-3208) or what action will be taken to prevent a violation.

5. Legal and Related Matters

a. Have you been involved in any of the following filings where the filing was denied, disapproved, withdrawn, or otherwise returned without favorable action by a federal or state regulatory authority or a self-regulatory organization:

1. A charter or license application, a depository institution holding company application, or a federal deposit insurance application, in which you were listed as an organizer, director, senior executive officer, or a person that would own or control (either individually or as a member of a group) 10 percent or more of any class of voting securities or other voting equity interest of the institution, or similar position?  ☐ Yes  ☒ No

2. A merger application in which you were listed as a director, senior executive officer, or similar position?  ☐ Yes  ☒ No

3. A notice of change in director or senior executive officer, or similar form, in which you were listed as a director, senior executive officer, or similar position?  ☐ Yes  ☒ No

## Interagency Biographical and Financial Report—Continued

4. A notice of change in control for a depository institution or other company, or a similar form, in which you were listed (either individually or as a member of a group) as an acquirer or transferee? ☐ Yes ☒ No

5. Any other application, notice, or other regulatory or administrative request which was filed with a federal or state regulatory authority or a self-regulatory organization in which you were listed in some capacity? ☐ Yes ☒ No

b. Have you or any depository institution or depository institution holding company with which you are or were associated been subject to any supervisory agreement, enforcement action, civil money penalty, prohibition or removal order, or other supervisory or administrative action taken or imposed by any federal or state regulatory authority or other governmental entity? ☐ Yes ☒ No

c. Has any depository institution with which you are or were associated:

1. Been placed into conservatorship or receivership or otherwise failed? ☐ Yes ☒ No

2. Received financial assistance from a federal agency or instrumentality (for example, FDIC, Resolution Trust Corporation, Federal Savings and Loan Insurance Corporation)? ☐ Yes ☒ No

3. Merged with or been acquired by an institution that received financial assistance from a federal agency or instrumentality in connection with the transaction? ☐ Yes ☒ No

d. Have you or any company with which you are or were associated:

1. Filed a petition under any chapter of the Bankruptcy Code or had an involuntary bankruptcy petition filed against you or the company? ☐ Yes ☒ No

2. Defaulted on a loan or financial obligation of any sort, whether as obligor, cosigner, or guarantor? ☐ Yes ☒ No

3. Forfeited property in full or partial satisfaction of any financial obligation? ☐ Yes ☒ No

4. Had a lien placed against property for failure to pay taxes or other debts? ☐ Yes ☒ No

5. Had wages or income garnished for any reason? ☐ Yes ☒ No

6. Failed or refused to pay any outstanding judgments? ☐ Yes ☒ No

e. Have you or any company or depository institution with which you are or were associated been involved in any lawsuit, formal or informal investigation, examination, or administrative proceeding that may result in, or resulted in, any penalty (including, but not limited to, any sanction, fine, order to pay damages, loss of right or benefit, forfeiture of property interest, or revocation of license), agreement, undertaking, consent, judgment, or order imposed by or entered into with any of the following entities:

1. Any federal or state court? ☐ Yes ☒ No

2. Any department, agency, or commission of the United States government? ☐ Yes ☒ No

3. Any state, municipal, or foreign governmental entity? ☐ Yes ☒ No

4. Any self-regulatory organization (for example, NASD, FASB, state bar)? ☐ Yes ☒ No

f. Have you or any company or depository institution with which you are or were associated been arrested for, charged with, indicted for, or convicted of (including a conviction where the record was expunged), or ever pleaded nolo contendere to, any criminal matter (other than minor traffic violations)? ☐ Yes ☒ No

LAM00064556

## Interagency Biographical and Financial Report—Continued

g. If you answer "yes" to any question in 5(a) through 5(f), provide your explanation by identifying the number of the question, describing the situation in detail, and, where relevant, including the:

- Name and location of any institution, company, party, court, regulatory agency, or self-regulatory organization involved.
- Nature of your association with any institution or company (for example, officer, director, organizer, principal shareholder, or owner).
- Type of any application, notice, or other regulatory or administrative request.
- Nature of any supervisory, enforcement, or administrative action.
- Direct and indirect debt terms, defaulted amount, and creditor regarding any financial obligation.
- Date of any relevant event.
- Nature of any lawsuit, charge, or proceeding.
- Jurisdiction in which any legal proceeding occurred.
- Resolution or disposition of the matter.

6. Additional Information

Present any other information you believe is important to evaluate your filing. If you are involved in the organization of a new depository institution or depository institution holding company, discuss your specific role.

# Interagency Biographical and Financial Report—Continued

## Financial Report

Financial Statement as of April 30 , 2012

| Assets | | Liabilities and Net Worth | |
|---|---|---|---|
| Cash on hand and in depository institutions | $ 300,000  4,100,000 | Accounts payable | $ 40,000 |
| Marketable securities (Schedule A) | | Notes payable and other loans (Schedule F) | 7,000,000 |
| Notes receivable (Schedule B) | 1,668,658 | Real estate mortgages (Schedule C) | 350,000 |
| Real estate (Schedule C) | 15,500,000 | Other liabilities (Schedule G) | |
| Proprietary interests and other securities (Schedule D) | 3,608,345 | TOTAL LIABILITIES | 7,390,000 |
| | | Net worth (Total assets less total liabilities) | 13,887,003 |
| Retirement funds and other assets (Schedule E) | 200,000 | | |
| TOTAL ASSETS | $ 21,277,003 | TOTAL LIABILITIES AND NET WORTH | $ 21,277,003 |

## Contingent Liabilities

In addition to the liabilities listed on the Financial Statement, have you endorsed, guaranteed, or become otherwise indirectly or contingently liable for the debts of others or through a pending lawsuit?

☐ Yes  ☒ No

If "yes," complete the following:

| Name and Address of Debtor or Obligor | Name and Address of Creditor or Obligee | Description and Value of Collateral | Date Due | Current Amount |
|---|---|---|---|---|
| | | | | $ |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| TOTAL | | | | $0 |

LAM00064558

## Interagency Biographical and Financial Report—Continued

## Supporting Schedules

Schedules must agree in total with the appropriate item contained in the Financial Statement on page 8 of this report.

### Schedule A — Marketable Securities

Indicate all debt and equity securities listed on an exchange or otherwise regularly traded in an open market. Separate debt and equity securities. Securities of closely held corporations should be listed on Schedule D—Proprietary Interests. The description should include the name of the issuer, the principal amount or number of shares held, and the interest rate, if applicable. Small holdings may be aggregated and shown as "other" provided that they account for no more than 10 percent of marketable securities.

| Description | Market Value |
|---|---|
|  | $ |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| TOTAL | $ |

### Schedule B — Notes Receivable

The description should include the name of the obligor, the note's maturity and terms of repayment, and a description of any collateral. If the note is payable to you and others jointly, indicate only your beneficial interest under Current Balance.

| Description | Current Balance |
|---|---|
| 13044 Amar Rd Baldwin Park CA | $ 392,159 |
| 26841 Calle Hermosa Capistrano Beach, CA | 1,276,499 |
|  |  |
|  |  |
|  |  |
|  |  |
| TOTAL | $ 1,668,658 |

LAM00064559

## Interagency Biographical and Financial Report—Continued

### Schedule C — Real Estate and Related Loans

List all real estate in which you hold a beneficial interest. Submit year-end financial statements, including profit and loss statements, for the last two years for each investment (exclude residence) in which you have an interest equal to 10 percent or more of your net worth. Also submit a cash flow statement on any investment property valued at 10 percent or more of net worth.

| Description and Location (City and State) | Owner of Property | Percent Owner- ship | Mortgage Holder | Maturity Date | Current Market Value[1] | Current Balance[2] |
|---|---|---|---|---|---|---|
| 200 Bushnell Avenue, Alhambra | Lucy Gao | 100% | N/A | | 700,000 | 350,000 |
| 1211 E. Garvey Avenue, West Covina | Lucy Gao | 50% | First Comm. Bk | | 14,800,000 | 7,000,000 |
| | | 0% | | | | |
| | | 0% | | | | |
| | | 0% | | | | |
| TOTAL | | | | | $ 15,500,000 | $ 7,350,000 |

1. Carry TOTAL forward to Assets - Real estate
2. Carry TOTAL forward to Liabilities - Real estate mortgages

### Schedule D — Proprietary Interests and Other Securities

List all companies, the shares of which are not listed on a securities exchange or otherwise regularly traded, in which you hold a beneficial interest. (*Submit year-end financial statements, including profit and loss and cash flow statements, for the last two years for each business interest in which you have an interest equal to 10 percent or more of your net worth.*)

| Name and Address of Company | Legal Form of Company | Nature of Business | Percent Ownership | Current Value |
|---|---|---|---|---|
| Liberty Asset Management Corporation 3218 E Holt Avenue Suite 101 West Covina | Corporation | Portfolio Management | 20% | $ 250,000 |
| JSK 23 LLC 20687-2 Amar Rd # 835 Walnut CA | Limited Liability Company | Real Estate Holding | 90% | 1,718,033 |
| Sunshine Fields LLC 20687-2 Amar Rd # 835 Walnut CA | Limited Liability Company | Real Estate Holding | 90% | 1,640,312 |
| | | | 0% | |
| TOTAL | | | | $ 3,608,345 |

LAM00064560

# Interagency Biographical and Financial Report—Continued

## Schedule E — Other Assets

Include retirement funds (for example, 401K, IRA, Keogh), accounts receivable, merchandise and inventory at lower of cost or market value, machinery and equipment (less depreciation), and life insurance at its cash surrender value.

| Description | Basis for Valuation | Current Value |
|---|---|---|
| New York Life Insurance | Cash surrender value | $ 120,000 |
| Simple IRA | IRA statement | 30,000 |
| Cadillac Escalade | Kelly Blue Book | 50,000 |
| | | |
| | | |
| TOTAL | | $ 200,000 |

## Interagency Biographical and Financial Report—Continued

### Schedule F — Notes Payable and Other Loans

Indicate all loans or notes payable, including loans on life insurance and retirement funds (but not real estate mortgages listed in Schedule C). Loan origination information must include the original date, loan amount, and co-makers, if any, and their percent obligation. Small obligations may be aggregated and shown as "other," provided that they account for no more than 20 percent of other loans and notes payable. Indicate any debt that is contractually delinquent by an asterisk next to the current balance.

| Name and Address of Creditor and Loan Origination Information | Description and Value of Collateral | Maturity Date | Current Balance |
|---|---|---|---|
| First Commercial Bank | $14,800,000 | 09/13/2016 | $ 7,000,000 |
| | | | |
| | | | |
| | | | |
| TOTAL | | | $ 7,000,000 |

### Schedule G — Other Liabilities

Include interest and taxes due and unpaid, other debts accrued, and other liabilities.

| Payable To | Description | Maturity Date | Current Balance |
|---|---|---|---|
| | | | $ |
| | | | |
| | | | |
| | | | |
| TOTAL | | | $ |

LAM00064562

# Interagency Biographical and Financial Report—Continued

## Cash Flow Statement[1]

| Sources of Cash | 20 10 | 20 11 | Projected Current Year 20 12 | Projected Next Year 20 13 |
|---|---|---|---|---|
| Salaries, wages, commissions, and other employment income | $ 65,000 | $ 111,500 | $ 156,000 | $200,000 |
| Rents, royalties, and investments | 38,000 | 51,310 | 60,000 | 65,000 |
| Income from dividends and interest | 2,000 | 3,000 | 5,000 | 7,000 |
| Income and other distributions from partnerships | 110,000 | 150,000 | 180,000 | 205,000 |
| Other sources[2] | | | 352,500 | |
| Total cash received | 215,000 | 281,810 | 352,500 | 402,875 |
| **Uses of Cash** | | | | |
| Personal living expenses (rent, household) | 60,000 | 60,000 | 72,000 | 80,000 |
| Fixed obligations[1] | | | | |
| Income taxes | 15,000 | 25,000 | 60,000 | 80,000 |
| Capital contributions to partnerships | | | | |
| Other uses[2] | 50,000 | 75,000 | 75,000 | 10,000 |
| Total cash outlay | 125,000 | 160,000 | 177,000 | 200,000 |
| NET CASH FLOW (def cit) | $ | $ | $ | $ |

1. Discuss any signif cant changes on a separate page.
2. Itemize on a separate page any items amounting to 10 percent or more of total cash received or total cash outlay.
3. Fixed obligations include debt service on all loans and any budgeted capital improvement expenditures for real estate investments. Any loan proceeds or debt service related to this transaction should be included in projections for other sources or uses.

LAM00064563

## Privacy Act Notice

The solicitation and collection of this information, including a Social Security Number, is authorized by those statutes that require an appropriate federal banking agency to determine the competence, experience, integrity, and financial ability of individuals proposing to serve a federally regulated financial institution in an official capacity — that is, as a director, officer, employee, or principal shareholder. These statutes include: 12 U.S.C. § 27 (national bank charters); 12 U.S.C. § 1464 (federal savings bank charters); 12 U.S.C. § 1815 (federal deposit insurance); 12 U.S.C. § 1817(j) (changes in control of insured depository institutions); and 12 U.S C. § 1831(i) (agency disapproval of directors and senior executive officers of insured depository institutions or depository institution holding companies). The provision of requested information, including a Social Security Number, is voluntary. However, the failure to provide any requested information may result in denial, disapproval, or delay in the processing of an application or notice.

Depending on the manner in which an appropriate federal banking agency maintains solicited information, some or all of that information may be subject to the Privacy Act of 1974, 5 U.S.C. § 552a. In such instances, disclosures of covered information may be made to: (1) third parties to complete background checks; (2) financial institutions for supervisory purposes; (3) governmental, tribal, self-regulatory, or professional organizations when information is relevant to either a known or suspected violation of law or licensing standard or relevant and necessary to the governmental or self-regulatory organization's regulation or supervision of financial service providers; (4) the Department of Justice, a court, an adjudicative body, a party in litigation, or a witness when relevant and necessary to a legal or administrative proceeding, (5) congressional offices when the information is relevant to an inquiry initiated on behalf of its provider; (6) an agency's contractors or agents, and (7) other third parties when mandated or authorized by statute.

Additionally, while certain of the solicited information is exempt from disclosure under the Freedom of Information Act because disclosure would constitute a clearly unwarranted invasion of personal privacy, other information is not exempt. Nonexempt information will ordinarily include the names of individuals, the financial institutions that they propose to serve, the statutory context in which information has been provided, and prior bank-related employment and affiliation.

## Certification

I understand that the appropriate regulatory agency may conduct extensive checks into my background, experience, and related matters in conjunction with my application or filing.

I certify that the information contained in the biographical report and financial report, including all attachments, has been carefully examined by me and is true, correct, and complete. I acknowledge that any misrepresentation or omission of a material fact constitutes fraud in the inducement and may subject me to legal sanctions provided by 18 USC §§ 1001 and 1007.



Signed this ___ 22 ___ day of ___ May ___, 2012

Signature

Print or type name

Title (if applicable)

Signature[1]

Print or type name

Title (if applicable)

---

1. If a joint financial statement is being submitted, both parties should complete the "Certification."

LAM00000064564

# EXHIBIT I

**Subject:** Fwd: Wire Instructions FMM and Dean

**From:** Lucy Gao (lucy@libertycmc.com)

**To:** margaretchiu@sbcglobal.net;

**Date:** Friday, June 21, 2013 12:30 PM

Hi Margaret

Please see below wire instructions . Let me know if you need anything else. The breakdown is 4,500,000 to Foundation Member account for 9.9% of Company and 500,000 for 1.1% of company to Dean JP account

Thanks

*Wire Instructions for FMM*

| | |
|---|---|
| Title of account | Foundation Managing Member LLC |
| Address on Account: | 100 West Putnam Ave 3rd Fl Greenwich, CT 06830 |
| Account number: | 877200410 |
| Routing Number: | 021 000 021 |
| Name of Bank: | JP Morgan Chase Bank NA |
| Address: | 270 Park Avenue, NY, NY 10021 |

*Wire Instructions for Dean*

| | |
|---|---|
| Title of account | Dean Barr and Alison Alexander Barr |
| Address on Account: | 15 Cedarwood Drive Greenwich, CT 06830 |
| Account number: | 746008314865 |
| Routing Number: | 021 000 021 |
| Name of Bank: | JP Morgan Chase Bank NA |
| Address: | 270 Park Avenue, NY, NY 10021 |

--
Thank you,
Lucy Gao
Liberty Capital Management Corporation
3218 E. Holt Avenue
West Covina, CA 91791

P: (626)214-2154
F: (626)214-9057

# EXHIBIT  J



# First American Title Company

655 North Central Avenue, Suite 110 • Glendale, CA 91203

Office Phone:(818)242-5800   Office Fax:

## Borrower's Estimated Settlement Statement

| | |
|---|---|
| **Property:** 166 Geary Street # 300, San Francisco, CA 94108 Lot: 10 | **File No:** LGL-4444479 **Officer:** Eugene Kim/EK **Estimated Settlement Date:** 09/05/2013 **Disbursement Date:** **Print Date:** 04/01/2014, 12:58 PM |

**Borrower:** HK Grace Building LLO ·
**Address:**
**Seller:**
**Address:**
**Lender:** United Security Investors
**Address:** 301 North Canon Drive, Suite 207, Beverly Hills, CA, 90210
**New Loan No.:** USF 11756

| Charge Description | Borrower | Borrower |
|---|---|---|
| **New Loan(s):** | | |
| Lender: United Security Investors | | |
| New Loan to File - United Security Investors | | 4,000,000.00 |
| Interest on new loan  04/01/14 to 04/30/14  @$1444.444444/day  - United Security Investors | 41,888.89 | |
| Processing Fee  - United Security Investors | 1,495.00 | |
| Origination Charge - United Security Investors | 120,000.00 | |
| Assignment Fee  - United Security Investors | 105.00 | |
| Loan Docs  - United Security Investors | 4,500.00 | |
| | | |
| **Title/Escrow Charges to:** | | |
| Escrow Fee  to First American Title Company | 1,250.00 | |
| ALTA Loan Policy Extended - 1  to First American Title Company | 3,500.00 | |
| Endorsement (Lender) 104.1  to First American Title Company | 125.00 | |
| Record Deed of Trust - 1  to First American Title Company | 120.00 | |
| | | |
| **Disbursements Paid:** | | |
| 2013-14 Property Taxes: 2nd Half Due  to San Francisco Tax Collectors Office | 148,731.24 | |
| | | |
| Cash ( From) (X To) Borrower | 3,660,284.87 | |
| | | |
| **Totals** | 4,000,000.00 | 4,000,000.00 |

**BORROWER(S):**

HK Grace Building LLC( a California limited liability company

By: Lucy Gao

Initials: _____

# EXHIBIT K



# First American Title Company

655 North Central Avenue, Suite 110 • Glendale, CA 91203

Office Phone:(818)242-5800   Office Fax:

## Seller's Estimated Settlement Statement

| | | | |
|---|---|---|---|
| Property: | 1595 East 17th Street, Santa Ana, CA 92705 Lot: 4 | File No: | LGL-4809537 |
| | | Officer: | Eugene Kim/EK |
| | | Estimated Settlement Date: | 06/05/2015 |
| | | Disbursement Date: | |
| | | Print Date: | 06/05/2015, 2:14 PM |
| Buyer: | Atlantis Corporate Property LLC | | |
| Address: | 1595 East 17th Street, Santa Ana, CA 92705 | | |
| Seller: | 1595 17th Street LLC | | |
| Address: | 3218 E. Holt Avenue #201, West Covina, CA 91791 | | |
| Lender: | First Citizens Bank & Trust | | |
| Address: | 26980 Crown Valley Parkway, Mission Viejo, CA, 92691 | | |
| New Loan No.: | | | |

| Charge Description | Seller Charge | Seller Credit |
|---|---|---|
| **Consideration:** | | |
| Total Consideration | | 1,700,000.00 |
| | | |
| **Prorations:** | | |
| 2014-15 Property Taxes: 2nd Half 06/06/15 to 07/01/15 @$9540.76/semi. | | 1,219.10 |
| | | |
| **Commission:** | | |
| Commission Paid at Settlement to LEVEL Asset Management, Inc. | 51,000.00 | |
| Commission Paid at Settlement to CBRE | 51,000.00 | |
| | | |
| **Payoff Loan(s):** | | |
| Lender: Bank Sinopac | | |
| Principal Balance  - Bank Sinopac | 1,435,318.34 | |
| | | |
| **Title/Escrow Charges to:** | | |
| Escrow Fee to First American Title Company | 1,350.00 | |
| ALTA Owners Policy Standard to First American Title Company | 1,020.00 | |
| County Documentary Transfer Tax to First American Title Company | 1,870.00 | |
| | | |
| **Disbursements Paid:** | | |
| Association Current Balance Due to Tiarra Real Estate Services, Inc | 4,420.96 | |
| Natural Hazard Disclosure Report to FANHD | 65.00 | |
| Fire Sprinkler to Orange County Fire Protection | 2,744.36 | |
| Interior Lights & Repairs to Classic Property Services | 1,025.00 | |
| Elevator Conveyance to Department of Industrial Relations | 225.00 | |
| Roof Repairs to Advanced Comfort Solutions | 427.50 | |
| Elevator Inspection to Excelator Elevator Corp. | 420.00 | |
| 2012 Invoices to Ace Management Services | 35,968.09 | |
| 2013 Invoices to Ace Management Services | 61,069.86 | |
| 2014 Invoices to Ace Management Services | 43,448.79 | |
| 2015 Invoices to Ace Management Services | 3,487.50 | |
| Roof Repair to Three D Roofing | 495.00 | |
| 2014-15 Property Taxes: 2nd Half Due to Orange County Tax Collector | 9,540.76 | |
| 2014-15 Property Taxes: 2nd Half Penalty to Orange County Tax Collector | 977.07 | |
| 2013-14 Defaulted Tax Lien to Orange County Tax Collector | 24,748.84 | |
| | | |
| | | |
| **Totals** | 1,701,210.10 | 1,701,210.10 |

Notice -- This Estimated Settlement Statement is subject to changes, corrections or additions at the time of final computation of Escrow Settlement Statement.

Initials: _____

Continued From Page 1

## *Seller's Estimated Settlement Statement*

**Settlement Date:**
**Print Date:**        08/05/2015

**File No:**    LGL-4809537
**Officer:**    Eugene Kim/EK

SELLER(S):

1595 17th Street LLC, a California limited
liability company

By: Lucy Gao

140

# EXHIBIT L

## OPERATING AGREEMENT
## OF
## HK GRACE BUILDING LLC

This Operating Agreement ("Agreement") of HK Grace Building LLC (the "Company") effective as of this 8th day of December, 2011, by, between and among the undersigned confirms our understanding as to the matters contained herein.

The parties hereto agree as follows:

### ARTICLE 1

### Definitions

SECTION 1.1. As used herein, the following terms and phrases shall have the meanings indicated:

A.      "Act" shall mean the Limited Liability Company Act of the State of organization, as amended.

B.      "Capital Account" shall mean, with respect to each Member, the account established for each Member pursuant to Section 6.5, which will initially equal the Capital Contributions of such Member and will be (a) increased by the amount of Net Profits allocated to such Member and (b) reduced by the amount of Net Losses allocated to such Member and the amount of Cash Flow distributed to such Member. Members' Capital Accounts shall be determined and maintained in accordance with the rules and paragraph (b)(2)(iv) of Regulation Section 1.704-1 of the Code.

C.      "Capital Contributions" shall mean the fair market value of the amounts contributed by the Members pursuant to Section 6.1.

D.      "Cash Flow" shall have the meaning provided in Section 7.1.

E.      "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent revenue laws.

F.      "Operating Manager" shall mean the Member or Members selected by the Members in accordance with this Agreement to serve as Operating Manger or Operating Managers of the Company.

G.      "Members" shall mean the persons designated as such in Schedule A of this Agreement, any successor(s) to their interests as such in the Company; and any other person who pursuant to this Agreement shall become a Member, and any reference to a "Member" shall be to any one of the then Members.

H.      "Net Profits" and "Net Losses" shall mean the net profit or net loss, respectively, of the Company determined in accordance with Section 8.1.

I.      The words "Membership Interest" shall mean a Member's interest in the Company which shall be in the proportion that the Member's share of the profits and losses of the Company bears to the aggregate shares of all the Members. A Membership Interest may be evidenced by a certificate issued by the Company. A Membership Interest may be expressed on a certificate as "Units" where a Member's Units bears the same relationship to the aggregate Units of all Members that the Member's Membership Interest bears to the aggregate Membership Interests of all Members. A Member's Interest may be a certified security or an uncertificated security within the meaning of section 8-102 of the Uniform Commercial Code if the requirements of section 8-103(c) are met, and if the requirements are not met such interest shall, for purposes of the Uniform Commercial Code, be deemed to be a general intangible asset.

J.      "Company" shall mean this Limited Liability Company.

K. "Person" shall mean any natural person, corporation, partnership, joint venture, association, limited liability company or other business or legal entity.

## ARTICLE II

### Organization of the Company

SECTION 2.1. The purpose of the Company is to conduct an lawful business for which limited liability companies may be organized and to do all things necessary or useful in connection with the foregoing.

SECTION 2.2. The Company name shall be "HK Grace Building LLC".

SECTION 2.3. The Members shall be Members in the Company and shall continue to do business under the name of the Company until the Operating Managers shall change the name or the Company shall terminate.

SECTION 2.4. The principal address of the Company shall be such place or places as the Operating Mangers may determine. The Operation Managers will give notice to the Members promptly after any change in the location of the principal office of the Company.

SECTION 2.5. The Company shall terminate on the date provided in the Articles of Organization, except that the Company may terminate prior to such date as provided in this Agreement.

## ARTICLE III

### Status of Members

SECTION 3.1. No Member will be bound by, or be personally liable for the expenses, liabilities or obligations of the Company.

SECTION 3.2. No Member will be entitled to withdraw any part of his Capital Account or to receive any distributions from the Company except as expressly provided in this Agreement.

SECTION 3.3. No Member will have the right to require partition of the Company property or to compel any sale or appraisal of the Company's assets or any sale of a deceased Member's interest in the Company's assets, notwithstanding any provision of law to the contrary.

## ARTICLE IV

### Meeting of Members

SECTION 4.1. An annual meeting of Members shall be held within five (5) months after the close of the fiscal year of the Company on such date and at the time and place (either within or without the state of its organization) as shall be fixed by the Members. At the annual meeting, the Members shall elect the Operating Managers and transact such other business as may properly be brought before the meeting.

SECTION 4.2. A special meeting of Members may be called at any time by the Operating Managers and shall be called by the Operating Managers at the request in writing of that Membership Interest specified in Schedule A of the Members entitled to vote at such meeting. Any such request shall state the purpose or purposes of the proposed meeting. Business transacted at any special meeting of Members shall be confined to the purposes set forth in the notice thereof.

SECTION 4.3. Written notice of the time, place and purpose of every meeting of Members (and, if other than an annual meeting, the person or persons at whose direction the meeting is being called), shall be given by the Operating Mangers to each Member of record

entitled to vote at such meeting, not less than ten nor more than sixty days prior to the date set for the meeting. Notice shall be given either personally or by mailing said notice by first class mail to each Member at his address appearing on the record book of the Company or at such other address appearing on the record book of the Company or at such other address supplied by him in writing to the Operating Managers of the Company for the purpose of receiving notice.

A written waiver of notice setting forth the purposes of the meeting for which notice is waived, signed by the person or persons entitled to such notice, whether before or after the time of the meeting stated therein, shall be deemed equivalent to the giving of such notice. The attendance by a Member at a meeting either in person or by proxy without protesting the lack of notice thereof shall constitute a waiver of notice of such Member.

All notices given with respect to an original meeting shall extend to any and all adjournments thereof and such business as might have been transacted at the original meeting may be transacted at any adjournment thereof; no notice of any adjourned meeting need be given if an announcement of the time and place of the adjourned meeting is made at the original meeting.

SECTION 4.4. The holders of a majority in interest of the Members present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of members except as otherwise provided by statute of the Articles of Organization. If, however, a quorum shall not be present or represented at any meeting of Members, the Members entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting or originally notified. When a quorum is once present to organize a meeting, such quorum is not deemed broken by the subsequent withdrawal of any Members.

SECTION 4.5. Every Member entitled to vote at any meeting shall be entitled to vote in accordance with his membership interest in the Company held by him of record on the date fixed as the record date for said meeting and may so vote in person or by proxy. Any Company action shall be authorized by a majority in interest of the votes cast by the Members entitled to vote thereon except as may otherwise be provided by statute, the Articles of Organization or this Operating Agreement.

SECTION 4.6. Every proxy must be signed by the Member entitled to vote or by his duly authorized attorney-in-fact and shall be valid only if filed with the Operating Managers of the Company prior to the commencement of voting on the matter in regard to which said proxy is to be voted. No proxy shall be valid after the expiration of eleven months from the date of its execution unless otherwise expressly provided in the proxy. Every proxy shall be revocable at the pleasure of the person executing it except as otherwise provided by statute. Unless the proxy by its terms provides for a specific revocation date and except as otherwise provided by statute, revocation of a proxy shall not be effective unless and until such revocation is executed in writing by the Member who executed such proxy and the revocation is filed with the Operating Managers of the Company prior to the voting of the proxy.

SECTION 4.7. All meetings of Members shall be presided over by the Operating Mangers, or if not present, by a Member thereby chosen by the Members at the meeting. The Operating Managers or the person presiding at the meeting shall appoint any person present to act as secretary of the meeting.

SECTION 4.8. For the purpose of determining the Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof or to express consent or dissent from any proposal without a meeting, or for the purpose of determining the Members entitled to receive payment of any distribution of Cash Flow or the allotment of any rights, or for the purpose of any other action, the Members may fix, in advance, a date as the record date for any such determination of Members. Such date shall not be more than fifty nor less than ten days before the date of any meeting nor more than fifty days prior to any action taken without a meeting, the payment of any distribution of Cash Flow or the allotment of any rights, or any

other action. When a determination of Members of record entitled to notice of, or to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof, unless the Members fix a new record date under this Section for the adjourned date.

SECTION 4.9. The company shall be entitled to treat the holder of record of any Membership Interest as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the Act.

## ARTICLE V

### Management

SECTION 5.1. Management of the Company shall be vested in all of the Members who shall also serve as Operating Managers of the Company. The Operating Managers shall vote in proportion to their Membership Interests in the Company. Except as otherwise provided in this Agreement, all decisions of the Operating Managers shall be by a majority in interest of the Members. All Operating Mangers must be Members of the Company. No Member will take part in or interfere in any manner with the conduct or control of business of the Company or have any right or authority to act for or bind the Company except as provided in this Agreement.

SECTION 5.2. The Operating Mangers shall hold office for the term for which elected and until a successor has been elected and qualified. A vacancy in the office of Operating Manager arising from any cause may be filled for the unexpired portion of the term by the Members.

SECTION 5.3. Any Operating Manager may resign at any time by giving written notice to the Members. Any such resignation shall take effect at the time specified therein or, if the time is not specified therein, upon the receipt thereof, irrespective of whether any such resignations shall have been accepted.

SECTION 5.4. The Company shall be managed by the Operating Managers and the conduct of the Company's business shall be controlled and conducted solely and exclusively by the Operating Managers in accordance with this Agreement. In addition to and not in limitation of any rights and powers conferred by law or other provisions of this Agreement, the Operating Managers shall have and may exercise on behalf of the Company all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company, and to maximize Company profits.

SECTION 5.5. Notwithstanding the foregoing, the Operating Managers may not make any of the management decisions stated in Schedule B without obtaining the consent of that Membership Interest stated in Schedule A.

SECTION 5.6. The Operating Manager shall service as Tax Matters Member as such term is defined in Code Section 6231 (a)(7).

SECTION 5.7. Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he, his testator or interstate, then, is or was a manager, Member, employee or agent of the Company, or then serves or has served on behalf of the Company in any capacity at the request of the Company, shall be indemnified by the Company against reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with an appeal therein, to the fullest extent permissible by the Act. Such right of indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

## ARTICLE VI

### Capital

SECTION 6.1. The Members have contributed to the Company in exchange for their membership interests.

SECTION 6.2. The fair market value and the adjusted basis of the contributing Member of any property other than cash contributed to the Company by a Member shall be set forth on Schedule A, annexed hereto.

SECTION 6.3. Except as expressly provided in this Agreement, no Member shall be required to make any additional contributions to the capital of the Company.

SECTION 6.4. No interest shall be paid on the Capital Account of any Member.

SECTION 6.5. A Capital Account shall be established for each Member on the books and records of the Company. If any assets of the Company are distributed to the Members in kind, the Capital Accounts of the Members shall be adjusted to reflect the difference between the fair market value of such assets on the date of distribution and the basis of the Company in such assets.

## ARTICLE VII

### Distributions of Cash

SECTION 7.1. The Company shall distribute to the Members from time to time all cash (regardless of the source thereof) of the Company which is not required for the operation or the reasonable working capital requirements of the Company (such cash is sometimes referred to herein as "Cash Flow"). For purposes of this Agreement all Cash Flow allocated to the Members shall be allocated among them in proportion to their respective Membership Interests.

SECTION 7.2. Distributions of Cash Flow shall be made from time to time in such manner as determined by the Operating Managers.

## ARTICLE VIII

### Profits and Losses

SECTION 8.1. The Net Profits and Net Losses of the Company shall be the net profits and net losses of the Company as determined for Federal income tax purposes.

SECTION 8.2. The Net Profits and Net Losses of the Company and each item of income, gain, loss, deduction or credit entering into the computation thereof, shall be allocated to the Members in the same proportions that they share in distributions of Cash Flow pursuant to Section 7.1, or if there is no Cash Flow, that they would have shared if there had been Cash Flow.

SECTION 8.3. References herein to "Reg. Sec.", are to the regulations promulgated by the United States Treasury to the Code. The terms "minimum gain", "minimum gain chargeback", "qualified income offset", "nonrecourse deduction" and "nonrecourse liability" are to be interpreted consistent with the definitions and use of such terms in Reg. Sec. 1.704-2 and Reg. Sec. 1.704-1. The following special allocations shall be made in the following order:

A. Except as other set forth in Reg. Sec. 1.704-2(f), if there is a net decrease in minimum gain, during the fiscal year of the Company, each Member, shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease of minimum gain determined in accordance with Reg. Sec. 1.704-2(g). Allocations in accordance with this Section shall be made first from the disposition of Company assets subject to nonrecourse liabilities, to the extent of the minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the taxable year. This Section is intended to comply with the minimum gain chargeback requirement of Reg. Sec. 1.704-2(f).

B.    Except as otherwise set forth in Reg. Sec. 1.704-2(i)(4), if there is a net decrease in a Member's nonrecourse liability minimum gain attributable to Members' nonrecourse liabilities during any fiscal year, each Member who has a share of the Member nonrecourse liability minimum gain attributable to Member nonrecourse liability shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease in Members' nonrecourse debt minimum gain attributable to such member nonrecourse debt.  Allocations pursuant to this Section shall be made first from gain recognized from the disposition of Company assets subject to Member nonrecourse liabilities to the extent of Member minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the fiscal year.  This section is intended to comply with the minimum gain chargeback requirements of Reg. Sec. 1.704-2(i).

C.    A Member who unexpectedly receives an adjustment, allocation or distribution described in (4), (5) or (6) of Reg. Sec. 1.704-1(b)(2)(ii)(d) will be allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible.  An allocation shall be made pursuant to this Section and if and to the extent a Member would have a deficit in his adjusted Capital Account after all other allocations provided for in this Section 8.3 were made as if this paragraph were not in the Agreement.

D.    Nonrecourse deductions shall be allocated among the Members in the same proportion in which they share the Cash Flow of the Company.

E.    Any nonrecourse deduction shall be allocated to any Member who bears the economic risk of loss with respect to the Member nonrecourse liability to which such deduction is attributable.

SECTION 8.4.  Any Company gain or loss realized with respect to property, other than money, contributed to the Company by a Member shall be shared among the Members pursuant to Code section 704(c) and regulations to be promulgated thereunder so as to take account of the difference between the Company basis and the fair market value of the property at the time of the contribution ("built-in gain or loss").  Such built-in gain or loss shall be allocated to the contributing Member upon the disposition of the property.

## ARTICLE IX

### Admission and Withdrawal of a Member

SECTION 9.1.  A Member may transfer his interest in the Company to another person or entity only with the prior unanimous consent of the other Members either in writing or at a meeting called for such purpose.  If all of the other Members do not approve of the transfer, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member.  The transferee shall be entitled to receive the share of profits, losses and Cash Flow or other compensation by way of income and the return of contributions to which the transferor otherwise would be entitled.

SECTION 9.2.  The Members agree to sign such additional documents as may be required in order to admit additional Members to the Company, pursuant to section 9.1 as well as, among other things, to provide for the division of profits, losses and Cash Flow among the Members.

SECTION 9.3.  All costs and expenses incurred by the Company in connection with the assignment of a Member's interest, including any filing fees and publishing costs and the fees and disbursements of counsel, shall be paid by the assigning Member.

SECTION 9.4.  Each person who becomes a Member in the Company, by becoming a Member, shall and does hereby ratify and agree to be bound by the terms and conditions of this Agreement.

## ARTICLE X

### Termination or Dissolution of Company

LAM00006730

SECTION 10.1. The Company shall be terminated prior to the date of expiration of the term provided in Section 2.5 if (a) a majority in interest of the Members consent that the Company should be terminated and dissolved, or (b) the Company is dissolved pursuant to this Agreement.

SECTION 10.2. The Company shall be terminated in the event any Member (i) withdraws, resigns or is expelled from the Company; (ii) makes an assignment for the benefit of creditors, is the subject of an order for relief under Title 11 of the United States Code, files a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding of this nature, seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator for all or any substantial part of his properties; (iii) dies; or (iv) a judgment is entered by a court of competent jurisdiction adjudicating him incompetent to manage his person or his property.

SECTION 10.3. If the Company is dissolved, the owners of a majority in interest of the remaining Members may elect to reconstitute and continue the Company as a successor Company upon the same conditions as are set forth in this Agreement. Any such election to continue the Company will not result in the creation of a new Company among the remaining Members, nor will such election require the amendment of this Agreement or the execution of an amended Agreement.

SECTION 10.4. Upon the termination and dissolution of the Company, the then Operating Manager, or Operating Managers, if any, or, if there is no Operating Manager, any person elected to perform such liquidation by the written consent of the owners of a majority in interest of the Members, shall proceed to the liquidation of the Company. The proceeds of such liquidation shall be applied and distributed as follows:

A.      If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled. The fair market value of such assets shall be determined by an independent appraiser to be selected by the Company's independent public accountants. The amount by which the fair market value of any Property to be distributed in kind to the Members exceeds or is less than the basis of such Property, shall, to the extent not otherwise recognized by the Company, be taken into account in computing Net Profits or Net Losses (and shall be allocated among the Members in accordance with Section 8.2) for purposes of crediting or charging the Capital Accounts of, and liquidating distributions to, the Members under Section 10.4.B.

B.      All distributions upon liquidation of the Company shall be distributed as follows: to each of the Members, in proportion to the amount of their respective positive Capital Accounts, as such accounts have been adjusted (i) in accordance with Section 6.5 to reflect the Net Profit or Net Loss realized or incurred upon the sale of the Company's property or assets and deemed sale pursuant to Section 10.4.A; (ii) in accordance with Section 8.2 to reflect all Net Profits or Net Losses with respect to the year of liquidation. No Member shall be liable to repay the negative amount of his Capital Account.

SECTION 10.5. Each of the Members shall be furnished with a statement, reviewed by the Company's independent public accountants, which shall set forth the assets and liabilities of the Company as of the date of the Company's liquidation. Upon completion of the liquidation, the Operating Managers shall execute and cause to be filed a Certificate of Dissolution of the Company and any and all other documents necessary with respect to termination of the Company.

## ARTICLE XI

### Books and Reports

SECTION 11.1. The Operating Mangers shall cause the Company to maintain the following records:

A.    Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Company, shall be kept by the Operating Managers at the principal office of the Company. The fiscal year of the Company shall be the calendar year. The books of account of the Company shall be kept in accordance with sound accounting practices and principles applied in a consistent manner by the Company; provided, however, that all methods of accounting and treating particular transactions shall be in accordance with the methods of accounting employed for Federal income tax purposes. All determinations by the Operating Managers with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding upon al the Members unless the determination is inconsistent with any express provision of this Agreement.

B.    A current list of the full name and last known mailing address of each Member set forth in alphabetical order together with the contribution and share in profits and losses of each Member; a copy of the Articles of Organization of the Company and any amendments thereto; a copy of the Company Operating Agreement and any amendments thereto; a copy of the Company's federal, state and local income tax returns for the three most recent fiscal years.

C.    Any member shall have the right from time to time at his expense to have his accountants and representatives examine and/or audit the books and records of the Company and the information referred to in this Section, and the Operating Managers will make such books and records and information available for such examinations and/or audits.

SECTION 11.2. No value shall be placed for any purpose upon the Company name or the right to its use, or upon the goodwill of the Company or its business. Upon termination or dissolution of the Company (without reconstitution thereof) as provided in this Agreement, neither the Company name or the right to its use, nor the goodwill of the Company, shall be considered as an asset of the Company.

SECTION 11.3. The Operating Managers will cause to be sent to the Members within a reasonable period after the close of each year the following: (a) annual statements of the Company's gross receipts and operating expenses, and the capital accounts of each Member, prepared by the Company's independent public accountants, to be transmitted to each Member; and (b) a report to be transmitted to each Member indicating the Member's share of the Company's profit or loss for that year and the Member's allocable share of all items of income, gain, loss, deduction, and credit, for Federal income tax purposes.

## ARTICLE XII

### Tax Elections

SECTION 12.1. In the event of a transfer of a Member's interest, or upon the death of a Member, or in the event of the distribution of Company property to any party hereto, the Company may (but need not necessarily) file an election, in accordance with Section 754 of the Code to cause the basis of the Company Property to be adjusted for Federal income tax purposes, as provided by Sections 734 and 743 of the Code.

## ARTICLE XIII

### Miscellaneous

SECTION 13.1. Any notice or other communication under this Agreement shall be in writing and shall be considered given when mailed by registered or certified mail, return receipt requested, to the parties at the following addresses (or at such other address as a party shall have previously specified by notice to the others as the address to which notice shall be given to him):

A. If to the Company, to it in care of the Operating Managers at the address of the Company.

B. If to the Operating Managers, to them at the address of the Company.

C. If to any Member, to him at his address set forth on the books and records of the Company.

SECTION 13.2. This Agreement contains a complete statement of all of the arrangements among the parties with respect to the Company and cannot be changed or terminated orally or in any manner other than by a written agreement executed by all of the Members. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

SECTION 13.3. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

SECTION 13.4. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations of the jurisdiction in which the Company does business. If any provision of this Agreement, or the application thereof to any person or circumstance, shall for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected, but rather shall be enforced to the extent permitted by law.

SECTION 13.5. Anything hereinbefore in this Agreement to the contrary notwithstanding, all references to the Property of the Company are deemed to include the profits, losses and Cash Flow of the Property.

SECTION 13.6. Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the State of organization of the Company applicable to agreements made and to be performed in the State of organization of the Company.

SECTION 13.7. The captions, headings and table of contents in this Agreement are solely for convenience of reference and shall not affect its interpretation.

SECTION 13.8. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall be deemed to constitute a single document.

SECTION 13.9. Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement Effective as of the day and year first above written.

Lucy Gao, Managing Member

**OPERATING AGREEMENT
OF
HK GRACE BUILDING LLC**

Percentage Interests of Members of HK Grace Building LLC as of December 8, 2011.

| Member Name | Percentage Interest |
|---|---|
| Lucy Gao | 100% |

## OPERATING AGREEMENT
## OF
## HK GRACE BUILDING LLC

Operating Managers may not make any of the following management decisions without obtaining the consent of that Membership Interest:

a. any merger, consolidation or other business combination;
b. sale or other disposition of substantially all the assets of the LLC;
c. dissolution of the LLC;
d. filing of a petition or commencing other proceedings seeking reorganization;
e. liquidation, arrangement or other similar relief under any federal or state law relating to bankruptcy or insolvency;
f. the amendment or modification of any provision of this Agreement;
g. the issuance of additional LLC Units to any Member or other person;
h. the removal of any Member;
i. the decision to appoint managers for the LLC under Article V hereof.

LAM00006735

Exhibit "C"

Articles of Organization

5

© 2007 Geraci Law Firm; All Rights Reserved.
LLC Certificate

Rev. 05/11

| | LLC-1 | File # | 2 0 1 1 3 3 2 1 0 0 0 1 |



## State of California
### Secretary of State

### Limited Liability Company
### Articles of Organization

**ENDORSED - FILED**
In the office of the Secretary of State
of the State of California

**NOV 21 2011**

A $70.00 filing fee must accompany this form.

Important – Read instructions before completing this form.

This Space For Filing Use Only

---

**Entity Name** (End the name with the words "Limited Liability Company," or the abbreviations "LLC" or "L.L.C." The words "Limited" and "Company" may be abbreviated to "Ltd." and "Co.," respectively.)

**1. NAME OF LIMITED LIABILITY COMPANY**

HK Grace Building LLC

---

**Purpose** (The following statement is required by statute and should not be altered.)

**2. THE PURPOSE OF THE LIMITED LIABILITY COMPANY IS TO ENGAGE IN ANY LAWFUL ACT OR ACTIVITY FOR WHICH A LIMITED LIABILITY COMPANY MAY BE ORGANIZED UNDER THE BEVERLY-KILLEA LIMITED LIABILITY COMPANY ACT.**

---

**Initial Agent for Service of Process** (If the agent is an individual, the agent must reside in California and both items 3 and 4 must be completed. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and item 3 must be completed (leave item 4 blank).

**3. NAME OF INITIAL AGENT FOR SERVICE OF PROCESS**

Paracorp Incorporated

---

**4. IF AN INDIVIDUAL, ADDRESS OF INITIAL AGENT FOR SERVICE OF PROCESS IN CALIFORNIA**    CITY    STATE    ZIP CODE

CA

---

**Management** (Check only one)

**5. THE LIMITED LIABILITY COMPANY WILL BE MANAGED BY:**

[✓] ONE MANAGER

[ ] MORE THAN ONE MANAGER

[ ] ALL LIMITED LIABILITY COMPANY MEMBER(S)

---

**Additional Information**

**6. ADDITIONAL INFORMATION SET FORTH ON THE ATTACHED PAGES, IF ANY, IS INCORPORATED HEREIN BY THIS REFERENCE AND MADE A PART OF THIS CERTIFICATE.**

---

**Execution**

**7. I DECLARE I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.**

11/21/2011

DATE    SIGNATURE OF ORGANIZER

Nicola Highsmith
TYPE OR PRINT NAME OF ORGANIZER

---

LLC-1 (REV 04/2010)    APPROVED BY SECRETARY OF STATE

154
LAM00006737

## THE HOUSING FINANCIAL DISCRIMINATION ACT OF 1977
## FAIR LENDING NOTICE

It is illegal to discriminate in the provision of or in the availability of financial assistance because of the consideration of:

1. Trends, characteristics or conditions in the neighborhood or geographic area surrounding a housing accommodation, unless the financial institution can demonstrate in the particular case that such consideration is required to avoid an unsafe and unsound business practice; or

2. Race, color, religion, sex, marital status, domestic partnership, national origin or ancestry. It is illegal to consider the racial, ethnic, religious or national origin composition of a neighborhood or geographic area surrounding a housing accommodation or whether or not such composition is undergoing change, or is expected to undergo change, in appraising a housing accommodation or in determining whether or not, or under what terms and conditions, to provide financial assistance.

These provisions govern financial assistance for the purpose of the purchase, construction, rehabilitation or refinancing of one- to four-unit family residences occupied by the owner and for the purpose of the home improvement of any one- to four-unit family residence.

If you have any questions about your rights, or if you wish to file a complaint, contact the management of this financial institution or the Bureau of Real Estate at one of the following locations:

2201 Broadway
P.O. Box 187000 (mailing address)
Sacramento, CA 95818-7000

1350 Front Street, Suite 3064
San Diego, CA 92101-3687

2550 Mariposa Mall, Suite 3070
Fresno, CA 93721-2273

320 W. 4th Street, Suite 350
Los Angeles, CA 90013-1105

1515 Clay Street, Suite 702
Oakland, CA 94612-1462

---

### ACKNOWLEDGMENT OF RECEIPT

HK GRACE BUILDING, LLC
a California limited liability company

By: _____          Date: 3/31/14
Name: Lucy Gao
Title: Managing Member

---

## OPERATING AGREEMENT
## OF
## STRONG WATER CAPITAL MANAGEMENT LLC

This Operating Agreement ("Agreement") of STRONG WATER CAPITAL MANAGEMENT LLC (the "Company") effective as of this 22nd day of March, 2013, by, between and among the undersigned confirms our understanding as to the matters contained herein.

The parties hereto agree as follows:

## ARTICLE 1

## Definitions

SECTION 1.1. As used herein, the following terms and phrases shall have the meanings indicated:

A.  "Act" shall mean the Limited Liability Company Act of the State of organization, as amended.

B.  "Capital Account" shall mean, with respect to each Member, the account established for each Member pursuant to Section 6.5, which will initially equal the Capital Contributions of such Member and will be (a) increased by the amount of Net Profits allocated to such Member and (b) reduced by the amount of Net Losses allocated to such Member and the amount of Cash Flow distributed to such Member. Members' Capital Accounts shall be determined and maintained in accordance with the rules and paragraph (b)(2)(iv) of Regulation Section 1.704-1 of the Code.

C.  "Capital Contributions" shall mean the fair market value of the amounts contributed by the Members pursuant to Section 6.1.

D.  "Cash Flow" shall have the meaning provided in Section 7.1.

E.  "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent revenue laws.

F.  "Operating Manager" shall mean the Member or Members selected by the Members in accordance with this Agreement to serve as Operating Manger or Operating Managers of the Company.

G.  "Members" shall mean the persons designated as such in Schedule A of this Agreement, any successor(s) to their interests as such in the Company; and any other person who pursuant to this Agreement shall become a Member, and any reference to a "Member" shall be to any one of the then Members.

H.  "Net Profits" and "Net Losses" shall mean the net profit or net loss, respectively, of the Company determined in accordance with Section 8.1.

I.  The words "Membership Interest" shall mean a Member's interest in the Company which shall be in the proportion that the Member's share of the profits and losses of the Company bears to the aggregate shares of all the Members. A Membership Interest may be evidenced by a certificate issued by the Company. A Membership Interest may be expressed on a certificate as "Units" where a Member's Units bears the same relationship to the aggregate Units of all Members that the Member's Membership Interest bears to the aggregate Membership Interests of all Members. A Member's Interest may be a certified security or an uncertificated security within the meaning of section 8-102 of the Uniform

Commercial Code if the requirements of section 8-103(c) are met, and if the requirements are not met such interest shall, for purposes of the Uniform Commercial Code, be deemed to be a general intangible asset.

J.    "Company" shall mean this Limited Liability Company.

K.    "Person" shall mean any natural person, corporation, partnership, joint venture, association, limited liability company or other business or legal entity.

## ARTICLE II

### Organization of the Company

SECTION 2.1. The purpose of the Company is to conduct an lawful business for which limited liability companies may be organized and to do all things necessary or useful in connection with the foregoing.

SECTION 2.2. The Company name shall be "STRONG WATER CAPITAL MANAGEMENT LLC".

SECTION 2.3. The Members shall be Members in the Company and shall continue to do business under the name of the Company until the Operating Managers shall change the name or the Company shall terminate.

SECTION 2.4. The principal address of the Company shall be such place or places as the Operating Mangers may determine. The Operation Managers will give notice to the Members promptly after any change in the location of the principal office of the Company.

SECTION 2.5. The Company shall terminate on the date provided in the Articles of Organization, except that the Company may terminate prior to such date as provided in this Agreement.

## ARTICLE III

### Status of Members

SECTION 3.1. No Member will be bound by, or be personally liable for the expenses, liabilities or obligations of the Company.

SECTION 3.2. No Member will be entitled to withdraw any part of his Capital Account or to receive any distributions from the Company except as expressly provided in this Agreement.

SECTION 3.3. No Member will have the right to require partition of the Company property or to compel any sale or appraisal of the Company's assets or any sale of a deceased Member's interest in the Company's assets, notwithstanding any provision of law to the contrary.

## ARTICLE IV

### Meeting of Members

SECTION 4.1. An annual meeting of Members shall be held within five (5) months after the close of the fiscal year of the Company on such date and at the time and place (either within or without the state of its organization) as shall be fixed by the Members. At the annual meeting, the Members shall elect the Operating Managers and transact such other business as may properly be brought before the meeting.

SECTION 4.2. A special meeting of Members may be called at any time by the Operating Managers and shall be called by the Operating Managers at the request in writing of that Membership interest specified in Schedule C of the Members entitled to vote at such meeting. Any such request shall state the purpose or purposes of the proposed meeting. Business transacted at any special meeting of Members shall be confined to the purposes set forth in the notice thereof.

SECTION 4.3. Written notice of the time, place and purpose of every meeting of Members (and, if other than an annual meeting, the person or persons at whose direction the meeting is being called), shall be given by the Operating Mangers to each Member of record entitled to vote at such meeting, not less than ten nor more than sixty days prior to the date set for the meeting. Notice shall be given either personally or by mailing said notice by first class mail to each Member at his address appearing on the record book of the Company or at such other address appearing on the record book of the Company or at such other address supplied by him in writing to the Operating Managers of the Company for the purpose of receiving notice.

A written waiver of notice setting forth the purposes of the meeting for which notice is waived, signed by the person or persons entitled to such notice, whether before or after the time of the meeting stated therein, shall be deemed equivalent to the giving of such notice. The attendance by a Member at a meeting either in person or by proxy without protesting the lack of notice thereof shall constitute a waiver of notice of such Member.

All notices given with respect to an original meeting shall extend to any and all adjournments thereof and such business as might have been transacted at the original meeting may be transacted at any adjournment thereof; no notice of any adjourned meeting need be given if an announcement of the time and place of the adjourned meeting is made at the original meeting.

SECTION 4.4. The holders of a majority in interest of the Members present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of members except as otherwise provided by statute of the Articles of Organization. If, however, a quorum shall not be present or represented at any meeting of Members, the Members entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting or originally notified. When a quorum is once present to organize a meeting, such quorum is not deemed broken by the subsequent withdrawal of any Members.

SECTION 4.5. Every Member entitled to vote at any meeting shall be entitled to vote in accordance with his membership interest in the Company held by him of record on the date fixed as the record date for said meeting and may so vote in person or by proxy. Any Company action shall be authorized by a majority in interest of the votes cast by the Members entitled to vote thereon except as may otherwise be provided by statute, the Articles of Organization or this Operating Agreement.

SECTION 4.6. Every proxy must be signed by the Member entitled to vote or by his duly authorized attorney-in-fact and shall be valid only if filed with the Operating Managers of the Company prior to the commencement of voting on the matter in regard to which said proxy is to be voted. No proxy shall be valid after the expiration of eleven months from the date of its execution unless otherwise expressly provided in the proxy. Every proxy shall be revocable at the pleasure of the person executing it except as otherwise provided by statute. Unless the proxy by its terms provides for a specific revocation date and except as otherwise provided by statute, revocation of a proxy shall not be effective unless and until such revocation is executed in writing by the Member who executed such proxy and the revocation is filed with the Operating Managers of the Company prior to the voting of the proxy.

SECTION 4.7. All meetings of Members shall be presided over by the Operating Mangers, or if not present, by a Member thereby chosen by the Members at the meeting. The Operating Managers or the person presiding at the meeting shall appoint any person present to act as secretary of the meeting.

SECTION 4.8. For the purpose of determining the Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof or to express consent or dissent from any proposal without a meeting, or for the purpose of determining the Members entitled to receive payment of any distribution of Cash Flow or the allotment of any rights, or for the purpose of any other action, the Members may fix, in advance, a date as the record date for any such determination of Members. Such date shall not be more than fifty nor less than ten days before the date of any meeting nor more than fifty days prior to any action taken without a meeting, the payment of any distribution of Cash Flow or the allotment of any rights, or any other action. When a determination of Members of record entitled to notice of, or to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof, unless the Members fix a new record date under this Section for the adjourned date.

SECTION 4.9. The company shall be entitled to treat the holder of record of any Membership Interest as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the Act.

## ARTICLE V

### Management

SECTION 5.1. Management of the Company shall be vested in all of the Members who shall also serve as Operating Managers of the Company. The Operating Managers shall vote in proportion to their Membership Interests in the Company. Except as otherwise provided in this Agreement, all decisions of the Operating Managers shall be by a majority in interest of the Members. All Operating Mangers must be Members of the Company. No Member will take part in or interfere in any manner with the conduct or control of business of the Company or have any right or authority to act for or bind the Company except as provided in this Agreement.

SECTION 5.2. The Operating Mangers shall hold office for the term for which elected and until a successor has been elected and qualified. A vacancy in the office of Operating Manager arising from any cause may be filled for the unexpired portion of the term by the Members.

SECTION 5.3. Any Operating Manager may resign at any time by giving written notice to the Members. Any such resignation shall take effect at the time specified therein or, if the time is not specified therein, upon the receipt thereof, irrespective of whether any such resignations shall have been accepted.

SECTION 5.4. The Company shall be managed by the Operating Managers and the conduct of the Company's business shall be controlled and conducted solely and exclusively by the Operating Managers in accordance with this Agreement. In addition to and not in limitation of any rights and powers conferred by law or other provisions of this Agreement, the Operating Managers shall have and may exercise on behalf of the Company all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company, and to maximize Company profits.

SECTION 5.5. Notwithstanding the foregoing, the Operating Managers may not make any of the management decisions stated in Schedule B without obtaining the consent of that Membership Interest stated in Schedule B.

SECTION 5.6. The Operating Manager shall service as Tax Matters Member as such term is defined in Code Section 6231 (a)(7).

SECTION 5.7. Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he, his testator or interstate, then, is or was a manager, Member, employee or agent of the Company, or then serves or has served on behalf of the Company in any capacity at the request of the Company, shall be indemnified by the Company against reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with an appeal therein, to the fullest extent permissible by the Act. Such right of indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

## ARTICLE VI

### Capital

SECTION 6.1. The Members have contributed to the Company in exchange for their membership interests, the cash and other property as set forth on Schedule A, annexed hereto.

SECTION 6.2. The fair market value and the adjusted basis of the contributing Member of any property other than cash contributed to the Company by a Member shall be set forth on Schedule A, annexed hereto.

SECTION 6.3. Except as expressly provided in this Agreement, no Member shall be required to make any additional contributions to the capital of the Company.

SECTION 6.4. No interest shall be paid on the Capital Account of any Member.

SECTION 6.5. A Capital Account shall be established for each Member on the books and records of the Company. If any assets of the Company are distributed to the Members in kind, the Capital Accounts of the Members shall be adjusted to reflect the difference between the fair market value of such assets on the date of distribution and the basis of the Company in such assets.

## ARTICLE VII

### Distributions of Cash

SECTION 7.1. The Company shall distribute to the Members from time to time all cash (regardless of the source thereof) of the Company which is not required for the operation or the reasonable working capital requirements of the Company (such cash is sometimes referred to herein as "Cash Flow"). For purposes of this Agreement all Cash Flow allocated to the Members shall be allocated among them in proportion to their respective Membership Interests.

SECTION 7.2. Distributions of Cash Flow shall be made from time to time in such manner as determined by the Operating Managers.

# ARTICLE VIII

## Profits and Losses

SECTION 8.1. The Net Profits and Net Losses of the Company shall be the net profits and net losses of the Company as determined for Federal income tax purposes.

SECTION 8.2. The Net Profits and Net Losses of the Company and each item of income, gain, loss, deduction or credit entering into the computation thereof, shall be allocated to the Members in the same proportions that they share in distributions of Cash Flow pursuant to Section 7.1, or if there is no Cash Flow, that they would have shared if there had been Cash Flow.

SECTION 8.3. References herein to "Reg. Sec.", are to the regulations promulgated by the United States Treasury to the Code. The terms "minimum gain", "minimum gain chargeback", "qualified income offset", "nonrecourse deduction" and "nonrecourse liability" are to be interpreted consistent with the definitions and use of such terms in Reg. Sec. 1.704-2 and Reg. Sec. 1.704-1. The following special allocations shall be made in the following order:

A. Except as other set forth in Reg. Sec. 1.704-2(f), if there is a net decrease in minimum gain, during the fiscal year of the Company, each Member, shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease of minimum gain determined in accordance with Reg. Sec. 1.704-2(g). Allocations in accordance with this Section shall be made first from the disposition of Company assets subject to nonrecourse liabilities, to the extent of the minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the taxable year. This Section is intended to comply with the minimum gain chargeback requirement of Reg. Sec. 1.704-2(f).

B. Except as otherwise set forth in Reg. Sec. 1.704-2(i)(4), if there is a net decrease in a Member's nonrecourse liability minimum gain attributable to Members' nonrecourse liabilities during any fiscal year, each Member who has a share of the Member nonrecourse liability minimum gain attributable to Member nonrecourse liability shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease in Members' nonrecourse debt minimum gain attributable to such member nonrecourse debt. Allocations pursuant to this Section shall be made first from gain recognized from the disposition of Company assets subject to Member nonrecourse liabilities to the extent of Member minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the fiscal year. This section is intended to comply with the minimum gain chargeback requirements of Reg. Sec. 1.704-2(i).

C. A Member who unexpectedly receives an adjustment, allocation or distribution described in (4), (5) or (6) of Reg. Sec. 1.704-1(b)(2)(ii)(d) will be allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. An allocation shall be made pursuant to this Section and if and to the extent a Member would have a deficit in his adjusted Capital Account after all other allocations provided for in this Section 8.3 were made as if this paragraph were not in the Agreement.

D. Nonrecourse deductions shall be allocated among the Members in the same proportion in which they share the Cash Flow of the Company.

E. Any nonrecourse deduction shall be allocated to any Member who bears the economic risk of loss with respect to the Member nonrecourse liability to which such deduction is attributable.

SECTION 8.4. Any Company gain or loss realized with respect to property, other than money, contributed to the Company by a Member shall be shared among the Members pursuant to Code section 704(c) and regulations to be promulgated thereunder so as to take account of the difference between the Company basis and the fair market value of the property at the time of the contribution ("built-in gain or loss"). Such built-in gain or loss shall be allocated to the contributing Member upon the disposition of the property.

## ARTICLE IX

### Admission and Withdrawal of a Member

SECTION 9.1. A Member may transfer his interest in the Company to another person or entity only with the prior unanimous consent of the other Members either in writing or at a meeting called for such purpose. If all of the other Members do not approve of the transfer, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee shall be entitled to receive the share of profits, losses and Cash Flow or other compensation by way of income and the return of contributions to which the transferor otherwise would be entitled.

SECTION 9.2. The Members agree to sign such additional documents as may be required in order to admit additional Members to the Company, pursuant to section 9.1 as well as, among other things, to provide for the division of profits, losses and Cash Flow among the Members.

SECTION 9.3. All costs and expenses incurred by the Company in connection with the assignment of a Member's interest, including any filing fees and publishing costs and the fees and disbursements of counsel, shall be paid by the assigning Member.

SECTION 9.4. Each person who becomes a Member in the Company, by becoming a Member, shall and does hereby ratify and agree to be bound by the terms and conditions of this Agreement.

## ARTICLE X

### Termination or Dissolution of Company

SECTION 10.1. The Company shall be terminated prior to the date of expiration of the term provided in Section 2.5 if (a) a majority in interest of the Members consent that the Company should be terminated and dissolved, or (b) the Company is dissolved pursuant to this Agreement.

SECTION 10.2. The Company shall be terminated in the event any Member (i) withdraws, resigns or is expelled from the Company; (ii) makes an assignment for the benefit of creditors, is the subject of an order for relief under Title 11 of the United States Code, files a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding of this nature, seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator for all or any substantial part of his properties; (iii) dies; or (iv) a judgment is entered by a court of competent jurisdiction adjudicating him incompetent to manage his person or his property.

SECTION 10.3. If the Company is dissolved, the owners of a majority in interest of the remaining Members may elect to reconstitute and continue the Company as a successor Company upon the same conditions as are set forth in this Agreement. Any such election to continue the Company will not result in the creation of a new Company among the remaining Members, nor will such election require the amendment of this Agreement or the execution of an amended Agreement.

SECTION 10.4. Upon the termination and dissolution of the Company, the then Operating Manager, or Operating Managers, if any, or, if there is no Operating Manager, any person elected to perform such liquidation by the written consent of the owners of a majority in interest of the Members, shall proceed to the liquidation of the Company. The proceeds of such liquidation shall be applied and distributed as follows:

A. If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled. The fair market value of such assets shall be determined by an independent appraiser to be selected by the Company's independent public accountants. The amount by which the fair market value of any Property to be distributed in kind to the Members exceeds or is less than the basis of such Property, shall, to the extent not otherwise recognized by the Company, be taken into account in computing Net Profits or Net Losses (and shall be allocated among the Members in accordance with Section 8.2) for purposes of crediting or charging the Capital Accounts of, and liquidating distributions to, the Members under Section 10.4.B.

B. All distributions upon liquidation of the Company shall be distributed as follows: to each of the Members, in proportion to the amount of their respective positive Capital Accounts, as such accounts have been adjusted (i) in accordance with Section 6.5 to reflect the Net Profit or Net Loss realized or incurred upon the sale of the Company's property or assets and deemed sale pursuant to Section 10.4.A; (ii) in accordance with Section 8.2 to reflect all Net Profits or Net Losses with respect to the year of liquidation. No Member shall be liable to repay the negative amount of his Capital Account.

SECTION 10.5. Each of the Members shall be furnished with a statement, reviewed by the Company's independent public accountants, which shall set forth the assets and liabilities of the Company as of the date of the Company's liquidation. Upon completion of the liquidation, the Operating Managers shall execute and cause to be filed a Certificate of Dissolution of the Company and any and all other documents necessary with respect to termination of the Company.

## ARTICLE XI

### Books and Reports

SECTION 11.1. The Operating Mangers shall cause the Company to maintain the following records:

A. Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Company, shall be kept by the Operating Managers at the principal office of the Company. The fiscal year of the Company shall be the calendar year. The books of account of the Company shall be kept in accordance with sound accounting practices and principles applied in a consistent manner by the Company; provided, however, that all methods of accounting and treating particular transactions shall be in accordance with the methods of accounting employed for Federal income tax purposes. All determinations by the Operating Managers with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding upon al the Members unless the determination is inconsistent with any express provision of this Agreement.

B. A current list of the full name and last known mailing address of each Member set forth in alphabetical order together with the contribution and share in profits and losses of each Member; a copy of the Articles of Organization of the Company and any amendments thereto; a copy of the

Company Operating Agreement and any amendments thereto; a copy of the Company's federal, state and local income tax returns for the three most recent fiscal years.

C.    Any member shall have the right from time to time at his expense to have his accountants and representatives examine and/or audit the books and records of the Company and the information referred to in this Section, and the Operating Managers will make such books and records and information available for such examinations and/or audits.

SECTION 11.2. No value shall be placed for any purpose upon the Company name or the right to its use, or upon the goodwill of the Company or its business. Upon termination or dissolution of the Company (without reconstitution thereof) as provided in this Agreement, neither the Company name or the right to its use, nor the goodwill of the Company, shall be considered as an asset of the Company.

SECTION 11.3. The Operating Managers will cause to be sent to the Members within a reasonable period after the close of each year the following: (a) annual statements of the Company's gross receipts and operating expenses, and the capital accounts of each Member, prepared by the Company's independent public accountants, to be transmitted to each Member; and (b) a report to be transmitted to each Member indicating the Member's share of the Company's profit or loss for that year and the Member's allocable share of all items of income, gain, loss, deduction, and credit, for Federal income tax purposes.

## ARTICLE XII

### Tax Elections

SECTION 12.1. In the event of a transfer of a Member's interest, or upon the death of a Member, or in the event of the distribution of Company property to any party hereto, the Company may (but need not necessarily) file an election, in accordance with Section 754 of the Code to cause the basis of the Company Property to be adjusted for Federal income tax purposes, as provided by Sections 734 and 743 of the Code.

## ARTICLE XIII

### Miscellaneous

SECTION 13.1. Any notice or other communication under this Agreement shall be in writing and shall be considered given when mailed by registered or certified mail, return receipt requested, to the parties at the following addresses (or at such other address as a party shall have previously specified by notice to the others as the address to which notice shall be given to him):

A.    If to the Company, to it in care of the Operating Managers at the address of the Company.

B.    If to the Operating Managers, to them at the address of the Company.

C.    If to any Member, to him at his address set forth on the books and records of the Company.

SECTION 13.2. This Agreement contains a complete statement of all of the arrangements among the parties with respect to the Company and cannot be changed or terminated orally or in any manner other than by a written agreement executed by all of the Members. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

SECTION 13.3. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

SECTION 13.4. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations of the jurisdiction in which the Company does business. If any provision of this Agreement, or the application thereof to any person or circumstance, shall for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected, but rather shall be enforced to the extent permitted by law.

SECTION 13.5. Anything hereinbefore in this Agreement to the contrary notwithstanding, all references to the Property of the Company are deemed to include the profits, losses and Cash Flow of the Property.

SECTION 13.6. Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the State of organization of the Company applicable to agreements made and to be performed in the State of organization of the Company.

SECTION 13.7. The captions, headings and table of contents in this Agreement are solely for convenience of reference and shall not affect its interpretation.

SECTION 13.8. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall be deemed to constitute a single document.

SECTION 13.9. Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement Effective as of the day and year first above written.

Lucy Gao, Managing Member

**"SCHEDULE A"**

**OPERATING AGREEMENT**
**OF**
**STRONG WATER CAPITAL MANAGEMENT LLC**

Percentage Interests of Members of Strong Water Capital Management LLC as of March 22, 2013.

| Member Name | Percentage Interest |
|---|---|
| Lucy Gao | 100% |

## "SCHEDULE B"

## OPERATING AGREEMENT
## OF
## STRONG WATER CAPITAL MANAGEMENT LLC

Operating Managers may not make any of the following management decisions without obtaining the consent of that Membership Interest:

a.  any merger, consolidation or other business combination;
b.  sale or other disposition of substantially all the assets of the LLC;
c.  dissolution of the LLC;
d.  filing of a petition or commencing other proceedings seeking reorganization;
e.  liquidation, arrangement or other similar relief under any federal or state law relating to bankruptcy or insolvency;
f.  the amendment or modification of any provision of this Agreement;
g.  the issuance of additional LLC Units to any Member or other person;
h.  the removal of any Member;
i.  the decision to appoint managers for the LLC under Article V hereof.

## OPERATING AGREEMENT
## OF
## SGCC DTLA 81, LLC

This Operating Agreement ("Agreement") of SGCC DTLA 81, LLC (the "Company") effective as of this 27th day of June, 2013, by, between and among the undersigned confirms our understanding as to the matters contained herein.

The parties hereto agree as follows:

### ARTICLE 1

### Definitions

SECTION 1.1. As used herein, the following terms and phrases shall have the meanings indicated:

A.    "Act" shall mean the Limited Liability Company Act of the State of organization, as amended.

B.    "Capital Account" shall mean, with respect to each Member, the account established for each Member pursuant to Section 6.5, which will initially equal the Capital Contributions of such Member and will be (a) increased by the amount of Net Profits allocated to such Member and (b) reduced by the amount of Net Losses allocated to such Member and the amount of Cash Flow distributed to such Member. Members' Capital Accounts shall be determined and maintained in accordance with the rules and paragraph (b)(2)(iv) of Regulation Section 1.704-1 of the Code.

C.    "Capital Contributions" shall mean the fair market value of the amounts contributed by the Members pursuant to Section 6.1.

D.    "Cash Flow" shall have the meaning provided in Section 7.1.

E.    "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent revenue laws.

F.    "Operating Manager" shall mean the Member or Members selected by the Members in accordance with this Agreement to serve as Operating Manger or Operating Managers of the Company.

G.    "Members" shall mean the persons designated as such in Schedule A of this Agreement, any successor(s) to their interests as such in the Company; and any other person who pursuant to this Agreement shall become a Member, and any reference to a "Member" shall be to any one of the then Members.

H.    "Net Profits" and "Net Losses" shall mean the net profit or net loss, respectively, of the Company determined in accordance with Section 8.1.

I.    The words "Membership Interest" shall mean a Member's interest in the Company which shall be in the proportion that the Member's share of the profits and losses of the Company bears to the aggregate shares of all the Members. A Membership Interest may be evidenced by a certificate issued by the Company. A Membership Interest may be expressed on a certificate as "Units" where a Member's Units bears the same relationship to the aggregate Units of all Members that the Member's Membership Interest bears to the aggregate Membership Interests of all Members. A Member's Interest may be a certified security or an uncertificated security within the meaning of section 8-102 of the Uniform Commercial Code if the requirements

1

of section 8-103(c) are met, and if the requirements are not met such interest shall, for purposes of the Uniform Commercial Code, be deemed to be a general intangible asset.

J. "Company" shall mean this Limited Liability Company.

K. "Person" shall mean any natural person, corporation, partnership, joint venture, association, limited liability company or other business or legal entity.

## ARTICLE II

### Organization of the Company

SECTION 2.1. The purpose of the Company is to conduct a lawful business for which limited liability companies may be organized and to do all things necessary or useful in connection with the foregoing.

SECTION 2.2. The Company name shall be "SGCC DTLA 81, LLC".

SECTION 2.3. The Members shall be Members in the Company and shall continue to do business under the name of the Company until the Operating Managers shall change the name or the Company shall terminate.

SECTION 2.4. The principal address of the Company shall be such place or places as the Operating Mangers may determine. The Operation Managers will give notice to the Members promptly after any change in the location of the principal office of the Company.

SECTION 2.5. The Company shall terminate on the date provided in the Articles of Organization, except that the Company may terminate prior to such date as provided in this Agreement.

## ARTICLE III

### Status of Members

SECTION 3.1. No Member will be bound by, or be personally liable for the expenses, liabilities or obligations of the Company.

SECTION 3.2. No Member will be entitled to withdraw any part of his Capital Account or to receive any distributions from the Company except as expressly provided in this Agreement.

SECTION 3.3. No Member will have the right to require partition of the Company property or to compel any sale or appraisal of the Company's assets or any sale of a deceased Member's interest in the Company's assets, notwithstanding any provision of law to the contrary.

## ARTICLE IV

### Meeting of Members

SECTION 4.1. An annual meeting of Members shall be held within five (5) months after the close of the fiscal year of the Company on such date and at the time and place (either within or without the state of its organization) as shall be fixed by the Members. At the annual meeting, the Members shall elect the Operating Managers and transact such other business as may properly be brought before the meeting.

SECTION 4.2. A special meeting of Members may be called at any time by the Operating Managers and shall be called by the Operating Managers at the request in writing of that Membership interest specified in Schedule C of the Members entitled to vote at such meeting.

2

Any such request shall state the purpose or purposes of the proposed meeting. Business transacted at any special meeting of Members shall be confined to the purposes set forth in the notice thereof.

SECTION 4.3. Written notice of the time, place and purpose of every meeting of Members (and, if other than an annual meeting, the person or persons at whose direction the meeting is being called), shall be given by the Operating Mangers to each Member of record entitled to vote at such meeting, not less than ten nor more than sixty days prior to the date set for the meeting. Notice shall be given either personally or by mailing said notice by first class mail to each Member at his address appearing on the record book of the Company or at such other address appearing on the record book of the Company or at such other address supplied by him in writing to the Operating Managers of the Company for the purpose of receiving notice.

A written waiver of notice setting forth the purposes of the meeting for which notice is waived, signed by the person or persons entitled to such notice, whether before or after the time of the meeting stated therein, shall be deemed equivalent to the giving of such notice. The attendance by a Member at a meeting either in person or by proxy without protesting the lack of notice thereof shall constitute a waiver of notice of such Member.

All notices given with respect to an original meeting shall extend to any and all adjournments thereof and such business as might have been transacted at the original meeting may be transacted at any adjournment thereof; no notice of any adjourned meeting need be given if an announcement of the time and place of the adjourned meeting is made at the original meeting.

SECTION 4.4. The holders of at least 60% in interest of the Members present in person or in representation by proxy, shall be requisite and shall constitute a quorum. If however, a quorum shall not be present or represented at any meeting of members, the members entitled to vote thereat shall have the power to adjourn the meeting until a quorum shall be present or represented.

SECTION 4.5. Any company action shall be authorized by consensus approval of majority of members in Schedule A, regardless of shares in interests.

SECTION 4.6. Every proxy must be signed by the Member entitled to vote or by his duly authorized attorney-in-fact and shall be valid only if filed with the Operating Managers of the Company prior to the commencement of voting on the matter in regard to which said proxy is to be voted. No proxy shall be valid after the expiration of eleven months from the date of its execution unless otherwise expressly provided in the proxy. Every proxy shall be revocable at the pleasure of the person executing it except as otherwise provided by statute. Unless the proxy by its terms provides for a specific revocation date and except as otherwise provided by statute, revocation of a proxy shall not be effective unless and until such revocation is executed in writing by the Member who executed such proxy and the revocation is filed with the Operating Managers of the Company prior to the voting of the proxy.

SECTION 4.7. All meetings of Members shall be presided over by the Operating Mangers, or if not present, by a Member thereby chosen by the Members at the meeting. The Operating Managers or the person presiding at the meeting shall appoint any person present to act as secretary of the meeting.

SECTION 4.8. For the purpose of determining the Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof or to express consent or dissent from any proposal without a meeting, or for the purpose of determining the Members entitled to receive payment of any distribution of Cash Flow or the allotment of any rights, or for the purpose of any other action, the Members may fix, in advance, a date as the record date for any such determination of Members. Such date shall not be more than fifty nor less than ten days before the date of any meeting nor more than fifty days prior to any action taken without a

3

meeting, the payment of any distribution of Cash Flow or the allotment of any rights, or any other action. When a determination of Members of record entitled to notice of, or to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof, unless the Members fix a new record date under this Section for the adjourned date.

SECTION 4.9. The company shall be entitled to treat the holder of record of any Membership Interest as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the Act.

### ARTICLE V

#### Management

SECTION 5.1. The Operating Manager shall be the person designated by all of the Members and shall be vested upon such designation in accordance with the terms of this Operating Agreement. The Operating Managers shall vote in proportion to their Membership Interests in the Company. Except as otherwise provided in this Agreement, all decisions of the Operating Managers shall be by a majority in interest of the Members. All Operating Mangers must be Members of the Company. No Member will take part in or interfere in any manner with the conduct or control of business of the Company or have any right or authority to act for or bind the Company except as provided in this Agreement.

SECTION 5.2. The Operating Mangers shall hold office for the term for which elected and until a successor has been elected and qualified. A vacancy in the office of Operating Manager arising from any cause may be filled for the unexpired portion of the term by the Members.

SECTION 5.3. Any Operating Manager may resign at any time by giving written notice to the Members. Any such resignation shall take effect at the time specified therein or, if the time is not specified therein, upon the receipt thereof, irrespective of whether any such resignations shall have been accepted.

SECTION 5.4. The Company shall be managed by the Operating Managers and the conduct of the Company's business shall be controlled and conducted solely and exclusively by the Operating Managers in accordance with this Agreement. In addition to and not in limitation of any rights and powers conferred by law or other provisions of this Agreement, the Operating Managers shall have and may exercise on behalf of the Company all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company, and to maximize Company profits.

SECTION 5.5. The Operating Manager may not make any of the management decisions stated in Schedule B, without obtaining the written approval of majority of members stated in Schedule A.

SECTION 5.6. The Operating Manager shall service as Tax Matters Member as such term is defined in Code Section 6231 (a)(7).

SECTION 5.7. Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he, his testator or interstate, then, is or was a manager, Member, employee or agent of the Company, or then serves or has served on behalf of the Company in any capacity at the request of the Company, shall be indemnified by the Company against reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with an appeal therein, to the fullest extent permissible by the Act. Such right of

4

indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

SECTION 5.8. Operating Manager shall be elected by the consensus approval of majority of members in Schedule A at each annual meeting of Members and service for one year, unless extended by written approval of majority of Members in Schedule A.

SECTION 5.9. Majority of Members in Schedule A have the right to terminate the Operating Manager, with or without cause, at their sole discretion and cause reelection of new Operating Manager.

## ARTICLE VI

### Capital

SECTION 6.1. The Members have contributed to the Company in exchange for their membership interests, the cash and other property as set forth on Schedule A, annexed hereto.

SECTION 6.2. The fair market value and the adjusted basis of the contributing Member of any property other than cash contributed to the Company by a Member shall be set forth on Schedule A, annexed hereto.

SECTION 6.3. Except as expressly provided in this Agreement, no Member shall be required to make any additional contributions to the capital of the Company.

SECTION 6.4. No interest shall be paid on the Capital Account of any Member.

SECTION 6.5. A Capital Account shall be established for each Member on the books and records of the Company. If any assets of the Company are distributed to the Members in kind, the Capital Accounts of the Members shall be adjusted to reflect the difference between the fair market value of such assets on the date of distribution and the basis of the Company in such assets.

## ARTICLE VII

### Distributions of Cash

SECTION 7.1. The Company shall distribute to the Members from time to time all cash (regardless of the source thereof) of the Company which is not required for the operation or the reasonable working capital requirements of the Company (such cash is sometimes referred to herein as "Cash Flow"). For purposes of this Agreement all Cash Flow allocated to the Members shall be allocated among them in proportion to their respective Membership Interests.

SECTION 7.2. Distribution of Cash Flow shall be made from time to time in such manner as determined by the majority of members shown in Schedule A.

## ARTICLE VIII

### Profits and Losses

SECTION 8.1. The Net Profits and Net Losses of the Company shall be the net profits and net losses of the Company as determined for Federal Income tax purposes.

SECTION 8.2. The Net Profits and Net Losses of the Company and each item of income, gain, loss, deduction or credit entering into the computation thereof, shall be allocated to the Members in the same proportions that they share in distributions of Cash Flow pursuant to

5

Section 7.1, or if there is no Cash Flow, that they would have shared if there had been Cash Flow.

SECTION 8.3. References herein to "Reg. Sec.", are to the regulations promulgated by the United States Treasury to the Code. The terms "minimum gain", "minimum gain chargeback", "qualified income offset", "nonrecourse deduction" and "nonrecourse liability" are to be interpreted consistent with the definitions and use of such terms in Reg. Sec. 1.704-2 and Reg. Sec. 1.704-1. The following special allocations shall be made in the following order:

A.     Except as other set forth in Reg. Sec. 1.704-2(f), if there is a net decrease in minimum gain, during the fiscal year of the Company, each Member, shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease of minimum gain determined in accordance with Reg. Sec. 1.704-2(g). Allocations in accordance with this Section shall be made first from the disposition of Company assets subject to nonrecourse liabilities, to the extent of the minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the taxable year. This Section is intended to comply with the minimum gain chargeback requirement of Reg. Sec. 1.704-2(f).

B.     Except as otherwise set forth in Reg. Sec. 1.704-2(i)(4), if there is a net decrease in a Member's nonrecourse liability minimum gain attributable to Members' nonrecourse liabilities during any fiscal year, each Member who has a share of the Member nonrecourse liability minimum gain attributable to Member nonrecourse liability shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease in Members' nonrecourse debt minimum gain attributable to such member nonrecourse debt. Allocations pursuant to this Section shall be made first from gain recognized from the disposition of Company assets subject to Member nonrecourse liabilities to the extent of Member minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the fiscal year. This section is intended to comply with the minimum gain chargeback requirements of Reg. Sec. 1.704-2(i).

C.     A Member who unexpectedly receives an adjustment, allocation or distribution described in (4), (5) or (6) of Reg. Sec. 1.704-1(b)(2)(ii)(d) will be allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. An allocation shall be made pursuant to this Section and if and to the extent a Member would have a deficit in his adjusted Capital Account after all other allocations provided for in this Section 8.3 were made as if this paragraph were not in the Agreement.

D.     Nonrecourse deductions shall be allocated among the Members in the same proportion in which they share the Cash Flow of the Company.

E.     Any nonrecourse deduction shall be allocated to any Member who bears the economic risk of loss with respect to the Member nonrecourse liability to which such deduction is attributable.

SECTION 8.4. Any Company gain or loss realized with respect to property, other than money, contributed to the Company by a Member shall be shared among the Members pursuant to Code section 704(c) and regulations to be promulgated thereunder so as to take account of the difference between the Company basis and the fair market value of the property at the time of the contribution ("built-in gain or loss"). Such built-in gain or loss shall be allocated to the contributing Member upon the disposition of the property.

6

LAM00123596

## ARTICLE IX

### Admission and Withdrawal of a Member

SECTION 9.1. A Member may transfer his interest in the Company to another person or entity only with the prior unanimous consent of the other Members either in writing or at a meeting called for such purpose. If all of the other Members do not approve of the transfer, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee shall be entitled to receive the share of profits, losses and Cash Flow or other compensation by way of income and the return of contributions to which the transferor otherwise would be entitled.

SECTION 9.2. The Members agree to sign such additional documents as may be required in order to admit additional Members to the Company, pursuant to section 9.1 as well as, among other things, to provide for the division of profits, losses and Cash Flow among the Members.

SECTION 9.3. All costs and expenses incurred by the Company in connection with the assignment of a Member's interest, including any filing fees and publishing costs and the fees and disbursements of counsel, shall be paid by the assigning Member.

SECTION 9.4. Each person who becomes a Member in the Company, by becoming a Member, shall and does hereby ratify and agree to be bound by the terms and conditions of this Agreement.

### ARTICLE X

### Termination or Dissolution of Company

SECTION 10.1. The Company shall be terminated prior to the date of expiration of the term provided in Section 2.5 if (a) a majority in interest of the Members consent that the Company should be terminated and dissolved, or (b) the Company is dissolved pursuant to this Agreement.

SECTION 10.2. The Company shall be terminated in the event any Member (i) withdraws, resigns or is expelled from the Company; (ii) makes an assignment for the benefit of creditors, is the subject of an order for relief under Title 11 of the United States Code, files a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding of this nature, seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator for all or any substantial part of his properties; (iii) dies; or (iv) a judgment is entered by a court of competent jurisdiction adjudicating him incompetent to manage his person or his property.

SECTION 10.3. If the Company is dissolved, the owners of a majority in interest of the remaining Members may elect to reconstitute and continue the Company as a successor Company upon the same conditions as are set forth in this Agreement. Any such election to continue the Company will not result in the creation of a new Company among the remaining Members, nor will such election require the amendment of this Agreement or the execution of an amended Agreement.

SECTION 10.4. Upon the termination and dissolution of the Company, the then Operating Manager, or Operating Managers, if any, or, if there is no Operating Manager, any person elected to perform such liquidation by the written consent of the owners of a majority in interest of the Members, shall proceed to the liquidation of the Company. The proceeds of such liquidation shall be applied and distributed as follows:

7

174
LAM00123597

A.    If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled. The fair market value of such assets shall be determined by an independent appraiser to be selected by the Company's independent public accountants. The amount by which the fair market value of any Property to be distributed in kind to the Members exceeds or is less than the basis of such Property, shall, to the extent not otherwise recognized by the Company, be taken into account in computing Net Profits or Net Losses (and shall be allocated among the Members in accordance with Section 8.2) for purposes of crediting or charging the Capital Accounts of, and liquidating distributions to, the Members under Section 10.4.B.

B.    All distributions upon liquidation of the Company shall be distributed as follows: to each of the Members, in proportion to the amount of their respective positive Capital Accounts, as such accounts have been adjusted (i) in accordance with Section 6.5 to reflect the Net Profit or Net Loss realized or incurred upon the sale of the Company's property or assets and deemed sale pursuant to Section 10.4.A; (ii) in accordance with Section 8.2 to reflect all Net Profits or Net Losses with respect to the year of liquidation. No Member shall be liable to repay the negative amount of his Capital Account.

SECTION 10.5. Each of the Members shall be furnished with a statement, reviewed by the Company's independent public accountants, which shall set forth the assets and liabilities of the Company as of the date of the Company's liquidation. Upon completion of the liquidation, the Operating Managers shall execute and cause to be filed a Certificate of Dissolution of the Company and any and all other documents necessary with respect to termination of the Company.

## ARTICLE XI

### Books and Reports

SECTION 11.1. The Operating Mangers shall cause the Company to maintain the following records:

A.    Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Company, shall be kept by the Operating Managers at the principal office of the Company. The fiscal year of the Company shall be the calendar year. The books of account of the Company shall be kept in accordance with sound accounting practices and principles applied in a consistent manner by the Company; provided, however, that all methods of accounting and treating particular transactions shall be in accordance with the methods of accounting employed for Federal income tax purposes. All determinations by the Operating Managers with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding upon all the Members unless the determination is inconsistent with any express provision of this Agreement.

B.    A current list of the full name and last known mailing address of each Member set forth in alphabetical order together with the contribution and share in profits and losses of each Member; a copy of the Articles of Organization of the Company and any amendments thereto; a copy of the Company Operating Agreement and any amendments thereto; a copy of the Company's federal, state and local income tax returns for the three most recent fiscal years.

C.    Any member shall have the right from time to time at his expense to have his accountants and representatives examine and/or audit the books and records of the Company and the information referred to in this Section, and the Operating Managers will make such books and records and information available for such examinations and/or audits.

8

SECTION 11.2. No value shall be placed for any purpose upon the Company name or the right to its use, or upon the goodwill of the Company or its business. Upon termination or dissolution of the Company (without reconstitution thereof) as provided in this Agreement, neither the Company name or the right to its use, nor the goodwill of the Company, shall be considered as an asset of the Company.

SECTION 11.3. The Operating Managers will cause to be sent to the Members within a reasonable period after the close of each year the following: (a) annual statements of the Company's gross receipts and operating expenses, and the capital accounts of each Member, prepared by the Company's independent public accountants, to be transmitted to each Member; and (b) a report to be transmitted to each Member indicating the Member's share of the Company's profit or loss for that year and the Member's allocable share of all items of income, gain, loss, deduction, and credit, for Federal income tax purposes.

## ARTICLE XII

### Tax Elections

SECTION 12.1. In the event of a transfer of a Member's interest, or upon the death of a Member, or in the event of the distribution of Company property to any party hereto, the Company may (but need not necessarily) file an election, in accordance with Section 754 of the Code to cause the basis of the Company Property to be adjusted for Federal income tax purposes, as provided by Sections 734 and 743 of the Code.

## ARTICLE XIII

### Miscellaneous

SECTION 13.1. Any notice or other communication under this Agreement shall be in writing and shall be considered given when mailed by registered or certified mail, return receipt requested, to the parties at the following addresses (or at such other address as a party shall have previously specified by notice to the others as the address to which notice shall be given to him):

A.      If to the Company, to it in care of the Operating Managers at the address of the Company.

B.      If to the Operating Managers, to them at the address of the Company.

C.      If to any Member, to him at his address set forth on the books and records of the Company.

SECTION 13.2. This Agreement contains a complete statement of all of the arrangements among the parties with respect to the Company and cannot be changed or terminated orally or in any manner other than by a written agreement executed by all of the Members. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

SECTION 13.3. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

SECTION 13.4. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations of the jurisdiction in which the Company does business. If any provision of this Agreement, or the application thereof to any person or circumstance, shall for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to

9

176
LAM00123599

other persons or circumstances shall not be affected, but rather shall be enforced to the extent permitted by law.

SECTION 13.5. Anything hereinbefore in this Agreement to the contrary notwithstanding, all references to the Property of the Company are deemed to include the profits, losses and Cash Flow of the Property.

SECTION 13.6. Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the State of organization of the Company applicable to agreements made and to be performed in the State of organization of the Company.

SECTION 13.7. The captions, headings and table of contents in this Agreement are solely for convenience of reference and shall not affect its interpretation.

SECTION 13.8. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall be deemed to constitute a single document.

SECTION 13.9. Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement Effective as of the day and year first above written.

_____
Huntington Giant Capital Corporation, Managing Member

10

## "SCHEDULE A"

## OPERATING AGREEMENT
## OF
## SGCC DTLA 81, LLC

Percentage Interests of Members of SGCC DTLA 81, LLC as of June 27, 2013.

| Member Name | Percentage Interest |
|---|---|
| Huntington Giant Capital Corporation | 100% |

11

## "SCHEDULE B"

### OPERATING AGREEMENT
### OF
### SGCC DTLA 81, LLC

Operating Managers may not make any of the following management decisions without obtaining the consent of that Membership Interest:

a. Any merger, consolidation or other business combination;
b. Sale or other deposition of any assets of the LLC;
c. Dissolution of the LLC;
d. Filing of a petition or commencing other proceedings seeking reorganization;
e. Liquidation, arrangement or other similar relief under any federal or state law relating to bankruptcy or insolvency
f. The amendment or modification of any provision of this Agreement;
g. The issuance of additional LLC Units to any Member or other person;
h. The removal of any Member;
i. The decision to appoint managers for the LLC under Article V hereof;
j. Acquisition of properties valued more than 5% of the Company assets or valued more than $50,000 in amount.
k. Make loans in any amount to any members or any third party;
l. Assume any loans or take any loans from any sources;
m. Make decision or conduction other than for the best interest of the Company and for the best interest of its all members;
n. Take compensations without the consensus approval of all members in Schedule A

12

LAM00123602

## OPERATING AGREEMENT
## OF
## COASTLINE INVESTMENTS LLC

This Operating Agreement ("Agreement") of Coastline Investments LLC (the "Company") effective as of this 15th day of September, 2011, by, between and among the undersigned confirms our understanding as to the matters contained herein.

The parties hereto agree as follows:

## ARTICLE 1

### Definitions

SECTION 1.1. As used herein, the following terms and phrases shall have the meanings indicated:

A. "Act" shall mean the Limited Liability Company Act of the State of organization, as amended.

B. "Capital Account" shall mean, with respect to each Member, the account established for each Member pursuant to Section 6.5, which will initially equal the Capital Contributions of such Member and will be (a) increased by the amount of Net Profits allocated to such Member and (b) reduced by the amount of Net Losses allocated to such Member and the amount of Cash Flow distributed to such Member. Members' Capital Accounts shall be determined and maintained in accordance with the rules and paragraph (b)(2)(iv) of Regulation Section 1.704-1 of the Code.

C. "Capital Contributions" shall mean the fair market value of the amounts contributed by the Members pursuant to Section 6.1.

D. "Cash Flow" shall have the meaning provided in Section 7.1.

E. "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent revenue laws.

F. "Operating Manager" shall mean the Member or Members selected by the Members in accordance with this Agreement to serve as Operating Manger or Operating Managers of the Company.

G. "Members" shall mean the persons designated as such in Schedule A of this Agreement, any successor(s) to their interests as such in the Company; and any other person who pursuant to this Agreement shall become a Member, and any reference to a "Member" shall be to any one of the then Members.

H. "Net Profits" and "Net Losses" shall mean the net profit or net loss, respectively, of the Company determined in accordance with Section 8.1.

I. The words "Membership Interest" shall mean a Member's interest in the Company which shall be in the proportion that the Member's share of the profits and losses of the Company bears to the aggregate shares of all the Members. A Membership Interest may be evidenced by a certificate issued by the Company. A Membership Interest may be expressed on a certificate as "Units" where a Member's Units bears the same relationship to the aggregate Units of all Members that the Member's Membership Interest bears to the aggregate Membership Interests of all Members. A Member's Interest may be a certified security or an uncertificated security within the meaning of section 8-102 of the Uniform Commercial Code if the requirements of section 8-103(c) are met, and if the requirements are not met such interest shall, for purposes of the Uniform Commercial Code, be deemed to be a general intangible asset.

J. "Company" shall mean this Limited Liability Company.

K. "Person" shall mean any natural person, corporation, partnership, joint venture, association, limited liability company or other business or legal entity.

## ARTICLE II

### Organization of the Company

SECTION 2.1. The purpose of the Company is to conduct an lawful business for which limited liability companies may be organized and to do all things necessary or useful in connection with the foregoing.

SECTION 2.2. The Company name shall be "Coastline Investments LLC".

SECTION 2.3. The Members shall be Members in the Company and shall continue to do business under the name of the Company until the Operating Managers shall change the name or the Company shall terminate.

SECTION 2.4. The principal address of the Company shall be such place or places as the Operating Mangers may determine. The Operation Managers will give notice to the Members promptly after any change in the location of the principal office of the Company.

SECTION 2.5. The Company shall terminate on the date provided in the Articles of Organization, except that the Company may terminate prior to such date as provided in this Agreement.

## ARTICLE III

### Status of Members

SECTION 3.1. No Member will be bound by, or be personally liable for the expenses, liabilities or obligations of the Company.

SECTION 3.2. No Member will be entitled to withdraw any part of his Capital Account or to receive any distributions from the Company except as expressly provided in this Agreement.

SECTION 3.3. No Member will have the right to require partition of the Company property or to compel any sale or appraisal of the Company's assets or any sale of a deceased Member's interest in the Company's assets, notwithstanding any provision of law to the contrary.

## ARTICLE IV

### Meeting of Members

SECTION 4.1. An annual meeting of Members shall be held within five (5) months after the close of the fiscal year of the Company on such date and at the time and place (either within or without the state of its organization) as shall be fixed by the Members. At the annual meeting, the Members shall elect the Operating Managers and transact such other business as may properly be brought before the meeting.

SECTION 4.2. A special meeting of Members may be called at any time by the Operating Managers and shall be called by the Operating Managers at the request in writing of that Membership Interest specified in Schedule A of the Members entitled to vote at such meeting. Any such request shall state the purpose or purposes of the proposed meeting. Business transacted at any special meeting of Members shall be confined to the purposes set forth in the notice thereof.

SECTION 4.3. Written notice of the time, place and purpose of every meeting of Members (and, if other than an annual meeting, the person or persons at whose direction the meeting is being called), shall be given by the Operating Mangers to each Member of record

entitled to vote at such meeting, not less than ten nor more than sixty days prior to the date set for the meeting. Notice shall be given either personally or by mailing said notice by first class mail to each Member at his address appearing on the record book of the Company or at such other address appearing on the record book of the Company or at such other address supplied by him in writing to the Operating Managers of the Company for the purpose of receiving notice.

A written waiver of notice setting forth the purposes of the meeting for which notice is waived, signed by the person or persons entitled to such notice, whether before or after the time of the meeting stated therein, shall be deemed equivalent to the giving of such notice. The attendance by a Member at a meeting either in person or by proxy without protesting the lack of notice thereof shall constitute a waiver of notice of such Member.

All notices given with respect to an original meeting shall extend to any and all adjournments thereof and such business as might have been transacted at the original meeting may be transacted at any adjournment thereof; no notice of any adjourned meeting need be given if an announcement of the time and place of the adjourned meeting is made at the original meeting.

SECTION 4.4. The holders of a majority in interest of the Members present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of members except as otherwise provided by statute of the Articles of Organization. If, however, a quorum shall not be present or represented at any meeting of Members, the Members entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting or originally notified. When a quorum is once present to organize a meeting, such quorum is not deemed broken by the subsequent withdrawal of any Members.

SECTION 4.5. Every Member entitled to vote at any meeting shall be entitled to vote in accordance with his membership interest in the Company held by him of record on the date fixed as the record date for said meeting and may so vote in person or by proxy. Any Company action shall be authorized by a majority in interest of the votes cast by the Members entitled to vote thereon except as may otherwise be provided by statute, the Articles of Organization or this Operating Agreement.

SECTION 4.6. Every proxy must be signed by the Member entitled to vote or by his duly authorized attorney-in-fact and shall be valid only if filed with the Operating Managers of the Company prior to the commencement of voting on the matter in regard to which said proxy is to be voted. No proxy shall be valid after the expiration of eleven months from the date of its execution unless otherwise expressly provided in the proxy. Every proxy shall be revocable at the pleasure of the person executing it except as otherwise provided by statute. Unless the proxy by its terms provides for a specific revocation date and except as otherwise provided by statute, revocation of a proxy shall not be effective unless and until such revocation is executed in writing by the Member who executed such proxy and the revocation is filed with the Operating Managers of the Company prior to the voting of the proxy.

SECTION 4.7. All meetings of Members shall be presided over by the Operating Mangers, or if not present, by a Member thereby chosen by the Members at the meeting. The Operating Managers or the person presiding at the meeting shall appoint any person present to act as secretary of the meeting.

SECTION 4.8. For the purpose of determining the Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof or to express consent or dissent from any proposal without a meeting, or for the purpose of determining the Members entitled to receive payment of any distribution of Cash Flow or the allotment of any rights, or for the purpose of any other action, the Members may fix, in advance, a date as the record date for any such determination of Members. Such date shall not be more than fifty nor less than ten days before the date of any meeting nor more than fifty days prior to any action taken without a meeting, the payment of any distribution of Cash Flow or the allotment of any rights, or any

other action. When a determination of Members of record entitled to notice of, or to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof, unless the Members fix a new record date under this Section for the adjourned date.

SECTION 4.9. The company shall be entitled to treat the holder of record of any Membership Interest as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the Act.

## ARTICLE V

### Management

SECTION 5.1. Management of the Company shall be vested in all of the Members who shall also serve as Operating Managers of the Company. The Operating Managers shall vote in proportion to their Membership Interests in the Company. Except as otherwise provided in this Agreement, all decisions of the Operating Managers shall be by a majority in interest of the Members. All Operating Mangers must be Members of the Company. No Member will take part in or interfere in any manner with the conduct or control of business of the Company or have any right or authority to act for or bind the Company except as provided in this Agreement.

SECTION 5.2. The Operating Mangers shall hold office for the term for which elected and until a successor has been elected and qualified. A vacancy in the office of Operating Manager arising from any cause may be filled for the unexpired portion of the term by the Members.

SECTION 5.3. Any Operating Manager may resign at any time by giving written notice to the Members. Any such resignation shall take effect at the time specified therein or, if the time is not specified therein, upon the receipt thereof, irrespective of whether any such resignations shall have been accepted.

SECTION 5.4. The Company shall be managed by the Operating Managers and the conduct of the Company's business shall be controlled and conducted solely and exclusively by the Operating Managers in accordance with this Agreement. In addition to and not in limitation of any rights and powers conferred by law or other provisions of this Agreement, the Operating Managers shall have and may exercise on behalf of the Company all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company, and to maximize Company profits.

SECTION 5.5. Notwithstanding the foregoing, the Operating Managers may not make any of the management decisions stated in Schedule B without obtaining the consent of that Membership Interest stated in Schedule A.

SECTION 5.6. The Operating Manager shall service as Tax Matters Member as such term is defined in Code Section 6231 (a)(7).

SECTION 5.7. Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he, his testator or interstate, then, is or was a manager, Member, employee or agent of the Company, or then serves or has served on behalf of the Company in any capacity at the request of the Company, shall be indemnified by the Company against reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with an appeal therein, to the fullest extent permissible by the Act. Such right of indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

## ARTICLE VI

### Capital

SECTION 6.1. The Members have contributed to the Company In exchange for their membership interests.

SECTION 6.2. The fair market value and the adjusted basis of the contributing Member of any property other than cash contributed to the Company by a Member shall be set forth on Schedule A, annexed hereto.

SECTION 6.3. Except as expressly provided in this Agreement, no Member shall be required to make any additional contributions to the capital of the Company.

SECTION 6.4. No interest shall be paid on the Capital Account of any Member.

SECTION 6.5. A Capital Account shall be established for each Member on the books and records of the Company. If any assets of the Company are distributed to the Members in kind, the Capital Accounts of the Members shall be adjusted to reflect the difference between the fair market value of such assets on the date of distribution and the basis of the Company in such assets.

## ARTICLE VII

### Distributions of Cash

SECTION 7.1. The Company shall distribute to the Members from time to time all cash (regardless of the source thereof) of the Company which is not required for the operation or the reasonable working capital requirements of the Company (such cash is sometimes referred to herein as "Cash Flow"). For purposes of this Agreement all Cash Flow allocated to the Members shall be allocated among them in proportion to their respective Membership Interests.

SECTION 7.2. Distributions of Cash Flow shall be made from time to time in such manner as determined by the Operating Managers.

## ARTICLE VIII

### Profits and Losses

SECTION 8.1. The Net Profits and Net Losses of the Company shall be the net profits and net losses of the Company as determined for Federal income tax purposes.

SECTION 8.2. The Net Profits and Net Losses of the Company and each item of income, gain, loss, deduction or credit entering into the computation thereof, shall be allocated to the Members In the same proportions that they share In distributions of Cash Flow pursuant to Section 7.1, or if there is no Cash Flow, that they would have shared if there had been Cash Flow.

SECTION 8.3. References herein to "Reg. Sec.", are to the regulations promulgated by the United States Treasury to the Code. The terms "minimum gain", "minimum gain chargeback", "qualified income offset", "nonrecourse deduction" and "nonrecourse liability" are to be interpreted consistent with the definitions and use of such terms in Reg. Sec. 1.704-2 and Reg. Sec. 1.704-1. The following special allocations shall be made in the following order:

A.      Except as other set forth in Reg. Sec. 1.704-2(f), if there is a net decrease in minimum gain, during the fiscal year of the Company, each Member, shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease of minimum gain determined in accordance with Reg. Sec. 1.704-2(g). Allocations in accordance with this Section shall be made first from the disposition of Company assets subject to nonrecourse liabilities, to the extent of the minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the taxable year. This Section is intended to comply with the minimum gain chargeback requirement of Reg. Sec. 1.704-2(f).

B.  Except as otherwise set forth in Reg. Sec. 1.704-2(i)(4), if there is a net decrease in a Member's nonrecourse liability minimum gain attributable to Members' nonrecourse liabilities during any fiscal year, each Member who has a share of the Member nonrecourse liability minimum gain attributable to Member nonrecourse liability shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease in Members' nonrecourse debt minimum gain attributable to such member nonrecourse debt. Allocations pursuant to this Section shall be made first from gain recognized from the disposition of Company assets subject to Member nonrecourse liabilities to the extent of Member minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the fiscal year. This section is intended to comply with the minimum gain chargeback requirements of Reg. Sec. 1.704-2(i).

C.  A Member who unexpectedly receives an adjustment, allocation or distribution described in (4), (5) or (6) of Reg. Sec. 1.704-1(b)(2)(ii)(d) will be allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. An allocation shall be made pursuant to this Section and if and to the extent a Member would have a deficit in his adjusted Capital Account after all other allocations provided for in this Section 8.3 were made as if this paragraph were not in the Agreement.

D.  Nonrecourse deductions shall be allocated among the Members in the same proportion in which they share the Cash Flow of the Company.

E.  Any nonrecourse deduction shall be allocated to any Member who bears the economic risk of loss with respect to the Member nonrecourse liability to which such deduction is attributable.

SECTION 8.4. Any Company gain or loss realized with respect to property, other than money, contributed to the Company by a Member shall be shared among the Members pursuant to Code section 704(c) and regulations to be promulgated thereunder so as to take account of the difference between the Company basis and the fair market value of the property at the time of the contribution ("built-in gain or loss"). Such built-in gain or loss shall be allocated to the contributing Member upon the disposition of the property.

## ARTICLE IX

### Admission and Withdrawal of a Member

SECTION 9.1. A Member may transfer his interest in the Company to another person or entity only with the prior unanimous consent of the other Members either in writing or at a meeting called for such purpose. If all of the other Members do not approve of the transfer, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee shall be entitled to receive the share of profits, losses and Cash Flow or other compensation by way of income and the return of contributions to which the transferor otherwise would be entitled.

SECTION 9.2. The Members agree to sign such additional documents as may be required in order to admit additional Members to the Company, pursuant to section 9.1 as well as, among other things, to provide for the division of profits, losses and Cash Flow among the Members.

SECTION 9.3. All costs and expenses incurred by the Company in connection with the assignment of a Member's interest, including any filing fees and publishing costs and the fees and disbursements of counsel, shall be paid by the assigning Member.

SECTION 9.4. Each person who becomes a Member in the Company, by becoming a Member, shall and does hereby ratify and agree to be bound by the terms and conditions of this Agreement.

## ARTICLE X

### Termination or Dissolution of Company

SECTION 10.1. The Company shall be terminated prior to the date of expiration of the term provided in Section 2.5 if (a) a majority in interest of the Members consent that the Company should be terminated and dissolved, or (b) the Company is dissolved pursuant to this Agreement.

SECTION 10.2. The Company shall be terminated in the event any Member (i) withdraws, resigns or is expelled from the Company; (ii) makes an assignment for the benefit of creditors, is the subject of an order for relief under Title 11 of the United States Code, files a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding of this nature, seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator for all or any substantial part of his properties; (iii) dies; or (iv) a judgment is entered by a court of competent jurisdiction adjudicating him incompetent to manage his person or his property.

SECTION 10.3. If the Company is dissolved, the owners of a majority in interest of the remaining Members may elect to reconstitute and continue the Company as a successor Company upon the same conditions as are set forth in this Agreement. Any such election to continue the Company will not result in the creation of a new Company among the remaining Members, nor will such election require the amendment of this Agreement or the execution of an amended Agreement.

SECTION 10.4. Upon the termination and dissolution of the Company, the then Operating Manager, or Operating Managers, if any, or, if there is no Operating Manager, any person elected to perform such liquidation by the written consent of the owners of a majority in interest of the Members, shall proceed to the liquidation of the Company. The proceeds of such liquidation shall be applied and distributed as follows:

A. If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled. The fair market value of such assets shall be determined by an independent appraiser to be selected by the Company's independent public accountants. The amount by which the fair market value of any Property to be distributed in kind to the Members exceeds or is less than the basis of such Property, shall, to the extent not otherwise recognized by the Company, be taken into account in computing Net Profits or Net Losses (and shall be allocated among the Members in accordance with Section 8.2) for purposes of crediting or charging the Capital Accounts of, and liquidating distributions to, the Members under Section 10.4.B.

B. All distributions upon liquidation of the Company shall be distributed as follows: to each of the Members, in proportion to the amount of their respective positive Capital Accounts, as such accounts have been adjusted (i) in accordance with Section 6.5 to reflect the Net Profit or Net Loss realized or incurred upon the sale of the Company's property or assets and deemed sale pursuant to Section 10.4.A; (ii) in accordance with Section 8.2 to reflect all Net Profits or Net Losses with respect to the year of liquidation. No Member shall be liable to repay the negative amount of his Capital Account.

SECTION 10.5. Each of the Members shall be furnished with a statement, reviewed by the Company's independent public accountants, which shall set forth the assets and liabilities of the Company as of the date of the Company's liquidation. Upon completion of the liquidation, the Operating Managers shall execute and cause to be filed a Certificate of Dissolution of the Company and any and all other documents necessary with respect to termination of the Company.

## ARTICLE XI

## Books and Reports

SECTION 11.1. The Operating Mangers shall cause the Company to maintain the following records:

A. Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Company, shall be kept by the Operating Managers at the principal office of the Company. The fiscal year of the Company shall be the calendar year. The books of account of the Company shall be kept in accordance with sound accounting practices and principles applied in a consistent manner by the Company; provided, however, that all methods of accounting and treating particular transactions shall be in accordance with the methods of accounting employed for Federal income tax purposes. All determinations by the Operating Managers with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding upon al the Members unless the determination is inconsistent with any express provision of this Agreement.

B. A current list of the full name and last known mailing address of each Member set forth in alphabetical order together with the contribution and share In profits and losses of each Member; a copy of the Articles of Organization of the Company and any amendments thereto; a copy of the Company Operating Agreement and any amendments thereto; a copy of the Company's federal, state and local income tax returns for the three most recent fiscal years.

C. Any member shall have the right from time to time at his expense to have his accountants and representatives examine and/or audit the books and records of the Company and the information referred to In this Section, and the Operating Managers will make such books and records and information available for such examinations and/or audits.

SECTION 11.2. No value shall be placed for any purpose upon the Company name or the right to Its use, or upon the goodwill of the Company or its business. Upon termination or dissolution of the Company (without reconstitution thereof) as provided in this Agreement, neither the Company name or the right to its use, nor the goodwill of the Company, shall be considered as an asset of the Company.

SECTION 11.3. The Operating Managers will cause to be sent to the Members within a reasonable period after the close of each year the following: (a) annual statements of the Company's gross receipts and operating expenses, and the capital accounts of each Member, prepared by the Company's independent public accountants, to be transmitted to each Member; and (b) a report to be transmitted to each Member indicating the Member's share of the Company's profit or loss for that year and the Member's allocable share of all items of income, gain, loss, deduction, and credit, for Federal income tax purposes.

## ARTICLE XII

### Tax Elections

SECTION 12.1. In the event of a transfer of a Member's interest, or upon the death of a Member, or in the event of the distribution of Company property to any party hereto, the Company may (but need not necessarily) file an election, in accordance with Section 754 of the Code to cause the basis of the Company Property to be adjusted for Federal income tax purposes, as provided by Sections 734 and 743 of the Code.

## ARTICLE XIII

### Miscellaneous

SECTION 13.1. Any notice or other communication under this Agreement shall be in writing and shall be considered given when mailed by registered or certified mail, return receipt requested, to the parties at the following addresses (or at such other address as a party shall have previously specified by notice to the others as the address to which notice shall be given to him):

A.     If to the Company, to it in care of the Operating Managers at the address of the Company.

B.     If to the Operating Managers, to them at the address of the Company.

C.     If to any Member, to him at his address set forth on the books and records of the Company.

SECTION 13.2. This Agreement contains a complete statement of all of the arrangements among the parties with respect to the Company and cannot be changed or terminated orally or in any manner other than by a written agreement executed by all of the Members. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

SECTION 13.3. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

SECTION 13.4. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations of the jurisdiction in which the Company does business. If any provision of this Agreement, or the application thereof to any person or circumstance, shall for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected, but rather shall be enforced to the extent permitted by law.

SECTION 13.5. Anything hereinbefore in this Agreement to the contrary notwithstanding, all references to the Property of the Company are deemed to include the profits, losses and Cash Flow of the Property.

SECTION 13.6. Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the State of organization of the Company applicable to agreements made and to be performed in the State of organization of the Company.

SECTION 13.7. The captions, headings and table of contents in this Agreement are solely for convenience of reference and shall not affect its interpretation.

SECTION 13.8. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall be deemed to constitute a single document.

SECTION 13.9. Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement Effective as of the day and year first above written.

Lucy Gao, Managing Member

## "SCHEDULE A"

### OPERATING AGREEMENT
### OF
### COASTLINE INVESTMENTS LLC

Percentage Interests of Members of Coastline Investments LLC as of September 15, 2011.

| Member Name | Percentage Interest |
|---|---|
| Lucy Gao | 100% |

**OPERATING AGREEMENT**
**OF**
**COASTLINE INVESTMENTS LLC**

Operating Managers may not make any of the following management decisions without obtaining the consent of that Membership Interest:

a. any merger, consolidation or other business combination;
b. sale or other disposition of substantially all the assets of the LLC;
c. dissolution of the LLC;
d. filing of a petition or commencing other proceedings seeking reorganization;
e. liquidation, arrangement or other similar relief under any federal or state law relating to bankruptcy or insolvency;
f. the amendment or modification of any provision of this Agreement;
g. the issuance of additional LLC Units to any Member or other person;
h. the removal of any Member;
I. the decision to appoint managers for the LLC under Article V hereof.

## OPERATING AGREEMENT
## OF
## DIAMOND WATERFALLS LLC

This Operating Agreement ("Agreement") of Diamond Waterfalls LLC (the "Company") effective as of this 8th day of November, 2011, by, between and among the undersigned confirms our understanding as to the matters contained herein.

The parties hereto agree as follows:

### ARTICLE 1

#### Definitions

SECTION 1.1. As used herein, the following terms and phrases shall have the meanings indicated:

A.     "Act" shall mean the Limited Liability Company Act of the State of organization, as amended.

B.     "Capital Account" shall mean, with respect to each Member, the account established for each Member pursuant to Section 6.5, which will initially equal the Capital Contributions of such Member and will be (a) increased by the amount of Net Profits allocated to such Member and (b) reduced by the amount of Net Losses allocated to such Member and the amount of Cash Flow distributed to such Member. Members' Capital Accounts shall be determined and maintained in accordance with the rules and paragraph (b)(2)(iv) of Regulation Section 1.704-1 of the Code.

C.     "Capital Contributions" shall mean the fair market value of the amounts contributed by the Members pursuant to Section 6.1.

D.     "Cash Flow" shall have the meaning provided in Section 7.1.

E.     "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent revenue laws.

F.     "Operating Manager" shall mean the Member or Members selected by the Members in accordance with this Agreement to serve as Operating Manger or Operating Managers of the Company.

G.     "Members" shall mean the persons designated as such in Schedule A of this Agreement, any successor(s) to their interests as such in the Company; and any other person who pursuant to this Agreement shall become a Member, and any reference to a "Member" shall be to any one of the then Members.

H.     "Net Profits" and "Net Losses" shall mean the net profit or net loss, respectively, of the Company determined in accordance with Section 8.1.

I.     The words "Membership Interest" shall mean a Member's interest in the Company which shall be in the proportion that the Member's share of the profits and losses of the Company bears to the aggregate shares of all the Members. A Membership Interest may be evidenced by a certificate issued by the Company. A Membership Interest may be expressed on a certificate as "Units" where a Member's Units bears the same relationship to the aggregate Units of all Members that the Member's Membership Interest bears to the aggregate Membership Interests of all Members. A Member's Interest may be a certified security or an uncertificated security within the meaning of section 8-102 of the Uniform Commercial Code if the requirements of section 8-103(c) are met, and if the requirements are not met such interest shall, for purposes of the Uniform Commercial Code, be deemed to be a general intangible asset.

J.     "Company" shall mean this Limited Liability Company.

LAM00051309

K. "Person" shall mean any natural person, corporation, partnership, joint venture, association, limited liability company or other business or legal entity.

## ARTICLE II

### Organization of the Company

SECTION 2.1. The purpose of the Company is to conduct an lawful business for which limited liability companies may be organized and to do all things necessary or useful in connection with the foregoing.

SECTION 2.2. The Company name shall be "Diamond Waterfalls LLC".

SECTION 2.3. The Members shall be Members in the Company and shall continue to do business under the name of the Company until the Operating Managers shall change the name or the Company shall terminate.

SECTION 2.4. The principal address of the Company shall be such place or places as the Operating Mangers may determine. The Operation Managers will give notice to the Members promptly after any change in the location of the principal office of the Company.

SECTION 2.5. The Company shall terminate on the date provided in the Articles of Organization, except that the Company may terminate prior to such date as provided in this Agreement.

## ARTICLE III

### Status of Members

SECTION 3.1. No Member will be bound by, or be personally liable for the expenses, liabilities or obligations of the Company.

SECTION 3.2. No Member will be entitled to withdraw any part of his Capital Account or to receive any distributions from the Company except as expressly provided in this Agreement.

SECTION 3.3. No Member will have the right to require partition of the Company property or to compel any sale or appraisal of the Company's assets or any sale of a deceased Member's interest in the Company's assets, notwithstanding any provision of law to the contrary.

## ARTICLE IV

### Meeting of Members

SECTION 4.1. An annual meeting of Members shall be held within five (5) months after the close of the fiscal year of the Company on such date and at the time and place (either within or without the state of its organization) as shall be fixed by the Members. At the annual meeting, the Members shall elect the Operating Managers and transact such other business as may properly be brought before the meeting.

SECTION 4.2. A special meeting of Members may be called at any time by the Operating Managers and shall be called by the Operating Managers at the request in writing of that Membership interest specified in Schedule A of the Members entitled to vote at such meeting. Any such request shall state the purpose or purposes of the proposed meeting. Business transacted at any special meeting of Members shall be confined to the purposes set forth in the notice thereof.

SECTION 4.3. Written notice of the time, place and purpose of every meeting of Members (and, if other than an annual meeting, the person or persons at whose direction the meeting is being called), shall be given by the Operating Mangers to each Member of record

entitled to vote at such meeting, not less than ten nor more than sixty days prior to the date set for the meeting. Notice shall be given either personally or by mailing said notice by first class mail to each Member at his address appearing on the record book of the Company or at such other address appearing on the record book of the Company or at such other address supplied by him in writing to the Operating Managers of the Company for the purpose of receiving notice.

A written waiver of notice setting forth the purposes of the meeting for which notice is waived, signed by the person or persons entitled to such notice, whether before or after the time of the meeting stated therein, shall be deemed equivalent to the giving of such notice. The attendance by a Member at a meeting either in person or by proxy without protesting the lack of notice thereof shall constitute a waiver of notice of such Member.

All notices given with respect to an original meeting shall extend to any and all adjournments thereof and such business as might have been transacted at the original meeting may be transacted at any adjournment thereof; no notice of any adjourned meeting need be given if an announcement of the time and place of the adjourned meeting is made at the original meeting.

SECTION 4.4. The holders of a majority in interest of the Members present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of members except as otherwise provided by statute of the Articles of Organization. If, however, a quorum shall not be present or represented at any meeting of Members, the Members entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting or originally notified. When a quorum is once present to organize a meeting, such quorum is not deemed broken by the subsequent withdrawal of any Members.

SECTION 4.5. Every Member entitled to vote at any meeting shall be entitled to vote in accordance with his membership interest in the Company held by him of record on the date fixed as the record date for said meeting and may so vote in person or by proxy. Any Company action shall be authorized by a majority in interest of the votes cast by the Members entitled to vote thereon except as may otherwise be provided by statute, the Articles of Organization or this Operating Agreement.

SECTION 4.6. Every proxy must be signed by the Member entitled to vote or by his duly authorized attorney-in-fact and shall be valid only if filed with the Operating Managers of the Company prior to the commencement of voting on the matter in regard to which said proxy is to be voted. No proxy shall be valid after the expiration of eleven months from the date of its execution unless otherwise expressly provided in the proxy. Every proxy shall be revocable at the pleasure of the person executing it except as otherwise provided by statute. Unless the proxy by its terms provides for a specific revocation date and except as otherwise provided by statute, revocation of a proxy shall not be effective unless and until such revocation is executed in writing by the Member who executed such proxy and the revocation is filed with the Operating Managers of the Company prior to the voting of the proxy.

SECTION 4.7. All meetings of Members shall be presided over by the Operating Mangers, or if not present, by a Member thereby chosen by the Members at the meeting. The Operating Managers or the person presiding at the meeting shall appoint any person present to act as secretary of the meeting.

SECTION 4.8. For the purpose of determining the Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof or to express consent or dissent from any proposal without a meeting, or for the purpose of determining the Members entitled to receive payment of any distribution of Cash Flow or the allotment of any rights, or for the purpose of any other action, the Members may fix, in advance, a date as the record date for any such determination of Members. Such date shall not be more than fifty nor less than ten days before the date of any meeting nor more than fifty days prior to any action taken without a meeting, the payment of any distribution of Cash Flow or the allotment of any rights, or any

other action. When a determination of Members of record entitled to notice of, or to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof, unless the Members fix a new record date under this Section for the adjourned date.

SECTION 4.9. The company shall be entitled to treat the holder of record of any Membership Interest as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the Act.

## ARTICLE V

### Management

SECTION 5.1. Management of the Company shall be vested in all of the Members who shall also serve as Operating Managers of the Company. The Operating Managers shall vote in proportion to their Membership Interests in the Company. Except as otherwise provided in this Agreement, all decisions of the Operating Managers shall be by a majority in interest of the Members. All Operating Mangers must be Members of the Company. No Member will take part in or interfere in any manner with the conduct or control of business of the Company or have any right or authority to act for or bind the Company except as provided in this Agreement.

SECTION 5.2. The Operating Mangers shall hold office for the term for which elected and until a successor has been elected and qualified. A vacancy in the office of Operating Manager arising from any cause may be filled for the unexpired portion of the term by the Members.

SECTION 5.3. Any Operating Manager may resign at any time by giving written notice to the Members. Any such resignation shall take effect at the time specified therein or, if the time is not specified therein, upon the receipt thereof, irrespective of whether any such resignations shall have been accepted.

SECTION 5.4. The Company shall be managed by the Operating Managers and the conduct of the Company's business shall be controlled and conducted solely and exclusively by the Operating Managers in accordance with this Agreement. In addition to and not in limitation of any rights and powers conferred by law or other provisions of this Agreement, the Operating Managers shall have and may exercise on behalf of the Company all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company, and to maximize Company profits.

SECTION 5.5. Notwithstanding the foregoing, the Operating Managers may not make any of the management decisions stated in Schedule B without obtaining the consent of that Membership Interest stated in Schedule A.

SECTION 5.6. The Operating Manager shall service as Tax Matters Member as such term is defined in Code Section 6231 (a)(7).

SECTION 5.7. Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he, his testator or interstate, then, is or was a manager, Member, employee or agent of the Company, or then serves or has served on behalf of the Company in any capacity at the request of the Company, shall be indemnified by the Company against reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with an appeal therein, to the fullest extent permissible by the Act. Such right of indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

## ARTICLE VI

### Capital

SECTION 6.1. The Members have contributed to the Company in exchange for their membership interests.

SECTION 6.2. The fair market value and the adjusted basis of the contributing Member of any property other than cash contributed to the Company by a Member shall be set forth on Schedule A, annexed hereto.

SECTION 6.3. Except as expressly provided in this Agreement, no Member shall be required to make any additional contributions to the capital of the Company.

SECTION 6.4. No interest shall be paid on the Capital Account of any Member.

SECTION 6.5. A Capital Account shall be established for each Member on the books and records of the Company. If any assets of the Company are distributed to the Members in kind, the Capital Accounts of the Members shall be adjusted to reflect the difference between the fair market value of such assets on the date of distribution and the basis of the Company in such assets.

## ARTICLE VII

### Distributions of Cash

SECTION 7.1. The Company shall distribute to the Members from time to time all cash (regardless of the source thereof) of the Company which is not required for the operation or the reasonable working capital requirements of the Company (such cash is sometimes referred to herein as "Cash Flow"). For purposes of this Agreement all Cash Flow allocated to the Members shall be allocated among them in proportion to their respective Membership Interests.

SECTION 7.2. Distributions of Cash Flow shall be made from time to time in such manner as determined by the Operating Managers.

## ARTICLE VIII

### Profits and Losses

SECTION 8.1. The Net Profits and Net Losses of the Company shall be the net profits and net losses of the Company as determined for Federal income tax purposes.

SECTION 8.2. The Net Profits and Net Losses of the Company and each item of income, gain, loss, deduction or credit entering into the computation thereof, shall be allocated to the Members in the same proportions that they share in distributions of Cash Flow pursuant to Section 7.1, or if there is no Cash Flow, that they would have shared if there had been Cash Flow.

SECTION 8.3. References herein to "Reg. Sec.", are to the regulations promulgated by the United States Treasury to the Code. The terms "minimum gain", "minimum gain chargeback", "qualified income offset", "nonrecourse deduction" and "nonrecourse liability" are to be interpreted consistent with the definitions and use of such terms in Reg. Sec. 1.704-2 and Reg. Sec. 1.704-1. The following special allocations shall be made in the following order:

A.     Except as other set forth in Reg. Sec. 1.704-2(f), if there is a net decrease in minimum gain, during the fiscal year of the Company, each Member, shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease of minimum gain determined in accordance with Reg. Sec. 1.704-2(g). Allocations in accordance with this Section shall be made first from the disposition of Company assets subject to nonrecourse liabilities, to the extent of the minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the taxable year. This Section is intended to comply with the minimum gain chargeback requirement of Reg. Sec. 1.704-2(f).

LAM00051313

B.    Except as otherwise set forth in Reg. Sec. 1.704-2(i)(4), if there is a net decrease in a Member's nonrecourse liability minimum gain attributable to Members' nonrecourse liabilities during any fiscal year, each Member who has a share of the Member nonrecourse liability minimum gain attributable to Member nonrecourse liability shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease in Members' nonrecourse debt minimum gain attributable to such member nonrecourse debt. Allocations pursuant to this Section shall be made first from gain recognized from the disposition of Company assets subject to Member nonrecourse liabilities to the extent of Member minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the fiscal year. This section is intended to comply with the minimum gain chargeback requirements of Reg. Sec. 1.704-2(i).

C.    A Member who unexpectedly receives an adjustment, allocation or distribution described in (4), (5) or (6) of Reg. Sec. 1.704-1(b)(2)(ii)(d) will be allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. An allocation shall be made pursuant to this Section and if and to the extent a Member would have a deficit in his adjusted Capital Account after all other allocations provided for in this Section 8.3 were made as if this paragraph were not in the Agreement.

D.    Nonrecourse deductions shall be allocated among the Members in the same proportion in which they share the Cash Flow of the Company.

E.    Any nonrecourse deduction shall be allocated to any Member who bears the economic risk of loss with respect to the Member nonrecourse liability to which such deduction is attributable.

SECTION 8.4. Any Company gain or loss realized with respect to property, other than money, contributed to the Company by a Member shall be shared among the Members pursuant to Code section 704(c) and regulations to be promulgated thereunder so as to take account of the difference between the Company basis and the fair market value of the property at the time of the contribution ("built-in gain or loss"). Such built-in gain or loss shall be allocated to the contributing Member upon the disposition of the property.

## ARTICLE IX

### Admission and Withdrawal of a Member

SECTION 9.1. A Member may transfer his interest in the Company to another person or entity only with the prior unanimous consent of the other Members either in writing or at a meeting called for such purpose. If all of the other Members do not approve of the transfer, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee shall be entitled to receive the share of profits, losses and Cash Flow or other compensation by way of income and the return of contributions to which the transferor otherwise would be entitled.

SECTION 9.2. The Members agree to sign such additional documents as may be required in order to admit additional Members to the Company, pursuant to section 9.1 as well as, among other things, to provide for the division of profits, losses and Cash Flow among the Members.

SECTION 9.3. All costs and expenses incurred by the Company in connection with the assignment of a Member's interest, including any filing fees and publishing costs and the fees and disbursements of counsel, shall be paid by the assigning Member.

SECTION 9.4. Each person who becomes a Member in the Company, by becoming a Member, shall and does hereby ratify and agree to be bound by the terms and conditions of this Agreement.

## ARTICLE X

### Termination or Dissolution of Company

LAM00051314

SECTION 10.1. The Company shall be terminated prior to the date of expiration of the term provided in Section 2.5 if (a) a majority in interest of the Members consent that the Company should be terminated and dissolved, or (b) the Company is dissolved pursuant to this Agreement.

SECTION 10.2. The Company shall be terminated in the event any Member (i) withdraws, resigns or is expelled from the Company; (ii) makes an assignment for the benefit of creditors, is the subject of an order for relief under Title 11 of the United States Code, files a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding of this nature, seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator for all or any substantial part of his properties; (iii) dies; or (iv) a judgment is entered by a court of competent jurisdiction adjudicating him incompetent to manage his person or his property.

SECTION 10.3. If the Company is dissolved, the owners of a majority in interest of the remaining Members may elect to reconstitute and continue the Company as a successor Company upon the same conditions as are set forth in this Agreement. Any such election to continue the Company will not result in the creation of a new Company among the remaining Members, nor will such election require the amendment of this Agreement or the execution of an amended Agreement.

SECTION 10.4. Upon the termination and dissolution of the Company, the then Operating Manager, or Operating Managers, if any, or, if there is no Operating Manager, any person elected to perform such liquidation by the written consent of the owners of a majority in interest of the Members, shall proceed to the liquidation of the Company. The proceeds of such liquidation shall be applied and distributed as follows:

A.    If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled. The fair market value of such assets shall be determined by an independent appraiser to be selected by the Company's independent public accountants. The amount by which the fair market value of any Property to be distributed in kind to the Members exceeds or is less than the basis of such Property, shall, to the extent not otherwise recognized by the Company, be taken into account in computing Net Profits or Net Losses (and shall be allocated among the Members in accordance with Section 8.2) for purposes of crediting or charging the Capital Accounts of, and liquidating distributions to, the Members under Section 10.4.B.

B.    All distributions upon liquidation of the Company shall be distributed as follows: to each of the Members, in proportion to the amount of their respective positive Capital Accounts, as such accounts have been adjusted (i) in accordance with Section 6.5 to reflect the Net Profit or Net Loss realized or incurred upon the sale of the Company's property or assets and deemed sale pursuant to Section 10.4.A; (ii) in accordance with Section 8.2 to reflect all Net Profits or Net Losses with respect to the year of liquidation. No Member shall be liable to repay the negative amount of his Capital Account.

SECTION 10.5. Each of the Members shall be furnished with a statement, reviewed by the Company's independent public accountants, which shall set forth the assets and liabilities of the Company as of the date of the Company's liquidation. Upon completion of the liquidation, the Operating Managers shall execute and cause to be filed a Certificate of Dissolution of the Company and any and all other documents necessary with respect to termination of the Company.

## ARTICLE XI

## Books and Reports

SECTION 11.1. The Operating Mangers shall cause the Company to maintain the following records:

A. Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Company, shall be kept by the Operating Managers at the principal office of the Company. The fiscal year of the Company shall be the calendar year. The books of account of the Company shall be kept in accordance with sound accounting practices and principles applied in a consistent manner by the Company; provided, however, that all methods of accounting and treating particular transactions shall be in accordance with the methods of accounting employed for Federal income tax purposes. All determinations by the Operating Managers with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding upon al the Members unless the determination is inconsistent with any express provision of this Agreement.

B. A current list of the full name and last known mailing address of each Member set forth in alphabetical order together with the contribution and share in profits and losses of each Member; a copy of the Articles of Organization of the Company and any amendments thereto; a copy of the Company Operating Agreement and any amendments thereto; a copy of the Company's federal, state and local income tax returns for the three most recent fiscal years.

C. Any member shall have the right from time to time at his expense to have his accountants and representatives examine and/or audit the books and records of the Company and the information referred to in this Section, and the Operating Managers will make such books and records and information available for such examinations and/or audits.

SECTION 11.2. No value shall be placed for any purpose upon the Company name or the right to its use, or upon the goodwill of the Company or its business. Upon termination or dissolution of the Company (without reconstitution thereof) as provided in this Agreement, neither the Company name or the right to its use, nor the goodwill of the Company, shall be considered as an asset of the Company.

SECTION 11.3. The Operating Managers will cause to be sent to the Members within a reasonable period after the close of each year the following: (a) annual statements of the Company's gross receipts and operating expenses, and the capital accounts of each Member, prepared by the Company's independent public accountants, to be transmitted to each Member; and (b) a report to be transmitted to each Member indicating the Member's share of the Company's profit or loss for that year and the Member's allocable share of all items of income, gain, loss, deduction, and credit, for Federal income tax purposes.

## ARTICLE XII

### Tax Elections

SECTION 12.1. In the event of a transfer of a Member's interest, or upon the death of a Member, or in the event of the distribution of Company property to any party hereto, the Company may (but need not necessarily) file an election, in accordance with Section 754 of the Code to cause the basis of the Company Property to be adjusted for Federal income tax purposes, as provided by Sections 734 and 743 of the Code.

## ARTICLE XIII

### Miscellaneous

SECTION 13.1. Any notice or other communication under this Agreement shall be in writing and shall be considered given when mailed by registered or certified mail, return receipt requested, to the parties at the following addresses (or at such other address as a party shall have previously specified by notice to the others as the address to which notice shall be given to him):

A.    If to the Company, to it in care of the Operating Managers at the address of the Company.

B.    If to the Operating Managers, to them at the address of the Company.

C.    If to any Member, to him at his address set forth on the books and records of the Company.

SECTION 13.2. This Agreement contains a complete statement of all of the arrangements among the parties with respect to the Company and cannot be changed or terminated orally or in any manner other than by a written agreement executed by all of the Members. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

SECTION 13.3. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

SECTION 13.4. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations of the jurisdiction in which the Company does business. If any provision of this Agreement, or the application thereof to any person or circumstance, shall for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected, but rather shall be enforced to the extent permitted by law.

SECTION 13.5. Anything hereinbefore in this Agreement to the contrary notwithstanding, all references to the Property of the Company are deemed to include the profits, losses and Cash Flow of the Property.

SECTION 13.6. Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the State of organization of the Company applicable to agreements made and to be performed in the State of organization of the Company.

SECTION 13.7. The captions, headings and table of contents in this Agreement are solely for convenience of reference and shall not affect its interpretation.

SECTION 13.8. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall be deemed to constitute a single document.

SECTION 13.9. Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement Effective as of the day and year first above written.

Lucy Gao, Managing Member

LAM00051317

**"SCHEDULE A"**

**OPERATING AGREEMENT**
**OF**
**DIAMOND WATERFALLS LLC**

Percentage Interests of Members of Diamond Waterfalls LLC as of November 8, 2011.

| Member Name | Percentage Interest |
|---|---|
| Lucy Gao | 100% |

LAM00051318

"SCHEDULE B"

**OPERATING AGREEMENT**
**OF**
**DIAMOND WATERFALLS LLC**

Operating Managers may not make any of the following management decisions without obtaining the consent of that Membership Interest:

a. any merger, consolidation or other business combination;
b. sale or other disposition of substantially all the assets of the LLC;
c. dissolution of the LLC;
d. filing of a petition or commencing other proceedings seeking reorganization;
e. liquidation, arrangement or other similar relief under any federal or state law relating to bankruptcy or insolvency;
f. the amendment or modification of any provision of this Agreement;
g. the issuance of additional LLC Units to any Member or other person;
h. the removal of any Member;
i. the decision to appoint managers for the LLC under Article V hereof.

LAM00051319

**OPERATING AGREEMENT**
**OF**
**Atherton Financial Building Limited Liability Company**

This Operating Agreement ("Agreement") of <u>Atherton Financial Building LLC</u> (the "Company") effective as of this <u>13</u> day of <u>April, 2012,</u> by, between and among the undersigned confirms our understanding as to the matters contained herein.

The parties hereto agree as follows:

**ARTICLE 1**

**Definitions**

SECTION 1.1. As used herein, the following terms and phrases shall have the meanings indicated:

A. "Act" shall mean the Limited Liability Company Act of the State of organization, as amended.

B. "Capital Account" shall mean, with respect to each Member, the account established for each Member pursuant to Section 6.5, which will initially equal the Capital Contributions of such Member and will be (a) increased by the amount of Net Profits allocated to such Member and (b) reduced by the amount of Net Losses allocated to such Member and the amount of Cash Flow distributed to such Member. Members' Capital Accounts shall be determined and maintained in accordance with the rules and paragraph (b)(2)(iv) of Regulation Section 1.704-1 of the Code.

C. "Capital Contributions" shall mean the fair market value of the amounts contributed by the Members pursuant to Section 6.1.

D. "Cash Flow" shall have the meaning provided in Section 7.1.

E. "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent revenue laws.

F. "Operating Manager" shall mean the Member of Members selected by the Members in accordance with this Agreement to serve as Operating Manger or Operating Managers of the Company.

G. "Members" shall mean the persons designated as such in Schedule A of this Agreement, any successor(s) to their interests as such in the Company; and any other person who pursuant to this Agreement shall become a Member, and any reference to a "Member" shall be to any one of the then Members.

H. "Net Profits" and "Net Losses" shall mean the net profit or net loss, respectively, of the Company determined in accordance with Section 8.1.

I. The words "Membership Interest" shall mean a Member's interest in the Company which shall be in the proportion that the Member's share of the profits and losses of the Company bears to the aggregate shares of all the Members. A Membership Interest may be evidenced by a certificate issued by the Company. A Membership Interest may be expressed on a certificate as "Units" where a Member's Units bears the same relationship to the aggregate Units of all Members that the Member's Membership Interest bears to the aggregate Membership Interests of all Members. A Member's Interest may be a certified security or an uncertificated security within the meaning of section 8-102 of the Uniform Commercial Code if the requirements of section 8-103(c) are met, and if the requirements are not met such interest shall, for purposes of the Uniform Commercial Code, be deemed to be a general intangible asset.

J. "Company" shall mean this Limited Liability Company.

K.    "Person" shall mean any natural person, corporation, partnership, joint venture, association, limited liability company or other business or legal entity.

## ARTICLE II

## Organization of the Company

SECTION 2.1. The purpose of the Company is to conduct an lawful business for which limited liability companies may be organized and to do all things necessary or useful in connection with the foregoing.

SECTION 2.2. The Company name shall be "Atherton Financial Building LLC".

SECTION 2.3. The Members shall be Members in the Company and shall continue to do business under the name of the Company until the Operating Managers shall change the name or the Company shall terminate.

SECTION 2.4. The principal address of the Company shall be such place or places as the Operating Mangers may determine.  The Operation Managers will give notice to the Members promptly after any change in the location of the principal office of the Company.

SECTION 2.5. The Company shall terminate on the date provided in the Articles of Organization, except that the Company may terminate prior to such date as provided in this Agreement.

## ARTICLE III

## Status of Members

SECTION 3.1. No Member will be bound by, or be personally liable for the expenses, liabilities or obligations of the Company.

SECTION 3.2. No Member will be entitled to withdraw any part of his Capital Account or to receive any distributions from the Company except as expressly provided in this Agreement.

SECTION 3.3. No Member will have the right to require partition of the Company property or to compel any sale or appraisal of the Company's assets or any sale of a deceased Member's interest in the Company's assets, notwithstanding any provision of law to the contrary.

## ARTICLE IV

## Meeting of Members

SECTION 4.1. An annual meeting of Members shall be held within five (5) months after the close of the fiscal year of the Company on such date and at the time and place (either within or without the state of its organization) as shall be fixed by the Members.  At the annual meeting, the Members shall elect the Operating Managers and transact such other business as may properly be brought before the meeting.

SECTION 4.2. A special meeting of Members may be called at any time by the Operating Managers and shall be called by the Operating Managers at the request in writing of that Membership interest specified in Schedule A of the Members entitled to vote at such meeting. Any such request shall state the purpose or purposes of the proposed meeting. Business transacted at any special meeting of Members shall be confined to the purposes set forth in the notice thereof.

SECTION 4.3. Written notice of the time, place and purpose of every meeting of Members (and, if other than an annual meeting, the person or persons at whose direction the meeting is being called), shall be given by the Operating Mangers to each Member of record

LAM00037514

entitled to vote at such meeting, not less than ten nor more than sixty days prior to the date set for the meeting. Notice shall be given either personally or by mailing said notice by first class mail to each Member at his address appearing on the record book of the Company or at such other address appearing on the record book of the Company or at such other address supplied by him in writing to the Operating Managers of the Company for the purpose of receiving notice.

A written waiver of notice setting forth the purposes of the meeting for which notice is waived, signed by the person or persons entitled to such notice, whether before or after the time of the meeting stated therein, shall be deemed equivalent to the giving of such notice. The attendance by a Member at a meeting either in person or by proxy without protesting the lack of notice thereof shall constitute a waiver of notice of such Member.

All notices given with respect to an original meeting shall extend to any and all adjournments thereof and such business as might have been transacted at the original meeting may be transacted at any adjournment thereof; no notice of any adjourned meeting need be given if an announcement of the time and place of the adjourned meeting is made at the original meeting.

SECTION 4.4. The holders of a majority in interest of the Members present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of members except as otherwise provided by statute of the Articles of Organization. If, however, a quorum shall not be present or represented at any meeting of Members, the Members entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting or originally notified. When a quorum is once present to organize a meeting, such quorum is not deemed broken by the subsequent withdrawal of any Members.

SECTION 4.5. Every Member entitled to vote at any meeting shall be entitled to vote in accordance with his membership interest in the Company held by him of record on the date fixed as the record date for said meeting and may so vote in person or by proxy. Any Company action shall be authorized by a majority in interest of the votes cast by the Members entitled to vote thereon except as may otherwise be provided by statute, the Articles of Organization or this Operating Agreement.

SECTION 4.6. Every proxy must be signed by the Member entitled to vote or by his duly authorized attorney-in-fact and shall be valid only if filed with the Operating Managers of the Company prior to the commencement of voting on the matter in regard to which said proxy is to be voted. No proxy shall be valid after the expiration of eleven months from the date of its execution unless otherwise expressly provided in the proxy. Every proxy shall be revocable at the pleasure of the person executing it except as otherwise provided by statute. Unless the proxy by its terms provides for a specific revocation date and except as otherwise provided by statute, revocation of a proxy shall not be effective unless and until such revocation is executed in writing by the Member who executed such proxy and the revocation is filed with the Operating Managers of the Company prior to the voting of the proxy.

SECTION 4.7. All meetings of Members shall be presided over by the Operating Mangers, or if not present, by a Member thereby chosen by the Members at the meeting. The Operating Managers or the person presiding at the meeting shall appoint any person present to act as secretary of the meeting.

SECTION 4.8. For the purpose of determining the Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof or to express consent or dissent from any proposal without a meeting, or for the purpose of determining the Members entitled to receive payment of any distribution of Cash Flow or the allotment of any rights, or for the purpose of any other action, the Members may fix, in advance, a date as the record date for any such determination of Members. Such date shall not be more than fifty nor less than ten days before the date of any meeting nor more than fifty days prior to any action taken without a meeting, the payment of any distribution of Cash Flow or the allotment of any rights, or any

204
LAM00037515

other action. When a determination of Members of record entitled to notice of, or to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof, unless the Members fix a new record date under this Section for the adjourned date.

SECTION 4.9. The company shall be entitled to treat the holder of record of any Membership Interest as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the Act.

## ARTICLE V

### Management

SECTION 5.1. Management of the Company shall be vested in all of the Members who shall also serve as Operating Managers of the Company. The Operating Managers shall vote in proportion to their Membership Interests in the Company. Except as otherwise provided in this Agreement, all decisions of the Operating Managers shall be by a majority in interest of the Members. All Operating Mangers must be Members of the Company. No Member will take part in or interfere in any manner with the conduct or control of business of the Company or have any right or authority to act for or bind the Company except as provided in this Agreement.

SECTION 5.2. The Operating Mangers shall hold office for the term for which elected and until a successor has been elected and qualified. A vacancy in the office of Operating Manager arising from any cause may be filled for the unexpired portion of the term by the Members.

SECTION 5.3. Any Operating Manager may resign at any time by giving written notice to the Members. Any such resignation shall take effect at the time specified therein or, if the time is not specified therein, upon the receipt thereof, irrespective of whether any such resignations shall have been accepted.

SECTION 5.4. The Company shall be managed by the Operating Managers and the conduct of the Company's business shall be controlled and conducted solely and exclusively by the Operating Managers in accordance with this Agreement. In addition to and not in limitation of any rights and powers conferred by law or other provisions of this Agreement, the Operating Managers shall have and may exercise on behalf of the Company all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company, and to maximize Company profits.

SECTION 5.5. Notwithstanding the foregoing, the Operating Managers may not make any of the management decisions stated in Schedule B without obtaining the consent of that Membership Interest stated in Schedule A.

SECTION 5.6. The Operating Manager shall service as Tax Matters Member as such term is defined in Code Section 6231 (a)(7).

SECTION 5.7. Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he, his testator or interstate, then, is or was a manager, Member, employee or agent of the Company, or then serves or has served on behalf of the Company in any capacity at the request of the Company, shall be indemnified by the Company against reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with an appeal therein, to the fullest extent permissible by the Act. Such right of indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

## ARTICLE VI

### Capital

SECTION 6.1. The Members have contributed to the Company in exchange for their membership interests, the cash and other property as set forth on Schedule A, annexed hereto.

SECTION 6.2. The fair market value and the adjusted basis of the contributing Member of any property other than cash contributed to the Company by a Member shall be set forth on Schedule A, annexed hereto.

SECTION 6.3. Except as expressly provided in this Agreement, no Member shall be required to make any additional contributions to the capital of the Company.

SECTION 6.4. No interest shall be paid on the Capital Account of any Member.

SECTION 6.5. A Capital Account shall be established for each Member on the books and records of the Company. If any assets of the Company are distributed to the Members in kind, the Capital Accounts of the Members shall be adjusted to reflect the difference between the fair market value of such assets on the date of distribution and the basis of the Company in such assets.

## ARTICLE VII

### Distributions of Cash

SECTION 7.1. The Company shall distribute to the Members from time to time all cash (regardless of the source thereof) of the Company which is not required for the operation or the reasonable working capital requirements of the Company (such cash is sometimes referred to herein as "Cash Flow"). For purposes of this Agreement all Cash Flow allocated to the Members shall be allocated among them in proportion to their respective Membership Interests.

SECTION 7.2. Distributions of Cash Flow shall be made from time to time in such manner as determined by the Operating Managers.

## ARTICLE VIII

### Profits and Losses

SECTION 8.1. The Net Profits and Net Losses of the Company shall be the net profits and net losses of the Company as determined for Federal income tax purposes.

SECTION 8.2. The Net Profits and Net Losses of the Company and each item of income, gain, loss, deduction or credit entering into the computation thereof, shall be allocated to the Members in the same proportions that they share in distributions of Cash Flow pursuant to Section 7.1, or if there is no Cash Flow, that they would have shared if there had been Cash Flow.

SECTION 8.3. References herein to "Reg. Sec.", are to the regulations promulgated by the United States Treasury to the Code. The terms "minimum gain", "minimum gain chargeback", "qualified income offset", "nonrecourse deduction" and "nonrecourse liability" are to be interpreted consistent with the definitions and use of such terms in Reg. Sec. 1.704-2 and Reg. Sec. 1.704-1. The following special allocations shall be made in the following order:

A. Except as other set forth in Reg. Sec. 1.704-2(f), if there is a net decrease in minimum gain, during the fiscal year of the Company, each Member, shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease of minimum gain determined in accordance with Reg. Sec. 1.704-2(g). Allocations in accordance with this Section shall be made first from the disposition of Company assets subject to nonrecourse liabilities, to the extent of the minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the taxable year. This Section is intended to comply with the minimum gain chargeback requirement of Reg. Sec. 1.704-2(f).

B.     Except as otherwise set forth in Reg. Sec. 1.704-2(i)(4), if there is a net decrease in a Member's nonrecourse liability minimum gain attributable to Members' nonrecourse liabilities during any fiscal year, each Member who has a share of the Member nonrecourse liability minimum gain attributable to Member nonrecourse liability shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease in Members' nonrecourse debt minimum gain attributable to such member nonrecourse debt. Allocations pursuant to this Section shall be made first from gain recognized from the disposition of Company assets subject to Member nonrecourse liabilities to the extent of Member minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the fiscal year. This section is intended to comply with the minimum gain chargeback requirements of Reg. Sec. 1.704-2(i).

C.     A Member who unexpectedly receives an adjustment, allocation or distribution described in (4), (5) or (6) of Reg. Sec. 1.704-1(b)(2)(ii)(d) will be allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. An allocation shall be made pursuant to this Section and if and to the extent a Member would have a deficit in his adjusted Capital Account after all other allocations provided for in this Section 8.3 were made as if this paragraph were not in the Agreement.

D.     Nonrecourse deductions shall be allocated among the Members in the same proportion in which they share the Cash Flow of the Company.

E.     Any nonrecourse deduction shall be allocated to any Member who bears the economic risk of loss with respect to the Member nonrecourse liability to which such deduction is attributable.

SECTION 8.4. Any Company gain or loss realized with respect to property, other than money, contributed to the Company by a Member shall be shared among the Members pursuant to Code section 704(c) and regulations to be promulgated thereunder so as to take account of the difference between the Company basis and the fair market value of the property at the time of the contribution ("built-in gain or loss"). Such built-in gain or loss shall be allocated to the contributing Member upon the disposition of the property.

## ARTICLE IX

### Admission and Withdrawal of a Member

SECTION 9.1. A Member may transfer his interest in the Company to another person or entity only with the prior unanimous consent of the other Members either in writing or at a meeting called for such purpose. If all of the other Members do not approve of the transfer, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee shall be entitled to receive the share of profits, losses and Cash Flow or other compensation by way of income and the return of contributions to which the transferor otherwise would be entitled.

SECTION 9.2. The Members agree to sign such additional documents as may be required in order to admit additional Members to the Company, pursuant to section 9.1 as well as, among other things, to provide for the division of profits, losses and Cash Flow among the Members.

SECTION 9.3. All costs and expenses incurred by the Company in connection with the assignment of a Member's interest, including any filing fees and publishing costs and the fees and disbursements of counsel, shall be paid by the assigning Member.

SECTION 9.4. Each person who becomes a Member in the Company, by becoming a Member, shall and does hereby ratify and agree to be bound by the terms and conditions of this Agreement.

## ARTICLE X

### Termination or Dissolution of Company

SECTION 10.1. The Company shall be terminated prior to the date of expiration of the term provided in Section 2.5 if (a) a majority in interest of the Members consent that the Company should be terminated and dissolved, or (b) the Company is dissolved pursuant to this Agreement.

SECTION 10.2. The Company shall be terminated in the event any Member (i) withdraws, resigns or is expelled from the Company; (ii) makes an assignment for the benefit of creditors, is the subject of an order for relief under Title 11 of the United States Code, files a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding of this nature, seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator for all or any substantial part of his properties; (iii) dies; or (iv) a judgment is entered by a court of competent jurisdiction adjudicating him incompetent to manage his person or his property.

SECTION 10.3. If the Company is dissolved, the owners of a majority in interest of the remaining Members may elect to reconstitute and continue the Company as a successor Company upon the same conditions as are set forth in this Agreement. Any such election to continue the Company will not result in the creation of a new Company among the remaining Members, nor will such election require the amendment of this Agreement or the execution of an amended Agreement.

SECTION 10.4. Upon the termination and dissolution of the Company, the then Operating Manager, or Operating Managers, if any, or, if there is no Operating Manager, any person elected to perform such liquidation by the written consent of the owners of a majority in interest of the Members, shall proceed to the liquidation of the Company. The proceeds of such liquidation shall be applied and distributed as follows:

A. If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled. The fair market value of such assets shall be determined by an independent appraiser to be selected by the Company's independent public accountants. The amount by which the fair market value of any Property to be distributed in kind to the Members exceeds or is less than the basis of such Property, shall, to the extent not otherwise recognized by the Company, be taken into account in computing Net Profits or Net Losses (and shall be allocated among the Members in accordance with Section 8.2) for purposes of crediting or charging the Capital Accounts of, and liquidating distributions to, the Members under Section 10.4.B.

B. All distributions upon liquidation of the Company shall be distributed as follows: to each of the Members, in proportion to the amount of their respective positive Capital Accounts, as such accounts have been adjusted (i) in accordance with Section 6.5 to reflect the Net Profit or Net Loss realized or incurred upon the sale of the Company's property or assets and deemed sale pursuant to Section 10.4.A; (ii) in accordance with Section 8.2 to reflect all Net Profits or Net Losses with respect to the year of liquidation. No Member shall be liable to repay the negative amount of his Capital Account.

SECTION 10.5. Each of the Members shall be furnished with a statement, reviewed by the Company's independent public accountants, which shall set forth the assets and liabilities of the Company as of the date of the Company's liquidation. Upon completion of the liquidation, the Operating Managers shall execute and cause to be filed a Certificate of Dissolution of the Company and any and all other documents necessary with respect to termination of the Company.

## ARTICLE XI

### Books and Reports

SECTION 11.1. The Operating Mangers shall cause the Company to maintain the following records:

A.    Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Company, shall be kept by the Operating Managers at the principal office of the Company. The fiscal year of the Company shall be the calendar year. The books of account of the Company shall be kept in accordance with sound accounting practices and principles applied in a consistent manner by the Company; provided, however, that all methods of accounting and treating particular transactions shall be in accordance with the methods of accounting employed for Federal income tax purposes. All determinations by the Operating Managers with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding upon al the Members unless the determination is inconsistent with any express provision of this Agreement.

B.    A current list of the full name and last known mailing address of each Member set forth in alphabetical order together with the contribution and share in profits and losses of each Member; a copy of the Articles of Organization of the Company and any amendments thereto; a copy of the Company Operating Agreement and any amendments thereto; a copy of the Company's federal, state and local income tax returns for the three most recent fiscal years.

C.    Any member shall have the right from time to time at his expense to have his accountants and representatives examine and/or audit the books and records of the Company and the information referred to in this Section, and the Operating Managers will make such books and records and information available for such examinations and/or audits.

SECTION 11.2. No value shall be placed for any purpose upon the Company name or the right to its use, or upon the goodwill of the Company or its business. Upon termination or dissolution of the Company (without reconstitution thereof) as provided in this Agreement, neither the Company name or the right to its use, nor the goodwill of the Company, shall be considered as an asset of the Company.

SECTION 11.3. The Operating Managers will cause to be sent to the Members within a reasonable period after the close of each year the following: (a) annual statements of the Company's gross receipts and operating expenses, and the capital accounts of each Member, prepared by the Company's independent public accountants, to be transmitted to each Member; and (b) a report to be transmitted to each Member indicating the Member's share of the Company's profit or loss for that year and the Member's allocable share of all items of income, gain, loss, deduction, and credit, for Federal income tax purposes.

## ARTICLE XII

### Tax Elections

SECTION 12.1. In the event of a transfer of a Member's interest, or upon the death of a Member, or in the event of the distribution of Company property to any party hereto, the Company may (but need not necessarily) file an election, in accordance with Section 754 of the Code to cause the basis of the Company Property to be adjusted for Federal income tax purposes, as provided by Sections 734 and 743 of the Code.

## ARTICLE XIII

### Miscellaneous

SECTION 13.1. Any notice or other communication under this Agreement shall be in writing and shall be considered given when mailed by registered or certified mail, return receipt requested, to the parties at the following addresses (or at such other address as a party shall have previously specified by notice to the others as the address to which notice shall be given to him):

A. If to the Company, to it in care of the Operating Managers at the address of the Company.

B. If to the Operating Managers, to them at the address of the Company.

C. If to any Member, to him at his address set forth on the books and records of the Company.

SECTION 13.2. This Agreement contains a complete statement of all of the arrangements among the parties with respect to the Company and cannot be changed or terminated orally or in any manner other than by a written agreement executed by all of the Members. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

SECTION 13.3. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

SECTION 13.4. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations of the jurisdiction in which the Company does business. If any provision of this Agreement, or the application thereof to any person or circumstance, shall for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected, but rather shall be enforced to the extent permitted by law.

SECTION 13.5. Anything hereinbefore in this Agreement to the contrary notwithstanding, all references to the Property of the Company are deemed to include the profits, losses and Cash Flow of the Property.

SECTION 13.6. Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the State of organization of the Company applicable to agreements made and to be performed in the State of organization of the Company.

SECTION 13.7. The captions, headings and table of contents in this Agreement are solely for convenience of reference and shall not affect its interpretation.

SECTION 13.8. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall be deemed to constitute a single document.

SECTION 13.9. Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement Effective as of the day and year first above written.

Lucy Gao
Managing Member

## "SCHEDULE A"

## OPERATING AGREEMENT
## OF
## ATHERTON FINANCIAL BUILDING LIMITED LIABILITY COMPANY

Percentage Interests of Members of Atherton Financial Building LLC.

| Member Name | Percentage Interest |
|-------------|---------------------|
| Lucy Gao | 100% |

## "SCHEDULE B"

### OPERATING AGREEMENT
### OF
### ATHERTON FINANCIAL BUILDING LIMITED LIABILITY COMPANY

Operating Managers may not make any of the following management decisions without obtaining the consent of that Membership Interest:

a. any merger, consolidation or other business combination;
b. sale or other disposition of substantially all the assets of the LLC;
c. dissolution of the LLC;
d. filing of a petition or commencing other proceedings seeking reorganization;
e. liquidation, arrangement or other similar relief under any federal or state law relating to bankruptcy or insolvency;
f. the amendment or modification of any provision of this Agreement;
g. the issuance of additional LLC Units to any Member or other person;
h. the removal of any Member;
i. the decision to appoint managers for the LLC under Article V hereof.

LAM00037523

## OPERATING AGREEMENT
## OF
## PACIFIC VIEW REO MANAGEMENT LLC

This Operating Agreement ("Agreement") of Pacific View REO Management LLC (the "Company") effective as of this 15th day of December, 2010, by, between and among the undersigned confirms our understanding as to the matters contained herein.

The parties hereto agree as follows:

### ARTICLE 1

#### Definitions

SECTION 1.1. As used herein, the following terms and phrases shall have the meanings indicated:

A.      "Act" shall mean the Limited Liability Company Act of the State of organization, as amended.

B.      "Capital Account" shall mean, with respect to each Member, the account established for each Member pursuant to Section 6.5, which will initially equal the Capital Contributions of such Member and will be (a) increased by the amount of Net Profits allocated to such Member and (b) reduced by the amount of Net Losses allocated to such Member and the amount of Cash Flow distributed to such Member. Members' Capital Accounts shall be determined and maintained in accordance with the rules and paragraph (b)(2)(iv) of Regulation Section 1.704-1 of the Code.

C.      "Capital Contributions" shall mean the fair market value of the amounts contributed by the Members pursuant to Section 6.1.

D.      "Cash Flow" shall have the meaning provided in Section 7.1.

E.      "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent revenue laws.

F.      "Operating Manager" shall mean the Member or Members selected by the Members in accordance with this Agreement to serve as Operating Manger or Operating Managers of the Company.

G.      "Members" shall mean the persons designated as such in Schedule A of this Agreement, any successor(s) to their interests as such in the Company; and any other person who pursuant to this Agreement shall become a Member, and any reference to a "Member" shall be to any one of the then Members.

H.      "Net Profits" and "Net Losses" shall mean the net profit or net loss, respectively, of the Company determined in accordance with Section 8.1.

I.      The words "Membership Interest" shall mean a Member's interest in the Company which shall be in the proportion that the Member's share of the profits and losses of the Company bears to the aggregate shares of all the Members. A Membership Interest may be evidenced by a certificate issued by the Company. A Membership Interest may be expressed on a certificate as "Units" where a Member's Units bears the same relationship to the aggregate Units of all Members that the Member's Membership Interest bears to the aggregate Membership Interests of all Members. A Member's Interest may be a certified security or an uncertificated security within the meaning of section 8-102 of the Uniform Commercial Code if the requirements of section 8-103(c) are met, and if the requirements are not met such interest shall, for purposes of the Uniform Commercial Code, be deemed to be a general intangible asset.

J.      "Company" shall mean this Limited Liability Company.

LAM00121044

K.    "Person" shall mean any natural person, corporation, partnership, joint venture, association, limited liability company or other business or legal entity.

## ARTICLE II

### Organization of the Company

SECTION 2.1. The purpose of the Company is to conduct an lawful business for which limited liability companies may be organized and to do all things necessary or useful in connection with the foregoing.

SECTION 2.2. The Company name shall be "Pacific View REO Management LLC".

SECTION 2.3. The Members shall be Members in the Company and shall continue to do business under the name of the Company until the Operating Managers shall change the name or the Company shall terminate.

SECTION 2.4. The principal address of the Company shall be such place or places as the Operating Mangers may determine.  The Operation Managers will give notice to the Members promptly after any change in the location of the principal office of the Company.

SECTION 2.5. The Company shall terminate on the date provided in the Articles of Organization, except that the Company may terminate prior to such date as provided in this Agreement.

## ARTICLE III

### Status of Members

SECTION 3.1. No Member will be bound by, or be personally liable for the expenses, liabilities or obligations of the Company.

SECTION 3.2. No Member will be entitled to withdraw any part of his Capital Account or to receive any distributions from the Company except as expressly provided in this Agreement.

SECTION 3.3. No Member will have the right to require partition of the Company property or to compel any sale or appraisal of the Company's assets or any sale of a deceased Member's interest in the Company's assets, notwithstanding any provision of law to the contrary.

## ARTICLE IV

### Meeting of Members

SECTION 4.1. An annual meeting of Members shall be held within five (5) months after the close of the fiscal year of the Company on such date and at the time and place (either within or without the state of its organization) as shall be fixed by the Members.  At the annual meeting, the Members shall elect the Operating Managers and transact such other business as may properly be brought before the meeting.

SECTION 4.2. A special meeting of Members may be called at any time by the Operating Managers and shall be called by the Operating Managers at the request in writing of that Membership interest specified in Schedule A of the Members entitled to vote at such meeting. Any such request shall state the purpose or purposes of the proposed meeting. Business transacted at any special meeting of Members shall be confined to the purposes set forth in the notice thereof.

SECTION 4.3. Written notice of the time, place and purpose of every meeting of Members (and, if other than an annual meeting, the person or persons at whose direction the meeting is being called), shall be given by the Operating Mangers to each Member of record

entitled to vote at such meeting, not less than ten nor more than sixty days prior to the date set for the meeting. Notice shall be given either personally or by mailing said notice by first class mail to each Member at his address appearing on the record book of the Company or at such other address appearing on the record book of the Company or at such other address supplied by him in writing to the Operating Managers of the Company for the purpose of receiving notice.

A written waiver of notice setting forth the purposes of the meeting for which notice is waived, signed by the person or persons entitled to such notice, whether before or after the time of the meeting stated therein, shall be deemed equivalent to the giving of such notice. The attendance by a Member at a meeting either in person or by proxy without protesting the lack of notice thereof shall constitute a waiver of notice of such Member.

All notices given with respect to an original meeting shall extend to any and all adjournments thereof and such business as might have been transacted at the original meeting may be transacted at any adjournment thereof; no notice of any adjourned meeting need be given if an announcement of the time and place of the adjourned meeting is made at the original meeting.

SECTION 4.4. The holders of a majority in interest of the Members present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of members except as otherwise provided by statute of the Articles of Organization. If, however, a quorum shall not be present or represented at any meeting of Members, the Members entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting or originally notified. When a quorum is once present to organize a meeting, such quorum is not deemed broken by the subsequent withdrawal of any Members.

SECTION 4.5. Every Member entitled to vote at any meeting shall be entitled to vote in accordance with his membership interest in the Company held by him of record on the date fixed as the record date for said meeting and may so vote in person or by proxy. Any Company action shall be authorized by a majority in interest of the votes cast by the Members entitled to vote thereon except as may otherwise be provided by statute, the Articles of Organization or this Operating Agreement.

SECTION 4.6. Every proxy must be signed by the Member entitled to vote or by his duly authorized attorney-in-fact and shall be valid only if filed with the Operating Managers of the Company prior to the commencement of voting on the matter in regard to which said proxy is to be voted. No proxy shall be valid after the expiration of eleven months from the date of its execution unless otherwise expressly provided in the proxy. Every proxy shall be revocable at the pleasure of the person executing it except as otherwise provided by statute. Unless the proxy by its terms provides for a specific revocation date and except as otherwise provided by statute, revocation of a proxy shall not be effective unless and until such revocation is executed in writing by the Member who executed such proxy and the revocation is filed with the Operating Managers of the Company prior to the voting of the proxy.

SECTION 4.7. All meetings of Members shall be presided over by the Operating Mangers, or if not present, by a Member thereby chosen by the Members at the meeting. The Operating Managers or the person presiding at the meeting shall appoint any person present to act as secretary of the meeting.

SECTION 4.8. For the purpose of determining the Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof or to express consent or dissent from any proposal without a meeting, or for the purpose of determining the Members entitled to receive payment of any distribution of Cash Flow or the allotment of any rights, or for the purpose of any other action, the Members may fix, in advance, a date as the record date for any such determination of Members. Such date shall not be more than fifty nor less than ten days before the date of any meeting nor more than fifty days prior to any action taken without a meeting, the payment of any distribution of Cash Flow or the allotment of any rights, or any

other action. When a determination of Members of record entitled to notice of, or to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof, unless the Members fix a new record date under this Section for the adjourned date.

SECTION 4.9. The company shall be entitled to treat the holder of record of any Membership Interest as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the Act.

## ARTICLE V

### Management

SECTION 5.1. Management of the Company shall be vested in all of the Members who shall also serve as Operating Managers of the Company. The Operating Managers shall vote in proportion to their Membership Interests in the Company. Except as otherwise provided in this Agreement, all decisions of the Operating Managers shall be by a majority in interest of the Members. All Operating Mangers must be Members of the Company. No Member will take part in or interfere in any manner with the conduct or control of business of the Company or have any right or authority to act for or bind the Company except as provided in this Agreement.

SECTION 5.2. The Operating Mangers shall hold office for the term for which elected and until a successor has been elected and qualified. A vacancy in the office of Operating Manager arising from any cause may be filled for the unexpired portion of the term by the Members.

SECTION 5.3. Any Operating Manager may resign at any time by giving written notice to the Members. Any such resignation shall take effect at the time specified therein or, if the time is not specified therein, upon the receipt thereof, irrespective of whether any such resignations shall have been accepted.

SECTION 5.4. The Company shall be managed by the Operating Managers and the conduct of the Company's business shall be controlled and conducted solely and exclusively by the Operating Managers in accordance with this Agreement. In addition to and not in limitation of any rights and powers conferred by law or other provisions of this Agreement, the Operating Managers shall have and may exercise on behalf of the Company all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company, and to maximize Company profits.

SECTION 5.5. Notwithstanding the foregoing, the Operating Managers may not make any of the management decisions stated in Schedule B without obtaining the consent of that Membership Interest stated in Schedule A.

SECTION 5.6. The Operating Manager shall service as Tax Matters Member as such term is defined in Code Section 6231 (a)(7).

SECTION 5.7. Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he, his testator or interstate, then, is or was a manager, Member, employee or agent of the Company, or then serves or has served on behalf of the Company in any capacity at the request of the Company, shall be indemnified by the Company against reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with an appeal therein, to the fullest extent permissible by the Act. Such right of indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

## ARTICLE VI

### Capital

SECTION 6.1. The Members have contributed to the Company in exchange for their membership interests.

SECTION 6.2. The fair market value and the adjusted basis of the contributing Member of any property other than cash contributed to the Company by a Member shall be set forth on Schedule A, annexed hereto.

SECTION 6.3. Except as expressly provided in this Agreement, no Member shall be required to make any additional contributions to the capital of the Company.

SECTION 6.4. No interest shall be paid on the Capital Account of any Member.

SECTION 6.5. A Capital Account shall be established for each Member on the books and records of the Company. If any assets of the Company are distributed to the Members in kind, the Capital Accounts of the Members shall be adjusted to reflect the difference between the fair market value of such assets on the date of distribution and the basis of the Company in such assets.

## ARTICLE VII

### Distributions of Cash

SECTION 7.1. The Company shall distribute to the Members from time to time all cash (regardless of the source thereof) of the Company which is not required for the operation or the reasonable working capital requirements of the Company (such cash is sometimes referred to herein as "Cash Flow"). For purposes of this Agreement all Cash Flow allocated to the Members shall be allocated among them in proportion to their respective Membership Interests.

SECTION 7.2. Distributions of Cash Flow shall be made from time to time in such manner as determined by the Operating Managers.

## ARTICLE VIII

### Profits and Losses

SECTION 8.1. The Net Profits and Net Losses of the Company shall be the net profits and net losses of the Company as determined for Federal income tax purposes.

SECTION 8.2. The Net Profits and Net Losses of the Company and each item of income, gain, loss, deduction or credit entering into the computation thereof, shall be allocated to the Members in the same proportions that they share in distributions of Cash Flow pursuant to Section 7.1, or if there is no Cash Flow, that they would have shared if there had been Cash Flow.

SECTION 8.3. References herein to "Reg. Sec.", are to the regulations promulgated by the United States Treasury to the Code. The terms "minimum gain", "minimum gain chargeback", "qualified income offset", "nonrecourse deduction" and "nonrecourse liability" are to be interpreted consistent with the definitions and use of such terms in Reg. Sec. 1.704-2 and Reg. Sec. 1.704-1. The following special allocations shall be made in the following order:

A. Except as other set forth in Reg. Sec. 1.704-2(f), if there is a net decrease in minimum gain, during the fiscal year of the Company, each Member, shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease of minimum gain determined in accordance with Reg. Sec. 1.704-2(g). Allocations in accordance with this Section shall be made first from the disposition of Company assets subject to nonrecourse liabilities, to the extent of the minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the taxable year. This Section is intended to comply with the minimum gain chargeback requirement of Reg. Sec. 1.704-2(f).

B.     Except as otherwise set forth in Reg. Sec. 1.704-2(i)(4), if there is a net decrease in a Member's nonrecourse liability minimum gain attributable to Members' nonrecourse liabilities during any fiscal year, each Member who has a share of the Member nonrecourse liability minimum gain attributable to Member nonrecourse liability shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease in Members' nonrecourse debt minimum gain attributable to such member nonrecourse debt. Allocations pursuant to this Section shall be made first from gain recognized from the disposition of Company assets subject to Member nonrecourse liabilities to the extent of Member minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the fiscal year. This section is intended to comply with the minimum gain chargeback requirements of Reg. Sec. 1.704-2(i).

C.     A Member who unexpectedly receives an adjustment, allocation or distribution described in (4), (5) or (6) of Reg. Sec. 1.704-1(b)(2)(ii)(d) will be allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. An allocation shall be made pursuant to this Section and if and to the extent a Member would have a deficit in his adjusted Capital Account after all other allocations provided for in this Section 8.3 were made as if this paragraph were not in the Agreement.

D.     Nonrecourse deductions shall be allocated among the Members in the same proportion in which they share the Cash Flow of the Company.

E.     Any nonrecourse deduction shall be allocated to any Member who bears the economic risk of loss with respect to the Member nonrecourse liability to which such deduction is attributable.

SECTION 8.4. Any Company gain or loss realized with respect to property, other than money, contributed to the Company by a Member shall be shared among the Members pursuant to Code section 704(c) and regulations to be promulgated thereunder so as to take account of the difference between the Company basis and the fair market value of the property at the time of the contribution ("built-in gain or loss"). Such built-in gain or loss shall be allocated to the contributing Member upon the disposition of the property.

## ARTICLE IX

### Admission and Withdrawal of a Member

SECTION 9.1. A Member may transfer his interest in the Company to another person or entity only with the prior unanimous consent of the other Members either in writing or at a meeting called for such purpose. If all of the other Members do not approve of the transfer, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee shall be entitled to receive the share of profits, losses and Cash Flow or other compensation by way of income and the return of contributions to which the transferor otherwise would be entitled.

SECTION 9.2. The Members agree to sign such additional documents as may be required in order to admit additional Members to the Company, pursuant to section 9.1 as well as, among other things, to provide for the division of profits, losses and Cash Flow among the Members.

SECTION 9.3. All costs and expenses incurred by the Company in connection with the assignment of a Member's interest, including any filing fees and publishing costs and the fees and disbursements of counsel, shall be paid by the assigning Member.

SECTION 9.4. Each person who becomes a Member in the Company, by becoming a Member, shall and does hereby ratify and agree to be bound by the terms and conditions of this Agreement.

## ARTICLE X

### Termination or Dissolution of Company

SECTION 10.1. The Company shall be terminated prior to the date of expiration of the term provided in Section 2.5 if (a) a majority in interest of the Members consent that the Company should be terminated and dissolved, or (b) the Company is dissolved pursuant to this Agreement.

SECTION 10.2. The Company shall be terminated in the event any Member (i) withdraws, resigns or is expelled from the Company; (ii) makes an assignment for the benefit of creditors, is the subject of an order for relief under Title 11 of the United States Code, files a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding of this nature, seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator for all or any substantial part of his properties; (iii) dies; or (iv) a judgment is entered by a court of competent jurisdiction adjudicating him incompetent to manage his person or his property.

SECTION 10.3. If the Company is dissolved, the owners of a majority in interest of the remaining Members may elect to reconstitute and continue the Company as a successor Company upon the same conditions as are set forth in this Agreement. Any such election to continue the Company will not result in the creation of a new Company among the remaining Members, nor will such election require the amendment of this Agreement or the execution of an amended Agreement.

SECTION 10.4. Upon the termination and dissolution of the Company, the then Operating Manager, or Operating Managers, if any, or, if there is no Operating Manager, any person elected to perform such liquidation by the written consent of the owners of a majority in interest of the Members, shall proceed to the liquidation of the Company. The proceeds of such liquidation shall be applied and distributed as follows:

A.      If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled. The fair market value of such assets shall be determined by an independent appraiser to be selected by the Company's independent public accountants. The amount by which the fair market value of any Property to be distributed in kind to the Members exceeds or is less than the basis of such Property, shall, to the extent not otherwise recognized by the Company, be taken into account in computing Net Profits or Net Losses (and shall be allocated among the Members in accordance with Section 8.2) for purposes of crediting or charging the Capital Accounts of, and liquidating distributions to, the Members under Section 10.4.B.

B.      All distributions upon liquidation of the Company shall be distributed as follows: to each of the Members, in proportion to the amount of their respective positive Capital Accounts, as such accounts have been adjusted (I) in accordance with Section 6.5 to reflect the Net Profit or Net Loss realized or incurred upon the sale of the Company's property or assets and deemed sale pursuant to Section 10.4.A; (ii) in accordance with Section 8.2 to reflect all Net Profits or Net Losses with respect to the year of liquidation. No Member shall be liable to repay the negative amount of his Capital Account.

SECTION 10.5. Each of the Members shall be furnished with a statement, reviewed by the Company's independent public accountants, which shall set forth the assets and liabilities of the Company as of the date of the Company's liquidation. Upon completion of the liquidation, the Operating Managers shall execute and cause to be filed a Certificate of Dissolution of the Company and any and all other documents necessary with respect to termination of the Company.

## ARTICLE XI

### Books and Reports

SECTION 11.1. The Operating Mangers shall cause the Company to maintain the following records:

A.     Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Company, shall be kept by the Operating Managers at the principal office of the Company. The fiscal year of the Company shall be the calendar year. The books of account of the Company shall be kept in accordance with sound accounting practices and principles applied in a consistent manner by the Company; provided, however, that all methods of accounting and treating particular transactions shall be in accordance with the methods of accounting employed for Federal income tax purposes. All determinations by the Operating Managers with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding upon al the Members unless the determination is inconsistent with any express provision of this Agreement.

B.     A current list of the full name and last known mailing address of each Member set forth in alphabetical order together with the contribution and share in profits and losses of each Member; a copy of the Articles of Organization of the Company and any amendments thereto; a copy of the Company Operating Agreement and any amendments thereto; a copy of the Company's federal, state and local income tax returns for the three most recent fiscal years.

C.     Any member shall have the right from time to time at his expense to have his accountants and representatives examine and/or audit the books and records of the Company and the information referred to in this Section, and the Operating Managers will make such books and records and information available for such examinations and/or audits.

SECTION 11.2. No value shall be placed for any purpose upon the Company name or the right to its use, or upon the goodwill of the Company or its business. Upon termination or dissolution of the Company (without reconstitution thereof) as provided in this Agreement, neither the Company name or the right to its use, nor the goodwill of the Company, shall be considered as an asset of the Company.

SECTION 11.3. The Operating Managers will cause to be sent to the Members within a reasonable period after the close of each year the following: (a) annual statements of the Company's gross receipts and operating expenses, and the capital accounts of each Member, prepared by the Company's independent public accountants, to be transmitted to each Member; and (b) a report to be transmitted to each Member indicating the Member's share of the Company's profit or loss for that year and the Member's allocable share of all items of income, gain, loss, deduction, and credit, for Federal income tax purposes.

## ARTICLE XII

### Tax Elections

SECTION 12.1. In the event of a transfer of a Member's interest, or upon the death of a Member, or in the event of the distribution of Company property to any party hereto, the Company may (but need not necessarily) file an election, in accordance with Section 754 of the Code to cause the basis of the Company Property to be adjusted for Federal income tax purposes, as provided by Sections 734 and 743 of the Code.

## ARTICLE XIII

### Miscellaneous

SECTION 13.1. Any notice or other communication under this Agreement shall be in writing and shall be considered given when mailed by registered or certified mail, return receipt requested, to the parties at the following addresses (or at such other address as a party shall have previously specified by notice to the others as the address to which notice shall be given to him):

A.     If to the Company, to it in care of the Operating Managers at the address of the Company.

B.     If to the Operating Managers, to them at the address of the Company.

C.     If to any Member, to him at his address set forth on the books and records of the Company.

SECTION 13.2. This Agreement contains a complete statement of all of the arrangements among the parties with respect to the Company and cannot be changed or terminated orally or in any manner other than by a written agreement executed by all of the Members. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

SECTION 13.3. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

SECTION 13.4. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations of the jurisdiction in which the Company does business. If any provision of this Agreement, or the application thereof to any person or circumstance, shall for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected, but rather shall be enforced to the extent permitted by law.

SECTION 13.5. Anything hereinbefore in this Agreement to the contrary notwithstanding, all references to the Property of the Company are deemed to include the profits, losses and Cash Flow of the Property.

SECTION 13.6. Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the State of organization of the Company applicable to agreements made and to be performed in the State of organization of the Company.

SECTION 13.7. The captions, headings and table of contents in this Agreement are solely for convenience of reference and shall not affect its interpretation.

SECTION 13.8. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall be deemed to constitute a single document.

SECTION 13.9. Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement Effective as of the day and year first above written.

Lucy Gao, Managing Member

## "SCHEDULE A"

## OPERATING AGREEMENT
## OF
## PACIFIC VIEW REO MANAGEMENT LLC

Percentage Interests of Members of Pacific View REO Management LLC.

| Member Name | Percentage Interest |
|---|---|
| Lucy Gao | 100% |

**OPERATING AGREEMENT**
**OF**
**PACIFIC VIEW REO MANAGEMENT LLC**

Operating Managers may not make any of the following management decisions without obtaining the consent of that Membership Interest:

a. any merger, consolidation or other business combination;
b. sale or other disposition of substantially all the assets of the LLC;
c. dissolution of the LLC;
d. filing of a petition or commencing other proceedings seeking reorganization;
e. liquidation, arrangement or other similar relief under any federal or state law relating to bankruptcy or insolvency;
f. the amendment or modification of any provision of this Agreement;
g. the issuance of additional LLC Units to any Member or other person;
h. the removal of any Member;
i. the decision to appoint managers for the LLC under Article V hereof.

## OPERATING AGREEMENT
## OF
## FACDC AZUSA LLC

This Operating Agreement ("Agreement") of FACDC AZUSA LLC (the "Company") effective as of this 11th day of December of 2014, by, between and among the undersigned confirms our understanding as to the matters contained herein.

The parties hereto agree as follows:

### ARTICLE 1

#### Definitions

SECTION 1.1. As used herein, the following terms and phrases shall have the meanings indicated:

A. "Act" shall mean the Limited Liability Company Act of the State of organization, as amended.

B. "Capital Account" shall mean, with respect to each Member, the account established for each Member pursuant to Section 6.5, which will initially equal the Capital Contributions of such Member and will be (a) increased by the amount of Net Profits allocated to such Member and (b) reduced by the amount of Net Losses allocated to such Member and the amount of Cash Flow distributed to such Member. Members' Capital Accounts shall be determined and maintained in accordance with the rules and paragraph (b)(2)(iv) of Regulation Section 1.704-1 of the Code.

C. "Capital Contributions" shall mean the fair market value of the amounts contributed by the Members pursuant to Section 6.1.

D. "Cash Flow" shall have the meaning provided in Section 7.1.

E. "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent revenue laws.

F. "Operating Manager" shall mean the Member of Members selected by the Members in accordance with this Agreement to serve as Operating Manger or Operating Managers of the Company.

G. "Members" shall mean the persons designated as such in Schedule A of this Agreement, any successor(s) to their interests as such in the Company; and any other person who pursuant to this Agreement shall become a Member, and any reference to a "Member" shall be to any one of the then Members.

H. "Net Profits" and "Net Losses" shall mean the net profit or net loss, respectively, of the Company determined in accordance with Section 8.1.

I. The words "Membership Interest" shall mean a Member's interest in the Company which shall be in the proportion that the Member's share of the profits and losses of the Company bears to the aggregate shares of all the Members. A Membership Interest may be evidenced by a certificate issued by the Company. A Membership Interest may be expressed on a certificate as "Units" where a Member's Units bears the same relationship to the aggregate Units of all Members that the Member's Membership Interest bears to the aggregate Membership Interests of all Members. A Member's Interest may be a certified security or an uncertificated security within the meaning of section 8-102 of the Uniform Commercial Code if the requirements of section 8-103(c) are met, and if the requirements are not met such Interest shall, for purposes of the Uniform Commercial Code, be deemed to be a general intangible asset.

J. "Company" shall mean this Limited Liability Company.

K.     "Person" shall mean any natural person, corporation, partnership, joint venture, association, limited liability company or other business or legal entity.

## ARTICLE II

### Organization of the Company

SECTION 2.1. The purpose of the Company is to conduct an lawful business for which limited liability companies may be organized and to do all things necessary or useful in connection with the foregoing.

SECTION 2.2. The Company name shall be "FACDC Azusa LLC".

SECTION 2.3. The Members shall be Members in the Company and shall continue to do business under the name of the Company until the Operating Managers shall change the name or the Company shall terminate.

SECTION 2.4. The principal address of the Company shall be such place or places as the Operating Mangers may determine. The Operation Managers will give notice to the Members promptly after any change in the location of the principal office of the Company.

SECTION 2.5. The Company shall terminate on the date provided in the Articles of Organization, except that the Company may terminate prior to such date as provided in this Agreement.

## ARTICLE III

### Status of Members

SECTION 3.1. No Member will be bound by, or be personally liable for the expenses, liabilities or obligations of the Company.

SECTION 3.2. No Member will be entitled to withdraw any part of his Capital Account or to receive any distributions from the Company except as expressly provided in this Agreement.

SECTION 3.3. No Member will have the right to require partition of the Company property or to compel any sale or appraisal of the Company's assets or any sale of a deceased Member's interest in the Company's assets, notwithstanding any provision of law to the contrary.

## ARTICLE IV

### Meeting of Members

SECTION 4.1. An annual meeting of Members shall be held within five (5) months after the close of the fiscal year of the Company on such date and at the time and place (either within or without the state of its organization) as shall be fixed by the Members. At the annual meeting, the Members shall elect the Operating Managers and transact such other business as may properly be brought before the meeting.

SECTION 4.2. A special meeting of Members may be called at any time by the Operating Managers and shall be called by the Operating Managers at the request in writing of that Membership Interest specified in Schedule C of the Members entitled to vote at such meeting. Any such request shall state the purpose or purposes of the proposed meeting. Business transacted at any special meeting of Members shall be confined to the purposes set forth in the notice thereof.

SECTION 4.3. Written notice of the time, place and purpose of every meeting of Members (and, if other than an annual meeting, the person or persons at whose direction the meeting is being called), shall be given by the Operating Mangers to each Member of record

entitled to vote at such meeting, not less than ten nor more than sixty days prior to the date set for the meeting. Notice shall be given either personally or by mailing said notice by first class mail to each Member at his address appearing on the record book of the Company or at such other address appearing on the record book of the Company or at such other address supplied by him in writing to the Operating Managers of the Company for the purpose of receiving notice.

A written waiver of notice setting forth the purposes of the meeting for which notice is waived, signed by the person or persons entitled to such notice, whether before or after the time of the meeting stated therein, shall be deemed equivalent to the giving of such notice. The attendance by a Member at a meeting either in person or by proxy without protesting the lack of notice thereof shall constitute a waiver of notice of such Member.

All notices given with respect to an original meeting shall extend to any and all adjournments thereof and such business as might have been transacted at the original meeting may be transacted at any adjournment thereof; no notice of any adjourned meeting need be given if an announcement of the time and place of the adjourned meeting is made at the original meeting.

SECTION 4.4. The holders of a majority in interest of the Members present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of members except as otherwise provided by statute of the Articles of Organization. If, however, a quorum shall not be present or represented at any meeting of Members, the Members entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting or originally notified. When a quorum is once present to organize a meeting, such quorum is not deemed broken by the subsequent withdrawal of any Members.

SECTION 4.5. Every Member entitled to vote at any meeting shall be entitled to vote in accordance with his membership interest in the Company held by him of record on the date fixed as the record date for said meeting and may so vote in person or by proxy. Any Company action shall be authorized by a majority in interest of the votes cast by the Members entitled to vote thereon except as may otherwise be provided by statute, the Articles of Organization or this Operating Agreement.

SECTION 4.6. Every proxy must be signed by the Member entitled to vote or by his duly authorized attorney-in-fact and shall be valid only if filed with the Operating Managers of the Company prior to the commencement of voting on the matter in regard to which said proxy is to be voted. No proxy shall be valid after the expiration of eleven months from the date of its execution unless otherwise expressly provided in the proxy. Every proxy shall be revocable at the pleasure of the person executing it except as otherwise provided by statute. Unless the proxy by its terms provides for a specific revocation date and except as otherwise provided by statute, revocation of a proxy shall not be effective unless and until such revocation is executed in writing by the Member who executed such proxy and the revocation is filed with the Operating Managers of the Company prior to the voting of the proxy.

SECTION 4.7. All meetings of Members shall be presided over by the Operating Mangers, or if not present, by a Member thereby chosen by the Members at the meeting. The Operating Managers or the person presiding at the meeting shall appoint any person present to act as secretary of the meeting.

SECTION 4.8. For the purpose of determining the Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof or to express consent or dissent from any proposal without a meeting, or for the purpose of determining the Members entitled to receive payment of any distribution of Cash Flow or the allotment of any rights, or for the purpose of any other action, the Members may fix, in advance, a date as the record date for any such determination of Members. Such date shall not be more than fifty nor less than ten days before the date of any meeting nor more than fifty days prior to any action taken without a meeting, the payment of any distribution of Cash Flow or the allotment of any rights, or any

other action. When a determination of Members of record entitled to notice of, or to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof, unless the Members fix a new record date under this Section for the adjourned date.

SECTION 4.9. The company shall be entitled to treat the holder of record of any Membership Interest as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the Act.

## ARTICLE V

### Management

SECTION 5.1. Management of the Company shall be vested in all of the Members who shall also serve as Operating Managers of the Company. The Operating Managers shall vote in proportion to their Membership Interests in the Company. Except as otherwise provided in this Agreement, all decisions of the Operating Managers shall be by a majority in interest of the Members. All Operating Mangers must be Members of the Company. No Member will take part in or interfere in any manner with the conduct or control of business of the Company or have any right or authority to act for or bind the Company except as provided in this Agreement.

SECTION 5.2. The Operating Mangers shall hold office for the term for which elected and until a successor has been elected and qualified. A vacancy in the office of Operating Manager arising from any cause may be filled for the unexpired portion of the term by the Members.

SECTION 5.3. Any Operating Manager may resign at any time by giving written notice to the Members. Any such resignation shall take effect at the time specified therein or, if the time is not specified therein, upon the receipt thereof, irrespective of whether any such resignations shall have been accepted.

SECTION 5.4. The Company shall be managed by the Operating Managers and the conduct of the Company's business shall be controlled and conducted solely and exclusively by the Operating Managers in accordance with this Agreement. In addition to and not in limitation of any rights and powers conferred by law or other provisions of this Agreement, the Operating Managers shall have and may exercise on behalf of the Company all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company, and to maximize Company profits.

SECTION 5.5. Notwithstanding the foregoing, the Operating Managers may not make any of the management decisions stated in Schedule B without obtaining the consent of that Membership Interest stated in Schedule B.

SECTION 5.6. The Operating Manager shall service as Tax Matters Member as such term is defined in Code Section 6231 (a)(7).

SECTION 5.7. Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he, his testator or interstate, then, is or was a manager, Member, employee or agent of the Company, or then serves or has served on behalf of the Company in any capacity at the request of the Company, shall be indemnified by the Company against reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with an appeal therein, to the fullest extent permissible by the Act. Such right of indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

## ARTICLE VI

### Capital

SECTION 6.1. The Members have contributed to the Company in exchange for their membership interests, the cash and other property as set forth on Schedule A, annexed hereto.

SECTION 6.2. The fair market value and the adjusted basis of the contributing Member of any property other than cash contributed to the Company by a Member shall be set forth on Schedule A, annexed hereto.

SECTION 6.3. Except as expressly provided in this Agreement, no Member shall be required to make any additional contributions to the capital of the Company.

SECTION 6.4. No interest shall be paid on the Capital Account of any Member.

SECTION 6.5. A Capital Account shall be established for each Member on the books and records of the Company. If any assets of the Company are distributed to the Members in kind, the Capital Accounts of the Members shall be adjusted to reflect the difference between the fair market value of such assets on the date of distribution and the basis of the Company in such assets.

## ARTICLE VII

### Distributions of Cash

SECTION 7.1. The Company shall distribute to the Members from time to time all cash (regardless of the source thereof) of the Company which is not required for the operation or the reasonable working capital requirements of the Company (such cash is sometimes referred to herein as "Cash Flow"). For purposes of this Agreement all Cash Flow allocated to the Members shall be allocated among them in proportion to their respective Membership Interests.

SECTION 7.2. Distributions of Cash Flow shall be made from time to time in such manner as determined by the Operating Managers.

## ARTICLE VIII

### Profits and Losses

SECTION 8.1. The Net Profits and Net Losses of the Company shall be the net profits and net losses of the Company as determined for Federal income tax purposes.

SECTION 8.2. The Net Profits and Net Losses of the Company and each item of income, gain, loss, deduction or credit entering into the computation thereof, shall be allocated to the Members in the same proportions that they share in distributions of Cash Flow pursuant to Section 7.1, or if there is no Cash Flow, that they would have shared if there had been Cash Flow.

SECTION 8.3. References herein to "Reg. Sec.", are to the regulations promulgated by the United States Treasury to the Code. The terms "minimum gain", "minimum gain chargeback", "qualified income offset", "nonrecourse deduction" and "nonrecourse liability" are to be interpreted consistent with the definitions and use of such terms in Reg. Sec. 1.704-2 and Reg. Sec. 1.704-1. The following special allocations shall be made in the following order:

A. Except as other set forth in Reg. Sec. 1.704-2(f), if there is a net decrease in minimum gain, during the fiscal year of the Company, each Member, shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease of minimum gain determined in accordance with Reg. Sec. 1.704-2(g). Allocations in accordance with this Section shall be made first from the disposition of Company assets subject to nonrecourse liabilities, to the extent of the minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the taxable year. This Section is intended to comply with the minimum gain chargeback requirement of Reg. Sec. 1.704-2(f).

228
LAM00115799

B.     Except as otherwise set forth in Reg. Sec. 1.704-2(i)(4), if there is a net decrease in a Member's nonrecourse liability minimum gain attributable to Members' nonrecourse liabilities during any fiscal year, each Member who has a share of the Member nonrecourse liability minimum gain attributable to Member nonrecourse liability shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease in Members' nonrecourse debt minimum gain attributable to such member nonrecourse debt. Allocations pursuant to this Section shall be made first from gain recognized from the disposition of Company assets subject to Member nonrecourse liabilities to the extent of Member minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the fiscal year. This section is intended to comply with the minimum gain chargeback requirements of Reg. Sec. 1.704-2(i).

C.     A Member who unexpectedly receives an adjustment, allocation or distribution described in (4), (5) or (6) of Reg. Sec. 1.704-1(b)(2)(ii)(d) will be allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. An allocation shall be made pursuant to this Section and if and to the extent a Member would have a deficit in his adjusted Capital Account after all other allocations provided for in this Section 8.3 were made as if this paragraph were not in the Agreement.

D.     Nonrecourse deductions shall be allocated among the Members in the same proportion in which they share the Cash Flow of the Company.

E.     Any nonrecourse deduction shall be allocated to any Member who bears the economic risk of loss with respect to the Member nonrecourse liability to which such deduction is attributable.

SECTION 8.4. Any Company gain or loss realized with respect to property, other than money, contributed to the Company by a Member shall be shared among the Members pursuant to Code section 704(c) and regulations to be promulgated thereunder so as to take account of the difference between the Company basis and the fair market value of the property at the time of the contribution ("built-in gain or loss"). Such built-in gain or loss shall be allocated to the contributing Member upon the disposition of the property.

## ARTICLE IX

### Admission and Withdrawal of a Member

SECTION 9.1. A Member may transfer his interest in the Company to another person or entity only with the prior unanimous consent of the other Members either in writing or at a meeting called for such purpose. If all of the other Members do not approve of the transfer, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee shall be entitled to receive the share of profits, losses and Cash Flow or other compensation by way of income and the return of contributions to which the transferor otherwise would be entitled.

SECTION 9.2. The Members agree to sign such additional documents as may be required in order to admit additional Members to the Company, pursuant to section 9.1 as well as, among other things, to provide for the division of profits, losses and Cash Flow among the Members.

SECTION 9.3. All costs and expenses incurred by the Company in connection with the assignment of a Member's interest, including any filing fees and publishing costs and the fees and disbursements of counsel, shall be paid by the assigning Member.

SECTION 9.4. Each person who becomes a Member in the Company, by becoming a Member, shall and does hereby ratify and agree to be bound by the terms and conditions of this Agreement.

## ARTICLE X

### Termination or Dissolution of Company

SECTION 10.1. The Company shall be terminated prior to the date of expiration of the term provided in Section 2.5 if (a) a majority in interest of the Members consent that the Company should be terminated and dissolved, or (b) the Company is dissolved pursuant to this Agreement.

SECTION 10.2. The Company shall be terminated in the event any Member (i) withdraws, resigns or is expelled from the Company; (ii) makes an assignment for the benefit of creditors, is the subject of an order for relief under Title 11 of the United States Code, files a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding of this nature, seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator for all or any substantial part of his properties; (iii) dies; or (iv) a judgment is entered by a court of competent jurisdiction adjudicating him incompetent to manage his person or his property.

SECTION 10.3. If the Company is dissolved, the owners of a majority in interest of the remaining Members may elect to reconstitute and continue the Company as a successor Company upon the same conditions as are set forth in this Agreement. Any such election to continue the Company will not result in the creation of a new Company among the remaining Members, nor will such election require the amendment of this Agreement or the execution of an amended Agreement.

SECTION 10.4. Upon the termination and dissolution of the Company, the then Operating Manager, or Operating Managers, if any, or, if there is no Operating Manager, any person elected to perform such liquidation by the written consent of the owners of a majority in interest of the Members, shall proceed to the liquidation of the Company. The proceeds of such liquidation shall be applied and distributed as follows:

A. If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled. The fair market value of such assets shall be determined by an independent appraiser to be selected by the Company's independent public accountants. The amount by which the fair market value of any Property to be distributed in kind to the Members exceeds or is less than the basis of such Property, shall, to the extent not otherwise recognized by the Company, be taken into account in computing Net Profits or Net Losses (and shall be allocated among the Members in accordance with Section 8.2) for purposes of crediting or charging the Capital Accounts of, and liquidating distributions to, the Members under Section 10.4.B.

B. All distributions upon liquidation of the Company shall be distributed as follows: to each of the Members, in proportion to the amount of their respective positive Capital Accounts, as such accounts have been adjusted (i) in accordance with Section 6.5 to reflect the Net Profit or Net Loss realized or incurred upon the sale of the Company's property or assets and deemed sale pursuant to Section 10.4.A; (ii) in accordance with Section 8.2 to reflect all Net Profits or Net Losses with respect to the year of liquidation. No Member shall be liable to repay the negative amount of his Capital Account.

SECTION 10.5. Each of the Members shall be furnished with a statement, reviewed by the Company's independent public accountants, which shall set forth the assets and liabilities of the Company as of the date of the Company's liquidation. Upon completion of the liquidation, the Operating Managers shall execute and cause to be filed a Certificate of Dissolution of the Company and any and all other documents necessary with respect to termination of the Company.

## ARTICLE XI

## Books and Reports

SECTION 11.1. The Operating Mangers shall cause the Company to maintain the following records:

A. Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Company, shall be kept by the Operating Managers at the principal office of the Company. The fiscal year of the Company shall be the calendar year. The books of account of the Company shall be kept in accordance with sound accounting practices and principles applied in a consistent manner by the Company; provided, however, that all methods of accounting and treating particular transactions shall be in accordance with the methods of accounting employed for Federal income tax purposes. All determinations by the Operating Managers with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding upon al the Members unless the determination is inconsistent with any express provision of this Agreement.

B. A current list of the full name and last known mailing address of each Member set forth in alphabetical order together with the contribution and share in profits and losses of each Member; a copy of the Articles of Organization of the Company and any amendments thereto; a copy of the Company Operating Agreement and any amendments thereto; a copy of the Company's federal, state and local income tax returns for the three most recent fiscal years.

C. Any member shall have the right from time to time at his expense to have his accountants and representatives examine and/or audit the books and records of the Company and the information referred to in this Section, and the Operating Managers will make such books and records and information available for such examinations and/or audits.

SECTION 11.2. No value shall be placed for any purpose upon the Company name or the right to its use, or upon the goodwill of the Company or its business. Upon termination or dissolution of the Company (without reconstitution thereof) as provided in this Agreement, neither the Company name or the right to its use, nor the goodwill of the Company, shall be considered as an asset of the Company.

SECTION 11.3. The Operating Managers will cause to be sent to the Members within a reasonable period after the close of each year the following: (a) annual statements of the Company's gross receipts and operating expenses, and the capital accounts of each Member, prepared by the Company's independent public accountants, to be transmitted to each Member; and (b) a report to be transmitted to each Member indicating the Member's share of the Company's profit or loss for that year and the Member's allocable share of all items of income, gain, loss, deduction, and credit, for Federal income tax purposes.

## ARTICLE XII

### Tax Elections

SECTION 12.1. In the event of a transfer of a Member's interest, or upon the death of a Member, or in the event of the distribution of Company property to any party hereto, the Company may (but need not necessarily) file an election, in accordance with Section 754 of the Code to cause the basis of the Company Property to be adjusted for Federal income tax purposes, as provided by Sections 734 and 743 of the Code.

## ARTICLE XIII

### Miscellaneous

SECTION 13.1. Any notice or other communication under this Agreement shall be in writing and shall be considered given when mailed by registered or certified mail, return receipt requested, to the parties at the following addresses (or at such other address as a party shall have previously specified by notice to the others as the address to which notice shall be given to him):

A.    If to the Company, to it in care of the Operating Managers at the address of the Company.

B.    If to the Operating Managers, to them at the address of the Company.

C.    If to any Member, to him at his address set forth on the books and records of the Company.

SECTION 13.2. This Agreement contains a complete statement of all of the arrangements among the parties with respect to the Company and cannot be changed or terminated orally or in any manner other than by a written agreement executed by all of the Members. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

SECTION 13.3. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

SECTION 13.4. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations of the jurisdiction in which the Company does business. If any provision of this Agreement, or the application thereof to any person or circumstance, shall for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected, but rather shall be enforced to the extent permitted by law.

SECTION 13.5. Anything hereinbefore in this Agreement to the contrary notwithstanding, all references to the Property of the Company are deemed to include the profits, losses and Cash Flow of the Property.

SECTION 13.6. Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the State of organization of the Company applicable to agreements made and to be performed in the State of organization of the Company.

SECTION 13.7. The captions, headings and table of contents in this Agreement are solely for convenience of reference and shall not affect its interpretation.

SECTION 13.8. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall be deemed to constitute a single document.

SECTION 13.9. Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

**"SCHEDULE A"**

**OPERATING AGREEMENT
OF
FACDC AZUSA LIMITED LIABILITY COMPANY**

Contributions and Percentage Interests of Members of FACDC AZUSA, LLC as of December 11, 2014.

| Member Name | Percentage Interest |
|-------------|---------------------|
| Lucy Gao    | 100%                |



## "SCHEDULE B"

## OPERATING AGREEMENT
## FACDC AZUSA LIMITED LIABILITY COMPANY

Operating Managers may not make any of the following management decisions without obtaining the consent of that Membership Interest:

a. any merger, consolidation or other business combination;
b. sale or other disposition of substantially all the assets of the LLC;
c. dissolution of the LLC;
d. filing of a petition or commencing other proceedings seeking reorganization;
e. liquidation, arrangement or other similar relief under any federal or state law relating to bankruptcy or insolvency;
f. the amendment or modification of any provision of this Agreement;
g. the issuance of additional LLC Units to any Member or other person;
h. the removal of any Member;
i. the decision to appoint managers for the LLC under Article V hereof.

## OPERATING AGREEMENT
## OF
## 1595 17th Street LLC

This Operating Agreement ("Agreement") of 1595 17th Street LLC (the "Company") effective as of this 20th day of August, 2009, by, between and among the undersigned confirms our understanding as to the matters contained herein.

The parties hereto agree as follows:

## ARTICLE 1

### Definitions

SECTION 1.1. As used herein, the following terms and phrases shall have the meanings indicated:

A.    "Act" shall mean the Limited Liability Company Act of the State of organization, as amended.

B.    "Capital Account" shall mean, with respect to each Member, the account established for each Member pursuant to Section 6.5, which will initially equal the Capital Contributions of such Member and will be (a) increased by the amount of Net Profits allocated to such Member and (b) reduced by the amount of Net Losses allocated to such Member and the amount of Cash Flow distributed to such Member. Members' Capital Accounts shall be determined and maintained in accordance with the rules and paragraph (b)(2)(iv) of Regulation Section 1.704-1 of the Code.

C.    "Capital Contributions" shall mean the fair market value of the amounts contributed by the Members pursuant to Section 6.1.

D.    "Cash Flow" shall have the meaning provided in Section 7.1.

E.    "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent revenue laws.

F.    "Operating Manager" shall mean the Member or Members selected by the Members or Members in accordance with this Agreement to serve as Operating Manger or Operating Managers of the Company.

G.    "Member(s)" shall mean the person(s) designated as such in Schedule A of this Agreement, any successor(s) to their interests as such in the Company; and any other person who pursuant to this Agreement shall become a Member, and any reference to a "Member" shall be to any one of the then Members.

H.    "Net Profits" and "Net Losses" shall mean the net profit or net loss, respectively, of the Company determined in accordance with Section 8.1.

I.    The words "Membership Interest" shall mean a Member's interest in the Company which shall be in the proportion that the Member's share of the profits and losses of the Company bears to the aggregate shares of all the Members. A Membership Interest may be evidenced by a certificate issued by the Company. A Membership Interest may be expressed on a certificate as "Units" where a Member's Units bears the same relationship to the aggregate Units of all Members that the Member's Membership Interest bears to the aggregate Membership Interests of all Members. A Member's Interest may be a certified security or an uncertificated security within the meaning of section 8-102 of the Uniform Commercial Code if the requirements of section 8-103(c) are met, and if the requirements are not met such interest shall, for purposes of the Uniform Commercial Code, be deemed to be a general intangible asset.

J.    "Company" shall mean this Limited Liability Company.

K. "Person" shall mean any natural person, corporation, partnership, joint venture, association, limited liability company or other business or legal entity.

## ARTICLE II

### Organization of the Company

SECTION 2.1. The purpose of the Company is to conduct a lawful business for which limited liability companies may be organized and to do all things necessary or useful in connection with the foregoing.

SECTION 2.2. The Company name shall be "1595 17th Street LLC".

SECTION 2.3. The Members shall be Members in the Company and shall continue to do business under the name of the Company until the Operating Managers shall change the name or the Company shall terminate.

SECTION 2.4. The principal address of the Company shall be such place or places as the Operating Mangers may determine. The Operation Managers will give notice to the Members promptly after any change in the location of the principal office of the Company.

SECTION 2.5. The Company shall terminate on the date provided in the Articles of Organization, except that the Company may terminate prior to such date as provided in this Agreement.

## ARTICLE III

### Status of Members

SECTION 3.1. No Member will be bound by, or be personally liable for the expenses, liabilities or obligations of the Company.

SECTION 3.2. No Member will be entitled to withdraw any part of his Capital Account or to receive any distributions from the Company except as expressly provided in this Agreement.

SECTION 3.3. No Member will have the right to require partition of the Company property or to compel any sale or appraisal of the Company's assets or any sale of a deceased Member's interest in the Company's assets, notwithstanding any provision of law to the contrary.

## ARTICLE IV

### Meeting of Members

SECTION 4.1. An annual meeting of Members shall be held within five (5) months after the close of the fiscal year of the Company on such date and at the time and place (either within or without the state of its organization) as shall be fixed by the Members. At the annual meeting, the Members shall elect the Operating Managers and transact such other business as may properly be brought before the meeting.

SECTION 4.2. A special meeting of Members may be called at any time by the Operating Managers and shall be called by the Operating Managers at the request in writing of that Membership interest specified in Schedule A of the Members entitled to vote at such meeting. Any such request shall state the purpose or purposes of the proposed meeting. Business transacted at any special meeting of Members shall be confined to the purposes set forth in the notice thereof.

SECTION 4.3. Written notice of the time, place and purpose of every meeting of Members (and, if other than an annual meeting, the person or persons at whose direction the meeting is being called), shall be given by the Operating Mangers to each Member of record

entitled to vote at such meeting, not less than ten nor more than sixty days prior to the date set for the meeting. Notice shall be given either personally or by mailing said notice by first class mail to each Member at his address appearing on the record book of the Company or at such other address appearing on the record book of the Company or at such other address supplied by him in writing to the Operating Managers of the Company for the purpose of receiving notice.

A written waiver of notice setting forth the purposes of the meeting for which notice is waived, signed by the person or persons entitled to such notice, whether before or after the time of the meeting stated therein, shall be deemed equivalent to the giving of such notice. The attendance by a Member at a meeting either in person or by proxy without protesting the lack of notice thereof shall constitute a waiver of notice of such Member.

All notices given with respect to an original meeting shall extend to any and all adjournments thereof and such business as might have been transacted at the original meeting may be transacted at any adjournment thereof; no notice of any adjourned meeting need be given if an announcement of the time and place of the adjourned meeting is made at the original meeting.

SECTION 4.4. The holders of a majority in interest of the Members present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of members except as otherwise provided by statute of the Articles of Organization. If, however, a quorum shall not be present or represented at any meeting of Members, the Members entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting or originally notified. When a quorum is once present to organize a meeting, such quorum is not deemed broken by the subsequent withdrawal of any Members.

SECTION 4.5. Every Member entitled to vote at any meeting shall be entitled to vote in accordance with his membership interest in the Company held by him of record on the date fixed as the record date for said meeting and may so vote in person or by proxy. Any Company action shall be authorized by a majority in interest of the votes cast by the Members entitled to vote thereon except as may otherwise be provided by statute, the Articles of Organization or this Operating Agreement.

SECTION 4.6. Every proxy must be signed by the Member entitled to vote or by his duly authorized attorney-in-fact and shall be valid only if filed with the Operating Managers of the Company prior to the commencement of voting on the matter in regard to which said proxy is to be voted. No proxy shall be valid after the expiration of eleven months from the date of its execution unless otherwise expressly provided in the proxy. Every proxy shall be revocable at the pleasure of the person executing it except as otherwise provided by statute. Unless the proxy by its terms provides for a specific revocation date and except as otherwise provided by statute, revocation of a proxy shall not be effective unless and until such revocation is executed in writing by the Member who executed such proxy and the revocation is filed with the Operating Managers of the Company prior to the voting of the proxy.

SECTION 4.7. All meetings of Members shall be presided over by the Operating Mangers, or if not present, by a Member thereby chosen by the Members at the meeting. The Operating Managers or the person presiding at the meeting shall appoint any person present to act as secretary of the meeting.

SECTION 4.8. For the purpose of determining the Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof or to express consent or dissent from any proposal without a meeting, or for the purpose of determining the Members entitled to receive payment of any distribution of Cash Flow or the allotment of any rights, or for the purpose of any other action, the Members may fix, in advance, a date as the record date for any such determination of Members. Such date shall not be more than fifty nor less than ten days before the date of any meeting nor more than fifty days prior to any action taken without a meeting, the payment of any distribution of Cash Flow or the allotment of any rights, or any

other action. When a determination of Members of record entitled to notice of, or to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof, unless the Members fix a new record date under this Section for the adjourned date.

SECTION 4.9. The company shall be entitled to treat the holder of record of any Membership Interest as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the Act.

## ARTICLE V

### Management

SECTION 5.1. Management of the Company shall be vested in all of the Members who shall also serve as Operating Managers of the Company. The Operating Managers shall vote in proportion to their Membership Interests in the Company. Except as otherwise provided in this Agreement, all decisions of the Operating Managers shall be by a majority in interest of the Members. All Operating Mangers must be Members of the Company. No Member will take part in or interfere in any manner with the conduct or control of business of the Company or have any right or authority to act for or bind the Company except as provided in this Agreement.

SECTION 5.2. The Operating Mangers shall hold office for the term for which elected and until a successor has been elected and qualified. A vacancy in the office of Operating Manager arising from any cause may be filled for the unexpired portion of the term by the Members.

SECTION 5.3. Any Operating Manager may resign at any time by giving written notice to the Members. Any such resignation shall take effect at the time specified therein or, if the time is not specified therein, upon the receipt thereof, irrespective of whether any such resignations shall have been accepted.

SECTION 5.4. The Company shall be managed by the Operating Managers and the conduct of the Company's business shall be controlled and conducted solely and exclusively by the Operating Managers in accordance with this Agreement. In addition to and not in limitation of any rights and powers conferred by law or other provisions of this Agreement, the Operating Managers shall have and may exercise on behalf of the Company all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company, and to maximize Company profits.

SECTION 5.5. Notwithstanding the foregoing, the Operating Managers may not make any of the management decisions stated in Schedule B without obtaining the consent of that Membership Interest stated in Schedule A.

SECTION 5.6. The Operating Manager shall service as Tax Matters Member as such term is defined in Code Section 6231 (a)(7).

SECTION 5.7. Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he, his testator or interstate, then, is or was a manager, Member, employee or agent of the Company, or then serves or has served on behalf of the Company in any capacity at the request of the Company, shall be indemnified by the Company against reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with an appeal therein, to the fullest extent permissible by the Act. Such right of indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

## ARTICLE VI

### Capital

SECTION 6.1. The Members have contributed to the Company in exchange for their membership interests, the cash and other property as set forth on Schedule A, annexed hereto.

SECTION 6.2. The fair market value and the adjusted basis of the contributing Member of any property other than cash contributed to the Company by a Member shall be set forth on Schedule A, annexed hereto.

SECTION 6.3. Except as expressly provided in this Agreement, no Member shall be required to make any additional contributions to the capital of the Company.

SECTION 6.4. No interest shall be paid on the Capital Account of any Member.

SECTION 6.5. A Capital Account shall be established for each Member on the books and records of the Company. If any assets of the Company are distributed to the Members in kind, the Capital Accounts of the Members shall be adjusted to reflect the difference between the fair market value of such assets on the date of distribution and the basis of the Company in such assets.

## ARTICLE VII

### Distributions of Cash

SECTION 7.1. The Company shall distribute to the Members from time to time all cash (regardless of the source thereof) of the Company which is not required for the operation or the reasonable working capital requirements of the Company (such cash is sometimes referred to herein as "Cash Flow"). For purposes of this Agreement all Cash Flow allocated to the Members shall be allocated among them in proportion to their respective Membership Interests.

SECTION 7.2. Distributions of Cash Flow shall be made from time to time in such manner as determined by the Operating Managers.

## ARTICLE VIII

### Profits and Losses

SECTION 8.1. The Net Profits and Net Losses of the Company shall be the net profits and net losses of the Company as determined for Federal Income tax purposes.

SECTION 8.2. The Net Profits and Net Losses of the Company and each item of income, gain, loss, deduction or credit entering into the computation thereof, shall be allocated to the Members in the same proportions that they share in distributions of Cash Flow pursuant to Section 7.1, or if there is no Cash Flow, that they would have shared if there had been Cash Flow.

SECTION 8.3. References herein to "Reg. Sec.", are to the regulations promulgated by the United States Treasury to the Code. The terms "minimum gain", "minimum gain chargeback", "qualified income offset", "nonrecourse deduction" and "nonrecourse liability" are to be interpreted consistent with the definitions and use of such terms in Reg. Sec. 1.704-2 and Reg. Sec. 1.704-1. The following special allocations shall be made in the following order:

A.    Except as other set forth in Reg. Sec. 1.704-2(f), if there is a net decrease in minimum gain, during the fiscal year of the Company, each Member, shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease of minimum gain determined in accordance with Reg. Sec. 1.704-2(g). Allocations in accordance with this Section shall be made first from the disposition of Company assets subject to nonrecourse liabilities, to the extent of the minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the taxable year. This Section is intended to comply with the minimum gain chargeback requirement of Reg. Sec. 1.704-2(f).

B. Except as otherwise set forth in Reg. Sec. 1.704-2(i)(4), if there is a net decrease in a Member's nonrecourse liability minimum gain attributable to Members' nonrecourse liabilities during any fiscal year, each Member who has a share of the Member nonrecourse liability minimum gain attributable to Member nonrecourse liability shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease in Members' nonrecourse debt minimum gain attributable to such member nonrecourse debt. Allocations pursuant to this Section shall be made first from gain recognized from the disposition of Company assets subject to Member nonrecourse liabilities to the extent of Member minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the fiscal year. This section is intended to comply with the minimum gain chargeback requirements of Reg. Sec. 1.704-2(i).

C. A Member who unexpectedly receives an adjustment, allocation or distribution described in (4), (5) or (6) of Reg. Sec. 1.704-1(b)(2)(II)(d) will be allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. An allocation shall be made pursuant to this Section and if and to the extent a Member would have a deficit in his adjusted Capital Account after all other allocations provided for in this Section 8.3 were made as if this paragraph were not in the Agreement.

D. Nonrecourse deductions shall be allocated among the Members in the same proportion in which they share the Cash Flow of the Company.

E. Any nonrecourse deduction shall be allocated to any Member who bears the economic risk of loss with respect to the Member nonrecourse liability to which such deduction is attributable.

SECTION 8.4. Any Company gain or loss realized with respect to property, other than money, contributed to the Company by a Member shall be shared among the Members pursuant to Code section 704(c) and regulations to be promulgated thereunder so as to take account of the difference between the Company basis and the fair market value of the property at the time of the contribution ("built-in gain or loss"). Such built-in gain or loss shall be allocated to the contributing Member upon the disposition of the property.

## ARTICLE IX

### Admission and Withdrawal of a Member

SECTION 9.1. A Member may transfer his interest in the Company to another person or entity only with the prior unanimous consent of the other Members either in writing or at a meeting called for such purpose. If all of the other Members do not approve of the transfer, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee shall be entitled to receive the share of profits, losses and Cash Flow or other compensation by way of income and the return of contributions to which the transferor otherwise would be entitled.

SECTION 9.2. The Members agree to sign such additional documents as may be required in order to admit additional Members to the Company, pursuant to section 9.1 as well as, among other things, to provide for the division of profits, losses and Cash Flow among the Members.

SECTION 9.3. All costs and expenses incurred by the Company in connection with the assignment of a Member's interest, including any filing fees and publishing costs and the fees and disbursements of counsel, shall be paid by the assigning Member.

SECTION 9.4. Each person who becomes a Member in the Company, by becoming a Member, shall and does hereby ratify and agree to be bound by the terms and conditions of this Agreement.

## ARTICLE X

### Termination or Dissolution of Company

SECTION 10.1. The Company shall be terminated prior to the date of expiration of the term provided in Section 2.5 if (a) a majority in interest of the Members consent that the Company should be terminated and dissolved, or (b) the Company is dissolved pursuant to this Agreement.

SECTION 10.2. The Company shall be terminated in the event any Member (i) withdraws, resigns or is expelled from the Company; (ii) makes an assignment for the benefit of creditors, is the subject of an order for relief under Title 11 of the United States Code, files a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding of this nature, seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator for all or any substantial part of his properties; (iii) dies; or (iv) a judgment is entered by a court of competent jurisdiction adjudicating him incompetent to manage his person or his property.

SECTION 10.3. If the Company is dissolved, the owners of a majority in interest of the remaining Members may elect to reconstitute and continue the Company as a successor Company upon the same conditions as are set forth in this Agreement. Any such election to continue the Company will not result in the creation of a new Company among the remaining Members, nor will such election require the amendment of this Agreement or the execution of an amended Agreement.

SECTION 10.4. Upon the termination and dissolution of the Company, the then Operating Manager, or Operating Managers, if any, or, if there is no Operating Manager, any person elected to perform such liquidation by the written consent of the owners of a majority in interest of the Members, shall proceed to the liquidation of the Company. The proceeds of such liquidation shall be applied and distributed as follows:

A.    If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled. The fair market value of such assets shall be determined by an independent appraiser to be selected by the Company's independent public accountants. The amount by which the fair market value of any Property to be distributed in kind to the Members exceeds or is less than the basis of such Property, shall, to the extent not otherwise recognized by the Company, be taken into account in computing Net Profits or Net Losses (and shall be allocated among the Members in accordance with Section 8.2) for purposes of crediting or charging the Capital Accounts of, and liquidating distributions to, the Members under Section 10.4.B.

B.    All distributions upon liquidation of the Company shall be distributed as follows: to each of the Members, in proportion to the amount of their respective positive Capital Accounts, as such accounts have been adjusted (i) in accordance with Section 6.5 to reflect the Net Profit or Net Loss realized or incurred upon the sale of the Company's property or assets and deemed sale pursuant to Section 10.4.A; (ii) in accordance with Section 8.2 to reflect all Net Profits or Net Losses with respect to the year of liquidation. No Member shall be liable to repay the negative amount of his Capital Account.

SECTION 10.5. Each of the Members shall be furnished with a statement, reviewed by the Company's independent public accountants, which shall set forth the assets and liabilities of the Company as of the date of the Company's liquidation. Upon completion of the liquidation, the Operating Managers shall execute and cause to be filed a Certificate of Dissolution of the Company and any and all other documents necessary with respect to termination of the Company.

## ARTICLE XI

### Books and Reports

SECTION 11.1. The Operating Mangers shall cause the Company to maintain the following records:

A. Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Company, shall be kept by the Operating Managers at the principal office of the Company. The fiscal year of the Company shall be the calendar year. The books of account of the Company shall be kept in accordance with sound accounting practices and principles applied in a consistent manner by the Company; provided, however, that all methods of accounting and treating particular transactions shall be in accordance with the methods of accounting employed for Federal income tax purposes. All determinations by the Operating Managers with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding upon al the Members unless the determination is inconsistent with any express provision of this Agreement.

B. A current list of the full name and last known mailing address of each Member set forth in alphabetical order together with the contribution and share in profits and losses of each Member; a copy of the Articles of Organization of the Company and any amendments thereto; a copy of the Company Operating Agreement and any amendments thereto; a copy of the Company's federal, state and local income tax returns for the three most recent fiscal years.

C. Any member shall have the right from time to time at his expense to have his accountants and representatives examine and/or audit the books and records of the Company and the information referred to in this Section, and the Operating Managers will make such books and records and information available for such examinations and/or audits.

SECTION 11.2. No value shall be placed for any purpose upon the Company name or the right to its use, or upon the goodwill of the Company or its business. Upon termination or dissolution of the Company (without reconstitution thereof) as provided in this Agreement, neither the Company name or the right to its use, nor the goodwill of the Company, shall be considered as an asset of the Company.

SECTION 11.3. The Operating Managers will cause to be sent to the Members within a reasonable period after the close of each year the following: (a) annual statements of the Company's gross receipts and operating expenses, and the capital accounts of each Member, prepared by the Company's independent public accountants, to be transmitted to each Member; and (b) a report to be transmitted to each Member indicating the Member's share of the Company's profit or loss for that year and the Member's allocable share of all items of income, gain, loss, deduction, and credit, for Federal income tax purposes.

## ARTICLE XII

### Tax Elections

SECTION 12.1. In the event of a transfer of a Member's interest, or upon the death of a Member, or in the event of the distribution of Company property to any party hereto, the Company may (but need not necessarily) file an election, in accordance with Section 754 of the Code to cause the basis of the Company Property to be adjusted for Federal income tax purposes, as provided by Sections 734 and 743 of the Code.

## ARTICLE XIII

### Miscellaneous

SECTION 13.1. Any notice or other communication under this Agreement shall be in writing and shall be considered given when mailed by registered or certified mail, return receipt requested, to the parties at the following addresses (or at such other address as a party shall have previously specified by notice to the others as the address to which notice shall be given to him):

A. If to the Company, to it in care of the Operating Managers at the address of the Company.

B. If to the Operating Managers, to them at the address of the Company.

C. If to any Member, to him at his address set forth on the books and records of the Company.

SECTION 13.2. This Agreement contains a complete statement of all of the arrangements among the parties with respect to the Company and cannot be changed or terminated orally or in any manner other than by a written agreement executed by all of the Members. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

SECTION 13.3. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

SECTION 13.4. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations of the jurisdiction in which the Company does business. If any provision of this Agreement, or the application thereof to any person or circumstance, shall for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected, but rather shall be enforced to the extent permitted by law.

SECTION 13.5. Anything hereinbefore in this Agreement to the contrary notwithstanding, all references to the Property of the Company are deemed to include the profits, losses and Cash Flow of the Property.

SECTION 13.6. Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the State of organization of the Company applicable to agreements made and to be performed in the State of organization of the Company.

SECTION 13.7. The captions, headings and table of contents in this Agreement are solely for convenience of reference and shall not affect its interpretation.

SECTION 13.8. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall be deemed to constitute a single document.

SECTION 13.9. Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement Effective as of the day and year first above written.

Lucy Gao
Member, Manager

## Schedule "A"
## OF
## 1595 17th Street LLC

Percentage Interests of Members of 1595 17th Street, LLC

**Members Names**          **Percentage of Interest**
Lucy Gao                          100%

LAM00107592

**"SCHEDULE B"**

**OPERATING AGREEMENT**
**OF**
**1595 17ᵗʰ STREET LIMITED LIABILITY COMPANY**

Operating Managers may not make any of the following management decisions without obtaining the consent of that Membership Interest:

a. any merger, consolidation or other business combination;
b. sale or other disposition of substantially all the assets of the LLC;
c. dissolution of the LLC;
d. filing of a petition or commencing other proceedings seeking reorganization;
e. liquidation, arrangement or other similar relief under any federal or state law relating to bankruptcy or insolvency;
f. the amendment or modification of any provision of this Agreement;
g. the issuance of additional LLC Units to any Member or other person;
h. the removal of any Member;
i. the decision to appoint managers for the LLC under Article V hereof.

## OPERATING AGREEMENT
## OF
## 544 San Antonlo Road LLC

This Operating Agreement ("Agreement") of 544 San Antonlo Road LLC (the "Company") effective as of this 20th day of August, 2009, by, between and among the undersigned confirms our understanding as to the matters contained herein.

The parties hereto agree as follows:

### ARTICLE 1

#### Definitions

SECTION 1.1. As used herein, the following terms and phrases shall have the meanings indicated:

A.     "Act" shall mean the Limited Liability Company Act of the State of organization, as amended.

B.     "Capital Account" shall mean, with respect to each Member, the account established for each Member pursuant to Section 6.5, which will initially equal the Capital Contributions of such Member and will be (a) increased by the amount of Net Profits allocated to such Member and (b) reduced by the amount of Net Losses allocated to such Member and the amount of Cash Flow distributed to such Member. Members' Capital Accounts shall be determined and maintained in accordance with the rules and paragraph (b)(2)(iv) of Regulation Section 1.704-1 of the Code.

C.     "Capital Contributions" shall mean the fair market value of the amounts contributed by the Members pursuant to Section 6.1.

D.     "Cash Flow" shall have the meaning provided in Section 7.1.

E. .   "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent revenue laws.

F.     "Operating Manager" shall mean the Member or Members selected by the Members in accordance with this Agreement to serve as Operating Manger or Operating Managers of the Company.

G.     "Members" shall mean the persons designated as such in Schedule A of this Agreement, any successor(s) to their interests as such in the Company; and any other person who pursuant to this Agreement shall become a Member, and any reference to a "Member" shall be to any one of the then Members.

H.     "Net Profits" and "Net Losses" shall mean the net profit or net loss, respectively, of the Company determined in accordance with Section 8.1.

I.     The words "Membership Interest" shall mean a Member's interest in the Company which shall be in the proportion that the Member's share of the profits and losses of the Company bears to the aggregate shares of all the Members. A Membership Interest may be evidenced by a certificate issued by the Company. A Membership Interest may be expressed on a certificate as "Units" where a Member's Units bears the same relationship to the aggregate Units of all Members that the Member's Membership Interest bears to the aggregate Membership Interests of all Members. A Member's Interest may be a certified security or an uncertificated security within the meaning of section 8-102 of the Uniform Commercial Code if the requirements

1

246

LAM00039294

of section 8-103(c) are met, and if the requirements are not met such interest shall, for purposes of the Uniform Commercial Code, be deemed to be a general intangible asset.

J.    "Company" shall mean this Limited Liability Company.

K.    "Person" shall mean any natural person, corporation, partnership, joint venture, association, limited liability company or other business or legal entity.

## ARTICLE II

### Organization of the Company

SECTION 2.1. The purpose of the Company is to conduct an lawful business for which limited liability companies may be organized and to do all things necessary or useful in connection with the foregoing.

SECTION 2.2. The Company name shall be "544 San Antonio Road LLC".

SECTION 2.3. The Members shall be Members in the Company and shall continue to do business under the name of the Company until the Operating Managers shall change the name or the Company shall terminate.

SECTION 2.4. The principal address of the Company shall be such place or places as the Operating Mangers may determine. The Operation Managers will give notice to the Members promptly after any change in the location of the principal office of the Company.

SECTION 2.5. The Company shall terminate on the date provided in the Articles of Organization, except that the Company may terminate prior to such date as provided in this Agreement.

## ARTICLE III

### Status of Members

SECTION 3.1. No Member will be bound by, or be personally liable for the expenses, liabilities or obligations of the Company.

SECTION 3.2. No Member will be entitled to withdraw any part of his Capital Account or to receive any distributions from the Company except as expressly provided in this Agreement.

SECTION 3.3. No Member will have the right to require partition of the Company property or to compel any sale or appraisal of the Company's assets or any sale of a deceased Member's interest in the Company's assets, notwithstanding any provision of law to the contrary.

## ARTICLE IV

### Meeting of Members

SECTION 4.1. An annual meeting of Members shall be held within five (5) months after the close of the fiscal year of the Company on such date and at the time and place (either within or without the state of its organization) as shall be fixed by the Members. At the annual meeting, the Members shall elect the Operating Managers and transact such other business as may properly be brought before the meeting.

SECTION 4.2. A special meeting of Members may be called at any time by the Operating Managers and shall be called by the Operating Managers at the request in writing of that Membership interest specified in Schedule C of the Members entitled to vote at such meeting.

2

Any such request shall state the purpose or purposes of the proposed meeting. Business transacted at any special meeting of Members shall be confined to the purposes set forth in the notice thereof.

SECTION 4.3. Written notice of the time, place and purpose of every meeting of Members (and, if other than an annual meeting, the person or persons at whose direction the meeting is being called), shall be given by the Operating Mangers to each Member of record entitled to vote at such meeting, not less than ten nor more than sixty days prior to the date set for the meeting. Notice shall be given either personally or by mailing said notice by first class mail to each Member at his address appearing on the record book of the Company or at such other address appearing on the record book of the Company or at such other address supplied by him in writing to the Operating Managers of the Company for the purpose of receiving notice.

A written waiver of notice setting forth the purposes of the meeting for which notice is waived, signed by the person or persons entitled to such notice, whether before or after the time of the meeting stated therein, shall be deemed equivalent to the giving of such notice. The attendance by a Member at a meeting either in person or by proxy without protesting the lack of notice thereof shall constitute a waiver of notice of such Member.

All notices given with respect to an original meeting shall extend to any and all adjournments thereof and such business as might have been transacted at the original meeting may be transacted at any adjournment thereof; no notice of any adjourned meeting need be given if an announcement of the time and place of the adjourned meeting is made at the original meeting.

SECTION 4.4. The holders of a majority in interest of the Members present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of members except as otherwise provided by statute of the Articles of Organization. If, however, a quorum shall not be present or represented at any meeting of Members, the Members entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting or originally notified. When a quorum is once present to organize a meeting, such quorum is not deemed broken by the subsequent withdrawal of any Members.

SECTION 4.5. Every Member entitled to vote at any meeting shall be entitled to vote in accordance with his membership interest in the Company held by him of record on the date fixed as the record date for said meeting and may so vote in person or by proxy. Any Company action shall be authorized by a majority in interest of the votes cast by the Members entitled to vote thereon except as may otherwise be provided by statute, the Articles of Organization or this Operating Agreement.

SECTION 4.6. Every proxy must be signed by the Member entitled to vote or by his duly authorized attorney-in-fact and shall be valid only if filed with the Operating Managers of the Company prior to the commencement of voting on the matter in regard to which said proxy is to be voted. No proxy shall be valid after the expiration of eleven months from the date of its execution unless otherwise expressly provided in the proxy. Every proxy shall be revocable at the pleasure of the person executing it except as otherwise provided by statute. Unless the proxy by its terms provides for a specific revocation date and except as otherwise provided by statute, revocation of a proxy shall not be effective unless and until such revocation is executed in writing by the Member who executed such proxy and the revocation is filed with the Operating Managers of the Company prior to the voting of the proxy.

SECTION 4.7. All meetings of Members shall be presided over by the Operating Mangers, or if not present, by a Member thereby chosen by the Members at the meeting. The Operating

3

LAM00039296

Managers or the person presiding at the meeting shall appoint any person present to act as secretary of the meeting.

SECTION 4.8. For the purpose of determining the Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof or to express consent or dissent from any proposal without a meeting, or for the purpose of determining the Members entitled to receive payment of any distribution of Cash Flow or the allotment of any rights, or for the purpose of any other action, the Members may fix, in advance, a date as the record date for any such determination of Members. Such date shall not be more than fifty nor less than ten days before the date of any meeting nor more than fifty days prior to any action taken without a meeting, the payment of any distribution of Cash Flow or the allotment of any rights, or any other action. When a determination of Members of record entitled to notice of, or to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof, unless the Members fix a new record date under this Section for the adjourned date.

SECTION 4.9. The company shall be entitled to treat the holder of record of any Membership Interest as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the Act.

## ARTICLE V

### Management

SECTION 5.1. The Operating Manager shall be the person designated by all of the Members and shall be vested upon such designation in accordance with the terms of this Operating Agreement. The Operating Managers shall vote in proportion to their Membership Interests in the Company. Except as otherwise provided in this Agreement, all decisions of the Operating Managers shall be by a majority in interest of the Members. All Operating Mangers must be Members of the Company. No Member will take part in or interfere in any manner with the conduct or control of business of the Company or have any right or authority to act for or bind the Company except as provided in this Agreement.

SECTION 5.2. The Operating Mangers shall hold office for the term for which elected and until a successor has been elected and qualified. A vacancy in the office of Operating Manager arising from any cause may be filled for the unexpired portion of the term by the Members.

SECTION 5.3. Any Operating Manager may resign at any time by giving written notice to the Members. Any such resignation shall take effect at the time specified therein or, if the time is not specified therein, upon the receipt thereof, irrespective of whether any such resignations shall have been accepted.

SECTION 5.4. The Company shall be managed by the Operating Managers and the conduct of the Company's business shall be controlled and conducted solely and exclusively by the Operating Managers in accordance with this Agreement. In addition to and not in limitation of any rights and powers conferred by law or other provisions of this Agreement, the Operating Managers shall have and may exercise on behalf of the Company all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company, and to maximize Company profits.

SECTION 5.5. Notwithstanding the foregoing, the Operating Managers may not make any of the management decisions stated in Schedule B without obtaining the consent of that Membership Interest stated in Schedule B.

4

LAM00039297

SECTION 5.6. The Operating Manager shall service as Tax Matters Member as such term is defined in Code Section 6231 (a)(7).

SECTION 5.7. Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he, his testator or interstate, then, is or was a manager, Member, employee or agent of the Company, or then serves or has served on behalf of the Company in any capacity at the request of the Company, shall be indemnified by the Company against reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with an appeal therein, to the fullest extent permissible by the Act. Such right of indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

## ARTICLE VI

### Capital

SECTION 6.1. The Members have contributed to the Company in exchange for their membership interests, the cash and other property as set forth on Schedule A, annexed hereto.

SECTION 6.2. The fair market value and the adjusted basis of the contributing Member of any property other than cash contributed to the Company by a Member shall be set forth on Schedule A, annexed hereto.

SECTION 6.3. Except as expressly provided in this Agreement, no Member shall be required to make any additional contributions to the capital of the Company.

SECTION 6.4. No interest shall be paid on the Capital Account of any Member.

SECTION 6.5. A Capital Account shall be established for each Member on the books and records of the Company. If any assets of the Company are distributed to the Members in kind, the Capital Accounts of the Members shall be adjusted to reflect the difference between the fair market value of such assets on the date of distribution and the basis of the Company in such assets.

## ARTICLE VII

### Distributions of Cash

SECTION 7.1. The Company shall distribute to the Members from time to time all cash (regardless of the source thereof) of the Company which is not required for the operation or the reasonable working capital requirements of the Company (such cash is sometimes referred to herein as "Cash Flow"). For purposes of this Agreement all Cash Flow allocated to the Members shall be allocated among them in proportion to their respective Membership Interests.

SECTION 7.2. Distributions of Cash Flow shall be made from time to time in such manner as determined by the Operating Managers.

## ARTICLE VIII

### Profits and Losses

SECTION 8.1. The Net Profits and Net Losses of the Company shall be the net profits and net losses of the Company as determined for Federal income tax purposes.

SECTION 8.2. The Net Profits and Net Losses of the Company and each item of income, gain, loss, deduction or credit entoring into the computation thereof, shall be allocated to the

5

LAM00039298

Members in the same proportions that they share in distributions of Cash Flow pursuant to Section 7.1, or if there is no Cash Flow, that they would have shared if there had been Cash Flow.

SECTION 8.3. References herein to "Reg. Sec.", are to the regulations promulgated by the United States Treasury to the Code. The terms "minimum gain", "minimum gain chargeback", "qualified income offset", "nonrecourse deduction" and "nonrecourse liability" are to be interpreted consistent with the definitions and use of such terms in Reg. Sec. 1.704-2 and Reg. Sec. 1.704-1. The following special allocations shall be made in the following order:

A.     Except as other set forth in Reg. Sec. 1.704-2(f), if there is a net decrease in minimum gain, during the fiscal year of the Company, each Member, shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease of minimum gain determined in accordance with Reg. Sec. 1.704-2(g). Allocations in accordance with this Section shall be made first from the disposition of Company assets subject to nonrecourse liabilities, to the extent of the minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the taxable year. This Section is intended to comply with the minimum gain chargeback requirement of Reg. Sec. 1.704-2(f).

B.     Except as otherwise set forth in Reg. Sec. 1.704-2(i)(4), if there is a net decrease in a Member's nonrecourse liability minimum gain attributable to Members' nonrecourse liabilities during any fiscal year, each Member who has a share of the Member nonrecourse liability minimum gain attributable to Member nonrecourse liability shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease in Members' nonrecourse debt minimum gain attributable to such member nonrecourse debt. Allocations pursuant to this Section shall be made first from gain recognized from the disposition of Company assets subject to Member nonrecourse liabilities to the extent of Member minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the fiscal year. This section is intended to comply with the minimum gain chargeback requirements of Reg. Sec. 1.704-2(i).

C.     A Member who unexpectedly receives an adjustment, allocation or distribution described in (4), (5) or (6) of Reg. Sec. 1.704-1(b)(2)(ii)(d) will be allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. An allocation shall be made pursuant to this Section and if and to the extent a Member would have a deficit in his adjusted Capital Account after all other allocations provided for in this Section 8.3 were made as if this paragraph were not in the Agreement.

D.     Nonrecourse deductions shall be allocated among the Members in the same proportion in which they share the Cash Flow of the Company.

E.     Any nonrecourse deduction shall be allocated to any Member who bears the economic risk of loss with respect to the Member nonrecourse liability to which such deduction is attributable.

SECTION 8.4. Any Company gain or loss realized with respect to property, other than money, contributed to the Company by a Member shall be shared among the Members pursuant to Code section 704(c) and regulations to be promulgated thereunder so as to take account of the difference between the Company basis and the fair market value of the property at the time of the contribution ("built-in gain or loss"). Such built-in gain or loss shall be allocated to the contributing Member upon the disposition of the property.

6

LAM00039299

## ARTICLE IX

### Admission and Withdrawal of a Member

SECTION 9.1. A Member may transfer his interest in the Company to another person or entity only with the prior unanimous consent of the other Members either in writing or at a meeting called for such purpose. If all of the other Members do not approve of the transfer, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee shall be entitled to receive the share of profits, losses and Cash Flow or other compensation by way of income and the return of contributions to which the transferor otherwise would be entitled.

SECTION 9.2. The Members agree to sign such additional documents as may be required in order to admit additional Members to the Company, pursuant to section 9.1 as well as, among other things, to provide for the division of profits, losses and Cash Flow among the Members.

SECTION 9.3. All costs and expenses incurred by the Company in connection with the assignment of a Member's interest, including any filing fees and publishing costs and the fees and disbursements of counsel, shall be paid by the assigning Member.

SECTION 9.4. Each person who becomes a Member in the Company, by becoming a Member, shall and does hereby ratify and agree to be bound by the terms and conditions of this Agreement.

### ARTICLE X

### Termination or Dissolution of Company

SECTION 10.1. The Company shall be terminated prior to the date of expiration of the term provided in Section 2.5 if (a) a majority in interest of the Members consent that the Company should be terminated and dissolved, or (b) the Company is dissolved pursuant to this Agreement.

SECTION 10.2. The Company shall be terminated in the event any Member (i) withdraws, resigns or is expelled from the Company; (ii) makes an assignment for the benefit of creditors, is the subject of an order for relief under Title 11 of the United States Code, files a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding of this nature, seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator for all or any substantial part of his properties; (iii) dies; or (iv) a judgment is entered by a court of competent jurisdiction adjudicating him incompetent to manage his person or his property.

SECTION 10.3. If the Company is dissolved, the owners of a majority in interest of the remaining Members may elect to reconstitute and continue the Company as a successor Company upon the same conditions as are set forth in this Agreement. Any such election to continue the Company will not result in the creation of a new Company among the remaining Members, nor will such election require the amendment of this Agreement or the execution of an amended Agreement.

SECTION 10.4. Upon the termination and dissolution of the Company, the then Operating Manager, or Operating Managers, if any, or, if there is no Operating Manager, any person elected to perform such liquidation by the written consent of the owners of a majority in interest of the Members, shall proceed to the liquidation of the Company. The proceeds of such liquidation shall be applied and distributed as follows:

7

252

LAM00039300

A.       If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled. The fair market value of such assets shall be determined by an independent appraiser to be selected by the Company's independent public accountants. The amount by which the fair market value of any Property to be distributed in kind to the Members exceeds or is less than the basis of such Property, shall, to the extent not otherwise recognized by the Company, be taken into account in computing Net Profits or Net Losses (and shall be allocated among the Members in accordance with Section 8.2) for purposes of crediting or charging the Capital Accounts of, and liquidating distributions to, the Members under Section 10.4.B.

B.       All distributions upon liquidation of the Company shall be distributed as follows: to each of the Members, in proportion to the amount of their respective positive Capital Accounts, as such accounts have been adjusted (i) in accordance with Section 6.5 to reflect the Net Profit or Net Loss realized or incurred upon the sale of the Company's property or assets and deemed sale pursuant to Section 10.4.A; (ii) in accordance with Section 8.2 to reflect all Net Profits or Net Losses with respect to the year of liquidation. No Member shall be liable to repay the negative amount of his Capital Account.

SECTION 10.5. Each of the Members shall be furnished with a statement, reviewed by the Company's independent public accountants, which shall set forth the assets and liabilities of the Company as of the date of the Company's liquidation. Upon completion of the liquidation, the Operating Managers shall execute and cause to be filed a Certificate of Dissolution of the Company and any and all other documents necessary with respect to termination of the Company.

## ARTICLE XI

### Books and Reports

SECTION 11.1. The Operating Mangers shall cause the Company to maintain the following records:

A.       Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Company, shall be kept by the Operating Managers at the principal office of the Company. The fiscal year of the Company shall be the calendar year. The books of account of the Company shall be kept in accordance with sound accounting practices and principles applied in a consistent manner by the Company; provided, however, that all methods of accounting and treating particular transactions shall be in accordance with the methods of accounting employed for Federal Income tax purposes. All determinations by the Operating Managers with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding upon all the Members unless the determination is inconsistent with any express provision of this Agreement.

B.       A current list of the full name and last known mailing address of each Member set forth in alphabetical order together with the contribution and share in profits and losses of each Member; a copy of the Articles of Organization of the Company and any amendments thereto; a copy of the Company Operating Agreement and any amendments thereto; a copy of the Company's federal, state and local income tax returns for the three most recent fiscal years.

C.       Any member shall have the right from time to time at his expense to have his accountants and representatives examine and/or audit the books and records of the Company and the Information referred to in this Section, and the Operating Managers will make such books and records and information available for such examinations and/or audits.

253
LAM00039301

SECTION 11.2. No value shall be placed for any purpose upon the Company name or the right to its use, or upon the goodwill of the Company or its business. Upon termination or dissolution of the Company (without reconstitution thereof) as provided in this Agreement, neither the Company name or the right to its use, nor the goodwill of the Company, shall be considered as an asset of the Company.

SECTION 11.3. The Operating Managers will cause to be sent to the Members within a reasonable period after the close of each year the following: (a) annual statements of the Company's gross receipts and operating expenses, and the capital accounts of each Member, prepared by the Company's independent public accountants, to be transmitted to each Member; and (b) a report to be transmitted to each Member indicating the Member's share of the Company's profit or loss for that year and the Member's allocable share of all items of income, gain, loss, deduction, and credit, for Federal Income tax purposes.

## ARTICLE XII

### Tax Elections

SECTION 12.1. In the event of a transfer of a Member's interest, or upon the death of a Member, or in the event of the distribution of Company property to any party hereto, the Company may (but need not necessarily) file an election, in accordance with Section 754 of the Code to cause the basis of the Company Property to be adjusted for Federal income tax purposes, as provided by Sections 734 and 743 of the Code.

## ARTICLE XIII

### Miscellaneous

SECTION 13.1. Any notice or other communication under this Agreement shall be in writing and shall be considered given when mailed by registered or certified mail, return receipt requested, to the parties at the following addresses (or at such other address as a party shall have previously specified by notice to the others as the address to which notice shall be given to him):

A. If to the Company, to it in care of the Operating Managers at the address of the Company.

B. If to the Operating Managers, to them at the address of the Company.

C. If to any Member, to him at his address set forth on the books and records of the Company.

SECTION 13.2. This Agreement contains a complete statement of all of the arrangements among the parties with respect to the Company and cannot be changed or terminated orally or in any manner other than by a written agreement executed by all of the Members. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

SECTION 13.3. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

SECTION 13.4. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations of the jurisdiction in which the Company does business. If any provision of this Agreement, or the application thereof to any person or circumstance, shall for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to

9

254

LAM00039302

other persons or circumstances shall not be affected, but rather shall be enforced to the extent permitted by law.

SECTION 13.5. Anything hereinbefore in this Agreement to the contrary notwithstanding, all references to the Property of the Company are deemed to include the profits, losses and Cash Flow of the Property.

SECTION 13.6. Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the State of organization of the Company applicable to agreements made and to be performed in the State of organization of the Company.

SECTION 13.7. The captions, headings and table of contents in this Agreement are solely for convenience of reference and shall not affect its interpretation.

SECTION 13.8. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall be deemed to constitute a single document.

SECTION 13.9. Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement Effective as of the day and year first above written.

Lucy Gad
Member, Operation Manager

**"SCHEDULE A"**

10

**OPERATING AGREEMENT**
**OF**
**544 San Antonio Road LLC**

Percentage Interests of Members of **544 San Antonio Road LLC**
as of August 20, 2009.

| Member Name | Percentage Interest |
|-------------|---------------------|
| Lucy Gao | 100% |

11

LAM00039304

**"SCHEDULE B"**

**OPERATING AGREEMENT**
**OF**
**544 San Antonio Road LLC**

Operating Managers may not make any of the following management decisions without obtaining the consent of that Membership Interest:

a. any merger, consolidation or other business combination;

b. sale or other disposition of substantially all the assets of the LLC;

c. dissolution of the LLC;

d. filing of a petition or commencing other proceedings seeking reorganization;

e. liquidation, arrangement or other similar relief under any federal or state law relating to bankruptcy or insolvency;

f. the amendment or modification of any provision of this Agreement;

g. the issuance of additional LLC Units to any Member or other person;

h. the removal of any Member;

i. the decision to appoint managers for the LLC under Article V hereof.

12

LAM00039305

## RESOLUTIONS OF OPERATING AGREEMENT OF 544 SAN ANTONIO ROAD LLC

RESOLVED THAT the addition of the following members to the 554 SAN ANTONIO ROAD LLC, a California limited liability company (the "Company"):

| Member Name | Percentage Interest |
|-------------|---------------------|
| Lucy Gao | 50% |

is hereby approved.

RESOLVED THAT after the addition of the following members to the Company, the membership interests in the Company shall be as follows:

| Member Name | Percentage Interest |
|-------------|---------------------|
| Lucy Gao | 100% |

The foregoing resolutions have been adopted and agreed by the manager and all members of the Company as of December 10, 2013.

Benny Kirk, Managing Member

Lucy Gao, Managing Member

LAM00039291

# EXHIBIT M

## OPERATING AGREEMENT
## OF
## EAST HEIGHTS LIMITED LIABILITY COMPANY

This Operating Agreement ("Agreement") of East Heights, LLC (the "Company") effective as of this 15th day of May, 2009, by, between and among the undersigned confirms our understanding as to the matters contained herein.

The parties hereto agree as follows:

### ARTICLE 1

#### Definitions

SECTION 1.1. As used herein, the following terms and phrases shall have the meanings indicated:

A.    "Act" shall mean the Limited Liability Company Act of the State of organization, as amended.

B.    "Capital Account" shall mean, with respect to each Member, the account established for each Member pursuant to Section 6.5, which will initially equal the Capital Contributions of such Member and will be (a) increased by the amount of Net Profits allocated to such Member and (b) reduced by the amount of Net Losses allocated to such Member and the amount of Cash Flow distributed to such Member. Members' Capital Accounts shall be determined and maintained in accordance with the rules and paragraph (b)(2)(iv) of Regulation Section 1.704-1 of the Code.

C.    "Capital Contributions" shall mean the fair market value of the amounts contributed by the Members pursuant to Section 6.1.

D.    "Cash Flow" shall have the meaning provided in Section 7.1.

E.    "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent revenue laws.

F.    "Operating Manager" shall mean the Member of Members selected by the Members in accordance with this Agreement to serve as Operating Manger or Operating Managers of the Company.

G.    "Members" shall mean the persons designated as such in Schedule A of this Agreement, any successor(s) to their interests as such in the Company; and any other person who pursuant to this Agreement shall become a Member, and any reference to a "Member" shall be to any one of the then Members.

H.    "Net Profits" and "Net Losses" shall mean the net profit or net loss, respectively, of the Company determined in accordance with Section 8.1.

I.    The words "Membership Interest" shall mean a Member's interest in the Company which shall be in the proportion that the Member's share of the profits and losses of the Company bears to the aggregate shares of all the Members. A Membership Interest may be evidenced by a certificate issued by the Company. A Membership Interest may be expressed on a certificate as "Units" where a Member's Units bears the same relationship to the aggregate Units of all Members that the Member's Membership Interest bears to the aggregate Membership Interests of all Members. A Member's Interest may be a certified security or an uncertificated security within the meaning of section 8-102 of the Uniform Commercial Code if the requirements of section 8-103(c) are met, and if the requirements are not met such interest shall, for purposes of the Uniform Commercial Code, be deemed to be a general intangible asset.

J.    "Company" shall mean this Limited Liability Company.

K.      "Person" shall mean any natural person, corporation, partnership, joint venture, association, limited liability company or other business or legal entity.

## ARTICLE II

### Organization of the Company

SECTION 2.1. The purpose of the Company is to conduct an lawful business for which limited liability companies may be organized and to do all things necessary or useful in connection with the foregoing.

SECTION 2.2. The Company name shall be "East Heights LLC".

SECTION 2.3. The Members shall be Members in the Company and shall continue to do business under the name of the Company until the Operating Managers shall change the name or the Company shall terminate.

SECTION 2.4. The principal address of the Company shall be such place or places as the Operating Mangers may determine. The Operation Managers will give notice to the Members promptly after any change in the location of the principal office of the Company.

SECTION 2.5. The Company shall terminate on the date provided in the Articles of Organization, except that the Company may terminate prior to such date as provided in this Agreement.

## ARTICLE III

### Status of Members

SECTION 3.1. No Member will be bound by, or be personally liable for the expenses, liabilities or obligations of the Company.

SECTION 3.2. No Member will be entitled to withdraw any part of his Capital Account or to receive any distributions from the Company except as expressly provided in this Agreement.

SECTION 3.3. No Member will have the right to require partition of the Company property or to compel any sale or appraisal of the Company's assets or any sale of a deceased Member's interest in the Company's assets, notwithstanding any provision of law to the contrary.

## ARTICLE IV

### Meeting of Members

SECTION 4.1. An annual meeting of Members shall be held within five (5) months after the close of the fiscal year of the Company on such date and at the time and place (either within or without the state of its organization) as shall be fixed by the Members. At the annual meeting, the Members shall elect the Operating Managers and transact such other business as may properly be brought before the meeting.

SECTION 4.2. A special meeting of Members may be called at any time by the Operating Managers and shall be called by the Operating Managers at the request in writing of that Membership interest specified in Schedule A of the Members entitled to vote at such meeting. Any such request shall state the purpose or purposes of the proposed meeting. Business transacted at any special meeting of Members shall be confined to the purposes set forth in the notice thereof.

SECTION 4.3. Written notice of the time, place and purpose of every meeting of Members (and, if other than an annual meeting, the person or persons at whose direction the meeting is being called), shall be given by the Operating Mangers to each Member of record

entitled to vote at such meeting, not less than ten nor more than sixty days prior to the date set for the meeting. Notice shall be given either personally or by mailing said notice by first class mail to each Member at his address appearing on the record book of the Company or at such other address appearing on the record book of the Company or at such other address supplied by him in writing to the Operating Managers of the Company for the purpose of receiving notice.

A written waiver of notice setting forth the purposes of the meeting for which notice is waived, signed by the person or persons entitled to such notice, whether before or after the time of the meeting stated therein, shall be deemed equivalent to the giving of such notice. The attendance by a Member at a meeting either in person or by proxy without protesting the lack of notice thereof shall constitute a waiver of notice of such Member.

All notices given with respect to an original meeting shall extend to any and all adjournments thereof and such business as might have been transacted at the original meeting may be transacted at any adjournment thereof; no notice of any adjourned meeting need be given if an announcement of the time and place of the adjourned meeting is made at the original meeting.

SECTION 4.4. The holders of a majority in interest of the Members present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of members except as otherwise provided by statute of the Articles of Organization. If, however, a quorum shall not be present or represented at any meeting of Members, the Members entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting or originally notified. When a quorum is once present to organize a meeting, such quorum is not deemed broken by the subsequent withdrawal of any Members.

SECTION 4.5. Every Member entitled to vote at any meeting shall be entitled to vote in accordance with his membership interest in the Company held by him of record on the date fixed as the record date for said meeting and may so vote in person or by proxy. Any Company action shall be authorized by a majority in interest of the votes cast by the Members entitled to vote thereon except as may otherwise be provided by statute, the Articles of Organization or this Operating Agreement.

SECTION 4.6. Every proxy must be signed by the Member entitled to vote or by his duly authorized attorney-in-fact and shall be valid only if filed with the Operating Managers of the Company prior to the commencement of voting on the matter in regard to which said proxy is to be voted. No proxy shall be valid after the expiration of eleven months from the date of its execution unless otherwise expressly provided in the proxy. Every proxy shall be revocable at the pleasure of the person executing it except as otherwise provided by statute. Unless the proxy by its terms provides for a specific revocation date and except as otherwise provided by statute, revocation of a proxy shall not be effective unless and until such revocation is executed in writing by the Member who executed such proxy and the revocation is filed with the Operating Managers of the Company prior to the voting of the proxy.

SECTION 4.7. All meetings of Members shall be presided over by the Operating Mangers, or if not present, by a Member thereby chosen by the Members at the meeting. The Operating Managers or the person presiding at the meeting shall appoint any person present to act as secretary of the meeting.

SECTION 4.8. For the purpose of determining the Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof or to express consent or dissent from any proposal without a meeting, or for the purpose of determining the Members entitled to receive payment of any distribution of Cash Flow or the allotment of any rights, or for the purpose of any other action, the Members may fix, in advance, a date as the record date for any such determination of Members. Such date shall not be more than fifty nor less than ten days before the date of any meeting nor more than fifty days prior to any action taken without a meeting, the payment of any distribution of Cash Flow or the allotment of any rights, or any

other action. When a determination of Members of record entitled to notice of, or to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof, unless the Members fix a new record date under this Section for the adjourned date.

SECTION 4.9. The company shall be entitled to treat the holder of record of any Membership Interest as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the Act.

## ARTICLE V

## Management

SECTION 5.1. Management of the Company shall be vested in all of the Members who shall also serve as Operating Managers of the Company. The Operating Managers shall vote in proportion to their Membership Interests in the Company. Except as otherwise provided in this Agreement, all decisions of the Operating Managers shall be by a majority in interest of the Members. All Operating Mangers must be Members of the Company. No Member will take part in or interfere in any manner with the conduct or control of business of the Company or have any right or authority to act for or bind the Company except as provided in this Agreement.

SECTION 5.2. The Operating Mangers shall hold office for the term for which elected and until a successor has been elected and qualified. A vacancy in the office of Operating Manager arising from any cause may be filled for the unexpired portion of the term by the Members.

SECTION 5.3. Any Operating Manager may resign at any time by giving written notice to the Members. Any such resignation shall take effect at the time specified therein or, if the time is not specified therein, upon the receipt thereof, irrespective of whether any such resignations shall have been accepted.

SECTION 5.4. The Company shall be managed by the Operating Managers and the conduct of the Company's business shall be controlled and conducted solely and exclusively by the Operating Managers in accordance with this Agreement. In addition to and not in limitation of any rights and powers conferred by law or other provisions of this Agreement, the Operating Managers shall have and may exercise on behalf of the Company all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company, and to maximize Company profits.

SECTION 5.5. Notwithstanding the foregoing, the Operating Managers may not make any of the management decisions stated in Schedule B without obtaining the consent of that Membership Interest stated in Schedule A.

SECTION 5.6. The Operating Manager shall service as Tax Matters Member as such term is defined in Code Section 6231 (a)(7).

SECTION 5.7. Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he, his testator or interstate, then, is or was a manager, Member, employee or agent of the Company, or then serves or has served on behalf of the Company in any capacity at the request of the Company, shall be indemnified by the Company against reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with an appeal therein, to the fullest extent permissible by the Act. Such right of indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

## ARTICLE VI

## Capital

SECTION 6.1. The Members have contributed to the Company in exchange for their membership interests, the cash and other property as set forth on Schedule A, annexed hereto.

SECTION 6.2. The fair market value and the adjusted basis of the contributing Member of any property other than cash contributed to the Company by a Member shall be set forth on Schedule A, annexed hereto.

SECTION 6.3. Except as expressly provided in this Agreement, no Member shall be required to make any additional contributions to the capital of the Company.

SECTION 6.4. No interest shall be paid on the Capital Account of any Member.

SECTION 6.5. A Capital Account shall be established for each Member on the books and records of the Company. If any assets of the Company are distributed to the Members in kind, the Capital Accounts of the Members shall be adjusted to reflect the difference between the fair market value of such assets on the date of distribution and the basis of the Company in such assets.

## ARTICLE VII

### Distributions of Cash

SECTION 7.1. The Company shall distribute to the Members from time to time all cash (regardless of the source thereof) of the Company which is not required for the operation or the reasonable working capital requirements of the Company (such cash is sometimes referred to herein as "Cash Flow"). For purposes of this Agreement all Cash Flow allocated to the Members shall be allocated among them in proportion to their respective Membership Interests.

SECTION 7.2. Distributions of Cash Flow shall be made from time to time in such manner as determined by the Operating Managers.

## ARTICLE VIII

### Profits and Losses

SECTION 8.1. The Net Profits and Net Losses of the Company shall be the net profits and net losses of the Company as determined for Federal income tax purposes.

SECTION 8.2. The Net Profits and Net Losses of the Company and each item of income, gain, loss, deduction or credit entering into the computation thereof, shall be allocated to the Members in the same proportions that they share in distributions of Cash Flow pursuant to Section 7.1, or if there is no Cash Flow, that they would have shared if there had been Cash Flow.

SECTION 8.3. References herein to "Reg. Sec.", are to the regulations promulgated by the United States Treasury to the Code. The terms "minimum gain", "minimum gain chargeback", "qualified income offset", "nonrecourse deduction" and "nonrecourse liability" are to be interpreted consistent with the definitions and use of such terms in Reg. Sec. 1.704-2 and Reg. Sec. 1.704-1. The following special allocations shall be made in the following order:

A. Except as other set forth in Reg. Sec. 1.704-2(f), if there is a net decrease in minimum gain, during the fiscal year of the Company, each Member, shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease of minimum gain determined in accordance with Reg. Sec. 1.704-2(g). Allocations in accordance with this Section shall be made first from the disposition of Company assets subject to nonrecourse liabilities, to the extent of the minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the taxable year. This Section is intended to comply with the minimum gain chargeback requirement of Reg. Sec. 1.704-2(f).

B.     Except as otherwise set forth in Reg. Sec. 1.704-2(I)(4), if there is a net decrease in a Member's nonrecourse liability minimum gain attributable to Members' nonrecourse liabilities during any fiscal year, each Member who has a share of the Member nonrecourse liability minimum gain attributable to Member nonrecourse liability shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease in Members' nonrecourse debt minimum gain attributable to such member nonrecourse debt.  Allocations pursuant to this Section shall be made first from gain recognized from the disposition of Company assets subject to Member nonrecourse liabilities to the extent of Member minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the fiscal year.  This section is intended to comply with the minimum gain chargeback requirements of Reg. Sec. 1.704-2(i).

C.     A Member who unexpectedly receives an adjustment, allocation or distribution described in (4), (5) or (6) of Reg. Sec. 1.704-1(b)(2)(ii)(d) will be allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible.  An allocation shall be made pursuant to this Section and if and to the extent a Member would have a deficit in his adjusted Capital Account after all other allocations provided for in this Section 8.3 were made as if this paragraph were not in the Agreement.

D.     Nonrecourse deductions shall be allocated among the Members in the same proportion in which they share the Cash Flow of the Company.

E.     Any nonrecourse deduction shall be allocated to any Member who bears the economic risk of loss with respect to the Member nonrecourse liability to which such deduction is attributable.

SECTION 8.4. Any Company gain or loss realized with respect to property, other than money, contributed to the Company by a Member shall be shared among the Members pursuant to Code section 704(c) and regulations to be promulgated thereunder so as to take account of the difference between the Company basis and the fair market value of the property at the time of the contribution ("built-in gain or loss").  Such built-in gain or loss shall be allocated to the contributing Member upon the disposition of the property.

## ARTICLE IX

### Admission and Withdrawal of a Member

SECTION 9.1. A Member may transfer his interest in the Company to another person or entity only with the prior unanimous consent of the other Members either in writing or at a meeting called for such purpose.  If all of the other Members do not approve of the transfer, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member.  The transferee shall be entitled to receive the share of profits, losses and Cash Flow or other compensation by way of income and the return of contributions to which the transferor otherwise would be entitled.

SECTION 9.2. The Members agree to sign such additional documents as may be required in order to admit additional Members to the Company, pursuant to section 9.1 as well as, among other things, to provide for the division of profits, losses and Cash Flow among the Members.

SECTION 9.3. All costs and expenses incurred by the Company in connection with the assignment of a Member's interest, including any filing fees and publishing costs and the fees and disbursements of counsel, shall be paid by the assigning Member.

SECTION 9.4. Each person who becomes a Member in the Company, by becoming a Member, shall and does hereby ratify and agree to be bound by the terms and conditions of this Agreement.

## ARTICLE X

### Termination or Dissolution of Company

SECTION 10.1. The Company shall be terminated prior to the date of expiration of the term provided in Section 2.5 if (a) a majority in interest of the Members consent that the Company should be terminated and dissolved, or (b) the Company is dissolved pursuant to this Agreement.

SECTION 10.2. The Company shall be terminated in the event any Member (i) withdraws, resigns or is expelled from the Company; (ii) makes an assignment for the benefit of creditors, is the subject of an order for relief under Title 11 of the United States Code, files a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding of this nature, seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator for all or any substantial part of his properties; (iii) dies; or (iv) a judgment is entered by a court of competent jurisdiction adjudicating him incompetent to manage his person or his property.

SECTION 10.3. If the Company is dissolved, the owners of a majority in interest of the remaining Members may elect to reconstitute and continue the Company as a successor Company upon the same conditions as are set forth in this Agreement. Any such election to continue the Company will not result in the creation of a new Company among the remaining Members, nor will such election require the amendment of this Agreement or the execution of an amended Agreement.

SECTION 10.4. Upon the termination and dissolution of the Company, the then Operating Manager, or Operating Managers, if any, or, if there is no Operating Manager, any person elected to perform such liquidation by the written consent of the owners of a majority in interest of the Members, shall proceed to the liquidation of the Company. The proceeds of such liquidation shall be applied and distributed as follows:

A. If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled. The fair market value of such assets shall be determined by an independent appraiser to be selected by the Company's independent public accountants. The amount by which the fair market value of any Property to be distributed in kind to the Members exceeds or is less than the basis of such Property, shall, to the extent not otherwise recognized by the Company, be taken into account in computing Net Profits or Net Losses (and shall be allocated among the Members in accordance with Section 8.2) for purposes of crediting or charging the Capital Accounts of, and liquidating distributions to, the Members under Section 10.4.B.

B. All distributions upon liquidation of the Company shall be distributed as follows: to each of the Members, in proportion to the amount of their respective positive Capital Accounts, as such accounts have been adjusted (i) in accordance with Section 6.5 to reflect the Net Profit or Net Loss realized or incurred upon the sale of the Company's property or assets and deemed sale pursuant to Section 10.4.A; (ii) in accordance with Section 8.2 to reflect all Net Profits or Net Losses with respect to the year of liquidation. No Member shall be liable to repay the negative amount of his Capital Account.

SECTION 10.5. Each of the Members shall be furnished with a statement, reviewed by the Company's independent public accountants, which shall set forth the assets and liabilities of the Company as of the date of the Company's liquidation. Upon completion of the liquidation, the Operating Managers shall execute and cause to be filed a Certificate of Dissolution of the Company and any and all other documents necessary with respect to termination of the Company.

## ARTICLE XI

### Books and Reports

SECTION 11.1. The Operating Mangers shall cause the Company to maintain the following records:

A.    Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Company, shall be kept by the Operating Managers at the principal office of the Company. The fiscal year of the Company shall be the calendar year. The books of account of the Company shall be kept in accordance with sound accounting practices and principles applied in a consistent manner by the Company; provided, however, that all methods of accounting and treating particular transactions shall be in accordance with the methods of accounting employed for Federal income tax purposes. All determinations by the Operating Managers with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding upon al the Members unless the determination is inconsistent with any express provision of this Agreement.

B.    A current list of the full name and last known mailing address of each Member set forth in alphabetical order together with the contribution and share in profits and losses of each Member; a copy of the Articles of Organization of the Company and any amendments thereto; a copy of the Company Operating Agreement and any amendments thereto; a copy of the Company's federal, state and local income tax returns for the three most recent fiscal years.

C.    Any member shall have the right from time to time at his expense to have his accountants and representatives examine and/or audit the books and records of the Company and the information referred to in this Section, and the Operating Managers will make such books and records and information available for such examinations and/or audits.

SECTION 11.2. No value shall be placed for any purpose upon the Company name or the right to its use, or upon the goodwill of the Company or its business. Upon termination or dissolution of the Company (without reconstitution thereof) as provided in this Agreement, neither the Company name or the right to its use, nor the goodwill of the Company, shall be considered as an asset of the Company.

SECTION 11.3. The Operating Managers will cause to be sent to the Members within a reasonable period after the close of each year the following: (a) annual statements of the Company's gross receipts and operating expenses, and the capital accounts of each Member, prepared by the Company's independent public accountants, to be transmitted to each Member; and (b) a report to be transmitted to each Member indicating the Member's share of the Company's profit or loss for that year and the Member's allocable share of all items of income, gain, loss, deduction, and credit, for Federal income tax purposes.

## ARTICLE XII

### Tax Elections

SECTION 12.1. In the event of a transfer of a Member's interest, or upon the death of a Member, or in the event of the distribution of Company property to any party hereto, the Company may (but need not necessarily) file an election, in accordance with Section 754 of the Code to cause the basis of the Company Property to be adjusted for Federal income tax purposes, as provided by Sections 734 and 743 of the Code.

## ARTICLE XIII

### Miscellaneous

SECTION 13.1. Any notice or other communication under this Agreement shall be in writing and shall be considered given when mailed by registered or certified mail, return receipt requested, to the parties at the following addresses (or at such other address as a party shall have previously specified by notice to the others as the address to which notice shall be given to him):

A.     If to the Company, to it in care of the Operating Managers at the address of the Company.

B.     If to the Operating Managers, to them at the address of the Company.

C.     If to any Member, to him at his address set forth on the books and records of the Company.

SECTION 13.2. This Agreement contains a complete statement of all of the arrangements among the parties with respect to the Company and cannot be changed or terminated orally or in any manner other than by a written agreement executed by all of the Members. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

SECTION 13.3. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

SECTION 13.4. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations of the jurisdiction in which the Company does business. If any provision of this Agreement, or the application thereof to any person or circumstance, shall for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected, but rather shall be enforced to the extent permitted by law.

SECTION 13.5. Anything hereinbefore in this Agreement to the contrary notwithstanding, all references to the Property of the Company are deemed to include the profits, losses and Cash Flow of the Property.

SECTION 13.6. Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the State of organization of the Company applicable to agreements made and to be performed in the State of organization of the Company.

SECTION 13.7. The captions, headings and table of contents in this Agreement are solely for convenience of reference and shall not affect its interpretation.

SECTION 13.8. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall be deemed to constitute a single document.

SECTION 13.9. Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement Effective as of the day and year first above written.

Lucy Gao
Member/Manager

## "SCHEDULE A"

## OPERATING AGREEMENT
## OF
## EAST HEIGHTS LIMITED LIABILITY COMPANY

Percentage Interests of Members of East Heights LLC.

| Member Name | Percentage Interest |
|---|---|
| Lucy Gao | 100% |

## OPERATING AGREEMENT
### OF
### EAST HEIGHTS LIMITED LIABILITY COMPANY

Operating Managers may not make any of the following management decisions without obtaining the consent of that Membership Interest:

a.  any merger, consolidation or other business combination;
b.  sale or other disposition of substantially all the assets of the LLC;
c.  dissolution of the LLC;
d.  filing of a petition or commencing other proceedings seeking reorganization;
e.  liquidation, arrangement or other similar relief under any federal or state law relating to bankruptcy or insolvency;
f.  the amendment or modification of any provision of this Agreement;
g.  the issuance of additional LLC Units to any Member or other person;
h.  the removal of any Member;
i.  the decision to appoint managers for the LLC under Article V hereof.

## OPERATING AGREEMENT
## OF
## BRIDGESTREAM MANAGEMENT LLC

This Operating Agreement ("Agreement") of Bridgestream Management LLC (the "Company") effective as of this 16th day of January 2014, by, between and among the undersigned confirms our understanding as to the matters contained herein.

The parties hereto agree as follows:

## ARTICLE 1

### Definitions

SECTION 1.1. As used herein, the following terms and phrases shall have the meanings indicated:

A.      "Act" shall mean the Limited Liability Company Act of the State of organization, as amended.

B.      "Capital Account" shall mean, with respect to each Member, the account established for each Member pursuant to Section 6.5, which will initially equal the Capital Contributions of such Member and will be (a) increased by the amount of Net Profits allocated to such Member and (b) reduced by the amount of Net Losses allocated to such Member and the amount of Cash Flow distributed to such Member. Members' Capital Accounts shall be determined and maintained in accordance with the rules and paragraph (b)(2)(iv) of Regulation Section 1.704-1 of the Code.

C.      "Capital Contributions" shall mean the fair market value of the amounts contributed by the Members pursuant to Section 6.1.

D.      "Cash Flow" shall have the meaning provided in Section 7.1.

E.      "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent revenue laws.

F.      "Operating Manager" shall mean the Member or Members selected by the Members in accordance with this Agreement to serve as Operating Manger or Operating Managers of the Company.

G.      "Members" shall mean the persons designated as such in Schedule A of this Agreement, any successor(s) to their interests as such in the Company; and any other person who pursuant to this Agreement shall become a Member, and any reference to a "Member" shall be to any one of the then Members.

H.      "Net Profits" and "Net Losses" shall mean the net profit or net loss, respectively, of the Company determined in accordance with Section 8.1.

I.      The words "Membership Interest" shall mean a Member's interest in the Company which shall be in the proportion that the Member's share of the profits and losses of the Company bears to the aggregate shares of all the Members. A Membership Interest may be evidenced by a certificate issued by the Company. A Membership Interest may be expressed on a certificate as "Units" where a Member's Units bears the same relationship to the aggregate Units of all Members that the Member's Membership Interest bears to the aggregate Membership Interests of all Members. A Member's Interest may be a certified security or an uncertificated security within the meaning of section 8-102 of the Uniform Commercial Code if the requirements

1

of section 8-103(c) are met, and if the requirements are not met such interest shall, for purposes of the Uniform Commercial Code, be deemed to be a general intangible asset.

J.    "Company" shall mean this Limited Liability Company.

K.    "Person" shall mean any natural person, corporation, partnership, joint venture, association, limited liability company or other business or legal entity.

## ARTICLE II

### Organization of the Company

SECTION 2.1. The purpose of the Company is to conduct an lawful business for which limited liability companies may be organized and to do all things necessary or useful in connection with the foregoing.

SECTION 2.2. The Company name shall be "Bridgestream Management LLC".

SECTION 2.3. The Members shall be Members in the Company and shall continue to do business under the name of the Company until the Operating Managers shall change the name or the Company shall terminate.

SECTION 2.4. The principal address of the Company shall be such place or places as the Operating Mangers may determine. The Operation Managers will give notice to the Members promptly after any change in the location of the principal office of the Company.

SECTION 2.5. The Company shall terminate on the date provided in the Articles of Organization, except that the Company may terminate prior to such date as provided in this Agreement.

## ARTICLE III

### Status of Members

SECTION 3.1. No Member will be bound by, or be personally liable for the expenses, liabilities or obligations of the Company.

SECTION 3.2. No Member will be entitled to withdraw any part of his Capital Account or to receive any distributions from the Company except as expressly provided in this Agreement.

SECTION 3.3. No Member will have the right to require partition of the Company property or to compel any sale or appraisal of the Company's assets or any sale of a deceased Member's interest in the Company's assets, notwithstanding any provision of law to the contrary.

## ARTICLE IV

### Meeting of Members

SECTION 4.1. An annual meeting of Members shall be held within five (5) months after the close of the fiscal year of the Company on such date and at the time and place (either within or without the state of its organization) as shall be fixed by the Members. At the annual meeting, the Members shall elect the Operating Managers and transact such other business as may properly be brought before the meeting.

SECTION 4.2. A special meeting of Members may be called at any time by the Operating Managers and shall be called by the Operating Managers at the request in writing of that Membership interest specified in Schedule C of the Members entitled to vote at such meeting.

2

Any such request shall state the purpose or purposes of the proposed meeting. Business transacted at any special meeting of Members shall be confined to the purposes set forth in the notice thereof.

SECTION 4.3. Written notice of the time, place and purpose of every meeting of Members (and, if other than an annual meeting, the person or persons at whose direction the meeting is being called), shall be given by the Operating Mangers to each Member of record entitled to vote at such meeting, not less than ten nor more than sixty days prior to the date set for the meeting. Notice shall be given either personally or by mailing said notice by first class mail to each Member at his address appearing on the record book of the Company or at such other address appearing on the record book of the Company or at such other address supplied by him in writing to the Operating Managers of the Company for the purpose of receiving notice.

A written waiver of notice setting forth the purposes of the meeting for which notice is waived, signed by the person or persons entitled to such notice, whether before or after the time of the meeting stated therein, shall be deemed equivalent to the giving of such notice. The attendance by a Member at a meeting either in person or by proxy without protesting the lack of notice thereof shall constitute a waiver of notice of such Member.

All notices given with respect to an original meeting shall extend to any and all adjournments thereof and such business as might have been transacted at the original meeting may be transacted at any adjournment thereof; no notice of any adjourned meeting need be given if an announcement of the time and place of the adjourned meeting is made at the original meeting.

SECTION 4.4. The holders of a majority in interest of the Members present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of members except as otherwise provided by statute of the Articles of Organization. If, however, a quorum shall not be present or represented at any meeting of Members, the Members entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting or originally notified. When a quorum is once present to organize a meeting, such quorum is not deemed broken by the subsequent withdrawal of any Members.

SECTION 4.5. Every Member entitled to vote at any meeting shall be entitled to vote in accordance with his membership interest in the Company held by him of record on the date fixed as the record date for said meeting and may so vote in person or by proxy. Any Company action shall be authorized by a majority in interest of the votes cast by the Members entitled to vote thereon except as may otherwise be provided by statute, the Articles of Organization or this Operating Agreement.

SECTION 4.6. Every proxy must be signed by the Member entitled to vote or by his duly authorized attorney-in-fact and shall be valid only if filed with the Operating Managers of the Company prior to the commencement of voting on the matter in regard to which said proxy is to be voted. No proxy shall be valid after the expiration of eleven months from the date of its execution unless otherwise expressly provided in the proxy. Every proxy shall be revocable at the pleasure of the person executing it except as otherwise provided by statute. Unless the proxy by its terms provides for a specific revocation date and except as otherwise provided by statute, revocation of a proxy shall not be effective unless and until such revocation is executed in writing by the Member who executed such proxy and the revocation is filed with the Operating Managers of the Company prior to the voting of the proxy.

SECTION 4.7. All meetings of Members shall be presided over by the Operating Mangers, or if not present, by a Member thereby chosen by the Members at the meeting. The Operating

3

Managers or the person presiding at the meeting shall appoint any person present to act as secretary of the meeting.

SECTION 4.8. For the purpose of determining the Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof or to express consent or dissent from any proposal without a meeting, or for the purpose of determining the Members entitled to receive payment of any distribution of Cash Flow or the allotment of any rights, or for the purpose of any other action, the Members may fix, in advance, a date as the record date for any such determination of Members. Such date shall not be more than fifty nor less than ten days before the date of any meeting nor more than fifty days prior to any action taken without a meeting, the payment of any distribution of Cash Flow or the allotment of any rights, or any other action. When a determination of Members of record entitled to notice of, or to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof, unless the Members fix a new record date under this Section for the adjourned date.

SECTION 4.9. The company shall be entitled to treat the holder of record of any Membership Interest as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the Act.

## ARTICLE V

### Management

SECTION 5.1. The Operating Manager shall be the person designated by all of the Members and shall be vested upon such designation in accordance with the terms of this Operating Agreement. The Operating Managers shall vote in proportion to their Membership Interests in the Company. Except as otherwise provided in this Agreement, all decisions of the Operating Managers shall be by a majority in interest of the Members. All Operating Mangers must be Members of the Company. No Member will take part in or interfere in any manner with the conduct or control of business of the Company or have any right or authority to act for or bind the Company except as provided in this Agreement.

SECTION 5.2. The Operating Mangers shall hold office for the term for which elected and until a successor has been elected and qualified. A vacancy in the office of Operating Manager arising from any cause may be filled for the unexpired portion of the term by the Members.

SECTION 5.3. Any Operating Manager may resign at any time by giving written notice to the Members. Any such resignation shall take effect at the time specified therein or, if the time is not specified therein, upon the receipt thereof, irrespective of whether any such resignations shall have been accepted.

SECTION 5.4. The Company shall be managed by the Operating Managers and the conduct of the Company's business shall be controlled and conducted solely and exclusively by the Operating Managers in accordance with this Agreement. In addition to and not in limitation of any rights and powers conferred by law or other provisions of this Agreement, the Operating Managers shall have and may exercise on behalf of the Company all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company, and to maximize Company profits.

SECTION 5.5. Notwithstanding the foregoing, the Operating Managers may not make any of the management decisions stated in Schedule B without obtaining the consent of that Membership Interest stated in Schedule B.

4

SECTION 5.6. The Operating Manager shall service as Tax Matters Member as such term is defined in Code Section 6231 (a)(7).

SECTION 5.7. Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he, his testator or interstate, then, is or was a manager, Member, employee or agent of the Company, or then serves or has served on behalf of the Company in any capacity at the request of the Company, shall be indemnified by the Company against reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with an appeal therein, to the fullest extent permissible by the Act. Such right of indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

## ARTICLE VI

### Capital

SECTION 6.1. The Members have contributed to the Company in exchange for their membership interests, the cash and other property as set forth on Schedule A, annexed hereto.

SECTION 6.2. The fair market value and the adjusted basis of the contributing Member of any property other than cash contributed to the Company by a Member shall be set forth on Schedule A, annexed hereto.

SECTION 6.3. Except as expressly provided in this Agreement, no Member shall be required to make any additional contributions to the capital of the Company.

SECTION 6.4. No interest shall be paid on the Capital Account of any Member.

SECTION 6.5. A Capital Account shall be established for each Member on the books and records of the Company. If any assets of the Company are distributed to the Members in kind, the Capital Accounts of the Members shall be adjusted to reflect the difference between the fair market value of such assets on the date of distribution and the basis of the Company in such assets.

## ARTICLE VII

### Distributions of Cash

SECTION 7.1. The Company shall distribute to the Members from time to time all cash (regardless of the source thereof) of the Company which is not required for the operation or the reasonable working capital requirements of the Company (such cash is sometimes referred to herein as "Cash Flow"). For purposes of this Agreement all Cash Flow allocated to the Members shall be allocated among them in proportion to their respective Membership Interests.

SECTION 7.2. Distributions of Cash Flow shall be made from time to time in such manner as determined by the Operating Managers.

## ARTICLE VIII

### Profits and Losses

SECTION 8.1. The Net Profits and Net Losses of the Company shall be the net profits and net losses of the Company as determined for Federal income tax purposes.

SECTION 8.2. The Net Profits and Net Losses of the Company and each item of income, gain, loss, deduction or credit entering into the computation thereof, shall be allocated to the

5

Members in the same proportions that they share in distributions of Cash Flow pursuant to Section 7.1, or if there is no Cash Flow, that they would have shared if there had been Cash Flow.

SECTION 8.3. References herein to "Reg. Sec.", are to the regulations promulgated by the United States Treasury to the Code. The terms "minimum gain", "minimum gain chargeback", "qualified income offset", "nonrecourse deduction" and "nonrecourse liability" are to be interpreted consistent with the definitions and use of such terms in Reg. Sec. 1.704-2 and Reg. Sec. 1.704-1. The following special allocations shall be made in the following order:

A. Except as other set forth in Reg. Sec. 1.704-2(f), if there is a net decrease in minimum gain, during the fiscal year of the Company, each Member, shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease of minimum gain determined in accordance with Reg. Sec. 1.704-2(g). Allocations in accordance with this Section shall be made first from the disposition of Company assets subject to nonrecourse liabilities, to the extent of the minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the taxable year. This Section is intended to comply with the minimum gain chargeback requirement of Reg. Sec. 1.704-2(f).

B. Except as otherwise set forth in Reg. Sec. 1.704-2(i)(4), if there is a net decrease in a Member's nonrecourse liability minimum gain attributable to Members' nonrecourse liabilities during any fiscal year, each Member who has a share of the Member nonrecourse liability minimum gain attributable to Member nonrecourse liability shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease in Members' nonrecourse debt minimum gain attributable to such member nonrecourse debt. Allocations pursuant to this Section shall be made first from gain recognized from the disposition of Company assets subject to Member nonrecourse liabilities to the extent of Member minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the fiscal year. This section is intended to comply with the minimum gain chargeback requirements of Reg. Sec. 1.704-2(i).

C. A Member who unexpectedly receives an adjustment, allocation or distribution described in (4), (5) or (6) of Reg. Sec. 1.704-1(b)(2)(ii)(d) will be allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. An allocation shall be made pursuant to this Section and if and to the extent a Member would have a deficit in his adjusted Capital Account after all other allocations provided for in this Section 8.3 were made as if this paragraph were not in the Agreement.

D. Nonrecourse deductions shall be allocated among the Members in the same proportion in which they share the Cash Flow of the Company.

E. Any nonrecourse deduction shall be allocated to any Member who bears the economic risk of loss with respect to the Member nonrecourse liability to which such deduction is attributable.

SECTION 8.4. Any Company gain or loss realized with respect to property, other than money, contributed to the Company by a Member shall be shared among the Members pursuant to Code section 704(c) and regulations to be promulgated thereunder so as to take account of the difference between the Company basis and the fair market value of the property at the time of the contribution ("built-in gain or loss"). Such built-in gain or loss shall be allocated to the contributing Member upon the disposition of the property.

6

## ARTICLE IX

### Admission and Withdrawal of a Member

SECTION 9.1. A Member may transfer his interest in the Company to another person or entity only with the prior unanimous consent of the other Members either in writing or at a meeting called for such purpose. If all of the other Members do not approve of the transfer, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee shall be entitled to receive the share of profits, losses and Cash Flow or other compensation by way of income and the return of contributions to which the transferor otherwise would be entitled.

SECTION 9.2. The Members agree to sign such additional documents as may be required in order to admit additional Members to the Company, pursuant to section 9.1 as well as, among other things, to provide for the division of profits, losses and Cash Flow among the Members.

SECTION 9.3. All costs and expenses incurred by the Company in connection with the assignment of a Member's interest, including any filing fees and publishing costs and the fees and disbursements of counsel, shall be paid by the assigning Member.

SECTION 9.4. Each person who becomes a Member in the Company, by becoming a Member, shall and does hereby ratify and agree to be bound by the terms and conditions of this Agreement.

### ARTICLE X

### Termination or Dissolution of Company

SECTION 10.1. The Company shall be terminated prior to the date of expiration of the term provided in Section 2.5 if (a) a majority in interest of the Members consent that the Company should be terminated and dissolved, or (b) the Company is dissolved pursuant to this Agreement.

SECTION 10.2. The Company shall be terminated in the event any Member (i) withdraws, resigns or is expelled from the Company; (ii) makes an assignment for the benefit of creditors, is the subject of an order for relief under Title 11 of the United States Code, files a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding of this nature, seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator for all or any substantial part of his properties; (iii) dies; or (iv) a judgment is entered by a court of competent jurisdiction adjudicating him incompetent to manage his person or his property.

SECTION 10.3. If the Company is dissolved, the owners of a majority in interest of the remaining Members may elect to reconstitute and continue the Company as a successor Company upon the same conditions as are set forth in this Agreement. Any such election to continue the Company will not result in the creation of a new Company among the remaining Members, nor will such election require the amendment of this Agreement or the execution of an amended Agreement.

SECTION 10.4. Upon the termination and dissolution of the Company, the then Operating Manager, or Operating Managers, if any, or, if there is no Operating Manager, any person elected to perform such liquidation by the written consent of the owners of a majority in interest of the Members, shall proceed to the liquidation of the Company. The proceeds of such liquidation shall be applied and distributed as follows:

7

A.     If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled. The fair market value of such assets shall be determined by an independent appraiser to be selected by the Company's independent public accountants. The amount by which the fair market value of any Property to be distributed in kind to the Members exceeds or is less than the basis of such Property, shall, to the extent not otherwise recognized by the Company, be taken into account in computing Net Profits or Net Losses (and shall be allocated among the Members in accordance with Section 8.2) for purposes of crediting or charging the Capital Accounts of, and liquidating distributions to, the Members under Section 10.4.B.

B.     All distributions upon liquidation of the Company shall be distributed as follows: to each of the Members, in proportion to the amount of their respective positive Capital Accounts, as such accounts have been adjusted (i) in accordance with Section 6.5 to reflect the Net Profit or Net Loss realized or incurred upon the sale of the Company's property or assets and deemed sale pursuant to Section 10.4.A; (ii) in accordance with Section 8.2 to reflect all Net Profits or Net Losses with respect to the year of liquidation. No Member shall be liable to repay the negative amount of his Capital Account.

SECTION 10.5. Each of the Members shall be furnished with a statement, reviewed by the Company's independent public accountants, which shall set forth the assets and liabilities of the Company as of the date of the Company's liquidation. Upon completion of the liquidation, the Operating Managers shall execute and cause to be filed a Certificate of Dissolution of the Company and any and all other documents necessary with respect to termination of the Company.

## ARTICLE XI

### Books and Reports

SECTION 11.1. The Operating Mangers shall cause the Company to maintain the following records:

A.     Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Company, shall be kept by the Operating Managers at the principal office of the Company. The fiscal year of the Company shall be the calendar year. The books of account of the Company shall be kept in accordance with sound accounting practices and principles applied in a consistent manner by the Company; provided, however, that all methods of accounting and treating particular transactions shall be in accordance with the methods of accounting employed for Federal income tax purposes. All determinations by the Operating Managers with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding upon al the Members unless the determination is inconsistent with any express provision of this Agreement.

B.     A current list of the full name and last known mailing address of each Member set forth in alphabetical order together with the contribution and share in profits and losses of each Member; a copy of the Articles of Organization of the Company and any amendments thereto; a copy of the Company Operating Agreement and any amendments thereto; a copy of the Company's federal, state and local income tax returns for the three most recent fiscal years.

C.     Any member shall have the right from time to time at his expense to have his accountants and representatives examine and/or audit the books and records of the Company and the information referred to in this Section, and the Operating Managers will make such books and records and information available for such examinations and/or audits.

8

SECTION 11.2. No value shall be placed for any purpose upon the Company name or the right to its use, or upon the goodwill of the Company or its business. Upon termination or dissolution of the Company (without reconstitution thereof) as provided in this Agreement, neither the Company name or the right to its use, nor the goodwill of the Company, shall be considered as an asset of the Company.

SECTION 11.3. The Operating Managers will cause to be sent to the Members within a reasonable period after the close of each year the following: (a) annual statements of the Company's gross receipts and operating expenses, and the capital accounts of each Member, prepared by the Company's independent public accountants, to be transmitted to each Member; and (b) a report to be transmitted to each Member indicating the Member's share of the Company's profit or loss for that year and the Member's allocable share of all items of income, gain, loss, deduction, and credit, for Federal income tax purposes.

## ARTICLE XII

### Tax Elections

SECTION 12.1. In the event of a transfer of a Member's interest, or upon the death of a Member, or in the event of the distribution of Company property to any party hereto, the Company may (but need not necessarily) file an election, in accordance with Section 754 of the Code to cause the basis of the Company Property to be adjusted for Federal income tax purposes, as provided by Sections 734 and 743 of the Code.

## ARTICLE XIII

### Miscellaneous

SECTION 13.1. Any notice or other communication under this Agreement shall be in writing and shall be considered given when mailed by registered or certified mail, return receipt requested, to the parties at the following addresses (or at such other address as a party shall have previously specified by notice to the others as the address to which notice shall be given to him):

A.    If to the Company, to it in care of the Operating Managers at the address of the Company.

B.    If to the Operating Managers, to them at the address of the Company.

C.    If to any Member, to him at his address set forth on the books and records of the Company.

SECTION 13.2. This Agreement contains a complete statement of all of the arrangements among the parties with respect to the Company and cannot be changed or terminated orally or in any manner other than by a written agreement executed by all of the Members. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

SECTION 13.3. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

SECTION 13.4. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations of the jurisdiction in which the Company does business. If any provision of this Agreement, or the application thereof to any person or circumstance, shall for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to

9

other persons or circumstances shall not be affected, but rather shall be enforced to the extent permitted by law.

SECTION 13.5. Anything hereinbefore in this Agreement to the contrary notwithstanding, all references to the Property of the Company are deemed to include the profits, losses and Cash Flow of the Property.

SECTION 13.6. Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the State of organization of the Company applicable to agreements made and to be performed in the State of organization of the Company.

SECTION 13.7. The captions, headings and table of contents in this Agreement are solely for convenience of reference and shall not affect its interpretation.

SECTION 13.8. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall be deemed to constitute a single document.

SECTION 13.9. Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement Effective as of the day and year first above written.

Lucy Gao, Managing Member

## "SCHEDULE A"

## OPERATING AGREEMENT
## OF
## BRIDGESTREAM MANAGEMENT LLC

Percentage Interests of Members of Bridgestream Management LLC as of January 16, 2014.

| Member Name | Percentage Interest |
|-------------|--------------------|
| Lucy Gao | 100% |

11

## OPERATING AGREEMENT
## OF
## BRIDGESTREAM MANAGEMENT LLC

Operating Managers may not make any of the following management decisions without obtaining the consent of that Membership Interest:

a. any merger, consolidation or other business combination;
b. sale or other disposition of substantially all the assets of the LLC;
c. dissolution of the LLC;
d. filing of a petition or commencing other proceedings seeking reorganization;
e. liquidation, arrangement or other similar relief under any federal or state law relating to bankruptcy or insolvency;
f. the amendment or modification of any provision of this Agreement;
g. the issuance of additional LLC Units to any Member or other person;
h. the removal of any Member;
i. the decision to appoint managers for the LLC under Article V hereof.

12

## OPERATING AGREEMENT
### OF
### Green Oak Asset Management Limited Liability Company

This Operating Agreement ("Agreement") of Green Oak Asset Management LLC (the "Company") effective as of this 8 day of March, 2010, by, between and among the undersigned confirms our understanding as to the matters contained herein.

The parties hereto agree as follows:

### ARTICLE 1

#### Definitions

SECTION 1.1. As used herein, the following terms and phrases shall have the meanings indicated:

A.     "Act" shall mean the Limited Liability Company Act of the State of organization, as amended.

B.     "Capital Account" shall mean, with respect to each Member, the account established for each Member pursuant to Section 6.5, which will initially equal the Capital Contributions of such Member and will be (a) increased by the amount of Net Profits allocated to such Member and (b) reduced by the amount of Net Losses allocated to such Member and the amount of Cash Flow distributed to such Member. Members' Capital Accounts shall be determined and maintained in accordance with the rules and paragraph (b)(2)(iv) of Regulation Section 1.704-1 of the Code.

C.     "Capital Contributions" shall mean the fair market value of the amounts contributed by the Members pursuant to Section 6.1.

D.     "Cash Flow" shall have the meaning provided in Section 7.1.

E.     "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent revenue laws.

F.     "Operating Manager" shall mean the Member of Members selected by the Members in accordance with this Agreement to serve as Operating Manger or Operating Managers of the Company.

G.     "Members" shall mean the persons designated as such in Schedule A of this Agreement, any successor(s) to their interests as such in the Company; and any other person who pursuant to this Agreement shall become a Member, and any reference to a "Member" shall be to any one of the then Members.

H.     "Net Profits" and "Net Losses" shall mean the net profit or net loss, respectively, of the Company determined in accordance with Section 8.1.

I.     The words "Membership Interest" shall mean a Member's interest in the Company which shall be in the proportion that the Member's share of the profits and losses of the Company bears to the aggregate shares of all the Members. A Membership Interest may be evidenced by a certificate issued by the Company. A Membership Interest may be expressed on a certificate as "Units" where a Member's Units bears the same relationship to the aggregate Units of all Members that the Member's Membership Interest bears to the aggregate Membership Interests of all Members. A Member's Interest may be a certified security or an uncertificated security within the meaning of section 8-102 of the Uniform Commercial Code if the requirements of section 8-103(c) are met, and if the requirements are not met such interest shall, for purposes of the Uniform Commercial Code, be deemed to be a general intangible asset.

J.     "Company" shall mean this Limited Liability Company.

K. "Person" shall mean any natural person, corporation, partnership, joint venture, association, limited liability company or other business or legal entity.

## ARTICLE II

### Organization of the Company

SECTION 2.1. The purpose of the Company is to conduct an lawful business for which limited liability companies may be organized and to do all things necessary or useful in connection with the foregoing.

SECTION 2.2. The Company name shall be "Green Oak Asset Management LLC".

SECTION 2.3. The Members shall be Members in the Company and shall continue to do business under the name of the Company until the Operating Managers shall change the name or the Company shall terminate.

SECTION 2.4. The principal address of the Company shall be such place or places as the Operating Mangers may determine. The Operation Managers will give notice to the Members promptly after any change in the location of the principal office of the Company.

SECTION 2.5. The Company shall terminate on the date provided in the Articles of Organization, except that the Company may terminate prior to such date as provided in this Agreement.

## ARTICLE III

### Status of Members

SECTION 3.1. No Member will be bound by, or be personally liable for the expenses, liabilities or obligations of the Company.

SECTION 3.2. No Member will be entitled to withdraw any part of his Capital Account or to receive any distributions from the Company except as expressly provided in this Agreement.

SECTION 3.3. No Member will have the right to require partition of the Company property or to compel any sale or appraisal of the Company's assets or any sale of a deceased Member's interest in the Company's assets, notwithstanding any provision of law to the contrary.

## ARTICLE IV

### Meeting of Members

SECTION 4.1. An annual meeting of Members shall be held within five (5) months after the close of the fiscal year of the Company on such date and at the time and place (either within or without the state of its organization) as shall be fixed by the Members. At the annual meeting, the Members shall elect the Operating Managers and transact such other business as may properly be brought before the meeting.

SECTION 4.2. A special meeting of Members may be called at any time by the Operating Managers and shall be called by the Operating Managers at the request in writing of that Membership interest specified in Schedule A of the Members entitled to vote at such meeting. Any such request shall state the purpose or purposes of the proposed meeting. Business transacted at any special meeting of Members shall be confined to the purposes set forth in the notice thereof.

SECTION 4.3. Written notice of the time, place and purpose of every meeting of Members (and, if other than an annual meeting, the person or persons at whose direction the meeting is being called), shall be given by the Operating Mangers to each Member of record

entitled to vote at such meeting, not less than ten nor more than sixty days prior to the date set for the meeting. Notice shall be given either personally or by mailing said notice by first class mail to each Member at his address appearing on the record book of the Company or at such other address appearing on the record book of the Company or at such other address supplied by him in writing to the Operating Managers of the Company for the purpose of receiving notice.

A written waiver of notice setting forth the purposes of the meeting for which notice is waived, signed by the person or persons entitled to such notice, whether before or after the time of the meeting stated therein, shall be deemed equivalent to the giving of such notice. The attendance by a Member at a meeting either in person or by proxy without protesting the lack of notice thereof shall constitute a waiver of notice of such Member.

All notices given with respect to an original meeting shall extend to any and all adjournments thereof and such business as might have been transacted at the original meeting may be transacted at any adjournment thereof; no notice of any adjourned meeting need be given if an announcement of the time and place of the adjourned meeting is made at the original meeting.

SECTION 4.4. The holders of a majority in interest of the Members present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of members except as otherwise provided by statute of the Articles of Organization. If, however, a quorum shall not be present or represented at any meeting of Members, the Members entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting or originally notified. When a quorum is once present to organize a meeting, such quorum is not deemed broken by the subsequent withdrawal of any Members.

SECTION 4.5. Every Member entitled to vote at any meeting shall be entitled to vote in accordance with his membership interest in the Company held by him of record on the date fixed as the record date for said meeting and may so vote in person or by proxy. Any Company action shall be authorized by a majority in interest of the votes cast by the Members entitled to vote thereon except as may otherwise be provided by statute, the Articles of Organization or this Operating Agreement.

SECTION 4.6. Every proxy must be signed by the Member entitled to vote or by his duly authorized attorney-in-fact and shall be valid only if filed with the Operating Managers of the Company prior to the commencement of voting on the matter in regard to which said proxy is to be voted. No proxy shall be valid after the expiration of eleven months from the date of its execution unless otherwise expressly provided in the proxy. Every proxy shall be revocable at the pleasure of the person executing it except as otherwise provided by statute. Unless the proxy by its terms provides for a specific revocation date and except as otherwise provided by statute, revocation of a proxy shall not be effective unless and until such revocation is executed in writing by the Member who executed such proxy and the revocation is filed with the Operating Managers of the Company prior to the voting of the proxy.

SECTION 4.7. All meetings of Members shall be presided over by the Operating Mangers, or if not present, by a Member thereby chosen by the Members at the meeting. The Operating Managers or the person presiding at the meeting shall appoint any person present to act as secretary of the meeting.

SECTION 4.8. For the purpose of determining the Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof or to express consent or dissent from any proposal without a meeting, or for the purpose of determining the Members entitled to receive payment of any distribution of Cash Flow or the allotment of any rights, or for the purpose of any other action, the Members may fix, in advance, a date as the record date for any such determination of Members. Such date shall not be more than fifty nor less than ten days before the date of any meeting nor more than fifty days prior to any action taken without a meeting, the payment of any distribution of Cash Flow or the allotment of any rights, or any

other action. When a determination of Members of record entitled to notice of, or to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof, unless the Members fix a new record date under this Section for the adjourned date.

SECTION 4.9. The company shall be entitled to treat the holder of record of any Membership Interest as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the Act.

## ARTICLE V

### Management

SECTION 5.1. Management of the Company shall be vested in all of the Members who shall also serve as Operating Managers of the Company. The Operating Managers shall vote in proportion to their Membership Interests in the Company. Except as otherwise provided in this Agreement, all decisions of the Operating Managers shall be by a majority in interest of the Members. All Operating Mangers must be Members of the Company. No Member will take part in or interfere in any manner with the conduct or control of business of the Company or have any right or authority to act for or bind the Company except as provided in this Agreement.

SECTION 5.2. The Operating Mangers shall hold office for the term for which elected and until a successor has been elected and qualified. A vacancy in the office of Operating Manager arising from any cause may be filled for the unexpired portion of the term by the Members.

SECTION 5.3. Any Operating Manager may resign at any time by giving written notice to the Members. Any such resignation shall take effect at the time specified therein or, if the time is not specified therein, upon the receipt thereof, irrespective of whether any such resignations shall have been accepted.

SECTION 5.4. The Company shall be managed by the Operating Managers and the conduct of the Company's business shall be controlled and conducted solely and exclusively by the Operating Managers in accordance with this Agreement. In addition to and not in limitation of any rights and powers conferred by law or other provisions of this Agreement, the Operating Managers shall have and may exercise on behalf of the Company all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company, and to maximize Company profits.

SECTION 5.5. Notwithstanding the foregoing, the Operating Managers may not make any of the management decisions stated in Schedule B without obtaining the consent of that Membership Interest stated in Schedule A.

SECTION 5.6. The Operating Manager shall service as Tax Matters Member as such term is defined in Code Section 6231 (a)(7).

SECTION 5.7. Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he, his testator or interstate, then, is or was a manager, Member, employee or agent of the Company, or then serves or has served on behalf of the Company in any capacity at the request of the Company, shall be indemnified by the Company against reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with an appeal therein, to the fullest extent permissible by the Act. Such right of indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

## ARTICLE VI

### Capital

SECTION 6.1. The Members have contributed to the Company in exchange for their membership interests, the cash and other property as set forth on Schedule A, annexed hereto.

SECTION 6.2. The fair market value and the adjusted basis of the contributing Member of any property other than cash contributed to the Company by a Member shall be set forth on Schedule A, annexed hereto.

SECTION 6.3. Except as expressly provided in this Agreement, no Member shall be required to make any additional contributions to the capital of the Company.

SECTION 6.4. No interest shall be paid on the Capital Account of any Member.

SECTION 6.5. A Capital Account shall be established for each Member on the books and records of the Company. If any assets of the Company are distributed to the Members in kind, the Capital Accounts of the Members shall be adjusted to reflect the difference between the fair market value of such assets on the date of distribution and the basis of the Company in such assets.

## ARTICLE VII

### Distributions of Cash

SECTION 7.1. The Company shall distribute to the Members from time to time all cash (regardless of the source thereof) of the Company which is not required for the operation or the reasonable working capital requirements of the Company (such cash is sometimes referred to herein as "Cash Flow"). For purposes of this Agreement all Cash Flow allocated to the Members shall be allocated among them in proportion to their respective Membership Interests.

SECTION 7.2. Distributions of Cash Flow shall be made from time to time in such manner as determined by the Operating Managers.

## ARTICLE VIII

### Profits and Losses

SECTION 8.1. The Net Profits and Net Losses of the Company shall be the net profits and net losses of the Company as determined for Federal income tax purposes.

SECTION 8.2. The Net Profits and Net Losses of the Company and each item of income, gain, loss, deduction or credit entering into the computation thereof, shall be allocated to the Members in the same proportions that they share in distributions of Cash Flow pursuant to Section 7.1, or if there is no Cash Flow, that they would have shared if there had been Cash Flow.

SECTION 8.3. References herein to "Reg. Sec.", are to the regulations promulgated by the United States Treasury to the Code. The terms "minimum gain", "minimum gain chargeback", "qualified income offset", "nonrecourse deduction" and "nonrecourse liability" are to be interpreted consistent with the definitions and use of such terms in Reg. Sec. 1.704-2 and Reg. Sec. 1.704-1. The following special allocations shall be made in the following order:

A.    Except as other set forth in Reg. Sec. 1.704-2(f), if there is a net decrease in minimum gain, during the fiscal year of the Company, each Member, shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease of minimum gain determined in accordance with Reg. Sec. 1.704-2(g). Allocations in accordance with this Section shall be made first from the disposition of Company assets subject to nonrecourse liabilities, to the extent of the minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the taxable year. This Section is intended to comply with the minimum gain chargeback requirement of Reg. Sec. 1.704-2(f).

B.    Except as otherwise set forth in Reg. Sec. 1.704-2(i)(4), if there is a net decrease in a Member's nonrecourse liability minimum gain attributable to Members' nonrecourse liabilities during any fiscal year, each Member who has a share of the Member nonrecourse liability minimum gain attributable to Member nonrecourse liability shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease in Members' nonrecourse debt minimum gain attributable to such member nonrecourse debt.   Allocations pursuant to this Section shall be made first from gain recognized from the disposition of Company assets subject to Member nonrecourse liabilities to the extent of Member minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the fiscal year.    This section is intended to comply with the minimum gain chargeback requirements of Reg. Sec. 1.704-2(i).

C.    A Member who unexpectedly receives an adjustment, allocation or distribution described in (4), (5) or (6) of Reg. Sec. 1.704-1(b)(2)(ii)(d) will be allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. An allocation shall be made pursuant to this Section and if and to the extent a Member would have a deficit in his adjusted Capital Account after all other allocations provided for in this Section 8.3 were made as if this paragraph were not in the Agreement.

D.    Nonrecourse deductions shall be allocated among the Members in the same proportion in which they share the Cash Flow of the Company.

E.    Any nonrecourse deduction shall be allocated to any Member who bears the economic risk of loss with respect to the Member nonrecourse liability to which such deduction is attributable.

SECTION 8.4. Any Company gain or loss realized with respect to property, other than money, contributed to the Company by a Member shall be shared among the Members pursuant to Code section 704(c) and regulations to be promulgated thereunder so as to take account of the difference between the Company basis and the fair market value of the property at the time of the contribution ("built-in gain or loss").   Such built-in gain or loss shall be allocated to the contributing Member upon the disposition of the property.

## ARTICLE IX

## Admission and Withdrawal of a Member

SECTION 9.1. A Member may transfer his interest in the Company to another person or entity only with the prior unanimous consent of the other Members either in writing or at a meeting called for such purpose.  If all of the other Members do not approve of the transfer, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member.  The transferee shall be entitled to receive the share of profits, losses and Cash Flow or other compensation by way of income and the return of contributions to which the transferor otherwise would be entitled.

SECTION 9.2. The Members agree to sign such additional documents as may be required in order to admit additional Members to the Company, pursuant to section 9.1 as well as, among other things, to provide for the division of profits, losses and Cash Flow among the Members.

SECTION 9.3. All costs and expenses incurred by the Company in connection with the assignment of a Member's interest, including any filing fees and publishing costs and the fees and disbursements of counsel, shall be paid by the assigning Member.

SECTION 9.4. Each person who becomes a Member in the Company, by becoming a Member, shall and does hereby ratify and agree to be bound by the terms and conditions of this Agreement.

## ARTICLE X

## Termination or Dissolution of Company

SECTION 10.1. The Company shall be terminated prior to the date of expiration of the term provided in Section 2.5 if (a) a majority in interest of the Members consent that the Company should be terminated and dissolved, or (b) the Company is dissolved pursuant to this Agreement.

SECTION 10.2. The Company shall be terminated in the event any Member (i) withdraws, resigns or is expelled from the Company; (ii) makes an assignment for the benefit of creditors, is the subject of an order for relief under Title 11 of the United States Code, files a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding of this nature, seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator for all or any substantial part of his properties; (iii) dies; or (iv) a judgment is entered by a court of competent jurisdiction adjudicating him incompetent to manage his person or his property.

SECTION 10.3. If the Company is dissolved, the owners of a majority in interest of the remaining Members may elect to reconstitute and continue the Company as a successor Company upon the same conditions as are set forth in this Agreement. Any such election to continue the Company will not result in the creation of a new Company among the remaining Members, nor will such election require the amendment of this Agreement or the execution of an amended Agreement.

SECTION 10.4. Upon the termination and dissolution of the Company, the then Operating Manager, or Operating Managers, if any, or, if there is no Operating Manager, any person elected to perform such liquidation by the written consent of the owners of a majority in interest of the Members, shall proceed to the liquidation of the Company. The proceeds of such liquidation shall be applied and distributed as follows:

A. If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled. The fair market value of such assets shall be determined by an independent appraiser to be selected by the Company's independent public accountants. The amount by which the fair market value of any Property to be distributed in kind to the Members exceeds or is less than the basis of such Property, shall, to the extent not otherwise recognized by the Company, be taken into account in computing Net Profits or Net Losses (and shall be allocated among the Members in accordance with Section 8.2) for purposes of crediting or charging the Capital Accounts of, and liquidating distributions to, the Members under Section 10.4.B.

B. All distributions upon liquidation of the Company shall be distributed as follows: to each of the Members, in proportion to the amount of their respective positive Capital Accounts, as such accounts have been adjusted (i) in accordance with Section 6.5 to reflect the Net Profit or Net Loss realized or incurred upon the sale of the Company's property or assets and deemed sale pursuant to Section 10.4.A; (ii) in accordance with Section 8.2 to reflect all Net Profits or Net Losses with respect to the year of liquidation. No Member shall be liable to repay the negative amount of his Capital Account.

SECTION 10.5. Each of the Members shall be furnished with a statement, reviewed by the Company's independent public accountants, which shall set forth the assets and liabilities of the Company as of the date of the Company's liquidation. Upon completion of the liquidation, the Operating Managers shall execute and cause to be filed a Certificate of Dissolution of the Company and any and all other documents necessary with respect to termination of the Company.

## ARTICLE XI

### Books and Reports

SECTION 11.1. The Operating Mangers shall cause the Company to maintain the following records:

A.  Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Company, shall be kept by the Operating Managers at the principal office of the Company. The fiscal year of the Company shall be the calendar year. The books of account of the Company shall be kept in accordance with sound accounting practices and principles applied in a consistent manner by the Company; provided, however, that all methods of accounting and treating particular transactions shall be in accordance with the methods of accounting employed for Federal income tax purposes. All determinations by the Operating Managers with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding upon al the Members unless the determination is inconsistent with any express provision of this Agreement.

B.  A current list of the full name and last known mailing address of each Member set forth in alphabetical order together with the contribution and share in profits and losses of each Member; a copy of the Articles of Organization of the Company and any amendments thereto; a copy of the Company Operating Agreement and any amendments thereto; a copy of the Company's federal, state and local income tax returns for the three most recent fiscal years.

C.  Any member shall have the right from time to time at his expense to have his accountants and representatives examine and/or audit the books and records of the Company and the information referred to in this Section, and the Operating Managers will make such books and records and information available for such examinations and/or audits.

SECTION 11.2. No value shall be placed for any purpose upon the Company name or the right to its use, or upon the goodwill of the Company or its business. Upon termination or dissolution of the Company (without reconstitution thereof) as provided in this Agreement, neither the Company name or the right to its use, nor the goodwill of the Company, shall be considered as an asset of the Company.

SECTION 11.3. The Operating Managers will cause to be sent to the Members within a reasonable period after the close of each year the following: (a) annual statements of the Company's gross receipts and operating expenses, and the capital accounts of each Member, prepared by the Company's independent public accountants, to be transmitted to each Member; and (b) a report to be transmitted to each Member indicating the Member's share of the Company's profit or loss for that year and the Member's allocable share of all items of income, gain, loss, deduction, and credit, for Federal income tax purposes.

## ARTICLE XII

### Tax Elections

SECTION 12.1. In the event of a transfer of a Member's interest, or upon the death of a Member, or in the event of the distribution of Company property to any party hereto, the Company may (but need not necessarily) file an election, in accordance with Section 754 of the Code to cause the basis of the Company Property to be adjusted for Federal income tax purposes, as provided by Sections 734 and 743 of the Code.

## ARTICLE XIII

### Miscellaneous

SECTION 13.1. Any notice or other communication under this Agreement shall be in writing and shall be considered given when mailed by registered or certified mail, return receipt requested, to the parties at the following addresses (or at such other address as a party shall have previously specified by notice to the others as the address to which notice shall be given to him):

A. If to the Company, to it in care of the Operating Managers at the address of the Company.

B. If to the Operating Managers, to them at the address of the Company.

C. If to any Member, to him at his address set forth on the books and records of the Company.

SECTION 13.2. This Agreement contains a complete statement of all of the arrangements among the parties with respect to the Company and cannot be changed or terminated orally or in any manner other than by a written agreement executed by all of the Members. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

SECTION 13.3. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

SECTION 13.4. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations of the jurisdiction in which the Company does business. If any provision of this Agreement, or the application thereof to any person or circumstance, shall for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected, but rather shall be enforced to the extent permitted by law.

SECTION 13.5. Anything hereinbefore in this Agreement to the contrary notwithstanding, all references to the Property of the Company are deemed to include the profits, losses and Cash Flow of the Property.

SECTION 13.6. Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the State of organization of the Company applicable to agreements made and to be performed in the State of organization of the Company.

SECTION 13.7. The captions, headings and table of contents in this Agreement are solely for convenience of reference and shall not affect its interpretation.

SECTION 13.8. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall be deemed to constitute a single document.

SECTION 13.9. Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement Effective as of the day and year first above written.

Lucy Gao
Member/Manager

**"SCHEDULE A"**

**OPERATING AGREEMENT**
**OF**
**GREEN OAK ASSET MANAGEMENT LIMITED LIABILITY COMPANY**

Percentage Interests of Members of Green Oak Asset Management LLC.

| Member Name | Percentage Interest |
|-------------|---------------------|
| Lucy Gao | 100% |

## "SCHEDULE B"

## OPERATING AGREEMENT
## OF
## GREEN OAK ASSET MANAGEMENT LIMITED LIABILITY COMPANY

Operating Managers may not make any of the following management decisions without obtaining the consent of that Membership Interest:

a. any merger, consolidation or other business combination;
b. sale or other disposition of substantially all the assets of the LLC;
c. dissolution of the LLC;
d. filing of a petition or commencing other proceedings seeking reorganization;
e. liquidation, arrangement or other similar relief under any federal or state law relating to bankruptcy or insolvency;
f. the amendment or modification of any provision of this Agreement;
g. the issuance of additional LLC Units to any Member or other person;
h. the removal of any Member;
i. the decision to appoint managers for the LLC under Article V hereof.

# EXHIBIT  N

## OPERATING AGREEMENT
## OF
## First American Regional Center LLC

This Operating Agreement ("Agreement") of First American Regional Center LLC (the "Company") effective as of this 24th day of December, 2014, by, between and among the undersigned confirms our understanding as to the matters contained herein.

The parties hereto agree as follows:

## ARTICLE 1

## Definitions

SECTION 1.1. As used herein, the following terms and phrases shall have the meanings indicated:

A.    "Act" shall mean the Limited Liability Company Act of the State of organization, as amended.

B.    "Capital Account" shall mean, with respect to each Member, the account established for each Member pursuant to Section 6.5, which will initially equal the Capital Contributions of such Member and will be (a) increased by the amount of Net Profits allocated to such Member and (b) reduced by the amount of Net Losses allocated to such Member and the amount of Cash Flow distributed to such Member. Members' Capital Accounts shall be determined and maintained in accordance with the rules and paragraph (b)(2)(iv) of Regulation Section 1.704-1 of the Code.

C.    "Capital Contributions" shall mean the fair market value of the amounts contributed by the Members pursuant to Section 6.1.

D.    "Cash Flow" shall have the meaning provided in Section 7.1.

E.    "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent revenue laws.

F.    "Operating Manager" shall mean the Member of Members selected by the Members in accordance with this Agreement to serve as Operating Manger or Operating Managers of the Company.

G.    "Members" shall mean the persons designated as such in Schedule A of this Agreement, any successor(s) to their interests as such in the Company; and any other person who pursuant to this Agreement shall become a Member, and any reference to a "Member" shall be to any one of the then Members.

H.    "Net Profits" and "Net Losses" shall mean the net profit or net loss, respectively, of the Company determined in accordance with Section 8.1.

I.    The words "Membership Interest" shall mean a Member's interest in the Company which shall be in the proportion that the Member's share of the profits and losses of the Company bears to the aggregate shares of all the Members. A Membership Interest may be evidenced by a certificate issued by the Company. A Membership Interest may be expressed on a certificate as "Units" where a Member's Units bears the same relationship to the aggregate Units of all Members that the Member's Membership Interest bears to the aggregate Membership Interests of all Members. A Member's Interest may be a certified security or an uncertificated security within the meaning of section 8-102 of the Uniform Commercial Code if the requirements of section 8-103(c) are met, and if the requirements are not met such Interest shall, for purposes of the Uniform Commercial Code, be deemed to be a general intangible asset.

J.    "Company" shall mean this Limited Liability Company.

LAM00007868

K.    "Person" shall mean any natural person, corporation, partnership, joint venture, association, limited liability company or other business or legal entity.

## ARTICLE II

### Organization of the Company

SECTION 2.1. The purpose of the Company is to conduct a lawful business for which limited liability companies may be organized and to do all things necessary or useful in connection with the foregoing.

SECTION 2.2. The Company name shall be "First American Regional Center LLC".

SECTION 2.3. The Members shall be Members in the Company and shall continue to do business under the name of the Company until the Operating Managers shall change the name or the Company shall terminate.

SECTION 2.4. The principal address of the Company shall be such place or places as the Operating Mangers may determine. The Operation Managers will give notice to the Members promptly after any change in the location of the principal office of the Company.

SECTION 2.5. The Company shall terminate on the date provided in the Articles of Organization, except that the Company may terminate prior to such date as provided in this Agreement.

## ARTICLE III

### Status of Members

SECTION 3.1. No Member will be bound by, or be personally liable for the expenses, liabilities or obligations of the Company.

SECTION 3.2. No Member will be entitled to withdraw any part of his Capital Account or to receive any distributions from the Company except as expressly provided in this Agreement.

SECTION 3.3. No Member will have the right to require partition of the Company property or to compel any sale or appraisal of the Company's assets or any sale of a deceased Member's interest in the Company's assets, notwithstanding any provision of law to the contrary.

## ARTICLE IV

### Meeting of Members

SECTION 4.1. An annual meeting of Members shall be held within five (5) months after the close of the fiscal year of the Company on such date and at the time and place (either within or without the state of its organization) as shall be fixed by the Members. At the annual meeting, the Members shall elect the Operating Managers and transact such other business as may properly be brought before the meeting.

SECTION 4.2. A special meeting of Members may be called at any time by the Operating Managers and shall be called by the Operating Managers at the request in writing of that Membership interest specified in Schedule C of the Members entitled to vote at such meeting. Any such request shall state the purpose or purposes of the proposed meeting. Business transacted at any special meeting of Members shall be confined to the purposes set forth in the notice thereof.

SECTION 4.3. Written notice of the time, place and purpose of every meeting of Members (and, if other than an annual meeting, the person or persons at whose direction the meeting is being called), shall be given by the Operating Mangers to each Member of record

entitled to vote at such meeting, not less than ten nor more than sixty days prior to the date set for the meeting. Notice shall be given either personally or by mailing said notice by first class mail to each Member at his address appearing on the record book of the Company or at such other address appearing on the record book of the Company or at such other address supplied by him in writing to the Operating Managers of the Company for the purpose of receiving notice.

A written waiver of notice setting forth the purposes of the meeting for which notice is waived, signed by the person or persons entitled to such notice, whether before or after the time of the meeting stated therein, shall be deemed equivalent to the giving of such notice. The attendance by a Member at a meeting either in person or by proxy without protesting the lack of notice thereof shall constitute a waiver of notice of such Member.

All notices given with respect to an original meeting shall extend to any and all adjournments thereof and such business as might have been transacted at the original meeting may be transacted at any adjournment thereof; no notice of any adjourned meeting need be given if an announcement of the time and place of the adjourned meeting is made at the original meeting.

SECTION 4.4. The holders of a majority in interest of the Members present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of members except as otherwise provided by statute of the Articles of Organization. If, however, a quorum shall not be present or represented at any meeting of Members, the Members entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting or originally notified. When a quorum is once present to organize a meeting, such quorum is not deemed broken by the subsequent withdrawal of any Members.

SECTION 4.5. Every Member entitled to vote at any meeting shall be entitled to vote in accordance with his membership interest in the Company held by him of record on the date fixed as the record date for said meeting and may so vote in person or by proxy. Any Company action shall be authorized by a majority in interest of the votes cast by the Members entitled to vote thereon except as may otherwise be provided by statute, the Articles of Organization or this Operating Agreement.

SECTION 4.6. Every proxy must be signed by the Member entitled to vote or by his duly authorized attorney-in-fact and shall be valid only if filed with the Operating Managers of the Company prior to the commencement of voting on the matter in regard to which said proxy is to be voted. No proxy shall be valid after the expiration of eleven months from the date of its execution unless otherwise expressly provided in the proxy. Every proxy shall be revocable at the pleasure of the person executing it except as otherwise provided by statute. Unless the proxy by its terms provides for a specific revocation date and except as otherwise provided by statute, revocation of a proxy shall not be effective unless and until such revocation is executed in writing by the Member who executed such proxy and the revocation is filed with the Operating Managers of the Company prior to the voting of the proxy.

SECTION 4.7. All meetings of Members shall be presided over by the Operating Mangers, or if not present, by a Member thereby chosen by the Members at the meeting. The Operating Managers or the person presiding at the meeting shall appoint any person present to act as secretary of the meeting.

SECTION 4.8. For the purpose of determining the Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof or to express consent or dissent from any proposal without a meeting, or for the purpose of determining the Members entitled to receive payment of any distribution of Cash Flow or the allotment of any rights, or for the purpose of any other action, the Members may fix, in advance, a date as the record date for any such determination of Members. Such date shall not be more than fifty nor less than ten days before the date of any meeting nor more than fifty days prior to any action taken without a meeting, the payment of any distribution of Cash Flow or the allotment of any rights, or any

other action. When a determination of Members of record entitled to notice of, or to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof, unless the Members fix a new record date under this Section for the adjourned date.

SECTION 4.9. The company shall be entitled to treat the holder of record of any Membership Interest as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the Act.

## ARTICLE V

## Management

SECTION 5.1. Management of the Company shall be vested in all of the Members who shall also serve as Operating Managers of the Company. The Operating Managers shall vote in proportion to their Membership Interests in the Company. Except as otherwise provided in this Agreement, all decisions of the Operating Managers shall be by a majority in interest of the Members. All Operating Mangers must be Members of the Company. No Member will take part in or interfere in any manner with the conduct or control of business of the Company or have any right or authority to act for or bind the Company except as provided in this Agreement.

SECTION 5.2. The Operating Mangers shall hold office for the term for which elected and until a successor has been elected and qualified. A vacancy in the office of Operating Manager arising from any cause may be filled for the unexpired portion of the term by the Members.

SECTION 5.3. Any Operating Manager may resign at any time by giving written notice to the Members. Any such resignation shall take effect at the time specified therein or, if the time is not specified therein, upon the receipt thereof, irrespective of whether any such resignations shall have been accepted.

SECTION 5.4. The Company shall be managed by the Operating Managers and the conduct of the Company's business shall be controlled and conducted solely and exclusively by the Operating Managers in accordance with this Agreement. In addition to and not in limitation of any rights and powers conferred by law or other provisions of this Agreement, the Operating Managers shall have and may exercise on behalf of the Company all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company, and to maximize Company profits.

SECTION 5.5. Notwithstanding the foregoing, the Operating Managers may not make any of the management decisions stated in Schedule B without obtaining the consent of that Membership Interest stated in Schedule B.

SECTION 5.6. The Operating Manager shall service as Tax Matters Member as such term is defined in Code Section 6231 (a)(7).

SECTION 5.7. Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he, his testator or interstate, then, is or was a manager, Member, employee or agent of the Company, or then serves or has served on behalf of the Company in any capacity at the request of the Company, shall be indemnified by the Company against reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with an appeal therein, to the fullest extent permissible by the Act. Such right of indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

## ARTICLE VI

## Capital

SECTION 6.1. The Members have contributed to the Company in exchange for their membership interests, the cash and other property as set forth on Schedule A, annexed hereto.

SECTION 6.2. The fair market value and the adjusted basis of the contributing Member of any property other than cash contributed to the Company by a Member shall be set forth on Schedule A, annexed hereto.

SECTION 6.3. Except as expressly provided in this Agreement, no Member shall be required to make any additional contributions to the capital of the Company.

SECTION 6.4. No interest shall be paid on the Capital Account of any Member.

SECTION 6.5. A Capital Account shall be established for each Member on the books and records of the Company. If any assets of the Company are distributed to the Members in kind, the Capital Accounts of the Members shall be adjusted to reflect the difference between the fair market value of such assets on the date of distribution and the basis of the Company in such assets.

## ARTICLE VII

### Distributions of Cash

SECTION 7.1. The Company shall distribute to the Members from time to time all cash (regardless of the source thereof) of the Company which is not required for the operation or the reasonable working capital requirements of the Company (such cash is sometimes referred to herein as "Cash Flow"). For purposes of this Agreement all Cash Flow allocated to the Members shall be allocated among them in proportion to their respective Membership Interests.

SECTION 7.2. Distributions of Cash Flow shall be made from time to time in such manner as determined by the Operating Managers.

## ARTICLE VIII

### Profits and Losses

SECTION 8.1. The Net Profits and Net Losses of the Company shall be the net profits and net losses of the Company as determined for Federal income tax purposes.

SECTION 8.2. The Net Profits and Net Losses of the Company and each item of income, gain, loss, deduction or credit entering into the computation thereof, shall be allocated to the Members in the same proportions that they share in distributions of Cash Flow pursuant to Section 7.1, or if there is no Cash Flow, that they would have shared if there had been Cash Flow.

SECTION 8.3. References herein to "Reg. Sec.", are to the regulations promulgated by the United States Treasury to the Code. The terms "minimum gain", "minimum gain chargeback", "qualified income offset", "nonrecourse deduction" and "nonrecourse liability" are to be interpreted consistent with the definitions and use of such terms in Reg. Sec. 1.704-2 and Reg. Sec. 1.704-1. The following special allocations shall be made in the following order:

A.    Except as other set forth in Reg. Sec. 1.704-2(f), if there is a net decrease in minimum gain, during the fiscal year of the Company, each Member, shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease of minimum gain determined in accordance with Reg. Sec. 1.704-2(g). Allocations in accordance with this Section shall be made first from the disposition of Company assets subject to nonrecourse liabilities, to the extent of the minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the taxable year. This Section is intended to comply with the minimum gain chargeback requirement of Reg. Sec. 1.704-2(f).

LAM00007872

B.    Except as otherwise set forth in Reg. Sec. 1.704-2(i)(4), if there is a net decrease in a Member's nonrecourse liability minimum gain attributable to Members' nonrecourse liabilities during any fiscal year, each Member who has a share of the Member nonrecourse liability minimum gain attributable to Member nonrecourse liability shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease in Members' nonrecourse debt minimum gain attributable to such member nonrecourse debt.  Allocations pursuant to this Section shall be made first from gain recognized from the disposition of Company assets subject to Member nonrecourse liabilities to the extent of Member minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the fiscal year.   This section is intended to comply with the minimum gain chargeback requirements of Reg. Sec. 1.704-2(i).

C.    A Member who unexpectedly receives an adjustment, allocation or distribution described in (4), (5) or (6) of Reg. Sec. 1.704-1(b)(2)(ii)(d) will be allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. An allocation shall be made pursuant to this Section and if and to the extent a Member would have a deficit in his adjusted Capital Account after all other allocations provided for in this Section 8.3 were made as if this paragraph were not in the Agreement.

D.    Nonrecourse deductions shall be allocated among the Members in the same proportion in which they share the Cash Flow of the Company.

E.    Any nonrecourse deduction shall be allocated to any Member who bears the economic risk of loss with respect to the Member nonrecourse liability to which such deduction is attributable.

SECTION 8.4. Any Company gain or loss realized with respect to property, other than money, contributed to the Company by a Member shall be shared among the Members pursuant to Code section 704(c) and regulations to be promulgated thereunder so as to take account of the difference between the Company basis and the fair market value of the property at the time of the contribution ("built-in gain or loss").   Such built-in gain or loss shall be allocated to the contributing Member upon the disposition of the property.

## ARTICLE IX

### Admission and Withdrawal of a Member

SECTION 9.1. A Member may transfer his interest in the Company to another person or entity only with the prior unanimous consent of the other Members either in writing or at a meeting called for such purpose.  If all of the other Members do not approve of the transfer, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member.  The transferee shall be entitled to receive the share of profits, losses and Cash Flow or other compensation by way of income and the return of contributions to which the transferor otherwise would be entitled.

SECTION 9.2. The Members agree to sign such additional documents as may be required in order to admit additional Members to the Company, pursuant to section 9.1 as well as, among other things, to provide for the division of profits, losses and Cash Flow among the Members.

SECTION 9.3. All costs and expenses incurred by the Company in connection with the assignment of a Member's interest, including any filing fees and publishing costs and the fees and disbursements of counsel, shall be paid by the assigning Member.

SECTION 9.4. Each person who becomes a Member in the Company, by becoming a Member, shall and does hereby ratify and agree to be bound by the terms and conditions of this Agreement.

## ARTICLE X

### Termination or Dissolution of Company

SECTION 10.1. The Company shall be terminated prior to the date of expiration of the term provided in Section 2.5 if (a) a majority in interest of the Members consent that the Company should be terminated and dissolved, or (b) the Company is dissolved pursuant to this Agreement.

SECTION 10.2. The Company shall be terminated in the event any Member (i) withdraws, resigns or is expelled from the Company; (ii) makes an assignment for the benefit of creditors, is the subject of an order for relief under Title 11 of the United States Code, files a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding of this nature, seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator for all or any substantial part of his properties; (iii) dies; or (iv) a judgment is entered by a court of competent jurisdiction adjudicating him incompetent to manage his person or his property.

SECTION 10.3. If the Company is dissolved, the owners of a majority in interest of the remaining Members may elect to reconstitute and continue the Company as a successor Company upon the same conditions as are set forth in this Agreement. Any such election to continue the Company will not result in the creation of a new Company among the remaining Members, nor will such election require the amendment of this Agreement or the execution of an amended Agreement.

SECTION 10.4. Upon the termination and dissolution of the Company, the then Operating Manager, or Operating Managers, if any, or, if there is no Operating Manager, any person elected to perform such liquidation by the written consent of the owners of a majority in interest of the Members, shall proceed to the liquidation of the Company. The proceeds of such liquidation shall be applied and distributed as follows:

A.       If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled. The fair market value of such assets shall be determined by an independent appraiser to be selected by the Company's independent public accountants. The amount by which the fair market value of any Property to be distributed in kind to the Members exceeds or is less than the basis of such Property, shall, to the extent not otherwise recognized by the Company, be taken into account in computing Net Profits or Net Losses (and shall be allocated among the Members in accordance with Section 8.2) for purposes of crediting or charging the Capital Accounts of, and liquidating distributions to, the Members under Section 10.4.B.

B.       All distributions upon liquidation of the Company shall be distributed as follows: to each of the Members, in proportion to the amount of their respective positive Capital Accounts, as such accounts have been adjusted (i) in accordance with Section 6.5 to reflect the Net Profit or Net Loss realized or incurred upon the sale of the Company's property or assets and deemed sale pursuant to Section 10.4.A; (ii) in accordance with Section 8.2 to reflect all Net Profits or Net Losses with respect to the year of liquidation. No Member shall be liable to repay the negative amount of his Capital Account.

SECTION 10.5. Each of the Members shall be furnished with a statement, reviewed by the Company's independent public accountants, which shall set forth the assets and liabilities of the Company as of the date of the Company's liquidation. Upon completion of the liquidation, the Operating Managers shall execute and cause to be filed a Certificate of Dissolution of the Company and any and all other documents necessary with respect to termination of the Company.

## ARTICLE XI

### Books and Reports

SECTION 11.1. The Operating Mangers shall cause the Company to maintain the following records:

A. Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Company, shall be kept by the Operating Managers at the principal office of the Company. The fiscal year of the Company shall be the calendar year. The books of account of the Company shall be kept in accordance with sound accounting practices and principles applied in a consistent manner by the Company; provided, however, that all methods of accounting and treating particular transactions shall be in accordance with the methods of accounting employed for Federal income tax purposes. All determinations by the Operating Managers with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding upon al the Members unless the determination is inconsistent with any express provision of this Agreement.

B. A current list of the full name and last known mailing address of each Member set forth in alphabetical order together with the contribution and share in profits and losses of each Member; a copy of the Articles of Organization of the Company and any amendments thereto; a copy of the Company Operating Agreement and any amendments thereto; a copy of the Company's federal, state and local income tax returns for the three most recent fiscal years.

C. Any member shall have the right from time to time at his expense to have his accountants and representatives examine and/or audit the books and records of the Company and the information referred to in this Section, and the Operating Managers will make such books and records and information available for such examinations and/or audits.

SECTION 11.2. No value shall be placed for any purpose upon the Company name or the right to its use, or upon the goodwill of the Company or its business. Upon termination or dissolution of the Company (without reconstitution thereof) as provided in this Agreement, neither the Company name or the right to its use, nor the goodwill of the Company, shall be considered as an asset of the Company.

SECTION 11.3. The Operating Managers will cause to be sent to the Members within a reasonable period after the close of each year the following: (a) annual statements of the Company's gross receipts and operating expenses, and the capital accounts of each Member, prepared by the Company's independent public accountants, to be transmitted to each Member; and (b) a report to be transmitted to each Member indicating the Member's share of the Company's profit or loss for that year and the Member's allocable share of all items of income, gain, loss, deduction, and credit, for Federal income tax purposes.

## ARTICLE XII

### Tax Elections

SECTION 12.1. In the event of a transfer of a Member's interest, or upon the death of a Member, or in the event of the distribution of Company property to any party hereto, the Company may (but need not necessarily) file an election, in accordance with Section 754 of the Code to cause the basis of the Company Property to be adjusted for Federal income tax purposes, as provided by Sections 734 and 743 of the Code.

## ARTICLE XIII

### Miscellaneous

SECTION 13.1. Any notice or other communication under this Agreement shall be in writing and shall be considered given when mailed by registered or certified mail, return receipt requested, to the parties at the following addresses (or at such other address as a party shall have previously specified by notice to the others as the address to which notice shall be given to him):

A.    If to the Company, to it in care of the Operating Managers at the address of the Company.

B.    If to the Operating Managers, to them at the address of the Company.

C.    If to any Member, to him at his address set forth on the books and records of the Company.

SECTION 13.2. This Agreement contains a complete statement of all of the arrangements among the parties with respect to the Company and cannot be changed or terminated orally or in any manner other than by a written agreement executed by all of the Members. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

SECTION 13.3. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

SECTION 13.4. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations of the jurisdiction in which the Company does business. If any provision of this Agreement, or the application thereof to any person or circumstance, shall for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected, but rather shall be enforced to the extent permitted by law.

SECTION 13.5.·Anything hereinbefore in this Agreement to the contrary notwithstanding, all references to the Property of the Company are deemed to include the profits, losses and Cash Flow of the Property.

SECTION 13.6. Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the State of organization of the Company applicable to agreements made and to be performed in the State of organization of the Company.

SECTION 13.7. The captions, headings and table of contents in this Agreement are solely for convenience of reference and shall not affect its interpretation.

SECTION 13.8. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall be deemed to constitute a single document.

SECTION 13.9. Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement Effective as of the day and year first above written.

Lucy Gao, Owner

## "SCHEDULE A"

## OPERATING AGREEMENT
## OF
## FIRST AMERICAN REGIONAL CENTER LIMITED LIABILITY COMPANY

Percentage Interests of Members of First American Regional Center LLC as of December 24th, 2014

| Member Name | Initial Capital Contribution | Total Agreed Value of Member's Contributions | Percentage Interest |
|---|---|---|---|
| Lucy Gao | | | 100% |

# FIRST AMENDMENT TO

## OPERATING AGREEMENT OF

### FIRST AMERICAN REGIONAL CENTER LLC

(a California limited liability company)

This First Amendment to the Operating Agreement (the **"Amendment"**) of First American Regional Center LLC, a California limited liability company (the **"Company"**), is entered into as of February 11, 2015 (the **"Effective Date"**), by Lucy Gao, as Sole Member and Manager (the **"Member"**).

WHEREAS, the Member is a party to that certain Operating Agreement of the Company, dated as of December 24, 2014 (the **"Agreement"**); and

WHEREAS, the Member desires to amend the Agreement to add provisions that address indemnification and liability issues.

NOW THEREFORE, in consideration of the mutual covenants contained herein, the Agreement is amended as follows:

1. The following Article XIV shall hereby be added and incorporated in its entirety as a part of the Agreement:

## "ARTICLE XIV

### Indemnification

SECTION 14.1. The Company shall indemnify, save harmless and pay all judgments and claims against each Member relating to any liability or damage incurred by such Member attributable to any act performed or omitted to be performed by such Member in connection with the business of the Company, including reasonable attorneys' fees incurred by such Member in connection with the defense of any action based on any such act or omission, which attorneys' fees shall be paid as incurred. The Company shall have the right to assume the defense in any action or claim with respect to which it is indemnifying a Member in accordance with the provisions of this Section 14.1. No Member shall be personally liable or responsible for any claims or obligations, whether to the Company or the other Member, with respect to any claim or obligation for which the Company has agreed to indemnify, save harmless or pay in accordance with the provisions of this Section 14.1; provided however, that the provisions of this Section 14.1 shall not result in the indemnification of any Member with respect to any liability, claim or obligation attributable

1

LAM00007878

to such Member's fraud, bad faith, gross negligence or willful misconduct or for any expense, cost or liability for which such Member is personally responsible or liable under the terms of this Agreement or any other instrument.

SECTION 14.2. The indemnification provided for in Section 14.1 shall apply only in the event, and to the extent, that a Member is not entitled to indemnification, or other payment, from any other source (including insurance).

SECTION 14.3. No Member shall be personally liable for failure of the Company to make distributions as set forth in this Agreement and shall not be liable, responsible, accountable in damages or otherwise to the Company or the other Member for any act or omission performed or omitted by such Member in connection with the Company or its business. Notwithstanding the foregoing, a Member shall in all instances be liable for acts or omissions in breach of this Agreement or which constitute fraud, gross negligence, willful misconduct or breach of fiduciary duty. If a Member acts or refrains from acting in reasonable reliance on the advice of counsel, the Member shall be deemed to have had a good faith belief with respect to such inaction or action. A Member shall not be required, however, to procure the advice of counsel to be entitled to the benefit of this section."

2. Schedule A of the Agreement shall be entirely amended and restated with Schedule A of this Amendment as attached hereto.

3. The provisions of this First Amendment to the Agreement shall be incorporated into and become a part of the Agreement. Except as provided in this First Amendment to the Agreement, all terms of the Agreement shall continue in full force. Only the provision(s) of the Agreement specifically amended shall be affected by this First Amendment to the Agreement. In the event that there is any conflict between the terms of this Amendment and the Agreement, the terms of this Amendment shall control.

[remainder of the page intentionally omitted]

2

LAM000007879

IN WITNESS WHEREOF, the undersigned has executed this Amendment as of the Effective Date.

**SOLE MEMBER & MANAGER:**

LUCY GAO

## "SCHEDULE A"

## OPERATING AGREEMENT
## OF
## FIRST AMERICAN REGIONAL CENTER LLC

Percentage Interests of Members of First American Regional Center LLC as of January 26, 2015:

| Member Name | Initial Capital Contribution | Total Agreed Value of Member's Contribution | Percentage Interest |
|---|---|---|---|
| Lucy Gao | $50,000.00 | $50,000.00 | 100% |

# ABSOLUTE ASSIGNMENT OF INTEREST
# IN LIMITED LIABILTY COMPANY

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, and in connection with a that certain Agreement to Sell Membership Interest dated as of <u>March 13, 2015</u>, Allen Li Li (hereinafter, "Assignor"), hereby absolutely and irrevocably ASSIGNS to LUCY GAO or its Assignee ("Assignee"), all of its rights, title and interest, in and to the limited liability company known as AMERICAN DEVELOPMENT AND INVESTMENT REGIONAL CENTER LLC, a California Limited Liability Company (the "Company"), all of its interest as a member of the Company, and all of its rights, remedies and benefits under or pursuant to that certain Operating Agreement of the Company, dated as of March 13, 2015 (as amended from the time to time, the "Operating Agreement"), or at law or in equity with respect to the Company (including, without limitation, all of Assignor's rights in and to its capital account under the Operation Agreement (all such property and rights being transferred hereinafter referred to as the "Membership Interest"). The undersigned Assignor hereby resigns, releases and relinquishes any managerial positions in connection with the Company.

Assignor represents, warrants and covenants, in favor of Assignee that prior to the date hereof, it has not conveyed the Membership Interest, or any right, title or interest therein, to any person or entity other than Assignee.

Assignor represents, warrants and covenants that the combined Membership Interest of the Assignors is the 100% total membership/ownership interest of the Company.

**IN WITNESS WHEREOF,** Assignor has executed this instrument as of the date hereinafter written.

Dated as of <u>March 13, 2015</u>                    ASSIGNORS:

Allen Li Li  A.K.A. Joseph Renyuan Lee

ACCEPTANCE The undersigned hereby consents to and accepts the above assignment of the Company, and agrees to indemnify, defend and hold harmless Assignor from and against any and all claims or liabilities associated with the Company that accrue on or after the date hereof.

Dated as of <u>March 13, 2015</u>                    ASSIGNEE

                                                     Lucy Gao

"A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document."

— See RioA —

309

LAM00007959

State of California, County of Los Angeles ]ss.

On 3/13/2013 before me Ady Simion, Notary Public, personally appeared Joseph Ran Voun Lee and Lucy Gao Seh. who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct. WITNESS my hand and official seal.

Ady Simion

ADY SIMION
COMM. # 1973825
NOTARY PUBLIC · CALIFORNIA
LOS ANGELES COUNTY
My Comm. Exp. March 30, 2016
GSN1

310

# EXHIBIT O

RECORDING REQUESTED BY

WHEN RECORDED MAIL TO
AND MAIL TAX STATEMENTS TO

LIBERTY ASSET MANAGEMENT CORPORATION
2648 E. Workman Avenue, #3001-263
West Covina, CA 91791

APN NO. 5778-006-010 & 5778-008-008

# QUITCLAIM DEED

THE UNDERSIGNED GRANTOR DECLARES
DOCUMENTARY TRANSFER TAX is **$0.00** CITY TAX **$0.00**
☐ computed on full value of property conveyed, or ☐ computed on full value less value of liens or
encumbrances remaining at time of sale,
☐ Unincorporated area: ☐ City of _____, and

"This conveyance confirms a change of name, and the grantor and grantee are the same party, R & T 11911."

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged
**WASHE, LLC, a California Limited Liability Company**

does hereby REMISE, RELEASE AND FOREVER QUITCLAIM TO:
**LIBERTY ASSET MANAGEMENT CORPORATION, a California Corporation**

The following described real property in the City of Arcadia, County of Los Angeles, and State of California:

**Legal Description per Attached Exhibit "A" hereto and made a part hereof.**
**(Property commonly known as: 1020 South Baldwin Avenue, Arcadia, CA 91007)**

Dated: February 26, 2016

BY: Benny Kirk, Managing Member of Washe, LLC, a
California Limited Liability Company

A notary public or other officer completing this certificate
verifies only the identity of the individual who signed the
document to which this certificate is attached and not the
truthfulness, accuracy, or validity of that document.

State of California

County of Los Angeles    **Kumar Venkatesan**
**Notary Public**

On FEB 26, 2016   before me, _____ (here
insert name and title of the officer), personally appeared BENNY KIRK _____, who proved to me on the basis of
satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to
me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on
the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is
true and correct.**

WITNESS my hand and official seal.

Signature _____ (Seal)

KUMAR VENKATESAN
Commission # 2108658
Notary Public - California
Los Angeles County
My Comm. Expires May 20, 2019

## EXHIBIT "A"

### LEGAL DESCRIPTION

Real property in the City of Arcadia, County of Los Angeles, State of California, described as follows:

PARCEL 1: (PORTION OF APN: 5778-006-010)

LOT 37 OF TRACT NO. 3430, IN THE CITY OF ARCADIA, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 42 PAGE (S) 32 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THE NORTH 67.11 FEET, MEASURED ALONG THE WEST LINE OF SAID LOT.

ALSO EXCEPTING THEREFROM THE WESTERLY 15.00 FEET, MEASURED AT RIGHT ANGLES FROM THE WESTERLY LINE OF SAID LOT.

ALSO EXCEPT THE INTEREST IN THE SOUTHERLY 30 FEET, MEASURED AT RIGHT ANGLES TO THE SOUTHERLY LINE OF SAID LOT, AS CONVEYED TO CITY OF ARCADIA, BY DEED RECORDED JANUARY 6, 1961, IN BOOK D1084 PAGE 846, OFFICIAL RECORDS.

PARCEL 2: (PORTION OF APN: 5778-006-010)

A PORTION OF LOTS 36 AND 37 OF TRACT NO. 3430, IN THE CITY OF ARCADIA, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 42, PAGE(S) 32 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

THE SOUTHERLY 72.89 FEET OF LOT 36, SAID 72.89 FEET BEING MEASURED ALONG THE WESTERLY LINE OF LOT 36 AND THE NORTHERLY 67.11 FEET OF LOT 37 67.11 FEET BEING MEASURED ALONG THE WESTERLY LINE OF LOT 37.

EXCEPT THEREFROM THE WESTERLY 15 FEET, MEASURED AT RIGHT ANGLES, TO THE WESTERLY LINE OF SAID LOTS 36 AND 37.

PARCEL 3: (APN: 5778-006-005)

THE EASTERLY 100 FEET OF LOT 35 OF TRACT NO. 3430, IN THE CITY OF ARCADIA, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 42, PAGE(S) 32 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 4:

AN EASEMENT FOR INGRESS AND EGRESS OVER THE WESTERLY 20.00 FEET OF THE EASTERLY 42.00 FEET OF LOT 36 OF TRACT NO. 3430, IN THE CITY OF ARCADIA, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 42, PAGE(S) 32 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THE SOUTHERLY 72.89 FEET, MEASURED ALONG THE WESTERLY LINE OF SAID LOT 36.

RECORDING REQUESTED BY

WHEN RECORDED MAIL TO
AND MAIL TAX STATEMENTS TO

LIBERTY ASSET MANAGEMENT CORPORATION
2648 E. Workman Avenue, #3001-263
West Covina, CA 91791

APN NO. 5323-020-035

# QUITCLAIM DEED

THE UNDERSIGNED GRANTOR DECLARES
    DOCUMENTARY TRANSFER TAX Is $0.00 CITY TAX $0.00
    ☐ computed on full value of property conveyed, or ☐ computed on full value less value of liens or
    encumbrances remaining at time of sale,
    ☐ Unincorporated area: ☐ City of _____, and

"This conveyance confirms a change of name, and the grantor and grantee are the same party, R & T 11911."

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged
**WASHE, LLC, a California Limited Liability Company**

does hereby REMISE, RELEASE AND FOREVER QUITCLAIM TO:
**LIBERTY ASSET MANAGEMENT CORPORATION, a California Corporation**

The following described real property in the City of San Marino, County of Los Angeles, and State of California:

**Legal Description per Attached Exhibit "A" hereto and made a part hereof.**
**(Property commonly known as: 415 Huntington Drive, San Marino, CA 91108)**

Dated: February 26, 2016 _____

BY: Benny Kirk, Managing Member of Washe, LLC, a
California Limited Liability Company

A notary public or other officer completing this certificate
verifies only the identity of the individual who signed the
document to which this certificate is attached and not the
truthfulness, accuracy, or validity of that document.

State of California

County of LOS ANGELES      **Kumar Venkatesan**
                           **Notary Public**

On FEB 26, 2016 before me, _____ (here
insert name and title of the officer), personally appeared BENNY KIRK , who proved to me on the basis of
satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to
me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on
the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is
true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

KUMAR VENKATESAN
Commission # 2108658
Notary Public - California
Los Angeles County
My Comm. Expires May 20, 2019

314

## LEGAL DESCRIPTION

Real property in the City of San Marino, County of Los Angeles, State of California, described as follows:

That portion of the Tract of land marked "J. A. Graves", as shown on Map of property belonging to J. A. Graves, in the City of San Marino, County of Los Angeles, State of California, as per Map recorded in Book 52 Page 66 of Miscellaneous Records, in the office of the County Recorder of said County, described as follows:

Beginning at a point in the Easterly line of Los Robles Avenue (formerly Wilson Avenue), said point being the most Southerly corner of Lot 8 of Tract No. 20320, as shown on Map recorded in Book 565 Pages 37 and 38 of Maps, in the office of the County Recorder of said County; thence North 54° 30' 32" East along the Southeasterly line of said Tract No. 20320, 261.33 feet, more or less, to the most Southwesterly line of the Northwesterly prolongation thereof of Lot 3 of Tract 2700, as shown on Map recorded in Book 28, Page 13 of Maps, in the office of the County Recorder of said County; thence South 34° 03' 10" East along the most Southwesterly line of the Northwesterly prolongation thereof of said Lot 3, 190.37 feet, more or less, to the Northwesterly line of Huntington Drive, as shown on said Map of Tract No. 2700; thence South 54° 31 19" West along said Northwesterly line of Huntington Drive, 300.17 feet, more or less, to the Northeasterly line of Stoneman Avenue, as shown on said Map of Tract No. 2700; thence North 33° 56' 50" West along the Northeasterly line of Stoneman Avenue, 134.19 feet, more or less, to the Easterly line of Wilson Avenue, as shown on said Map of Tract No. 2700; thence North 0° 01' 10" East along the Easterly line of said Wilson Avenue, 68.92 feet, more or less, to the point of beginning.

APN: 5323-020-035

# EXHIBIT P

**BUSINESS CHECKING**
**Account Agreement**

Account #022000764

Date: 05/12/2011

### Institution Name & Address

MEGA BANK

1370 S. Fullerton Road #101

Rowland Heights CA 91748   Referred Candace Chu

**IMPORTANT ACCOUNT OPENING INFORMATION:** Federal law requires . to obtain sufficient information to verify your identity. You may be ked several questions and to provide one or more forms of entification to fulfill this requirement. In some instances we may use itside sources to confirm the information. The information you provide protected by our privacy policy and federal law.

iter Non-Individual Owner Information on page 2. There is additional w ner/Signer Information space on page 2.

### Internal Use

### Account Title & Address

Liberty Asset Management Corporation     See Attached

3218 E Holt Ave. Suite 205

West Covina CA 91791

**CLOSED**

07/27/2012

### Ownership of Account

The specified ownership will remain the same for all accounts.

- ☐ Individual
- ☐ Joint Account
- ☐ Joint - Husband and Wife (With right of survivorship)
- ☐ Community Property (Husband and Wife)
- ☐ Tenancy in Common
- ☐ Trust-Separate Agreement Dated: _____
- ☐ _____

- ☒ Corporation - For Profit
- ☐ Corporation - Nonprofit
- ☐ Partnership
- ☐ Sole Proprietorship
- ☐ Limited Liability Company

### Owner/Signer Information 1

| | |
|---|---|
| ame | Benny James Kirk |
| Hationship | CEO |
| ddress | 385 Lemon Ave E-104, Walnut, CA 91789 |
| ailing Address (different.) | 3218 E Holt Ave. Suite 205, West Covina, CA 91791 |
| ome Phone | 626-506-4648 |
| ork Phone | 626-214-2154 |
| obile Phone | * * * |
| Mail | * * * |
| th Date | 09/10/1958 |
| SN/TIN | M) |
| w't Issued Photo ID ype, Number, State, ue Date, Exp Date) | 1 STATE DRIVERS 12/05/2008     09/10/2013 |
| her ID escription, Details) | CBI: Taiwan     MMN: Lee |
| iployer | Liberty Asset Management Corp. |
| evious ancial Inst. | * * * |

### Beneficiary Designation

(Check appropriate ownership above.)

- ☐ Totten Trust
- ☐ _____

☐ Pay-on-Death (P.O.D.)

### Beneficiary Name(s), Address(es), and SSN(s)

(Check appropriate beneficiary designation above.)

### Owner/Signer Information 2

| | |
|---|---|
| me | Vanessa Yvette Lavendera |
| ationship | Secretary |
| dress | 13017 Falcon Place, Chino, CA 91710 |
| iling Address different) | 3218 E Holt Ave. Suite 205, West Covina, CA 91791 |
| me Phone | 650-823-8972 |
| rk Phone | 626-214-2154 |
| b le Phone | * * * |
| ail | * * * |
| th Date | 09/29/1984 |
| N/TIN | (F) |
| r't Issued Photo ID pe, Number, State, re Date, Exp. Date) | 1 STATE DRIVERS 09/26/2008     09/29/2013 |
| er ID scription, Details) | CBI: Los Angeles     MMN: Roblev |
| ployer | Liberty Asset Management Corporation |
| rious ancial Inst. | * * * |

☐ If checked, this is a temporary account agreement.

Number of signatures required for withdrawal: 1 (one) _____

### Signature(s)

The undersigned authorize the financial institution to investigate credit and employment history and obtain reports from consumer reporting agency(ies) on them as individuals. Except as otherwise provided by law or other documents, each of the undersigned is authorized to make withdrawals from the account(s), provided the required number of signatures indicated above is satisfied. The undersigned personally and as, or on behalf of, the account owner(s) agree to the terms of, and acknowledge receipt of copy(ies) of, this document and the following:

- ☒ Terms and Conditions
- ☒ Electronic Fund Transfers
- ☐ Substitute Checks
- ☐ Common Features

- ☒ Privacy
- ☒ Truth in Savings
- ☒ Funds Availability
- ☐ _____

☐ Authorized Signer (See Owner/Signer Information for Authorized Signer designation(s).)

| x _____ Benny James Kirk | (M) | ] |

| x _____ Vanessa Yvette Lavendera | (F) | ] |

| x _____ Lucy Gad Sen (F) | 4 x ********** | ] |

iture Card-CA
ers Systems ™
ers Kluwer Financial Services ©2003, 2006

MPMP-LAZ-CA 5/2/2007
Page 1 of 2

Initials _____

317

| Owner/Signer Information 3 | |
|---|---|
| Name | Lucy Gao Seh |
| Relationship | Authorized Signer |
| Address | 1001 East Road, La Habra Hts, CA 90631 |
| Mailing Address (if different) | 3218 E Holt Ave. Suite 205, West Covina, CA 91791 |
| Home Phone | 562-697-6863 |
| Work Phone | 626-214-2154 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Birth Date | 03/04/1961 |
| SSN/TIN | (F) |
| Gov't Issued Photo ID Type, Number, State, Issue Date, Exp. Date) | 1 A TATE DRIVERS 02/18/2010          03/04/215 |
| Other ID Description, Details) | CBI: China   MMN: Wang |
| Employer | Liberty Asset Management Corp. |
| Previous Financial Inst. | * * * |

| Owner/Signer Information 4 | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID Type, Number, State, Issue Date, Exp. Date) | |
| Other ID Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

## Backup Withholding Certifications

If not a "U.S. Person," certify foreign status separately.)

TIN: 90-0463932

9 Taxpayer I.D. Number (TIN) - The number shown above is my correct taxpayer identification number.

9 Backup Withholding - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

] Exempt Recipients - I am an exempt recipient under the Internal Revenue Service Regulations.

certify under penalties of perjury the statements checked in his section and that I am a U.S. person (including a U.S. resident alien)-

_____ (Date)

Liberty Asset Management Corp.  Benny James Kirk (CEO)

| Non-Individual Owner Information | |
|---|---|
| Name | Liberty Asset Management Corporation |
| EIN | 90-0463932 |
| Phone | 626-214-2154 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Type of Entity | Articles #C2974580 |
| State/Country & Date of Organization | CA 02/22/2011 |
| Nature of Business | Real Estate Investments |
| Address | 3218 E Holt Ave. Suite 205, West Covina, CA 91791 |
| Mailing Address (if different) | 3218 E Holt Ave. Suite 205, West Covina, CA 91791 |
| Authorization/ Resolution Date | 05/12/2011 |
| Previous Financial Inst. | |

| Account Description | Account # | Initial Deposit/Source |
|---|---|---|
| BUSINESS CHECKING | 22000764 | $ 5,000.00*<br>☐ Cash ☒ Check<br>☐ _____ |
| | | $ _____<br>☐ Cash ☐ Check<br>☐ _____ |
| | | $ _____<br>☐ Cash ☐ Check<br>☐ _____ |

### Services Requested

☐ ATM   ☐ Debit/Check Cards (No. Requested: _____ )
☐ _____   ☐ _____
☐ _____   ☐ _____

### Other Terms/Information

nature Card-CA
ikers Systems ™
lters Kluwer Financial Services ©2003, 2006

OFAC

Initials: _____

MPMP-LAZ-CA 5/2/2007
Page 2 of 2

Reviewed By _____

**BUSINESS CHECKING**    Account#22000913

*Account Agreement*    Date: ____09/30/2011____

### Institution Name & Address

**Internal Use**

MEGA BANK

1370 S Fullerton Road #101

...wland Heights CA 91748   Referred By Candace Chu

### Account Title & Address

Liberty CMC Corporation

3218 E Holt Ave Ste 200

West Covina CA 91791

**CLOSED**

4/3/2015

**IMPORTANT ACCOUNT OPENING INFORMATION:** Federal law requires us to obtain sufficient information to verify your identity. You may be asked several questions and to provide one or more forms of identification to fulfill this requirement. In some instances we may use outside sources to confirm the information. The information you provide is protected by our privacy policy and federal law.

Enter **Non-Individual Owner Information** on page 2. There is additional Owner/Signer Information space on page 2.

### Ownership of Account

The specified ownership will remain the same for all accounts.

| | |
|---|---|
| ☐ Individual | ☒ Corporation - For Profit |
| ☐ Joint Account | ☐ Corporation - Nonprofit |
| ☐ Joint - Husband and Wife (With right of survivorship) | ☐ Partnership |
| | ☐ Sole Proprietorship |
| ☐ Community Property (Husband and Wife) | ☐ Limited Liability Company |
| ☐ Tenancy in Common | |
| ☐ Trust-Separate Agreement Dated: _____ | |
| ☐ | |

### Owner/Signer Information 1

| | |
|---|---|
| Name | Helena Hanna Cosman |
| Relationship | CEO, Secretary |
| Address | 623 Michigan Blvd, Pasadena CA 91107 |
| Mailing Address (if different) | 3218 E Holt Ave Ste 200, West Covina CA 91791 |
| Home Phone | 626-377-1081 |
| Work Phone | 626-214-2145 |
| Mobile Phone | • • • |
| E-Mail | • • • |
| Birth Date | 05/16/1960 |
| SSN/TIN | (F) |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | 1 STATE DRIVERS  06/02/2010    05/16/2014 |
| Other ID (Description, Details) | CBI: Taiwan   MMN: Lin |
| Employer | Liberty CMC Corporation |
| Previous Financial Inst. | • • • |

### Owner/Signer Information 2

| | |
|---|---|
| Name | Benny James Kirk |
| Relationship | Authorized Signer |
| Address | 385 Lemon Ave E-104, Walnut CA 91789 |
| Mailing Address (if different) | 3218 E Holt Ave Ste 200, West Covina CA 91791 |
| Home Phone | 626-506-4648 |
| Work Phone | 626-214-2142 |
| Mobile Phone | • • • |
| E-Mail | • • • |
| Birth Date | 09/10/1958 |
| SSN/TIN | (M) |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | 1 STATE DRIVERS  12/05/2008    09/10/2013 |
| Other ID (Description, Details) | CBI: Taiwan   MMN: Lee |
| Employer | Liberty CMC Corporation |
| Previous Financial Inst. | • • • |

### Beneficiary Designation

*(Check appropriate ownership above.)*

☐ Totten Trust       ☐ Pay-on-Death (P.O.D.)

☐

### Beneficiary Name(s), Address(es), and SSN(s)

*(Check appropriate beneficiary designation above.)*

☐ If checked, this is a temporary account agreement.

Number of signatures required for withdrawal: _1 (one)_

### Signature's

The undersigned authorize the financial institution to investigate credit and employment history and obtain reports from consumer reporting agenc(ies) on them as individuals. Except as otherwise provided by law or other documents, each of the undersigned is authorized to make withdrawals from the account(s), provided the required number of signatures indicated above is satisfied. The undersigned personally and as, or on behalf of, the account owner(s) agree to the terms of, and acknowledge receipt of copy(ies) of, this document and the following:

| | |
|---|---|
| ☒ Terms and Conditions | ☒ Privacy |
| ☒ Electronic Fund Transfers | ☒ Truth in Savings |
| ☐ Substitute Checks | ☒ Funds Availability |
| ☐ Common Features | ☐ _____ |

☐ Authorized Signer (See Owner/Signer Information for Authorized Signer designation(s).)

x _____ (F)
Helena Hanna Cosman

x _____ (M)
Benny James Kirk

x _____ (F)    x _____ (F)
Lucy Gao Su                       Vanessa Yvette Lavendera

...ure Card-CA
...ers Systems ™
Wolters Kluwer Financial Services ©2003, 2006

MPMP-LAZ-CA  5/2/2007
Page 1 of 2
Initials: _____

Liberty CMC Corporation - Acct #22000913
001
319

| | |
|---|---|
| Name | Lucy Gao Seh |
| Relationship | Authorized signer |
| Address | 1001 East Road, La Habra Hts, CA 90631 |
| Mailing Address (if different) | 3218 E Holt Ave Ste 200, West Covina CA 91791 |
| Home Phone | 562-697-6863 |
| Work Phone | 626-214-2142 |
| Mobile Phone | • • • |
| E-Mail | ▸ • • |
| Birth Date | 03/04/1961 |
| SSN/TIN | (F) |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | 1 STATE DRIVERS 02/18/2010          03/04/2015 |
| Other ID (Description, Details) | CBI: China   MMN: Wang |
| Employer | Liberty CMC Corporation |
| Previous Financial Inst. | • • • |

## Owner/Signer Information 4

| | |
|---|---|
| Name | Vanessa Yvette Lavendera |
| Relationship | Authorized Signer |
| Address | 13017 Falcon Place, Chino CA 91710 |
| Mailing Address (if different) | 3218 E Holt Ave Ste 200, West Covina CA 91791 |
| Home Phone | 650-823-8972 |
| Work Phone | 626-214-2142 |
| Mobile Phone | • • • |
| E-Mail | ▸ • • |
| Birth Date | 09/29/1984 |
| SSN/TIN | (F) |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | 1 STATE DRIVERS 09/26/2008          09/29/2013 |
| Other ID (Description, Details) | CBI: Los Angeles   MMN: Reblev |
| Employer | Liberty CMC Corporation |
| Previous Financial Inst. | • • • |

## Backup Withholding Certifications

*(If not a "U.S. Person," certify foreign status separately.)*

TIN:45-3329014

☒ **Taxpayer I.D. Number (TIN)** - The number shown above is my correct taxpayer identification number.

☒ **Backup Withholding** - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

☐ **Exempt Recipients** - I am an exempt recipient under the Internal Revenue Service Regulations.

I certify under penalties of perjury the statements checked in this section and that I am a U.S. person (including a U.S. resident alien).

X _____ (Date)

Liberty CMC Corporation-Helena Hanna Cosman

## Non-Individual Owner Information

| | |
|---|---|
| Name | Liberty CMC Corporation |
| EIN | 45-3329014 |
| Phone | 626-214-2142 |
| Mobile Phone | • • • |
| E-Mail | • • • |
| Type of Entity | ARTICLES OF INC  #C3408634 |
| State/Country & Date of Organization | CA 09/15/2011 |
| Nature of Business | Property Management Real Estate |
| Address | 136 N Grand Ave Suite 171, West Covina CA 91791 |
| Mailing Address (if different) | 3218 E Holt Ave Ste 200, West Covina CA 91791 |
| Authorization/ Resolution Date | 09/30/2011 |
| Previous Financial Inst. | |

| Account Description | Account # | Initial Deposit/Source |
|---|---|---|
| BUSINESS CHECKING | 22000913 | $ 2,256.57* ☐ Cash ☒ Check ☐ ____ |
| | | $ ____ ☐ Cash ☐ Check ☐ ____ |
| | | $ ____ ☐ Cash ☐ Check ☐ ____ |

## Services Requested

☐ ATM   ☐ Debit/Check Cards (No. Requested: ____ )
☐ ____   ☐ ____
☐ ____   ☐ ____

## Other Terms/Information

Signature Card-CA
Bankers Systems ™
Wolters Kluwer Financial Services ©2003, 2006

OFAC

MPMP-LAZ-CA 6/2/2
Page 2 c
Initials: ____

Reviewed By _____ Liberty CMC Corporation - Acct #22000913
002
320

## BUSINESS CHECKING
### Account Agreement

Account#22001242
Date: 07/16/2012

**Institution Name & Address**

MEGA BANK
1370 S. Fullerton Road #101
/land Heights, CA 91748    Referred By Candace Chu

**IMPORTANT ACCOUNT OPENING INFORMATION:** Federal law requires us to obtain sufficient information to verify your identity. You may be asked several questions and to provide one or more forms of identification to fulfill this requirement. In some instances we may use outside sources to confirm the information. The information you provide is protected by our privacy policy and federal law.
Enter Non-Individual Owner Information on page 2. There is additional Owner/Signer Information space on page 2.

**Internal Use**

**Account Title & Address**

Liberty Asset Management Corporation

3218 E Holt Ave, Suite #200
West Covina, CA 91791

**CLOSED**
04|0?| 2?|5

**Ownership of Account**

The specified ownership will remain the same for all accounts.

- ☐ Individual
- ☒ Corporation - For Profit
- ☐ Joint Account
- ☐ Corporation - Nonprofit
- ☐ Joint - Husband and Wife (With right of survivorship)
- ☐ Partnership
- ☐ Sole Proprietorship
- ☐ Community Property (Husband and Wife)
- ☐ Limited Liability Company
- ☐ Tenancy in Common
- ☐ Trust-Separate Agreement Dated: _____
- ☐ ~~BUSINESS CHECKING - 1~~

**Beneficiary Designation**

*(Check appropriate ownership above.)*

- ☐ Totten Trust
- ☐ Pay-on-Death (P.O.D.)
- ☐ _____

**Beneficiary Name(s), Address(es), and SSN(s)**

*(Check appropriate beneficiary designation above.)*

| **Owner/Signer Information 1** | | |
|---|---|---|
| Name | Benny James Kirk | |
| Relationship | Authorized Signer | |
| Address | 385 Lemon Ave E-104 Walnut, CA 91789 | |
| Mailing Address (if different) | 3218 E Holt Ave, Suite #200 West Covina, CA 91791 | |
| Home Phone | 626-506-4648 | |
| Work Phone | 626-214-2142 | |
| Mobile Phone | * * * | |
| E-Mail | * * * | |
| Birth Date | 09/10/1958 | |
| SSN/TIN | | |
| Gov't Issued Photo ID (Type, Number, State, Date, Exp. Date) | 1 STATE DRIVERS 12/5/2008 | 9/10/2013 |
| Other ID (Description, Details) | CBI: Taiwan  MMN: Lee | |
| Employer | Liberty Asset Management Corp. | |
| Previous Financial Inst. | * * * | |

| **Owner/Signer Information 2** | | |
|---|---|---|
| Name | Lucy Gao Seh | |
| Relationship | Authorized Signer | |
| Address | 1001 East Road La Habra Hts, CA 90631 | |
| Mailing Address (if different) | 3218 E Holt Ave, Suite #200 West Covina, CA 91791 | |
| Home Phone | 562-597-6863 | |
| Work Phone | 626-214-2142 | |
| Mobile Phone | * * * | |
| E-Mail | * * * | |
| Birth Date | 03/04/1961 | |
| SSN/TIN | | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | 1 STATE DRIVERS 2/18/2010 | 3/4/2015 |
| Other ID (Description, Details) | CBI: China  MMN: Wang | |
| Employer | Liberty Asset Management Corp. | |
| Previous Financial Inst. | * * * | |

☐ If checked, this is a temporary account agreement.

Number of signatures required for withdrawal: 1 (one) .

**Signature(s)**

The undersigned authorize the financial institution to investigate credit and employment history and obtain reports from consumer reporting agency(ies) on them as individuals. Except as otherwise provided by law or other documents, each of the undersigned is authorized to make withdrawals from the account(s), provided the required number of signatures indicated above is satisfied. The undersigned personally and as, or on behalf of, the account owner(s) agree to the terms of, and acknowledge receipt of copy(ies) of, this document and the following:

- ☒ Terms and Conditions
- ☒ Privacy
- ☒ Electronic Fund Transfers
- ☒ Truth in Savings
- ☒ Substitute Checks
- ☒ Funds Availability
- ☐ Common Features
- ☐ _____

☐ Authorized Signer (See Owner/Signer Information for Authorized Signer designation(s).)

X _____ (M)
Benny James Kirk

X _____ (F)
Lucy Gao Seh

[ X ************ ]  [ X ************ ]

jure Card-CA
irs Systems TM
'voters Kluwer Financial Services 4/2003, 2006

MPKA-LAZ-CA  5/2/2007
Page 1 of 2
Initials: _____

Liberty Asset Mgt. Corp. - Acct #22001242
001

| Name | |
|---|---|
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

## Owner/Signer Information 4

| Name | |
|---|---|
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

## Backup Withholding Certifications

*(If not a "U.S. Person," certify foreign status separately.)*

TIN: 80-0832089

[X] **Taxpayer I.D. Number (TIN)** - The number shown above is my correct taxpayer identification number.

[X] **Backup Withholding** - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

[ ] **Exempt Recipients** - I am an exempt recipient under the Internal Revenue Service Regulations.

I certify under penalties of perjury the statements checked in this section and that I am a U.S. person (including a U.S. resident alien).

_____  07/16/2012 (Date)

Liberty Asset - Benny James Kirk

## Non-Individual Owner Information

| Name | Liberty Asset Management Corporation |
|---|---|
| EIN | 80-0832089 |
| Phone | 626-214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Type of Entity | ARTICLES OF INC    C3447756 |
| State/Country & Date of Organization | CA 03/05/2012 |
| Nature of Business | Real Estate |
| Address | 136 N Grand Ave Ste 187, West Covina, CA 91791 |
| Mailing Address (if different) | 3218 E Holt Ave, Suite #200 West Covina, CA 91791 |
| Authorization/ Resolution Date | |
| Previous Financial Inst. | * * * |

| Account Description | Account # | Initial Deposit/Source |
|---|---|---|
| BUSINESS CHECKING | 22001242 | $2,000.00* [ ] Cash [X] Check [ ] _____ |
| | | $_____ [ ] Cash [ ] Check [ ] _____ |
| | | $_____ [ ] Cash [ ] Check [ ] _____ |

## Services Requested

[ ] ATM   [ ] Debit/Check Cards (No. Requested: _____)
[ ] _____   [ ] _____
[ ] _____   [ ] _____

## Other Terms/Information

Signature Card-CA
Bankers Systems ™
Wolters Kluwer Financial Services ©2003, 2006

MPMP4AZ-CA  8/2/20
Page 2 of

322

Reviewed By _____

OFAC _____

Initials: _____

Liberty Asset Mgt. Corp. - Acct #22001242
002

# CORPORATE AUTHORIZATION RESOLUTION

MEGA BANK
1970 S. Fullerton Road #101
Rowland Heights, CA 91748

By: Liberty Asset
Management Corporation

3218 E Holt Ave, Suite #200
West Covina, CA 91791

Referred to in this document as "Financial Institution"

Referred to in this document as "Corporation"

I, Benny James Kirk _____ , certify that I am Secretary (clerk) of the above named corporation organized under the laws of California _____ , Federal Employer I.D. Number 80-0832089 _____ , engaged in business under the trade name of Liberty Assets Management Corporation _____ , and that the resolutions on this document are a correct copy of the resolutions adopted at a meeting of the Board of Directors of the Corporation duly and properly called and held on _____ (date). These resolutions appear in the minutes of this meeting and have not been rescinded or modified.

AGENTS  Any Agent listed below, subject to any written limitations, is authorized to exercise the powers granted as indicated below:

| Name and Title or Position | Signature | Facsimile Signature (if used) |
|---|---|---|
| A. Benny James Kirk - Authorized Signer | | X _____ |
| B. Lucy Gao Seh - Authorized Signer | X _____ | X _____ |
| C. _____ | X _____ | X _____ |
| D. _____ | X _____ | X _____ |
| E. XXXXXXXXXXXX | X XXXXXXXXXXX | X XXXXXXXXXXX |
| F. _____ | X _____ | X _____ |

POWERS GRANTED (Attach one or more Agents to each power by placing the letter corresponding to their name in the area before each power. Following each power indicate the number of Agent signatures required to exercise the power.)

| Indicate A, B, C, D, E, and/or F | | Description of Power | Indicate number of signatures required |
|---|---|---|---|
| A, B | (1) | Exercise all of the powers listed in this resolution. | 1 |
| A, B | (2) | Open any deposit or share account(s) in the name of the Corporation. | 1 |
| A, B | (3) | Endorse checks and orders for the payment of money or otherwise withdraw or transfer funds on deposit with this Financial Institution. | 1 |
| A, B | (4) | Borrow money on behalf and in the name of the Corporation, sign, execute and deliver promissory notes or other evidences of indebtedness. | 1 |
| A, B | (5) | Endorse, assign, transfer, mortgage or pledge bills receivable, warehouse receipts, bills of lading, stocks, bonds, real estate or other property now owned or hereafter owned or acquired by the Corporation as security for sums borrowed, and to discount the same, unconditionally guarantee payment of all bills received, negotiated or discounted and to waive demand, presentment, protest, notice of protest and notice of non-payment. | 1 |
| A, B | (6) | Enter into a written lease for the purpose of renting, maintaining, accessing and terminating a Safe Deposit Box in this Financial Institution. | 1 |
| | (7) | Other _____ | |

LIMITATIONS ON POWERS  The following are the Corporation's express limitations on the powers granted under this resolution.

EFFECT ON PREVIOUS RESOLUTIONS  This resolution supersedes resolution dated _____ . If not completed, all resolutions remain in effect.

CERTIFICATION OF AUTHORITY
I further certify that the Board of Directors of the Corporation has, and at the time of adoption of this resolution had, full power and lawful authority to adopt the resolutions on page 2 and to confer the powers granted above to the persons named who have full power and lawful authority to exercise the same. (Apply seal below where appropriate.)

☐ If checked, the Corporation is a non-profit corporation.

In Witness Whereof, I have subscribed my name to this document and affixed the seal of the Corporation on  07/16/2012  (date).

_____
Attest by One Other Officer

_____
Secretary

© 1986, 1997 Bankers Systems, Inc., St. Cloud, MN  Form CA-1  5/1/2003

(page 1 of 2)

Liberty Asset Mgb CORP 11/box#22001242
023

# Authorizion Agreement

I ( Benny James Kirk )                    Authorized Lucy
Gao Seh                          to be the authorized signer

for Liberty Asset Management Corporation

Acount#22001242.

.

Benny James Kirk       Date:  07/16/0212

Liberty Asset Management Corporation

Liberty Asset Mgt. Corp. - Acct #22001242
024

# EAST WEST BANK 

## BUSINESS ACCOUNT SIGNATURE CARD

**ACCOUNT TITLE and BUSINESS ADDRESS**

**Liberty Asset Management Corp**

(Loan Number #2003418)

318 E Holt Ave
West Covina CA 91791

**ACCOUNT VESTING (BUSINESS TYPE)**

**Corporation**

**MAILING ADDRESS**

318 E Holt Ave
West Covina CA 91791

**TAX ID NUMBER**

## AGREEMENT

**By signing below, I/we:** (1) confirm that we have received and agree that the accounts and account services of the business named above ("Company") will be governed by the terms of the Bank's Deposit Agreement, Annual Percentage Yield and Account Terms Disclosure, and fee schedules; (2) acknowledge that the Deposit Agreement includes a provision for dispute resolution; (3) authorize the Bank to check our credit history from time to time; and (4) authorize the Bank to act on the oral, written or electronic instruction of any Authorized Signer listed below.

**TAX CERTIFICATION** - By signing below, I also certify under penalty of perjury that (1) the Taxpayer Identification Number set forth on this form is the correct TIN of the Company; and (2) the Company is not subject to backup withholding because: it is exempt from backup withholding; it has not been notified by the IRS that it is subject to backup withholding as a result of a failure to report all interest and dividends; or the IRS has notified it that it is no longer subject to backup withholding; and (3) Company is a U.S. person (including a U.S. resident alien).
*Instruction:* You must cross out (2) if it is not correct. If the Company is a foreign company, check this box [ ] and do not complete this certification. Ask us, instead, for an appropriate IRS W-8 form. Check this box [ ] if the Company is currently subject to backup withholding.

The Internal Revenue Service does not require your consent to any provisions of this document other than the Tax Certifications required to avoid backup withholding.

## AUTHORIZED SIGNERS

| Printed Name / Title | ID Type / ID Number | Signature | Funds Transfer Access |
|---|---|---|---|
| Lucy Gao | | *Lucy Gao* | ☒ |
| Benjamin Kirk | | *Benjamin Kirk* | ☒ |
| | | XXXXXXXXXXXXXXXXXXXXXX | ☐ |
| | | XXXXXXXXXXXXXXXXXXXXXX | ☐ |
| | | XXXXXXXXXXXXXXXXXXXXXX | ☐ |
| | | XXXXXXXXXXXXXXXXXXXXXX | ☐ |

Number of authorized signers required to act together to make withdrawals or transfers: [ 1 ]
*[Note: This information is for your own purposes. We may permit any authorized signer to act alone. See Deposit Agreement for details.]*

## RESOLUTION

**RESOLVED:** ☒ The President, any Vice President, the Secretary, Treasurer of the Company and/or ☐ _____

each is authorized to enter into deposit account, funds transfer, investment, and treasury management agreements with East West Bank, and to designate from time to time who is authorized to withdraw funds, initiate payment orders, execute service agreements, and otherwise give instructions on behalf of this Company with respect to its deposit accounts. This authorization is in addition to any other authorizations in effect and will remain in force until the Bank receives written notice of its revocation at the address(es) and in the manner designated by it.

**CERTIFICATION – I/We** certify that: (1) if the Company named above is a corporation, at least one of us is its Secretary or Assistant Secretary; if it is a partnership, we constitute all of its general partners or managing partners; or if it is a limited liability company, I am its Secretary or I/we are Member(s) and/or its only manager(s). (2) The foregoing resolution is a true copy of a resolution duly adopted by the Company's governing body and remains valid and effective. (3) The signatures and titles of the person(s) signing above as Authorized Signers are the genuine signatures and titles of those persons. (4) The person(s) listed as Authorized Signer(s) on this form are authorized to withdraw funds, initiate payment orders (if checked above), and otherwise give instructions on behalf of the Company with respect to its deposit accounts and services including to add or delete accounts to this signature card. No other person's signature or authorization is required to bind the Company with respect to the agreements or transactions mentioned in the resolution.

| Lucy Gao | | 10-17-2011 |
|---|---|---|
| Printed Name/Title (President, Secretary, Partner, Member, etc.) | Signature | Date |
| Benjamin Kirk | | 10-17-2011 |
| Printed Name/Title (President, Secretary, Partner, Member, etc.) | Signature | Date |

Business Signature Card 052011

[ Card **1** of **1** ]

# EASTWEST BANK

| | | |
|---|---|---|
| **ACCOUNT TITLE and BUSINESS ADDRESS** | **ACCOUNT VESTING (BUSINESS TYPE)** | **TAX ID NUMBER** |
| Liberty Asset Management Corp | Corporation | |
| (Loan Number #2003390) | **MAILING ADDRESS** | |
| 318 E Holt Ave | | |
| West Covina CA 91791 | 318 E Holt Ave | |
| | West Covina CA 91791 | |

## AGREEMENT

**By signing below,** I/we: (1) confirm that we have received and agree that the accounts and account services of the business named above ("Company") will be governed by the terms of the Bank's Deposit Agreement, Annual Percentage Yield and Account Terms Disclosure, and fee schedules; (2) acknowledge that the Deposit Agreement includes a provision for dispute resolution; (3) authorize the Bank to check our credit history from time to time; and (4) authorize the Bank to act on the oral, written or electronic instruction of any Authorized Signer listed below.

**TAX CERTIFICATION - By signing below,** I also certify under penalty of perjury that (1) the Taxpayer Identification Number set forth on this form is the correct TIN of the Company; and (2) the Company is not subject to backup withholding because: it is exempt from backup withholding; it has not been notified by the IRS that it is subject to backup withholding as a result of a failure to report all interest and dividends; or the IRS has notified it that it is no longer subject to backup withholding; and (3) Company is a U.S. person (including a U.S. resident alien).
*Instruction:* You must cross out (2) if it is not correct. If the Company is a foreign company, check this box [  ] and do not complete this certification. Ask us, instead, for an appropriate IRS W-8 form. Check this box [  ] if the Company is currently subject to backup withholding.

**The Internal Revenue Service does not require your consent to any provisions of this document other than the Tax Certifications required to avoid backup withholding.**

## AUTHORIZED SIGNERS

| Printed Name / Title | ID Type / ID Number | Signature | Funds Transfer Access |
|---|---|---|---|
| Lucy Gao | | Lucy Gao | ☒ |
| Benjamin Kirk | | Benjamin Kirk | ☒ |
| | | XXXXXXXXXXXXXXXXXXXXX | ☐ |
| | | XXXXXXXXXXXXXXXXXXXXX | ☐ |
| | | XXXXXXXXXXXXXXXXXXXXX | ☐ |
| | | XXXXXXXXXXXXXXXXXXXXX | ☐ |

Number of authorized signers required to act together to make withdrawals or transfers: [  1  ]
*[Note: This information is for your own purposes. We may permit any authorized signer to act alone. See Deposit Agreement for details.]*

## RESOLUTION

**RESOLVED:** ☒ The President, any Vice President, the Secretary, Treasurer of the Company and/or ☐ _____

each is authorized to enter into deposit account, funds transfer, investment, and treasury management agreements with East West Bank, and to designate from time to time who is authorized to withdraw funds, initiate payment orders, execute service agreements, and otherwise give instructions on behalf of this Company with respect to its deposit accounts. This authorization is in addition to any other authorizations in effect and will remain in force until the Bank receives written notice of its revocation at the address(es) and in the manner designated by it.

**CERTIFICATION –** I/We certify that: (1) If the Company named above is a corporation, at least one of us is its Secretary or Assistant Secretary; if it is a partnership, we constitute all of its general partners or managing partners; or If it is a limited liability company, I am its Secretary or I/we are Member(s) and/or its only manager(s).   (2) The foregoing resolution is a true copy of a resolution duly adopted by the Company's governing body and remains valid and effective. (3) The signatures and titles of the person(s) signing above as Authorized Signers are the genuine signatures and titles of those persons. (4) The person(s) listed as Authorized Signer(s) on this form are authorized to withdraw funds, initiate payment orders (if checked above), and otherwise give instructions on behalf of the Company with respect to its deposit accounts and services including to add or delete accounts to this signature card. No other person's signature or authorization is required to bind the Company with respect to the agreements or transactions mentioned in the resolution.

| | | |
|---|---|---|
| Lucy Gao | | 10-17-2011 |
| Printed Name/Title (President, Secretary, Partner, Member, etc.) | Signature | Date |
| Benjamin Kirk | | 10-17-2011 |
| Printed Name/Title (President, Secretary, Partner, Member, etc.) | Signature | Date |

Business Signature Card 052011

[ Card  1  of  1  ]

# EXHIBIT Q

**BUSINESS CHECKING**    Account#22001622

**Account Agreement**    Date: _____ 04/02/2014

Internal Use

| Institution Name & Address | Account Title & Address |
|---|---|

**MEGA BANK**

4370 S. Fullerton Road #101

   wland Heights, CA 91748    Referred by Candace

**Account Title & Address**

HK Grace Building LLC

**CLOSED**

3218 E Holt Ave Ste 100

West Covina    CA 91791     04/03/2015

**IMPORTANT ACCOUNT OPENING INFORMATION:** Federal law requires us to obtain sufficient information to verify your identity. You may be asked several questions and to provide one or more forms of identification to fulfill this requirement. In some instances we may use outside sources to confirm the information. The information you provide is protected by our privacy policy and federal law.

inter Non-Individual Owner Information on page 2. There is additional Owner/Signer Information space on page 2.

### Ownership of Account

The specified ownership will remain the same for all accounts.

☐ Individual      ☐ Corporation - For Profit

☐ Joint Account      ☐ Corporation - Nonprofit

☐ Joint - Husband and Wife    ☐ Partnership
   (With right of survivorship)    ☐ Sole Proprietorship

☐ Community Property     ☒ Limited Liability Company
   (Husband and Wife)

☐ Tenancy In Common

☐ Trust-Separate Agreement Dated: _____

☐ _____

### Owner/Signer Information 1

| | |
|---|---|
| Name | Lucy Gao Seh |
| Relationship | LLC Manager |
| Address | 1001 East Road |
| | La Habra Hts, CA 90631 |
| Mailing Address (if different) | 3218 E Holt Ave Ste 100 |
| | West Covina, CA 91791 |
| Home Phone | (662) 697-6863 |
| Work Phone | (626) 214-2154 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Birth Date | 03/04/1961 |
| SSN/TIN | |
| Gov't Issued Photo ID Type, Number, State, Issue Date, Exp. Date) | 1 STATE DRIVERS |
| | 12/16/2010      3/4/2015 |
| Other ID (Description, Details) | CBI: China MMN: Wang |
| Employer | Hk Grace Building LLC Manager LLC |
| Previous Financial Inst. | Mega Bank |

### Beneficiary Designation

(Check appropriate ownership above.)

☐ Totten Trust      ☐ Pay-on-Death (P.O.D.)

☐ _____

### Beneficiary Name(s), Address(es), and SSN(s)

(Check appropriate beneficiary designation above.)

### Owner/Signer Information 2

| | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

☐ If checked, this is a temporary account agreement.

Number of signatures required for withdrawal: 1 (one)

### Signature(s)

The undersigned authorize the financial institution to investigate credit and employment history and obtain reports from consumer reporting agency(ies) on them as individuals. Except as otherwise provided by law or other documents, each of the undersigned is authorized to make withdrawals from the account(s), provided the required number of signatures indicated above is satisfied. The undersigned personally and as, or on behalf of, the account owner(s) agree to the terms of, and acknowledge receipt of copy(ies) of, this document and the following:

☒ Terms and Conditions    ☒ Privacy

☒ Electronic Fund Transfers    ☒ Truth in Savings

☒ Substitute Checks    ☒ Funds Availability

☐ Common Features    ☐ _____

☐ Authorized Signer (See Owner/Signer Information for Authorized Signer designations.)

[ X _____    (F) ]
   Lucy Gao Seh

[ X ***************** ]

[ X ************* ] 4[ X *********** ]

ature Card-CA
Kers Systems ™
lters Kluwer Financial Services ©2003, 2006

MPMP-LAZ-CA 5/2/2007
Page 1 of 2
Initials: _____

## Owner/Signer Information 3

| | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

## Owner/Signer Information 4

| | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

## Backup Withholding Certifications

(If not a "U.S. Person," certify foreign status separately.)

TIN: 45-4329387

[X] Taxpayer I.D. Number (TIN) - The number shown above is my correct taxpayer identification number.

[X] Backup Withholding - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

[ ] Exempt Recipients - I am an exempt recipient under the Internal Revenue Service Regulations.

I certify under penalties of perjury the statements checked in this section and that I am a U.S. person (including a U.S. resident alien).

X _____  04/02/2014 (Date)

HK Grace Building LLC  Lucy Gao Seh

## Non-Individual Owner Information

| | |
|---|---|
| Name | HK Grace Building LLC |
| EIN | 45-4329387 |
| Phone | 626-214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Type of Entity | LLC 201133210001 |
| State/Country & Date of Organization | CA 11/21/2011 |
| Nature of Business | Real Estates |
| Address | 3218 E Holt Ave Ste 101 West Covina CA 91791 |
| Mailing Address (if different) | 3218 E Holt Ave Ste 101 West Covina CA 91791 |
| Authorization/ Resolution Date | |
| Previous Financial Inst. | |

| Account Description | Account # | Initial Deposit/Source |
|---|---|---|
| BUSINESS CHECKING | 22001622 | $ 3,500,000.00 [ ] Cash [ ] Check [X] Incoming WIRE |
| | | $ _____ [ ] Cash [ ] Check [ ] _____ |
| | | $ _____ [ ] Cash [ ] Check [ ] _____ |

## Services Requested

[ ] ATM  [ ] Debit/Check Cards (No. Requested: _____ )
[ ] _____ [ ] _____
[ ] _____ [ ] _____

## Other Terms/Information

Signature Card-CA
Bankers Systems ™
Wolters Kluwer Financial Services ©2003, 2006

Reviewed By _____

OFAC _____

Initials: ____

MPMR-LAZ-CA  5/2/2-
Page 2 c....

HK Grace - Acct #22001622
002
329

**BUSINESS CHECKING**  Account#22001408

**Account Agreement**  Date: _____05/08/2013_____

| Institution Name & Address | Internal Use |
|---|---|

MEGA BANK

1370 S. Fullerton Road #101

/land Heights, CA 91748          Referred By Candace chu

**Account Title & Address**

Strong Water Capital

Management LLC

*CLOSED*

3218 E Holt Ave #200

West Covina, CA 91791          04/08/2015

**IMPORTANT ACCOUNT OPENING INFORMATION:** Federal law requires us to obtain sufficient information to verify your identity. You may be asked several questions and to provide one or more forms of identification to fulfill this requirement. In some instances we may use outside sources to confirm the information. The information you provide is protected by our privacy policy and federal law.

Enter: Non-Individual Owner Information on page 2. There is additional Owner/Signer Information space on page 2.

**Ownership of Account**

The specified ownership will remain the same for all accounts.

☐ Individual
☐ Joint Account
☐ Joint - Husband and Wife (With right of survivorship)
☐ Community Property (Husband and Wife)
☐ Tenancy in Common
☐ Trust-Separate Agreement Dated: _____
☐ _____

☐ Corporation - For Profit
☐ Corporation - Nonprofit
☐ Partnership
☐ Sole Proprietorship
☒ Limited Liability Company

### Owner/Signer Information 1

| Name | Luch Gao Seh |
|---|---|
| Relationship | Manager LLC |
| Address | 1001 East Road<br>La Habra Hts, CA 90631 |
| Mailing Address (if different) | 3218 E Holt Ave #200<br>West Covina, CA 91791 |
| Home Phone | (562) 697-6863 |
| Work Phone | (626) 214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Birth Date | 03/04/1961 |
| SSN/TIN | (F) |
| Gov't Issued Photo ID (Type, Number, State, Date, Exp. Date) | 1 STATE DRIVERS<br>3/4/1961          3/4/2015 |
| Other ID (Description, Details) | CBI: China  MMN: Wang |
| Employer | Strong Water Capital Management LLC |
| Previous Financial Inst. | * * * |

**Beneficiary Designation**

(Check appropriate ownership above.)

☐ Totten Trust          ☐ Pay-on-Death (P.O.D.)
☐ _____

**Beneficiary Name(s), Address(es), and SSN(s)**

(Check appropriate beneficiary designation above.)

☐ If checked, this is a temporary account agreement.

Number of signatures required for withdrawal:  1 (one)  .

**Signature(s)**

### Owner/Signer Information 2

| Name | |
|---|---|
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

The undersigned authorize the financial institution to investigate credit and employment history and obtain reports from consumer reporting agency(ies) on them as individuals. Except as otherwise provided by law or other documents, each of the undersigned is authorized to make withdrawals from the account(s), provided the required number of signatures indicated above is satisfied. The undersigned personally and as, or on behalf of, the account owner(s) agree to the terms of, and acknowledge receipt of copy(ies) of, this document and the following:

☒ Terms and Conditions          ☒ Privacy
☒ Electronic Fund Transfers     ☒ Truth in Savings
☒ Substitute Checks             ☒ Funds Availability
☐ Common Features               ☐ _____

☐ Authorized Signer (See Owner/Signer Information for Authorized Signer designation(s).)

[ X _____ (F) ]
  Luch Gao Seh

[ X ***************** ]

[ X ************ ]  4[ X ************ ]

...ure Card-CA
...t Systems™
Wolters Kluwer Financial Services ©2003, 2006

MPMP-LAZ-CA  6/2/2007
Page 1 of 2
Initials: _____

Strong Water Capital Management - Acct #22001408
001
330

| Owner/Signer Information 3 | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

| Owner/Signer Information 4 | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

## Backup Withholding Certifications

*(If not a "U.S. Person," certify foreign status separately.)*

TIN: 90-0976759

[X] **Taxpayer I.D. Number (TIN)** - The number shown above is my correct taxpayer identification number.

[X] **Backup Withholding** - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

[ ] **Exempt Recipients** - I am an exempt recipient under the Internal Revenue Service Regulations.

I certify under penalties of perjury the statements checked in this section and that I am a U.S. person (including a U.S. resident alien).

X _____  5/8/2013  (Date)
Strong Water Capital Management LLC

Signature Card-CA
Bankers Systems ™
Wolters Kluwer Financial Services ©2003, 2006

| Non-Individual Owner Information | |
|---|---|
| Name | Strong Water Capital Management LLC |
| EIN | 90-0976759 |
| Phone | (626) 214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Type of Entity | LLC    201312710159 |
| State/Country & Date of Organization | CA  05/07/2013 |
| Nature of Business | Real Estate |
| Address | 3218 E Holt Ave #200, West Covina, CA 91791 |
| Mailing Address (if different) | 3218 E Holt Ave #200, West Covina, CA 91791 |
| Authorization/ Resolution Date | 05/08/2013 |
| Previous Financial Inst. | * * * |

| Account Description | Account # | Initial Deposit/Source |
|---|---|---|
| BUSINESS CHECKING | 22001408 | $ 2,000.00* |
| | | [ ] Cash  [X] Check  [ ] |
| | | $ _____ [ ] Cash  [ ] Check  [ ] |
| | | $ _____ [ ] Cash  [ ] Check  [ ] |

## Services Requested

[ ] ATM   [ ] Debit/Check Cards (No. Requested: _____ )
[ ] _____  [ ] _____
[ ] _____  [ ] _____

## Other Terms/Information

Reviewed By _____

CFAO

Strong Water Capital Management - Acct #22001408
002
331

**BUSINESS CHECKING** Account #22001416
**Account Agreement** Date: 08/19/2013

## Institution Name & Address

MEGA BANK
1370 S. Fullerton Road #101
owland Heights, CA 91748          Referred by Candace Chu

**IMPORTANT ACCOUNT OPENING INFORMATION:** Federal law requires us to obtain sufficient information to verify your identity. You may be asked several questions and to provide one or more forms of identification to fulfill this requirement. In some instances we may use outside sources to confirm the information. The information you provide is protected by our privacy policy and federal law.

Enter **Non-Individual Owner Information** on page 2. There is additional **Owner/Signer Information** space on page 2.

## Owner/Signer Information 1

| | |
|---|---|
| Name | Lucy Gao Seh |
| Relationship | Manager LLC |
| Address | 1001 East Road La Habra Hts, CA 90631 |
| Mailing Address (if different) | 3218 E Holt Ave Suite #200 West Covina, CA 91791 |
| Home Phone | (562) 697-6863 |
| Work Phone | (626) 214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Birth Date | 03/04/1961 |
| SSN/TIN | ) |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | 1 STATE DRIVERS 2/18/2010          3/4/2015 |
| Other ID (Description, Details) | CBI: China MMN: Wang |
| Employer | Diamond Waterfalls LLC |
| Previous Financial Inst. | * * * |

## Owner/Signer Information 2

| | |
|---|---|
| Name | Vanessa Yvette Lavendera |
| Relationship | Authorized Signer |
| Address | 13017 Falcon Place Chino, CA 91710 |
| Mailing Address (if different) | 3218 E Holt Ave Suite#200 West Covina, CA 91791 |
| Home Phone | (650) 823-8972 |
| Work Phone | (626) 214-2154 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Birth Date | 09/29/1984 |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | 1 STATE DRIVERS 9/26/2008          9/29/2013 |
| Other ID (Description, Details) | CBI: Los Angeles MMN: Robley |
| Employer | Von Karman 4490 LLC Manager LLC |
| Previous Financial Inst. | * * * |

## Internal Use

### Account Title & Address

Diamond Waterfalls LLC
DBA Diamond Bar Inn & Suites

3218 E Holt Ave Suite #200
West Covina, CA 91791

**CLOSED** 12/24/2013

### Ownership of Account

The specified ownership will remain the same for all accounts.

- [ ] Individual
- [X] Joint Account
- [ ] Joint - Husband and Wife (With right of survivorship)
- [ ] Community Property (Husband and Wife)
- [ ] Tenancy in Common
- [ ] Trust-Separate Agreement Dated: _____
- [ ] _____
- [ ] Corporation - For Profit
- [ ] Corporation - Nonprofit
- [ ] Partnership
- [ ] Sole Proprietorship
- [X] Limited Liability Company

### Beneficiary Designation

(Check appropriate ownership above.)

- [ ] Totten Trust
- [ ] _____
- [ ] Pay-on-Death (P.O.D.)

### Beneficiary Name(s), Address(es), and SSN(s)

(Check appropriate beneficiary designation above.)

- [ ] If checked, this is a temporary account agreement.

Number of signatures required for withdrawal: **1 (one)** ____.

### Signature(s)

The undersigned authorize the financial institution to investigate credit and employment history and obtain reports from consumer reporting agency(ies) on them as individuals. Except as otherwise provided by law or other documents, each of the undersigned is authorized to make withdrawals from the account(s), provided the required number of signatures indicated above is satisfied. The undersigned personally and as, or on behalf of, the account owner(s) agree to the terms of, and acknowledge receipt of copy(ies) of, this document and the following:

- [X] Terms and Conditions
- [X] Electronic Fund Transfers
- [X] Substitute Checks
- [ ] Common Features
- [X] Privacy
- [X] Truth in Savings
- [X] Funds Availability
- [ ] _____

- [ ] Authorized Signer (See Owner/Signer Information for Authorized Signer designation(s).)

X _____ Lucy Gao Seh          **(F)**

X _____ Vanessa Yvette Lavendera          **(F)**

[ X  *********** ]  4[ X  *********** ]

ture Card-CA
...ers Systems TM
Wolters Kluwer Financial Services ©2003, 2006

MFMP-LAZ-CA 5/2/2007
Page 1 of 2

Initials: _____

| Owner/Signer Information 3 | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | BUSINESS CHECKING |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

| Owner/Signer Information 4 | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | BUSINESS CHECKING |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

## Non-Individual Owner Information

| | |
|---|---|
| Name | Diamond Waterfalls LLC DBA Diamond Bar Inn & |
| EIN | 45-3839014 |
| Phone | (626) 214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Type of Entity | LLC   201130710177 |
| State/Country & Date of Organization | CA 10/27/2011 |
| Nature of Business | Real Estate |
| Address | 3218 E Holt Ave Suite #200, West Covina, CA 91791 |
| Mailing Address (if different) | 3218 E Holt Ave Suite #200, West Covina, CA 91791 |
| Authorization/ Resolution Date | 08/19/2013 |
| Previous Financial Inst. | * * * |

| Account Description | Account # | Initial Deposit/Source |
|---|---|---|
| BUSINESS CHECKING | 22001416 | $ 2,000.00*  ☐ Cash ☒ Check  ☐ _____ |
| | | $ _____  ☐ Cash ☐ Check  ☐ _____ |
| | | $ _____  ☐ Cash ☐ Check  ☐ _____ |

### Services Requested

☐ ATM    ☐ Debit/Check Cards (No. Requested: _____ )

☐ _____    ☐ _____

☐ _____    ☐ _____

### Other Terms/Information

### Backup Withholding Certifications

*(If not a "U.S. Person," certify foreign status separately.)*

TIN: 5-3839014

☒ **Taxpayer I.D. Number (TIN)** - The number shown above is my correct taxpayer identification number.

☒ **Backup Withholding** - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

☐ **Exempt Recipients** - I am an exempt recipient under the Internal Revenue Service Regulations.

**I certify under penalties of perjury the statements checked in this section and that I am a U.S. person (including a U.S. resident alien).**

X _____    08/19/2013 (Date)

Diamond Waterfalls LLC - Lucy Gao Seh

Signature Card-CA
Bankers Systems ™
Wolters Kluwer Financial Services ©2003, 2006

Reviewed By _____

OFAC M

MPMP-LAZ-CA 5/2/2
Page 2 o.
Initials: _____

Diamond Waterfalls LLC - Acct #: 22001416

## Institution Name & Address

MEGA BANK

370 S. Fullerton Road #101

owland Heights, CA 91748     Referred By Candace Chu

**IMPORTANT ACCOUNT OPENING INFORMATION:** Federal law requires us to obtain sufficient information to verify your identity. You may be asked several questions and to provide one or more forms of identification to fulfill this requirement. In some instances we may use outside sources to confirm the information. The information you provide is protected by our privacy policy and federal law.

Enter Non-Individual Owner Information on page 2. There is additional Owner/Signer Information space on page 2.

### Owner/Signer Information 1

| | |
|---|---|
| Name | Luch Gao Seh |
| Relationship | Manager LLC |
| Address | 1001 East Road<br>La Habra Hts, CA 90631 |
| Mailing Address (if different) | 3218 E Holt Ave Suite #200<br>West Covina, CA 91791 |
| Home Phone | (562) 697-6863 |
| Work Phone | (626) 214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Birth Date | 03/04/1961 |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | 1 STATE DRIVERS<br>3/4/1961     3/4/2015 |
| Other ID (Description, Details) | CBI: China  MMN: Wang |
| Employer | Coastline Investment LLC  Manager LLC |
| Previous Financial Inst. | * * * |

### Owner/Signer Information 2

| | |
|---|---|
| Name | Vanessa Yvette Lavendera |
| Relationship | Authorized Signer |
| Address | 13017 Falcon Place<br>Chino, CA 91710 |
| Mailing Address (if different) | 3218 E Holt Ave Suite #200<br>West Covina, CA 91791 |
| Home Phone | (650) 823-8972 |
| Work Phone | (626) 214-2154 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Birth Date | 09/29/1984 |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | 1 STATE DRIVERS<br>9/26/2008     9/29/2013 |
| Other ID (Description, Details) | CBI: Los Angeles  MMN: Robley |
| Employer | Von Karman 4490 LLC  Manager LLC |
| Previous Financial Inst. | |

---

Internal Use

### Account Title & Address

Coastline Investments LLC

DBA Hilltop Suites Hotel

3218 E Holt Ave Suite #200

West Covina, CA 91791

**CLOSED**

12/26/2013

### Ownership of Account

The specified ownership will remain the same for all accounts.

- [ ] Individual
- [ ] Joint Account
- [ ] Joint - Husband and Wife (With right of survivorship)
- [ ] Community Property (Husband and Wife)
- [ ] Tenancy in Common
- [ ] Trust-Separate Agreement Dated: _____
- [ ] _____
- [ ] Corporation - For Profit
- [ ] Corporation - Nonprofit
- [ ] Partnership
- [ ] Sole Proprietorship
- [x] Limited Liability Company

### Beneficiary Designation

(Check appropriate ownership above.)

- [ ] Totten Trust
- [ ] Pay-on-Death (P.O.D.)
- [ ] _____

### Beneficiary Name(s), Address(es), and SSN(s)

(Check appropriate beneficiary designation above.)

- [ ] If checked, this is a temporary account agreement.

Number of signatures required for withdrawal: 1 (one)

### Signature(s)

The undersigned authorize the financial institution to investigate credit and employment history and obtain reports from consumer reporting agency(ies) on them as individuals. Except as otherwise provided by law or other documents, each of the undersigned is authorized to make withdrawals from the account(s), provided the required number of signatures indicated above is satisfied. The undersigned personally and as, or on behalf of, the account owner(s) agree to the terms of, and acknowledge receipt of, this document and the following:

- [x] Terms and Conditions
- [x] Electronic Fund Transfers
- [x] Substitute Checks
- [ ] Common Features
- [x] Privacy
- [x] Truth in Savings
- [x] Funds Availability
- [ ] _____

- [ ] Authorized Signer (See Owner/Signer Information for Authorized Signer designation(s).)

X _____ (F)
Luch Gao Seh

X _____ (F)
Vanessa Yvette Lavendera

[ X ********** ] 4[ X ********** ]

nature Card-CA
...ters Systems™
Wolters Kluwer Financial Services ©2003, 2006

MPMPLAZ.CA 5/2/2007
Page 1 of 2
Initials: _____

Coastline Investment LLC - Acct #: 22001465
001
334

| Owner/Signer Information 3 | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | XXXXXXXXXXXXXXXX |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

| Owner/Signer Information 4 | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | XXXXXXXXXXXXXX |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

| Non-Individual Owner Information | |
|---|---|
| Name | Coastline Investments LLC |
| EIN | 80-0768177 |
| Phone | (626) 214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Type of Entity | LLC   201113210217 |
| State/Country & Date of Organization | CA   05/12/2011 |
| Nature of Business | Real Estate |
| Address | 3218 E Holt Ave Suite #200, West Covina, CA 91791 |
| Mailing Address (if different) | 3218 E Holt Ave Suite #200, West Covina, CA 91791 |
| Authorization/Resolution Date | 08/19/2013 |
| Previous Financial Inst. | * * * |

| Account Description | Account # | Initial Deposit/Source |
|---|---|---|
| BUSINESS CHECKING | 22001465 | $ 2,000.00*  ☐ Cash ☒ Check  ☐ _____ |
| | | $ _____  ☐ Cash ☐ Check  ☐ _____ |
| | | $ _____  ☐ Cash ☐ Check  ☐ _____ |

### Services Requested

☐ ATM    ☐ Debit/Check Cards (No. Requested: _____ )
☐ _____    ☐ _____
☐ _____    ☐ _____

### Other Terms/Information

### Backup Withholding Certifications

*(If not a "U.S. Person," certify foreign status separately.)*

TIN: 0-0768177

☒ **Taxpayer I.D. Number (TIN)** - The number shown above is my correct taxpayer identification number.

☒ **Backup Withholding** - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

☐ **Exempt Recipients** - I am an exempt recipient under the Internal Revenue Service Regulations.

I certify under penalties of perjury the statements checked in this section and that I am a U.S. person (including a U.S. resident alien).

X _____    08/19/2013 (Date)
   Coastline Investments LLC — Lucy Gao Seh

Signature Card-CA
Bankers Systems ™
Wolters Kluwer Financial Services ©2003, 2006

Reviewed By _____

OFAC _____

MP-MP-LAZ-CA  5/2/2
Page 2 c.
Initials. _____

Coastline Investment LLC - Acct #: 22001465

#4819     BU?   GCS CHECKING **Account Agreement**    ACcount#22001507    Date: _____03/13/2014_____

| | |
|---|---|
| **Institution Name & Address** | **Internal Use** |

### Institution Name & Address

MEGA BANK
1370 S. Fullerton Road #101
Rowland Heights , CA 91748     Referred By Candace Chu

**IMPORTANT ACCOUNT OPENING INFORMATION:** Federal law requires us to obtain sufficient information to verify your identity. You may be asked several questions and to provide one or more forms of identification to fulfill this requirement. In some instances we may use outside sources to confirm the information. The information you provide is protected by our privacy policy and federal law.
Enter **Non-Individual Owner Information** on page 2. There is additional Owner/Signer Information space on page 2.

### Owner/Signer Information 1

| Name | Lucy Gao Seh |
|---|---|
| Relationship | Manager LLC |
| Address | 3218 E Holt Ave #200<br>West Covina, CA 91791 |
| Mailing Address (if different) | 1001 East Road<br>la Habra Hts  CA 90631 |
| Home Phone | (562) 697-6863 |
| Work Phone | (626) 214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Birth Date | 03/04/1961 |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | 1 STATE DRIVERS<br>02/18/2010     3/4/2015 |
| Other ID (Description, Details) | CBI: China  MMN: Wang |
| Employer | Bridgestream Management LLC |
| Previous Financial Inst. | Mega Bank |

### Owner/Signer Information 2

| Name | |
|---|---|
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

### Account Title & Address

Bridgestream Management LLC

CLOSED
01/16/2015
See Attached

3218 E Holt Ave #200
West Covina   CA 91791

### Ownership of Account

The specified ownership will remain the same for all accounts.

- [ ] Individual
- [ ] Joint Account
- [ ] Joint - Husband and Wife (With right of survivorship)
- [ ] Community Property (Husband and Wife)
- [ ] Tenancy in Common
- [ ] Trust-Separate Agreement Dated: _____
- [ ] _____

- [ ] Corporation - For Profit
- [ ] Corporation - Nonprofit
- [ ] Partnership
- [ ] Sole Proprietorship
- [X] Limited Liability Company

### Beneficiary Designation

(Check appropriate ownership above.)
- [ ] Totten Trust
- [ ] Pay-on-Death (P.O.D.)
- [ ] _____

### Beneficiary Name(s), Address(es), and SSN(s)

(Check appropriate beneficiary designation above.)

- [ ] If checked, this is a temporary account agreement.

Number of signatures required for withdrawal: __1 (one)__ .

### Signature(s)

The undersigned authorize the financial institution to investigate credit and employment history and obtain reports from consumer reporting agency(ies) on them as individuals. Except as otherwise provided by law or other documents, each of the undersigned is authorized to make withdrawals from the account(s), provided the required number of signatures indicated above is satisfied. The undersigned personally and as, or on behalf of, the account owner(s) agree to the terms of, and acknowledge receipt of copy(ies) of, this document and the following:

- [X] Terms and Conditions
- [X] Electronic Fund Transfers
- [X] Substitute Checks
- [ ] Common Features
- [X] Privacy
- [X] Truth in Savings
- [X] Funds Availability
- [ ] _____

- [ ] Authorized Signer (See Owner/Signer Information for Authorized Signer designation(s).)

(F)

X _____
Lucy Gao Seh

X ***************

X ***********    4 X ***********

Signature Card-CA
Bankers Systems™
Wolters Kluwer Financial Services ©2005, 2006

NPMG LAZ-CA  5/2/2007
Page 1 of 2

Initials: ___

Bridgestream Management LLC - Acct #: 22001507
001
336

## Owner/Signer Information 3

| Field | Value |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | XXXXXXXXXXXXX |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

## Owner/Signer Information 4

| Field | Value |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | XXXXXXXXXXXXX |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

## Non-Individual Owner Information

| Field | Value |
|---|---|
| Name | Bridgestream Management LLC |
| EIN | 46-4589472 |
| Phone | 626-214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Type of Entity | LLC 201401710257 |
| State/Country & Date of Organization | CA 01/29/2014 |
| Nature of Business | Real Estate |
| Address | 3218 E Holt Ave #200 West Covina, CA 91791 |
| Mailing Address (if different) | 3218 E Holt Ave #200 West Covina, CA 91791 |
| Authorization/ Resolution Date | 02/13/2014 |
| Previous Financial Inst. | * * * |

## Account Description

| Account Description | Account # | Initial Deposit/Source |
|---|---|---|
| BUSINESS CHECKING | 22001507 | $811,506.88* ☐ Cash ☒ Check ☐ |
| | | $ ☐ Cash ☐ Check ☐ |
| | | $ ☐ Cash ☐ Check ☐ |

## Services Requested

☐ ATM   ☐ Debit/Check Cards (No. Requested: _____ )
☐ _____   ☐ _____
☐ _____   ☐ _____

## Other Terms/Information

## Backup Withholding Certifications

*(If not a "U.S. Person," certify foreign status separately.)*

TIN: 46-4589472

☒ **Taxpayer I.D. Number (TIN)** - The number shown above is my correct taxpayer identification number.

☒ **Backup Withholding** - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

☐ **Exempt Recipients** - I am an exempt recipient under the Internal Revenue Service Regulations.

I certify under penalties of perjury the statements checked in this section and that I am a U.S. person (including a U.S. resident alien).

X _____ 3/15/1 (Date)
Bridgestream Management LLC Lucy Gao Seh 02/13/2014

Reviewed By _____

OFAC M

Signature Card-CA
Bankers Systems
Wolters Kluwer Financial Services ©2003, 2006

MPMP-LAZ-CA 5/2/2007
Page 2 of 2

Initials M

Bridgestream Management LLC - Acct #: 22001507

**BUSINESS CHECKING**   Account#22001457
*Account Agreement*

Date: _____ 08/19/2013

| Institution Name & Address | | Internal Use |
|---|---|---|

MEGA BANK

'370 S. Fullerton Road #101

.wland Heights, CA 91748          Referred By Candace

| Account Title & Address |
|---|

Crystal Waterfalls LLC

DBA Park Inn by Radisson

**CLOSED**
12/24/2013

3218 E Holt Ave Suite #200

West Covina, CA 91791

**IMPORTANT ACCOUNT OPENING INFORMATION:** Federal law requires us to obtain sufficient information to verify your identity. You may be asked several questions and to provide one or more forms of identification to fulfill this requirement. In some instances we may use outside sources to confirm the information. The information you provide is protected by our privacy policy and federal law.

Enter **Non-Individual Owner Information** on page 2. There is additional Owner/Signer Information space on page 2.

| Ownership of Account |
|---|

The specified ownership will remain the same for all accounts.

| | |
|---|---|
| ☐ Individual | ☐ Corporation - For Profit |
| ☐ Joint Account | ☐ Corporation - Nonprofit |
| ☐ Joint - Husband and Wife (With right of survivorship) | ☐ Partnership |
| | ☐ Sole Proprietorship |
| ☐ Community Property (Husband and Wife) | ☒ Limited Liability Company |
| ☐ Tenancy in Common | |
| ☐ Trust-Separate Agreement Dated: _____ | |
| ☐ | |

| Owner/Signer Information 1 | |
|---|---|
| Name | Luch Gao Seh |
| Relationship | Manager LLC |
| Address | 1001 East Road La habra Hts, CA 90631 |
| Mailing Address (if different) | 3218 E Holt Ave Suite #200 West Covina, CA 91791 |
| Home Phone | (562) 697-6863 |
| Work Phone | (626) 214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Birth Date | 03/04/1961 |
| SSN/TIN | |
| Gov't Issued Photo ID pe, Number, State, .e Date, Exp. Date) | 1 STATE DRIVERS 3/4/1961          3/4/2015 |
| Other ID (Description, Details) | CBI: China  MMN: Wang |
| Employer | SF Montgomery LLC  Manager |
| Previous Financial Inst. | Mega Bank |

| Owner/Signer Information 2 | |
|---|---|
| Name | Vanessa Yvette Lavendera |
| Relationship | Authorized Signer |
| Address | 13017 Falcon Place Chino, CA 91710 |
| Mailing Address (if different) | 3218 E Holt Ave Suite #200, West Covina, CA 91791 |
| Home Phone | (650) 823-8972 |
| Work Phone | (626) 214-2154 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Birth Date | 09/29/1984 |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | 1 STATE DRIVERS 9/26/2008          9/29/2013 |
| Other ID (Description, Details) | CBI: Los Angeles  MMN: Roblev |
| Employer | Von Karman 4490 LLC  Manager LLC |
| Previous Financial Inst. | * * * |

| Beneficiary Designation |
|---|

*(Check appropriate ownership above.)*

| | |
|---|---|
| ☐ Totten Trust | ☐ Pay-on-Death (P.O.D.) |
| ☐ | |

| Beneficiary Name(s), Address(es), and SSN(s) |
|---|

*(Check appropriate beneficiary designation above.)*

☐ If checked, this is a temporary account agreement.

Number of signatures required for withdrawal:  1 (one)

| Signature(s) |
|---|

The undersigned authorize the financial institution to investigate credit and employment history and obtain reports from consumer reporting agency(ies) on them as individuals. Except as otherwise provided by law or other documents, each of the undersigned is authorized to make withdrawals from the account(s), provided the required number of signatures indicated above is satisfied. The undersigned personally and as, or on behalf of, the account owner(s) agree to the terms of, and acknowledge receipt of copy(ies) of, this document and the following:

| | |
|---|---|
| ☒ Terms and Conditions | ☒ Privacy |
| ☒ Electronic Fund Transfers | ☒ Truth in Savings |
| ☒ Substitute Checks | ☒ Funds Availability |
| ☐ Common Features | ☐ |

☐ Authorized Signer (See Owner/Signer Information for Authorized Signer designation(s).)

(F) _____ ]

X _____
Luch Gao Seh

(F) _____ ]

X _____
Vanessa Yvette Lavendera

[ X ************ ]  4[ X ********** ]

ature Card-CA
wars Systems TM
Wolters Kluwer Financial Services ©2003, 2008

MPMP-LAZ-CA_5/2/2007
Page 1 of 2

Initials: _____

Crystal Waterfalls - Acct #:22001457
001
338

## Owner/Signer Information 3

| | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | XXXXXXXXXXXXXX |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

## Owner/Signer Information 4

| | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | XXXXXXXXXXX |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

## Backup Withholding Certifications

*(If not a "U.S. Person," certify foreign status separately.)*

TIN: 5-2820298

☒ **Taxpayer I.D. Number (TIN)** - The number shown above is my correct taxpayer identification number.

☒ **Backup Withholding** - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

☐ **Exempt Recipients** - I am an exempt recipient under the Internal Revenue Service Regulations.

I certify under penalties of perjury the statements checked in this section and that I am a U.S. person (including a U.S. resident alien).

X _____    08/19/2013    (Date)

Crystal Waterfalls LLC    -Lucy Gao Seh

## Non-Individual Owner Information

| | |
|---|---|
| Name | Crystal Waterfalls LLC DBA Park Inn by Radisson |
| EIN | 45-2820298 |
| Phone | (626) 214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Type of Entity | LLC    201118210089 |
| State/Country & Date of Organization | CA    07/01/2011 |
| Nature of Business | Real Estate |
| Address | 3218 E Holt Ave Suite #200, West Covina, CA 91791 |
| Mailing Address (if different) | 3218 E Holt Ave Suite #200, West Covina, CA 91791 |
| Authorization/ Resolution Date | 08/19/2013 |
| Previous Financial Inst. | * * *    , |

## Account Description

| Account Description | Account # | Initial Deposit/Source |
|---|---|---|
| BUSINESS CHECKING | 22001457 | $ 2,000.00* |
| | | ☐ Cash  ☒ Check |
| | | ☐ _____ |
| | | $ _____ |
| | | ☐ Cash  ☐ Check |
| | | ☐ _____ |
| | | $ _____ |
| | | ☐ Cash  ☐ Check |
| | | ☐ _____ |

## Services Requested

☐ ATM    ☐ Debit/Check Cards (No. Requested: _____ )
☐ _____    ☐ _____
☐ _____    ☐ _____

## Other Terms/Information

Signature Card-CA
Bankers Systems™
Wolters Kluwer Financial Services ©2003, 2006

MFMP-LAZ-CA  5/2/2
Page 2 of

Initials: _____

Reviewed By _____

OFAC ___

Crystal Waterfalls - Acct #:22001457

# EXHIBIT R



**MEGA BANK**

www.megabankusa.com

000616

HK Grace Building LLC                                      30
3218 E Holt Ave Ste 100                                    0
West Covina CA  91791                                      3

Rowland Heights                           TELEPHONE:626-839-6060
1370 S. Fullerton Road #101
Rowland Heights, CA 91748

Effective January 1, 2013, all deposits accounts are PDIC insured up to
$250,000 per depositor.

BUSINESS CHECKING ACCOUNT 22001622

|  |  | LAST STATEMENT 04/02/14 | .00 |
|---|---|---|---|
| MINIMUM BALANCE | 662.87 | 3 CREDITS | 3,681,707.87 |
| AVERAGE BALANCE | 140,330.18 | 7 DEBITS | 3,681,045.00 |
|  |  | THIS STATEMENT 04/30/14 | 662.87 |

- - - - - - - OTHER CREDITS - - - - - - - - -

| DESCRIPTION | DATE | AMOUNT |
|---|---|---|
| To open new account | 04/02 | .00 |
| Incoming Wire B/O First American Title Co. | 04/02 | 3,500,000.00 |
| Incoming Wire B/O First American Title Co. | 04/03 | 181,707.87 |

- - - - - - - - - CHECKS - - - - - - - - - -

| CHECK #..DATE......AMOUNT | CHECK #..DATE......AMOUNT | CHECK #..DATE......AMOUNT |
|---|---|---|
| *04/02  210,000.00 | *04/03 3280,000.00 | 04/07  190,000.00 |

(*) INDICATES A GAP IN CHECK NUMBER SEQUENCE

- - - - - - - - - OTHER DEBITS - - - - - - - - -

| DESCRIPTION | DATE | AMOUNT |
|---|---|---|
| Incoming Wire Fee Charge Ref#040214-2375 | 04/02 | 10.00 |
| Incoming Wire Fee Charge Ref#040314-2236 | 04/03 | 10.00 |
| Outgoing Wire Fee Charge Ref#040414-03 | 04/04 | 25.00 |
| Outgoing Wire B/F First American Title Company | 04/04 | 1,000.00 |

* * * C O N T I N U E D * * *



Z0030412

341


HK Grace Building LLC

==========================================================================
BUSINESS CHECKING ACCOUNT 22001622
==========================================================================

- - - ITEMIZATION OF OVERDRAFT AND RETURNED ITEM FEES - - -

```
*****************************************************************
*                              |   TOTAL FOR   |    TOTAL      *
*                              |  THIS PERIOD  |  YEAR TO DATE *
*------------------------------------------------------------- *
* TOTAL OVERDRAFT FEES:        |      $.00     |      $.00     *
*------------------------------------------------------------- *
* TOTAL RETURNED ITEM FEES:    |      $.00     |      $.00     *
*****************************************************************
```

- - - - - - - - DAILY BALANCE - - - - - - - -

| DATE..........BALANCE | DATE..........BALANCE | DATE..........BALANCE |
|---|---|---|
| 04/02    3,289,990.00 | 04/04     190,662.87 | |
| 04/03      191,687.87 | 04/07        662.87 | |








# 4/02/14                    $210,000.00




# 4/03/14                    $3,280,000.00




# 4/07/14                    $190,000.00

 **MEGA BANK**
www.megabankusa.com

000614



HK Grace Building LLC
C/O Mega Bank                            30
1370 S Fullerton Road #101                1
Rowland Heights CA  91748                13

═══════════════════════════════════════════════════════════════════════════

Rowland Heights                         TELEPHONE:626-839-6060
1370 S. Fullerton Road #101
Rowland Heights, CA 91748
═══════════════════════════════════════════════════════════════════════════

    Effective January 1, 2013, all deposits accounts are FDIC insured up to
    $250,000 per depositor.

═══════════════════════════════════════════════════════════════════════════
                     BUSINESS CHECKING ACCOUNT 22001622
═══════════════════════════════════════════════════════════════════════════

                                        LAST STATEMENT 09/30/14       2,932.87
MINIMUM BALANCE              2,022.87        2 CREDITS             2,255,100.00
AVERAGE BALANCE           215,907.38       17 DEBITS             2,256,010.00
                                        THIS STATEMENT 10/31/14       2,022.87

- - - - - - - - - - DEPOSITS - - - - - - - - - -
REF #.....DATE......AMOUNT REF #.....DATE......AMOUNT REF #.....DATE......AMOUNT
      10/27    5,100.00

- - - - - - - - OTHER CREDITS - - - - - - - - -
DESCRIPTION                                              DATE        AMOUNT
Incoming wire Ref #0189 ORG: First American Title Company   10/03   2,250,000.00

- - - - - - - - - - CHECKS - - - - - - - - - -
CHECK #..DATE......AMOUNT  CHECK #..DATE......AMOUNT  CHECK #..DATE......AMOUNT
   *10/03    30,000.00       *10/08    20,000.00        *10/17    20,000.00
   *10/03    70,000.00       *10/08    80,000.00        *10/20    58,000.00
   *10/03   400,000.00       *10/09   135,000.00     9999 10/27     6,000.00
   *10/03   500,000.00       *10/14    50,000.00
   *10/06   800,000.00       *10/15    50,000.00

(*) INDICATES A GAP IN CHECK NUMBER SEQUENCE
              * * *  C O N T I N U E D  * * *

 **FDIC**

EQUAL HOUSING
LENDER

 **MEGA BANK**

www.megabankusa.com

HK Grace Building LLC

```
=================================================================
                BUSINESS CHECKING ACCOUNT 22001622
=================================================================
          - - - - - - - - OTHER DEBITS - - - - - - - - -
```

| DESCRIPTION | DATE | AMOUNT |
|---|---|---|
| Incoming wire fee Ref #0189 | 10/03 | 10.00 |
| MISCELLANEOUS DEBIT | 10/16 | 2,000.00 |
| MISCELLANEOUS DEBIT | 10/16 | 15,000.00 |
| MISCELLANEOUS DEBIT | 10/16 | 20,000.00 |

- - - ITEMIZATION OF OVERDRAFT AND RETURNED ITEM FEES - - -

```
*****************************************************************
*                          |   TOTAL FOR   |     TOTAL       *
*                          |  THIS PERIOD  |  YEAR TO DATE   *
*---------------------------------------------------------------*
* TOTAL OVERDRAFT FEES:     |     $.00      |      $.00       *
*---------------------------------------------------------------*
* TOTAL RETURNED ITEM FEES: |     $.00      |      $.00       *
*****************************************************************
```

- - - - - - - - DAILY BALANCE - - - - - - - -

| DATE.........BALANCE | | DATE.........BALANCE | | DATE.........BALANCE | |
|---|---|---|---|---|---|
| 10/03 | 1,252,922.87 | 10/14 | 167,922.87 | 10/20 | 2,922.87 |
| 10/06 | 452,922.87 | 10/15 | 117,922.87 | 10/27 | 2,022.87 |
| 10/08 | 352,922.87 | 10/16 | 80,922.87 | | |
| 10/09 | 217,922.87 | 10/17 | 60,922.87 | | |






\#        10/03/14              $30,000.00




\#        10/03/14              $70,000.00




\#        10/03/14              $400,000.00



\#        10/03/14              $500,000.00




# 10/06/14     $800,000.00




# 10/08/14     $20,000.00




# 10/08/14     $80,000.00



# 10/09/14     $135,000.00





#       10/14/14        $50,000.00




#       10/15/14        $50,000.00



#       10/17/14        $20,000.00




#       10/20/14        $58,000.00

8

#9999        10/27/14                $6,000.00

 **MEGA BANK**
www.megabankusa.com

HK Grace Building LLC
C/O Mega Bank
1370 S Fullerton Road #101
Rowland Heights CA  91748

CUSTOMER:         4962

AS OF:    10/03/14

PAGE  1

```
*****************************************
* T R A N S A C T I O N   R E C E I P T *
*****************************************
```

TYPE: BUSINESS CHECKING

ACCOUNT NUMBER:              22001622

CURRENT BALANCE:         1,252,922.87

DATE OF TRANSACTION:         10/03/14

TRANSACTION AMOUNT:      2,250,000.00

TRANSACTION TYPE:       WIRE TRANSFER

Incoming wire Ref #0189 ORG: First American Title Company

Your account has been credited for Incoming Wire.
Thank you for Banking with us

 **FDIC**

350   EQUAL OPPORTUNITY LENDER

ID

## FedPayments Manager℠ -- Funds

| | | |
|---|---|---|
| Delivered to FPM: | 10/03/2014 08:00:08 | Test/Prod:      Prod |
| IMAD: | 20141003 L1B78J1C 000026 10030800 | |
| OMAD: | 20141003 QMGPNP73 000189 10030800 | |

**BASIC INFORMATION**

| | |
|---|---|
| Sender ABA (3100): | 122241255 |
| Receiver ABA (3400): | 122244870 |
| Amount (2000): | 2,250,000.00 |
| Type/Subtype Code (1510): | 1000 - Transfer of Funds |
| Business Function (3600): | CTR - Customer Transfer |
| Sender Reference (3320): | 20142750845000 |

ORIGINATOR INFORMATION
Originator (5000)

| | |
|---|---|
| ID Code: | D - DDA Account Number |
| Identifier: | |
| Name: | FIRST AMERICAN TITLE COMPANY - NCS |
| Address: | ATTN NCS CORP ACCOUNTING |
| | 215 SOUTH STATE STREET, SUITE 300 |
| | SALT LAKE CITY UT 84111 |

Originator to Beneficiary  Information (6000)

| | |
|---|---|
| Text: | EXTENSION PAYMENT |
| | 166 GEARY STREET |

BENEFICIARY INFORMATION
Beneficiary (4200)

| | |
|---|---|
| ID Code: | D - DDA Account Number |
| Identifier: | |
| Name: | HK GRACE BUILDING LLC |

FI TO FI INFORMATION
FI to FI Information (6500)

| | |
|---|---|
| Text: | BEGIN, 19993,1688,529,6514896,688605 |
| | ,END |

OFAC checked

O.K.

MJ
10/3/14

351

11

HK Grace Building LLC
C/O Mega Bank                                           30
1370 S Fullerton Road #101                              0
Rowland Heights CA  91748                               5

Rowland Heights                              TELEPHONE: 626-839-6060
1370 S. Fullerton Road #101
Rowland Heights, CA 91748

Effective January 1, 2013, all deposits accounts are FDIC insured up to
$250,000 per depositor.

BUSINESS CHECKING ACCOUNT 22001622

|  |  | LAST STATEMENT 10/31/14 | 2,022.87 |
|---|---|---|---|
| MINIMUM BALANCE | 2,022.87 | 1 CREDITS | 26,191,905.68 |
| AVERAGE BALANCE | 762,121.01 | 6 DEBITS | 26,190,010.00 |
|  |  | THIS STATEMENT 11/28/14 | 3,918.55 |

- - - - - - - OTHER CREDITS - - - - - - - - -
DESCRIPTION                                       DATE        AMOUNT
Incoming wire Ref#2855 ORG: First American Title Company   11/17  26,191,905.68

- - - - - - - - - CHECKS - - - - - - - - - -
CHECK #..DATE......AMOUNT   CHECK #,.DATE......AMOUNT  CHECK #..DATE......AMOUNT
    *11/17 10,000,000.00      *11/18 8,500,000.00         11/21 1,190,000.00
    *11/18 5,000,000.00       *11/19 1,500,000.00 ↖

(*) INDICATES A GAP IN CHECK NUMBER SEQUENCE          wired to Lucy's personal.

- - - - - - - - - OTHER DEBITS - - - - - - - - -
DESCRIPTION                                       DATE        AMOUNT
Incoming wire fee Ref#2855                         11/17        10.00
              * * * C O N T I N U E D * * *

HK Grace Building LLC

BUSINESS CHECKING ACCOUNT 22001622

- - - ITEMIZATION OF OVERDRAFT AND RETURNED ITEM FEES - - -

```
*********************************************************************
*                              |     TOTAL FOR   |      TOTAL      *
*                              |    THIS PERIOD  |   YEAR TO DATE  *
*------------------------------------------------------------------*
* TOTAL OVERDRAFT FEES:        |      $.00       |       $.00      *
*------------------------------------------------------------------*
* TOTAL RETURNED ITEM FEES:    |      $.00       |       $.00      *
*********************************************************************
```

```
        - - - - - - - - DAILY BALANCE  - - - - - - - -
DATE..........BALANCE      DATE..........BALANCE      DATE..........BALANCE
11/17   16,193,918.55      11/19    1,193,918.55
11/18    2,693,918.55      11/21        3,918.55
```

- END OF STATEMENT -



**Name** HK Grace Brilly

**Account No** 22001622

11/18/14 Date

90-4487/1222
02

Pay to the Order of Lucey Gao

$ 8,500,000 50/100

Eight Million and five Hundred Dollars

**MEGA BANK**
1370 S Fullerton Rd Ste 101
Rowland Heights, CA 91748

For _____

⑆122244870⑆ 220016 2 2⑈ 045 0850000000 ⑈

---

MEGA Bank
>122244870<
2014-11-18
0800886309

33702



MEGA Bank
>122244870<
2014-11-18
0800886305

33702

Name  ItK Grace

Account No  >>60163>

Date  11/17/14

SO-4487/1222
02

Pay to the
Order of  Liberty Asset                          $ 10,000,000.00

Ten Million                                      Dollars

**MEGA BANK**
1370 S Fullerton Rd , Ste 101
Rowland Heights, CA 91748

For _____

⑈122244870⑈    2200 16 2 2⑆    04 ⑆ 10000000000⑈



MEGA Bank
>122244870<
2014-11-17
0800885203

33702



Name  HK Grace Building

Account No  2200 1622

11/18/14
Date

BO-4487/1222
02

Pay to the
Order of  Liberty Asset Manager Corp  $ 1,500,000 ⁵⁰⁄₁₀₀

One Million and five Hundred Thousand  Dollars

**M MEGA BANK**
1370 E. Fullerton Rd Ste 101
Rowland Heights, CA 91748

For

⑈ 1222 44870 ⑈       2200 1622 ⑈       045 ⑈ 01500000000 ⑈

---

MEGA Bank
>122244870<
2014-11-19
0800887903

33702

CREDITED TO THE ACCOUNT
OF THE WITHIN NAMED PAYEE(S)
ABSENCE OF ENDORSEMENT
GUARANTEED BY
MEGA BANK

17



**Name** H.K Grace Building L.L.C

**Account No** 2200/622

11/20/14

Date

90-4487/1222
02

Pay to the
Order of  Liberty Asset Managment Co  $1,190,000.00

One million One Hundred nirey nirne  **Dollars**

**M** **MEGA BANK**
1370 S Fullerton Rd , Ste 101
Rowland Heights, CA 91748

For_____

⑆122244870⑆  2200 16 2 2⑈  045"0 1 1 9000000,"

---

MEGA Bank
>122244870<
2014-11-21
0800892905

33702

Liberty Asset management
2200/14 v

## FedPayments Manager ℠ -- Funds

| | | | |
|---|---|---|---|
| Delivered to FPM: | 11/17/2014 17:10:04 | Test/Prod: | Prod |
| IMAD: | 20141117 L1B78J1C 003168 11171710 | | |
| OMAD: | 20141117 QMGFNP72 002855 11171710 | | |

**BASIC INFORMATION**

| | |
|---|---|
| Sender ABA {3100}: | 122241255 |
| Receiver ABA {3400}: | 122244870 |
| Amount {2000}: | 26,191,905.68 |
| Type/Subtype Code {1510}: | 1000 - Transfer of Funds |
| Business Function {3600}: | CTR - Customer Transfer |
| Sender Reference {3320}: | 20143210990100 |

**ORIGINATOR INFORMATION**

Originator {5000}
    ID Code:                     D - DDA Account Number
    Identifier:
    Name:                      FIRST AMERICAN TITLE COMPANY - NCS
    Address:               ATTN  NCS CORP ACCOUNTING
                            215 SOUTH STATE STREET, SUITE 380
                            SALT LAKE CITY UT 84111

Originator to Beneficiary  Information {6000}
    Text:                      SALE PROCEED
                              REF. 166 GEARY ST. SAN FRANCISCO

**BENEFICIARY INFORMATION**

Beneficiary {4200}
    ID Code:                     D - DDA Account Number
    Identifier:
    Name:                      HK GRACE BUILDING LLC

**FI TO FI INFORMATION**

FI to FI Information {6500}
    Text:                      BEGIN,20407,1568,529,6630145,688605
                              ,END

*OFAC checked*

*O.K.*

*MB*
*11/17/14*

# EXHIBIT S

**BUSINESS CHECKING**
**Account Agreement**

Account#22001069
Date: _____ 01/25/2012

| Institution Name & Address | Internal Use |
|---|---|

MEGA BANK

1370 S. Fullerton Road #101

Rowland Heights, CA 91748    Referred By Candace Chu

**SUPERSEDES PREVIOUS CARD**

DATED 02/09/2012 Add DBA

**Account Title & Address**

Diamond Point Real Estate Corporation

DBA Skyline Escrow Services

**CLOSED**

3218 E Holt Ave Suite 200

West Covina, CA 91791    10/10/2013

**IPORTANT ACCOUNT OPENING INFORMATION:** Federal law requires to obtain sufficient information to verify your identity. You may be iked several questions and to provide one or more forms of ntification to fulfill this requirement. In some instances we may use ts.de sources to confirm the information. The information you provide protected by our privacy policy and federal law.

ter **Non-Individual Owner Information** on page 2. There is additional wner/Signer Information space on page 2.

**Ownership of Account**

The specified ownership will remain the same for all accounts.

☐ Individual    ☒ Corporation - For Profit

☐ Joint Account    ☐ Corporation - Nonprofit

☐ Joint - Husband and Wife (With right of survivorship)    ☐ Partnership
    ☐ Sole Proprietorship

☐ Community Property (Husband and Wife)    ☐ Limited Liability Company

☐ Tenancy in Common

☐ Trust-Separate Agreement Dated: _____

☐

**Owner/Signer Information 1**

| | |
|---|---|
| ame | Lucy Gao Seh |
| elationship | CEO |
| ddress | 1001 East Road, La Habra Hts CA 90631 |
| ailng Address (different) | 3218 E Holt Ave Suite 200, West Covina CA 91791 |
| ome Phone | 562-697-6863 |
| ork Phone | 626-214-2142 |
| obile Phone | * * * |
| Mail | * * * |
| rth Date | 03/04/1961 |
| SN/TIN | |
| ov't Issued Photo ID Type, Number, State, sue Date Exp Date) | 1 STATE DRIVERS 2/18/2010    3/4/2015 |
| ther IO escription, Details) | CBI: China MMN Wang |
| nployer | Diamond Point Real Estate Corporation |
| evious anciel Inst | * * * |

**Beneficiary Designation**

(Check appropriate ownership above.)

☐ Totten Trust    ☐ Pay-on-Death (P.O.D.)

☐ _____

**Beneficiary Name(s), Address(es), and SSN(s)**

(Check appropriate beneficiary designation above.)

☐ If checked, this is a temporary account agreement.

Number of signatures required for withdrawal: 1 (one) _____.

**Signature(s)**

The undersigned authorize the financial institution to investigate credit and employment history and obtain reports from consumer reporting agency(ies) on them as individuals. Except as otherwise provided by law or other documents, each of the undersigned is authorized to make withdrawals from the account(s), provided the required number of signatures indicated above is satisfied. The undersigned personally and as, or on behalf of, the account owner(s) agree to the terms of, and acknowledge receipt of copy(ies) of, this document and the following:

☒ Terms and Conditions    ☒ Privacy

☒ Electronic Fund Transfers    ☒ Truth in Savings

☒ Substitute Checks    ☒ Funds Availability

☐ Common Features    ☐ _____

**Owner/Signer Information 2**

| | |
|---|---|
| me | Benny James Kirk |
| lationship | Authorized Signer |
| ldress | 385 Lemon Ave E-104, Walnut CA 91789 |
| ailng Address different) | 3218 E Holt Ave Suite 200, West Covina, CA 91791 |
| me Phone | 626-506-4548 |
| ork Phone | 626-214-2142 |
| obile Phone | * * * |
| Mail | * * * |
| rth Date | 09/10/1958 |
| N/TIN | |
| v't Issued Photo ID ype, Number, State, ue Date, Exp. Date) | 1 STATE DRIVERS 12/5/2008    9/10/2013 |
| her ID escription, Details) | CBI: Taiwan MMN: Lee |
| ployer | Diamond Point Real Estate Corporation |
| vious ancial Inst | * * * |

☐ Authorized Signer (See Owner/Signer Information for Authorized Signer designation(s).)

X _____ (F)
Lucy Gao Seh

X _____ (M)
Benny James Kirk

X *********    4 X *************

ature Card-CA
ers Systems™
ers Kluwar Financial Services ©2003, 2006

MP-LAZ-CA 5/2/2007
Page 1 of 2
Initials: _____

# Authorizion Agreement

I ( Lucy Gao Seh)                    Authorized Benny

James Kirk                    to be Authorized signer For

Diamond Point Real Estate Corporation.

Account#22001069

Lucy Gao Seh                    01/25/2012

Diamond Point Real Estate Corporation

Diamond Point Real Estate Corp
DBA Skyline Escrow Services                        30
136 N Grand Ave Ste 187                             3
West Covina CA  91791                               4


===============================================================================
Rowland Heights                              TELEPHONE: 626-839-6060
1370 S. Fullerton Road #101
Rowland Heights, CA 91748
===============================================================================
   Effective January 1, 2013, all deposits accounts are FDIC insured up to
   $250,000 per depositor.

===============================================================================
                         BUSINESS CHECKING ACCOUNT 22001069
===============================================================================

                                     LAST STATEMENT 12/31/12     2,379.48
MINIMUM BALANCE                 2,379.48     5 CREDITS          37,846.10
AVERAGE BALANCE                 2,650.18     8 DEBITS           37,095.56
                                     THIS STATEMENT 01/31/13     3,130.02

          - - - - - - - - - DEPOSITS - - - - - - - - - -
REF #.....DATE......AMOUNT REF #.....DATE......AMOUNT REF #.....DATE......AMOUNT
     01/08   11,000.00      01/24   23,000.00      01/29    3,500.00

          - - - - - - - - OTHER CREDITS - - - - - - - - -
DESCRIPTION                                          DATE      AMOUNT
Incoming Wire B/O First American Title Insurance Co.   01/07     144.08
Incoming Wire B/O First American Title Insurance Co.   01/07     202.02

          - - - - - - - - - - CHECKS - - - - - - - - - - -
CHECK #..DATE......AMOUNT  CHECK #..DATE......AMOUNT  CHECK #..DATE......AMOUNT
   5174 01/08    3,765.01     5176*01/30      85.30
   5175 01/08    7,277.62     5178 01/29   2,902.83

(*) INDICATES A GAP IN CHECK NUMBER SEQUENCE

          - - - - - - - - - OTHER DEBITS - - - - - - - - -
DESCRIPTION                                          DATE      AMOUNT
Incoming Wire Fee Charge Ref#010713-002886           01/07      10.00
Incoming Wire Fee Charge Ref#010713-002882           01/07      10.00
Outgoing Wire Fee Charge Ref#012413-08               01/24      25.00
                    * * * C O N T I N U E D * * *

# BUSINESS CHECKING
## Account Agreement

Account #22000814

Date: 05/24/2011

## Institution Name & Address

MEGA BANK
1370 S. Fullerton Road #101
Rowland Heights, CA 91748          Referred by Candace Chu

**IMPORTANT ACCOUNT OPENING INFORMATION:** Federal law requires us to obtain sufficient information to verify your identity. You may be asked several questions and to provide one or more forms of identification to fulfill this requirement. In some instances we may use outside sources to confirm the information. The information you provide is protected by our privacy policy and federal law.
Enter Non-Individual Owner Information on page 2. There is additional Owner/Signer Information space on page 2.

### Owner/Signer Information 1

| | |
|---|---|
| Name | Sonia Ming Jiu Chiou |
| Relationship | President |
| Address | 480 San Antonio Rd #210, Mountain View, CA 94040 |
| Mailing Address (if different) | 3218 E Holt Ave., Suite 200, West Covina, CA 91790 |
| Home Phone | (626) 484-1177 |
| Work Phone | (626) 214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Birth Date | 08/01/1954 |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | 1 STATE DRIVERS  7/17/2008    8/1/2013 |
| Other ID (Description, Details) | CBI: Taiwan MMN: Lee |
| Employer | New Life Real Estate Corp. CEO, Secretary |
| Previous Financial Inst. | * * * |

### Owner/Signer Information 2

| | |
|---|---|
| Name | Benny James Kirk |
| Relationship | Authorized Signer |
| Address | 385 Lemon Ave E-104, Walnut, CA 91789 |
| Mailing Address (if different) | 3218 E Holt Ave., Suite 200, West Covina, CA 91790 |
| Home Phone | (626) 506-4648 |
| Work Phone | (626) 214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Birth Date | 09/10/1958 |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | 1 STATE DRIVERS  12/5/2008    9/10/2013 |
| Other ID (Description, Details) | CBI: Taiwan MMN: Lee |
| Employer | New Life Real Estate Corp. Authorized Signer |
| Previous Financial Inst. | * * * |

## Internal Use
### Account Title & Address

New Life Real Estate Corporation
DBA Shoreline Escrow services

3218 E Holt Ave., Suite 200
West Covina, CA 91790

**CLOSED**
04/02/2012

### Ownership of Account

The specified ownership will remain the same for all accounts.

- [ ] Individual
- [ ] Joint Account
- [ ] Joint - Husband and Wife (With right of survivorship)
- [ ] Community Property (Husband and Wife)
- [x] Corporation - For Profit
- [ ] Corporation - Nonprofit
- [ ] Partnership
- [ ] Sole Proprietorship
- [ ] Limited Liability Company
- [ ] Tenancy in Common
- [ ] Trust-Separate Agreement Dated: _____
- [ ] _____

### Beneficiary Designation
(Check appropriate ownership above.)

- [ ] Totten Trust
- [ ] Pay-on-Death (P.O.D.)
- [ ] _____

### Beneficiary Name(s), Address(es), and SSN(s)
(Check appropriate beneficiary designation above.)

- [ ] If checked, this is a temporary account agreement.

Number of signatures required for withdrawal:  1 (one)  .

### Signature(s)

The undersigned authorize the financial institution to investigate credit and employment history and obtain reports from consumer reporting agency(ies) on them as individuals. Except as otherwise provided by law or other documents, each of the undersigned is authorized to make withdrawals from the account(s), provided the required number of signatures indicated above is satisfied. The undersigned personally and as, or on behalf of, the account owner(s) agree to the terms of, and acknowledge receipt of copy(ies) of, this document and the following:

- [x] Terms and Conditions
- [x] Electronic Fund Transfers
- [x] Substitute Checks
- [ ] Common Features
- [x] Privacy
- [x] Truth in Savings
- [x] Funds Availability
- [ ] _____

- [ ] Authorized Signer (See Owner/Signer Information for Authorized Signer designation(s).)

X _____
Sonia Ming Jiu Chiou    (F)

X _____
Benny James Kirk    (M)

X _____
Lucy Gao Seh    (F)

4 [ X******************* ]

Signature Card-CA
Bankers Systems ™
Wolters Kluwer Financial Services ©2003, 2006

MPMP-LAZ-CA  5/2/2007
Page 1 of 2

Initials: _____

364

| Owner/Signer Information 3 | |
|---|---|
| Name | Lucy Gao Seh |
| Relationship | Authorized Signer |
| Address | 1001 East Road, La Habra hts, CA 90631 |
| Mailing Address (if different) | 3218 E Holt Ave., Suite 200, West Covina, CA 91790 |
| Home Phone | (562) 697-8863 |
| Work Phone | (626) 214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Birth Date | 03/04/1961 |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | 1 STATE DRIVERS 2/18/2010          3/4/2015 |
| Other ID (Description, Details) | CBI: China  MMN: Wang |
| Employer | New Life Real Estate Corp.  Authorized Signer |
| Previous Financial Inst. | * * * |

| Owner/Signer Information 4 | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

## Backup Withholding Certifications

*(If not a "U.S. Person," certify foreign status separately.)*

TIN: 27-3653007

[X] **Taxpayer I.D. Number (TIN)** - The number shown above is my correct taxpayer identification number.

[X] **Backup Withholding** - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

[ ] **Exempt Recipients** - I am an exempt recipient under the Internal Revenue Service Regulations.

I certify under penalties of perjury the statements checked in this section and that I am a U.S. person (including a U.S. resident alien).

X _____  (Date)

New Life RealEstate Corporation - Sonia Ming-Ju Chiou

| Non-Individual Owner Information | |
|---|---|
| Name | New Life Real Estate Corporation |
| EIN | DBA Shoreline Escrow Services  27-3653007 |
| Phone | (626) 214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Type of Entity | ARTICLES OF INC   C3269822 |
| State/Country & Date of Organization | CA 01/05/2010 |
| Nature of Business | Real Estate Escrow Services |
| Address | 554 San Antonio Road Suite 203, Mountain View, CA 94040 |
| Mailing Address (if different) | 3218 E Holt Ave., Suite 200, West Covina, Ca 91790 |
| Authorization/ Resolution Date | 05/24/2011 |
| Previous Financial Inst. | * * * |

| Account Description | Account # | Initial Deposit/Source |
|---|---|---|
| BUSINESS CHECKING | 22000814 | $2,000.00 [ ] Cash [X] Check [ ] _____ |
| | | $ _____ [ ] Cash [ ] Check [ ] _____ |
| | | $ _____ [ ] Cash [ ] Check [ ] _____ |

## Services Requested

[ ] ATM     [ ] Debit/Check Cards (No. Requested: _____ )
[ ] _____   [ ] _____
[ ] _____   [ ] _____

## Other Terms/Information

Signature Card-CA
Bankers Systems TM
Wolters Kluwer Financial Services ©2003, 2006

OFAC _____

MPMP-LAZ-CA  6/2/2007
Page 2 of 2
Initials _____

Reviewed By _____

365

 **MEGA BANK**

# NEW ACCOUNT INFORMATION
## BUSINESS ACCOUNT

### IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

**GENERAL INFORMATION:**

| Account Number: 022000814 | Port#: 2860 | Tax ID Number: 27-3653007 | Date Opened: 05/24/2011 |
|---|---|---|---|

| Business Type: | ☐ Sole Ownership  ☒ Corporation  ☐ LLP  ☐ Other _____ | ☐ Partnership  ☐ LLC  ☐ Non-Profit Org | Account Type: | Checking  ☒ Unanalyzed ☐ Analysis  ☐ NOW  ☐ MMKT  ☐ Savings ☐ CD: Term _____  ☐ Other _____ |
|---|---|---|---|---|

**Please check all that apply and specify type of business:**

☒ Domestic: _Real Estate_ ☐ Foreign: _____ (Name the Country): _____

Foreign Registration ID: _____

☐ Retail: _____ ☐ Wholesale: _____ ☐ Manufacturing: _____

☐ Service Provider: _____ ☐ Import Export: _____ (Name the Country): _____

☐ Money Services Business: Registered with FinCEN? ☐ No ☐ Yes (Please provide FinCEN Registration Confirmation)

Licensed with the State, If applicable? ☐ No ☐ Yes (Please provide Licensing Confirmation)

☒ Other _Real Estate/Shoreline Escrow Services  EIN#27-3653007  Articles C3269822 01/05/2010_

**(TO BE COMPLETED BY CUSTOMER)**

| Business Name | New Life Real Estate Corporation DBA Shoreline Escrow Services |
|---|---|
| Business Address | 554 San Antonio Road Suite 203 |
| City/Zip | Mountain View CA 94040 |
| Mailing Address | 3218 E Holt Ave, Suite 200, West Covina, CA 91790 |
| Telephone # | 626-214-2154   Fax#: *** |

| Name of Authorized Signers | 1 Sonia Ming-Jiu Chiou | 2 Benny James Kirk | 3 Lucy Gao Seh |
|---|---|---|---|
| Title | 1 President | 2 Authorized Signer | 3 Authorized Signer |
| Home Address | 1 480 San Antonio Rd#210 | 2 385 Lemon Ave E-104 | 3 1001 East Road |
| City/Zip | Mountain View CA 94040 | Walnut CA 91789 | La Habra hts CA 9063 |
| Home Phone # | 626-484-1177 | 626-506-4648 | 562-697-6863 |
| Social Security # | | | |
| Type of ID & No. (D/L, Passport, Alien #) | | | |
| ID - Place of Issuance | CALIFORNIA | CALIFORNIA | CALIFORNIA |
| ID - Date of Issuance | 07/17/2008 | 12/05/2008 | 02/18/2010 |
| Expiration Date of ID | 08/01/2013 | 09/10/2013 | 03/04/2015 |
| Mother's Maiden Name | Lee | Lee | Wang |
| Date of Birth | 08/01/1964 | 09/10/1958 | 03/04/1961 |
| Place of Birth | Taiwan | Taiwan | China |

NA 423 (01/08)

Port#2860 **BUSINESS CHECKING Account Agreement** B Ck# 22000194 Date: 11/22/2010

CLOSED 12/06/2011 See Attached.

### Institution Name & Address

MEGA BANK
1370 S. Fullerton Road #101
Rowland Heights, CA 91748  Referred By Candace Chu

**Internal Use** — Acct. Reopen 09/15/2011

### Account Title & Address

New Life Real
Estate Corporation
DBA Vista Escrow Service
3218 E Holt Ave Suite 200
West Covina CA 91790

CLOSED 9/13/2011 See ATTACH

**IMPORTANT ACCOUNT OPENING INFORMATION:** Federal law requires us to obtain sufficient information to verify your identity. You may be asked several questions and to provide one or more forms of identification to fulfill this requirement. In some instances we may use outside sources to confirm the information. The information you provide is protected by our privacy policy and federal law.

Enter Non-Individual Owner Information on page 2. There is additional Owner/Signer Information space on page 2.

### Ownership of Account

The specified ownership will remain the same for all accounts.

☐ Individual
☐ Joint Account
☐ Joint - Husband and Wife (With right of survivorship)
☐ Community Property (Husband and Wife)
☒ Corporation - For Profit
☐ Corporation - Nonprofit
☐ Partnership
☐ Sole Proprietorship
☐ Limited Liability Company

☐ Tenancy in Common
☐ Trust-Separate Agreement Dated:
☐

### Owner/Signer Information 1

| | |
|---|---|
| Name | Sonia Ming Jiu Chiou |
| Relationship | CEO, Secretary |
| Address | 480 San Anotonio Road Suite 210, Mountain View, CA 94040 |
| Mailing Address (if different) | 3218 E Holt Ave Suite 200, West Covina, CA 91790 |
| Home Phone | (626) 484-1177 |
| Work Phone | 626-214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Birth Date | 08/01/1964 |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | 1 STATE DRIVERS  7/17/2008     8/1/2013 |
| Other ID (Description, Details) | CBI: Taiwan  MMN: Lee |
| Employer | New Life Real Estate Corp. CEO, Secretary |
| Previous Financial Inst. | * * * |

### Beneficiary Designation

(Check appropriate ownership above.)
☐ Totten Trust       ☐ Pay-on-Death (P.O.D.)
☐

### Beneficiary Name(s), Address(es), and SSN(s)

(Check appropriate beneficiary designation above.)

### Owner/Signer Information 2

| | |
|---|---|
| Name | Benny James Kirk |
| Relationship | Authorized Signer |
| Address | 385 Lemon Ave E-104, Walnut CA 91789 |
| Mailing Address (if different) | 3218 E Holt Ave Suite 200, West Covina, CA 91790 |
| Home Phone | (626) 506-4648 |
| Work Phone | 626-214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Birth Date | 09/10/1958 |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | 1 STATE DRIVERS  12/5/2008     9/10/2013 |
| Other ID (Description, Details) | CBI: Taiwan  MMN: Lee |
| Employer | New Life Real Estate Corp. Authorized Signer |
| Previous Financial Inst. | * * * |

☐ If checked, this is a temporary account agreement.
Number of signatures required for withdrawal: 1 (one)

### Signature(s)

The undersigned authorize the financial institution to investigate credit and employment history and obtain reports from consumer reporting agency(ies) on them as individuals. Except as otherwise provided by law or other documents, each of the undersigned is authorized to make withdrawals from the account(s), provided the required number of signatures indicated above is satisfied. The undersigned personally and as, or on behalf of, the account owner(s) agree to the terms of, and acknowledge receipt of copy(ies) of, this document and the following:

☒ Terms and Conditions      ☒ Privacy
☒ Electronic Fund Transfers   ☒ Truth in Savings
☒ Substitute Checks          ☒ Funds Availability
☐ Common Features            ☐ _____

☐ Authorized Signer (See Owner/Signer Information for Authorized Signer designation(s).)

[ X _(signature)_ ]
Sonia Ming Jiu Chiou

[ X _(signature)_ ]
Benny James Kirk

[ X _(signature)_ ]  4[ ******************** ]
Lucy Gao

Signature Card-CA
Bankers Systems ™
Wolters Kluwer Financial Services ©2003, 2006

MPMP LAZ-CA, 5/2/2007
Page 1 of 2

Intias

## Owner/Signer Information 3

| Field | Value |
|---|---|
| Name | Lucy Gao Seh |
| Relationship | Authorized Signer |
| Address | 1001 East Road, La Habra Hts, CA 90631 |
| Mailing Address (if different) | 3218 E Holt Ave Suite 200, West Covina, CA 91790 |
| Home Phone | (562) 697-6863 |
| Work Phone | 626-214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Birth Date | 03/04/1961 |
| SSN/TIN | |
| Gov't Issued Photo ID Type, Number, State, Issue Date, Exp Date) | 1 STATE DRIVERS  2/18/2010  3/4/2015 |
| Other ID Description, Details) | CBI: Taiwan  MMN: Lee |
| Employer | New Life Real Estate Corp.  Authorized Signer |
| Previous Financial Inst. | * * * |

## Owner/Signer Information 4

| Field | Value |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID Type, Number, State, Issue Date, Exp. Date) | |
| Other ID Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

## Backup Withholding Certifications

f not a "U.S. Person," certify foreign status separately.)

TIN: 27-3653007

} **Taxpayer I.D. Number (TIN)** - The number shown above is my correct taxpayer identification number.

} **Backup Withholding** - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, · the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

} **Exempt Recipients** - I am an exempt recipient under the Internal Revenue Service Regulations.

certify under penalties of perjury the statements checked in his section and that I am a U.S. person (including a U.S. resident alien).

_signature_   11/22/10 (Date)

New Life Real Estate Corporation-Sonia M. J. Chiou

ature Card-CA
kers Systems™
lers Kluwer Financial Services ©2003, 2008

## Non-Individual Owner Information

| Field | Value |
|---|---|
| Name | New Life Real Estate Corporation |
| EIN | 27-3653007    DBA Vista Escrow Services |
| Phone | 626-214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Type of Entity | ARTICLES OF INC   C3269822 |
| State/Country & Date of Organization | CA  01/05/2010 |
| Nature of Business | Real Estate/Vista Escrow Services |
| Address | 554 San Anotonio Road Suite 203, Mountain View, CA 94040 |
| Mailing Address (if different) | 3218 E Holt Ave Suite 200, West Covina CA 91790 |
| Authorization/ Resolution Date | 11/22/2010 |
| Previous Financial Inst. | |

| Account Description | Account # | Initial Deposit/Source |
|---|---|---|
| BUSINESS CHECKING | 22000194 | $3,000.00*  ☐ Cash  ☒ Check  ☐ |
| | | $ _____  ☐ Cash  ☐ Check  ☐ |
| | | $ _____  ☐ Cash  ☐ Check  ☐ |

## Services Requested

☐ ATM   ☐ Debit/Check Cards (No. Requested: _____ )
☐ _____   ☐ _____
☐ _____   ☐ _____

## Other Terms/Information

Reviewed By _____   OFAC _____

 **MEGA BANK**

# NEW ACCOUNT INFORMATION
# BUSINESS ACCOUNT

 CLOSED

## IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

Account Reopen 09/15/2011 Approve By Wilson Ngai

### GENERAL INFORMATION:

| Account Number: 022000194 | Port#: 2860 | Tax ID Number: 27-3653007 | Date Opened: 11/22/2010 |
|---|---|---|---|

| Business Type: | ☐ Sole Ownership ☐ Partnership<br>☒ Corporation ☐ LLC<br>☐ LLP ☐ Non-Profit Org<br>☐ Other _____ | Account Type: | Checking ☒ Unanalyzed ☐ Analysis<br>☐ NOW ☐ MMKT<br>☐ Savings ☐ CD: Term _____<br>☐ Other _____ |
|---|---|---|---|

**Please check all that apply and specify type of business:**

☒ Domestic: Real Estate ☐ Foreign: _____ (Name the Country): _____

Foreign Registration ID: _____

☐ Retail: _____ ☐ Wholesale: _____ ☐ Manufacturing: _____

☐ Service Provider: _____ ☐ Import Export: _____ (Name the Country): _____

☐ Money Services Business: Registered with FinCEN? ☐ No ☐ Yes (Please provide FinCEN Registration Confirmation)

Licensed with the State, If applicable? ☐ No ☐ Yes (Please provide Licensing Confirmation)

☒ Other Real Estate/ Vista Escrow Services EIN#27-3653007 Articles C3269822 01/05/2010

### (TO BE COMPLETED BY CUSTOMER)

| Business Name | New Life Real Estate Corporation DBA Vista Escrow Services | | |
|---|---|---|---|
| Business Address | 554 San Antonio Road Suite 203 | | |
| City/Zip | Mountain View CA 94040 | | |
| Mailing Address | 3218 E Holt Ave, Suite 200, West Covina, CA 91790 | | |
| Telephone # | 626-214-2142 Fax#: 626-214-2153 | | |
| Name of Authorized Signers | **1** Sonia Ming-Jiu Chiou | **2** Benny James Kirk | **3** Lucy Gao Seh |
| Title | 1 CEO, Secretary | 2 Authorized Signer | 3 Authorized Signer |
| Home Address | **1** | **2** 480 San Antonio Rd #210 385 Lemon Ave E-104 | **3** 1001 East Road |
| City/Zip | Mountain View CA 94040 | Walnut CA 91789 | La Habra Hts CA 90631 |
| Home Phone # | 626-484-1177 | 626-506-4648 | 562-697-6863 |
| Social Security # | | | |
| Type of ID & No. (D/L, Passport, Alien #) | | | |
| ID – Place of Issuance | CALIFORNIA | CALIFORNIA | CALIFORNIA |
| ID – Date of Issuance | 07/17/2008 | 12/05/2008 | 02/18/2010 |
| Expiration Date of ID | 08/01/2013 | 09/10/2013 | 03/04/2015 |
| Mother's Maiden Name | Lee | Lee | Wang |
| Date of Birth | 08/01/1964 | 09/10/1958 | 03/04/1961 |
| Place of Birth | Taiwan | Taiwan | China |

NA 423 (01/08)



# MEGA BANK

# NEW ACCOUNT INFORMATION
# BUSINESS ACCOUNT

## IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

03/17/2010 up date CIP

### GENERAL INFORMATION:

| Account Number: 022000533 | Port#: 1872   P.2 | Tax ID Number: 26-4785302 | Date Opened: 06/02/2009 |
|---|---|---|---|

| Business Type: | ☐ Sole Ownership ☐ Partnership<br>☒ Corporation ☐ LLC<br>☐ LLP ☐ Non-Profit Org<br>☐ Other _____ | Account Type: | Checking ☒ Unanalyzed ☐ Analysis<br>☐ NOW ☐ MMKT<br>☐ Savings ☐ CD: Term _____<br>☐ Other _____ |
|---|---|---|---|

**Please check all that apply and specify type of business:**

☒ Domestic: _Escrow Service_ ☐ Foreign: _____ (Name the Country): _____

Foreign Registration ID: _____

☐ Retail: _____   ☐ Wholesale: _____   ☐ Manufacturing: _____

☐ Service Provider: _____   ☐ Import Export: _____   (Name the Country): _____

☐ Money Services Business: Registered with FinCEN? ☐ No ☐ Yes (Please provide FinCEN Registration Confirmation)

Licensed with the State, If applicable? ☐ No ☐ Yes (Please provide Licensing Confirmation)

☒ Other _Escrow Service_ Corporation  EIN#26-4785302  Articles #3196796 04/24/2009

| (TO BE COMPLETED BY CUSTOMER) Add Authorized Signer (03/17/2010) | | | |
|---|---|---|---|
| **Business Name** | American Heritage Escrow Services Corporation | | |
| **Business Address** | 3218 E. Holt Ave. Suite #221 | | |
| **City/Zip** | West Covina, CA 91791 | | |
| **Mailing Address** | 3218 E. Holt Ave. Suite #221  West Covina, CA 91791 | | |
| **Telephone #** | 626-214-2151 | **Fax#:** 626-214-9057 | |
| **Name of Authorized Signers** | 1<br>Anne Cho | 2<br>Lucy Gao Seh | 3 |
| **Title** | 1 President | 2 Authorized Signer | 3 |
| **Home Address** | 1<br>6026 Red Spur Court | 2<br>1001 East Rd | 3 |
| **City/Zip** | Fontana, CA 92336 | La Habra Hts. CA 90631 | |
| **Home Phone #** | 323-770-1688 | 562-697-6863 | |
| **Social Security #** | | | |
| **Type of ID & No. (D/L, Passport, Alien #)** | | | |
| **ID - Place of Issuance** | CALIFORNIA | CALFORNIA | |
| **ID - Date of Issuance** | 03/11/2010 | 02/18/2010 | |
| **Expiration Date of ID** | 05/09/2010 | 03/04/2015 | |
| **Mother's Maiden Name** | An | Wang | |
| **Date of Birth** | 01/02/1978 | 03/04/1961 | |
| **Place of Birth** | Louisiana | China | |

## Authorizion Agreement

I ( Anne Cho)                    Authorized Lucy Gao She

to be he Authorized Signer For American

Heritage Escrow Services Corporation (DDA Account

#22000533).

3/18/2010

Anno Cho                    Date

American Heritage Escrow Services Corporation

# BUSINESS CHECKING
## Account Agreement

Account#022000731

Date: 01/13/2011

## Institution Name & Address

MEGA BANK

1370 S Fullerton Road #101

Rowland Heights CA 91748   Referred By Candace Chu

**IMPORTANT ACCOUNT OPENING INFORMATION:** Federal law requires us to obtain sufficient information to verify your identity. You may be asked several questions and to provide one or more forms of identification to fulfill this requirement. In some instances we may use outside sources to confirm the information. The information you provide is protected by our privacy policy and federal law.

Enter **Non-Individual** Owner Information on page 2. There is additional Owner/Signer Information space on page 2.

## Internal Use
## Account Title & Address

Golden View Horizon LLC

DBA Horizon Escrow Services

3218 E Holt Ave Suite 200

West Covina CA 91791

CLOSED
12/29/11

## Ownership of Account

The specified ownership will remain the same for all accounts.

| | |
|---|---|
| ☐ Individual | ☐ Corporation - For Profit |
| ☐ Joint Account | ☐ Corporation - Nonprofit |
| ☐ Joint - Husband and Wife (With right of survivorship) | ☐ Partnership |
| | ☐ Sole Proprietorship |
| ☐ Community Property (Husband and Wife) | ☒ Limited Liability Company |
| ☐ Tenancy in Common | |
| ☐ Trust-Separate Agreement Dated: ____ | |
| ☐ | |

## Owner/Signer Information 1

| | |
|---|---|
| Name | Lucy Gao Seh |
| Relationship | SEG Member |
| Address | 1001 East Road, La Habra Hts, CA 90631 |
| Mailing Address (if different) | 3218 E Holt Ave Suite 200, West Covina CA 91791 |
| Home Phone | 562-697-6863 |
| Work Phone | 626-214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Birth Date | 03/04/1961 |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | 1 STATE DRIVERS 02/18/2010          03/04/2015 |
| Other ID (Description, Details) | CBI: China    MMN:  Wang |
| Employer | Golden View Horizon LLC |
| Previous Financial Inst. | * * * |

## Owner/Signer Information 2

| | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

## Beneficiary Designation

(Check appropriate ownership above.)

☐ Totten Trust          ☐ Pay-on-Death (P.O.D.)

☐ ____

## Beneficiary Name(s), Address(es), and SSN(s)

(Check appropriate beneficiary designation above.)

☐ If checked, this is a temporary account agreement.

Number of signatures required for withdrawal:  1 (one)        .

## Signature(s)

The undersigned authorize the financial institution to investigate credit and employment history and obtain reports from consumer reporting agency(ies) on them as individuals. Except as otherwise provided by law or other documents, each of the undersigned is authorized to make withdrawals from the account(s), provided the required number of signatures indicated above is satisfied. The undersigned personally and as, or on behalf of, the account owner(s) agree to the terms of, and acknowledge receipt of copy(ies) of, this document and the following:

| | |
|---|---|
| ☒ Terms and Conditions | ☒ Privacy |
| ☒ Electronic Fund Transfers | ☒ Truth in Savings |
| ☐ Substitute Checks | ☒ Funds Availability |
| ☐ Common Features | ☐ ____ |

☐ Authorized Signer (See Owner/Signer Information for Authorized Signer designation(s).)

[ X                                                      (F) ]
  Lucy Gao Seh

[ X ************************************** ]

[ X ************* ] 4[ X ********* ]

Signature Card-CA
Bankers Systems ™
Wolters Kluwer Financial Services ©2003, 2006

MPMP-LAZ-CA 5/2/2007
Page 1 of 2
Initials: ____

372

| Owner/Signer Information 3 | |
| --- | --- |
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

| Owner/Signer Information 4 | |
| --- | --- |
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

## Backup Withholding Certifications

*(If not a "U.S. Person," certify foreign status separately.)*

TIN: 68-0611823

☒ **Taxpayer I.D. Number (TIN)** - The number shown above is my correct taxpayer identification number.

☒ **Backup Withholding** - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

☐ **Exempt Recipients** - I am an exempt recipient under the Internal Revenue Service Regulations.

I certify under penalties of perjury the statements checked in this section and that I am a U.S. person (including a U.S. resident alien).

X _____ 1/13/11 (Date)

Golden View Horizon LLC DBA Horizon Escrow Services

Signature Card-CA
Bankers Systems TM
Wolters Kluwer Financial Services ©2003, 2006

| Non-Individual Owner Information | |
| --- | --- |
| Name | Golden View Horizon LLC DBA Horizon Escrow Service |
| EIN | 68-0611823 |
| Phone | 626-214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Type of Entity | LLC#200516810077 |
| State/Country & Date of Organization | CA 01/03/2011 |
| Nature of Business | Property Management |
| Address | 500 W Bonita Ave Suite 3, San Dimas CA 91773 |
| Mailing Address (if different) | 3218 E Holt Ave Suite 200, West Covina CA 91791 |
| Authorization/ Resolution Date | 01/13/2011 |
| Previous Financial Inst. | |

| Account Description | Account # | Initial Deposit/Source |
| --- | --- | --- |
| Business Checking | 022000731 | $ 2,000.00* <br> ☐ Cash ☒ Check <br> ☐ _____ |
| | | $ _____ <br> ☐ Cash ☐ Check <br> ☐ _____ |
| | | $ _____ <br> ☐ Cash ☐ Check <br> ☐ _____ |

### Services Requested

☐ ATM  ☐ Debit/Check Cards (No. Requested: _____ )
☐ _____ ☐ _____
☐ _____ ☐ _____

### Other Terms/Information

OFAC ✓

Reviewed By _____

373

MPMP-LAZ-CA 5/2/2007
Page 2 of 2
Initials: ____

# EXHIBIT T

## Personal Financial Statement

### To: Shanghai Commercial Bank

| Name | Lucy Gao | Social Security No | |
|---|---|---|---|
| Residential Address: 3808 Hollins Avenue, Claremont, CA | | | Tel No. (626) 484-1177 |
| Occupation: Investor | | Title: President | |
| Employer: Liberty Capital Management Corp. | | Address: 3216 E. Holt Ave #101 West Covina, CA 91791 | Tel No. (626) 214-2154 |

Spouse to complete the information below if: 1) The spouse is a co-applicant of the credit request, or 2) The applicant is relying on community property assets for the credit request

| Spouse name | | Social Security No. (if applicable) | |
|---|---|---|---|
| Occupation | | Title | |
| Employer | | Address | Tel No. |

### Statement of Financial Condition as of March 2014

| Assets | US$ | Liabilties | US$ | |
|---|---|---|---|---|
| Cash on hand and in Bank | $150,000 | Notes Payable (Schedule 3) | $0 | |
| Stocks and Bonds (Schedule 1) | $80,000 | Other Notes and Accounts Payable Excluding Mortgage Payable (Schedule 4) | | |
| Accounts & Notes Receivable | | Mortgages Payable on Real Estate (Schedule 2) | $29,746,278 | |
| Real Estate (Schedule 2A & 2B) | $80,930,000 | | | |
| Life Insurance | | Other Liabilities | | |
| Face Value | $135,000 | Unpaid Interest | | |
| Cash surrender value | | Unpaid Taxes | | |
| Other personal property | | Other (Itemize, Schedule 4) | | |
| Automobile | | Total Liabilities | $29,746,278 | |
| Other (itemize, Schedule 4) | | Net Worth | $51,548,722 | |
| Total Assets | $81,295,000 | Total Liabilities and Net Worth | $81,295,000 | |
| | | | | |
| Annual Income (For Year 2012) | US$ | Annual Expenditure (For Year 2012) | US$ | |
| Salary & Wages | $213,500 | | | |
| Bonus & Commission | | | | |
| Dividends & interest | | | | |
| Real Estate Income (Net) | $2,219,843 | | | |
| Business or Professional Income (Net) | | | | |
| Other Income Describe | | | | |
| (Alimony, child support, or separate | | | | |
| maintenance income need not be | | | | |
| listed if you do not wish to have it | | | | |
| considered for repaying this loan) | | | | |
| Total Income | $2,433,343 | | | |

GENERAL INFORMATION (if married, these questions apply to both you and your spouse)

| | | | |
|---|---|---|---|
| Have you guaranteed or endorsed the notes of any other person? | Yes _____ | No _X_ | Amounts _____ |
| Have any actions or suits been filed against you or are there any unsatisfied judgments or decrees entered against you? | Yes _____ | No _X_ | Amounts _____ |
| Have you ever filed any petition under the Bankruptcy Act? | Yes _____ | No _X_ | Amounts _____ |
| Do you owe any Federal/State tax for years prior to the current year? | Yes _____ | No _X_ | Amounts _____ |
| Are any of the assets listed on this statement held under a Trust Agreement? | Yes _____ | No _X_ | Amounts _____ |

LAM00061501

## SCHEDULE 1: STOCKS AND BONDS

| No. of Shares | Description | Issued in Name of | Market Value | Value Pledged |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## SCHEDULE 2: REAL ESTATE OWNED

### Please use the attached form

## SCHEDULE 3: NOTES AND ACCOUNTS PAYABLE EXCLUDING MORTGAGE PAYABLE

| Payable to | Account Number | Maturity Date | Balance Due |
|---|---|---|---|
| Please see attached schedule 3 | | | |
| | | | |
| | | | |

## SCHEDULE 4: DETAILS RELATIVE TO OTHER IMPORTANT ASSETS AND LIABILITIES

## GIVE NAME OF BANKS OR FINANCE COMPANIES WHERE ACCOUNT MAINTAINED AND CREDIT HAS BEEN OBTAINED

| Name | Amount | Description of Security (if any) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

To induce Shanghai Commercial Bank to give or continue financial accommodation to, or at the request of the undersigned from time to time and in consideration of any such accommodation, the undersigned represents and warrants that the foregoing is a true statement of the financial condition of the undersigned as of the date indicated, and agrees (1) that said Bank may rely upon it as continuing to be true until notified in writing to the contrary by the undersigned; (2) that if it be not true in any material respect, or if the undersigned should die, become insolvent, make an assignment for the benefit of creditors, be the subject of any bankruptcy, recoganization, arrangement, insolvency, receivership, liquidation or dissolution proceedings, or if any property of the undersigned be attached garnished or subjected to any other legal process or if an adverse change occurs in the financial condition of the undersigned, then at the election of said Bank all indebtedness and obligations, direct and contingent, of the undersigned to said Bank shall become immediately due and payable without demand or notice.

I/we authorize you to obtain such information as you may require concerning the statements contained in this application shall remain your property whether or not the loan is granted. I/we further authorize you to verify the existence of the assets and liabilities as listed. I/we further authorize you to contact my/our creditors, or any consumer reporting agency, and to obtain credit ratings now and at any time hereafter, as required by good and proper loan procedures. I/we further authorize you to disclose the details of my/our transactions with the bank to properly accredited agencies without liability on your part. This statement is furnished for the purpose of procuring credit, and I/we understand there are penalties under the law for knowingly making any false statements, or making a willful over-evaluation of my/our land property or security for the purpose of influencing in any way the action of the bank in the evaluation of my/our application for credit.

Date signed  2/3/13

Date signed _____

By _____

By _____

LAM00061502
376

## SCHEDULE 2A - REAL ESTATE OWNED (LUCY GAO)

| Property Address | Type of Property | Title in Name of | Acquisition Date/Cost | Name of Lender | Market Value | Loan Balance | Rental Income (1) | Expenses (Tax, Insurance & Other Exp) (2) | Net Rental Income (1 - 2) | Mortgage Payment |
|---|---|---|---|---|---|---|---|---|---|---|
| 1211 E. Garvey Street, Covina, CA | Hotel | Crystal Waterfall LLC | 10/2/2011 $14,800,000 | First Commercial Bank | $25,000,000 | $6,892,699 | $4,214,729 | $2,704,292 | $1,510,437 | $43,300 |
| 3101 W. Temple Avenue, Pomona, CA | Hotel | Coastline Investments LLC | 5/1/12 $10,500,000 | First General Bank | $10,000,000 | $5,250,000 | $685,098 | $239,535 | $34,932 | $34,932 |
| 3200 W. Temple Avenue, Pomona, CA | Hotel | Diamond Waterfalls LLC | 3/26/2012 $10,500,000 | First General Bank | $10,000,000 | $5,250,000 | $1,094,511 | $554,612 | $539,899 | $34,932 |
| 1020 S. Baldwin Ave., Arcadia, CA 91007 | Retail Building | Goldstone Project Management LLC | 9/14/2012 $7,700,000 | SCBLA | $6,630,000 | $3,950,712 | $71,161 | $71,123 | $38 | $26,556 |
| | | | | TOTALS: | $51,630,000 | $21,343,411 | $6,065,499 | $3,569,562 | $2,085,306 | $139,720 |

Signature

3/3/13
Date

LAM00061503

## SCHEDULE 2B - REAL ESTATE OWNED (FIRST AMERICAN MERGERS & ACQUISITIONS CORPORATION)

| Property Address | Type of Property | Title in Name of | % of Ownership | Acquisition Date/Cost | Name of Lender | Market Value | Loan Balance | Rental Income (1) | Expenses (Tax, Insurance & Other Exp) (2) | Net Rental Income (1 - 2) | Mortgage Payment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1595 E. 17th Street, Santa Ana, CA | Office Building | 1595 17th St LLC | 100% | 9/11/2009 $1,750,000 | Bank SinoPac | $1,750,000 | $1,650,000 | $0 | $35,968 | ($35,968) | $3,094 |
| 544 San Antonio Road, Mountain View, CA | Office Building | 544 San Antonio Rd LLC | 100% | 10/28/2009 $2,850,000 | Preferred Bank | $8,000,000 | $3,200,000 | $211,500 | $196,384 | $15,116 | $8,115 |
| 3218 E. Holt Avenue, West Covina, CA | Office Building | Greenfield Investments LLC | 100% | 9/24/2010 $2,000,000 | Cervenka & Lukes Mortgage Group | $3,000,000 | $1,500,000 | $325,000 | $153,421 | $171,579 | $12,488 |
| 151 South Hudson Ave. Pasadena, CA 91101 | Condos | Pasadena Hudson Project LLC / Green & Hudson LLC | 30% | 8/4/2003 $1,070,000 | None | $11,000,000 | $0 | $0 | $1,190 | ($1,190) | $0 |
| 3808 Hollins Avenue, Claremont, CA | SFR | East Heights LLC | 100% | 8/3/2009 $3,000,000 | SCBLA | $3,500,000 | | $0 | | $0 | |
| 1001 East Road, La Habra Heights, CA | SFR | East Heights LLC | 100% | 5/29/2009 $750,000 | SCBLA | $800,000 | $2,052,867 | $0 | | $0 | $19,938 |
| 409 Avenida Santa Barbara, San Clemente, CA | Condos | Green Oak Asset Management LLC | 100% | 6/28/2010 $750,000 | SCBLA | $1,250,000 | | $0 | $15,000 | ($15,000) | |
| | | | | | TOTALS: | $29,300,000 | $8,402,867 | $536,500 | $401,963 | $134,537 | $43,635 |

Signature

3/3/13
Date

LAM00061504

378

## SCHEDULE 3 - OTHER NOTES PAYABLE

| Property Address | Type of Property | Title in Name of | Acquisition Date/Cost | Payable To | Loan Balance | Monthly Loan Payment |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  | TOTALS: | $0 | $0 |

Signature

LAM00061505

# EXHIBIT U

LIBERTY ASSET MANAGEMENT CORPORATION
3218 E. HOLT AVE., SUITE 212
WEST COVINA, CA 91791

001399

7/30/2013

MEGA BANK
1370 S. Fullerton Rd., Ste. 101
Rowland Heights, CA 91748
90-4457/1222

PAY TO THE
ORDER OF    North America Asset Management Corp          $ ***1,000,000.00

One Million and 00/100**********************************************************    DOLLARS

North America Asset Management Corp

MEMO

⑈001399⑈ ⑈122244870⑈⑈0 1200 1 24 2⑈

01 51 0 100000000⑈

THIS DOCUMENT HAS A COLORED SECURITY BACKGROUND. DO NOT CASH IF THE WORD "VOID" IS VISIBLE. THIS PAPER HAS AN ARTIFICIAL WATERMARK ON REVERSE SIDE AND IS ALTERATION PROTECTED

ENDORSEMENT AREA: Know Your Endorser. Require Identification

X  North American Asset Management

          2200(?)

DO NOT WRITE, STAMP OR          W THIS LINE
     RESERVED FOR FINANCL          USE *

33702

MEGA Bank
>122244870<
2013-07-30
800363712

THIS DOCUMENT INCLUDES THE FOLLOWING SECURITY
FEATURES EXCEEDING CRA GUIDELINES

· COLORED SECURITY PATTERN ON FACE WITH COPIER "VOID"
  (VISIBLE WORD "VOID" INDICATES A PROBABLE PHOTOCOPY)
· INVISIBLE ULTRAVIOLET FLUORESCENT FIBERS FACE AND
  BACK
· ULTRAVIOLET DULL PAPER
· ARTIFICIAL SECURE DOCUMENT WATERMARK VISIBLE ON
  BACK WHEN HELD AT AN ANGLE
· PRIMARY INDICATOR STAINS     PROVIDE EVIDENCE OF
  ALTERATION
· MICROPRINT ENDORSEMENT LINES ON BACK
· SECURITY SCREEN ABSENCE OF "ORIGINAL DOCUMENT"
  VERBIAGE ON BACK OF CHECK

ATTEMPTS TO COPY OR CHEMICALLY ALTER THIS DOCUMENT WILL
ACTIVATE SECURITY FEATURES

THIS DOCUMENT MAY INCLUDE A MICROPRINT SIGNATURE LINE

* FEDERAL BANKING ACT 1987 - FEDERAL RESERVE REG. CC

North America Asset Management Corp. - Acct.#: 22001325
034

381

# EXHIBIT  V

**BUSINESS CHECKING**
**Account Agreement**

Account#22001325
Date: _____ 04/17/2013

| Institution Name & Address | Internal Use |
|---|---|

**MEGA BANK**
1370 S. Fullerton Road #101
Rowland Heights, CA 91748          Referred By Candace Chu

### Account Title & Address

North America Asset Management Corporation

**CLOSED**

3218 E Holt Ave #200
West Covina, CA 91791

07/23/2014
TF 226 b0 90 5

**IMPORTANT ACCOUNT OPENING INFORMATION:** Federal law requires us to obtain sufficient information to verify your identity. You may be asked several questions and to provide one or more forms of identification to fulfill this requirement. In some instances we may use outside sources to confirm the information. The information you provide is protected by our privacy policy and federal law.

Enter **Non-Individual Owner Information** on page 2. There is additional Owner/Signer Information space on page 2.

### Ownership of Account

The specified ownership will remain the same for all accounts.

☐ Individual          ☒ Corporation - For Profit
☐ Joint Account       ☐ Corporation - Nonprofit
☐ Joint - Husband and Wife     ☐ Partnership
   (With right of survivorship)  ☐ Sole Proprietorship
☐ Community Property    ☐ Limited Liability Company
   (Husband and Wife)

☐ Tenancy in Common
☐ Trust-Separate Agreement Dated: _____
☐

### Owner/Signer Information 1

| Name | Benny James Kirk |
|---|---|
| Relationship | CEO |
| Address | 385 Lemon Ave E-104 |
| | Walnut, CA 91789 |
| Mailing Address (if different) | 3218 E Holt Ave #200 |
| | West Covina, CA 91791 |
| Home Phone | (626) 506-4548 |
| Work Phone | (626) 214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Birth Date | 09/10/1958 |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | 1 STATE DRIVERS |
| | 12/5/2008          9/10/2013 |
| Other ID (Description, Details) | CBI: Taiwan MMN: Lee |
| Employer | North America Asset Management Corporation |
| Previous Financial Inst. | * * * |

### Beneficiary Designation

(Check appropriate ownership above.)

☐ Totten Trust          ☐ Pay-on-Death (P.O.D.)
☐

### Beneficiary Name(s), Address(es), and SSN(s)

(Check appropriate beneficiary designation above.)

☐ If checked, this is a temporary account agreement.

Number of signatures required for withdrawal:  1 (one)

### Signature(s)

The undersigned authorize the financial institution to investigate credit and employment history and obtain reports from consumer reporting agency(ies) on them as individuals. Except as otherwise provided by law or other documents, each of the undersigned is authorized to make withdrawals from the account(s), provided the required number of signatures indicated above is satisfied. The undersigned personally and as, or on behalf of, the account owner(s) agree to the terms of, and acknowledge receipt of copy(ies) of, this document and the following:

☒ Terms and Conditions      ☒ Privacy
☒ Electronic Fund Transfers  ☒ Truth in Savings
☒ Substitute Checks          ☒ Funds Availability
☐ Common Features            ☐

☐ Authorized Signer (See Owner/Signer Information for Authorized Signer designation(s).)          (M)

Benny James Kirk

X  ******************

X  ************        4 X  ************

### Owner/Signer Information 2

| Name | |
|---|---|
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

Signature Card-CA
Bankers Systems ™
Wolters Kluwer Financial Services ©2003, 2006

MPMP-LAZ-CA  5/2/2007
Page 1 of 2
Initials _____

North America Asset Management Corp. - Acct #: 22001325
00383

## Owner/Signer Information 3

| Field | Value |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | XXXXXXXXXXXXX |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

## Owner/Signer Information 4

| Field | Value |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | XXXXXXXXXXXX |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

## Backup Withholding Certifications

*(If not a "U.S. Person," certify foreign status separately.)*

TIN: 45-3324959

[X] **Taxpayer I.D. Number (TIN)** - The number shown above is my correct taxpayer identification number.

[X] **Backup Withholding** - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding

[ ] **Exempt Recipients** - I am an exempt recipient under the Internal Revenue Service Regulations.

I certify under penalties of perjury the statements checked in this section and that I am a U.S. person (including a U.S. resident alien).

X _____ (Date)

North America Asset Management Corporation    04/17/2013

## Non-Individual Owner Information

| Field | Value |
|---|---|
| Name | North America Asset Management Corporation |
| EIN | 45-3324959 |
| Phone | (626) 214-2142 |
| Mobile Phone | * * * |
| E-Mail | * * * |
| Type of Entity | ARTICLES OF INC   C3406309 |
| State/Country & Date of Organization | CA  09/06/2011 |
| Nature of Business | Real Estate |
| Address | 1906 El Camino Real, Manlo Park, CA 94027 |
| Mailing Address (if different) | 3218 E Holt Ave #200  West Covina, CA 91791 |
| Authorization/ Resolution Date | 04/17/2013 |
| Previous Financial Inst | * * * |

| Account Description | Account # | Initial Deposit/Source |
|---|---|---|
| BUSINESS CHECKING | 22001325 | $ 2,000.00*  [ ] Cash  [X] Check  [ ] _____ |
| | | $ _____  [ ] Cash  [ ] Check  [ ] _____ |
| | | $ _____  [ ] Cash  [ ] Check  [ ] _____ |

## Services Requested

[ ] ATM    [ ] Debit/Check Cards (No. Requested: _____ )

[ ] _____  [ ] _____
[ ] _____  [ ] _____

## Other Terms/Information

Signature Card-CA
Bankers Systems TM
Wolters Kluwer Financial Services ©2003, 2006

Reviewed By _____

OFAC _____

Initials: ____

North America Asset Management Corp. - Acct #: 22001325

# EXHIBIT W



**Sincere Escrow**
935 S. San Gabriel Blvd.
San Gabriel, CA 91776
Tel: (626) 286-1880
Fax: (626) 286-2983

Margaret Chiu
Escrow Officer

Date: March 26, 2013
Escrow No.: 013665-MC

AMENDED ESCROW INSTRUCTIONS

Property Address:     3931 Alemany Blvd.,
                      San Francisco, CA 94132

THE ABOVE NUMBERED ESCROW IS HEREBY AMENDED AND/OR SUPPLEMENTED AS FOLLOWS:

From funds received from investors, please wire the following funds to:

$1,800,000.00 to Liberty Asset Management Corporation
  $200,000.00 to 444 E. Huntington, LLC for payoff Plus interest, if any
  $948,510.00 to Liberty Asset Management Corporation

After deduction of the above, balance to be transfer to your account of 13393MC and 13433MC for the escrow fees.

ALL OTHER TERMS AND CONDITIONS TO REMAIN THE SAME.

SELLERS:

LIBERTY ASSET MANAGEMENT
CORPORATION, a California Corporation

By:



### CITIZENS
### BUSINESS BANK

## *Outgoing Wire-Advice of Debit*

| | |
|---|---|
| **DATE:** | 03/26/2013 |
| **ACCOUNT #:** | *****1991 |
| **AMOUNT:** | 1,800,000.00 |
| **BANK REF #:** | 20130850213900 |
| **IMAD #:** | 20130326L1LFBU0C000479 |

*Additional payment details are shown below:*

**RECEIVING BANK:**      MEGA BANK
**RECEIVING BANK aba:**   122244870

**BENEFICIARY BANK:**
**bENEFICIARY bANK id:**

**Beneficiary:**      LIBERTY ASSET MANAGEMENT COPR
**Beneficiary Account:** *****1242
**Beneficiary ADDRESS:**
**3218 E. HOLT AVENUE**
**WEST COVINA, CA 91791**
**BNF Info:**

**Beneficiary Info (OBI):**

**Bank to Bank Info (BBI):**
**REFERENCE: WALGREENS 2013LLC**

Legal Disclaimer: The information transmitted may contain confidential material and is intended only for the person or entity to which it is addressed. Any review, retransmission, dissemination or other use of, or taking of any action by persons or entities other than the intended recipient is prohibited. If you are not the intended recipient, please delete the information from your system and contact the sender.

# SINCERE ESCROW

## REQUEST FOR OUTGOING BANK WIRE TRANSFER

Ref No.:          30658

## **Escrow No.: 013665-MC**

Date: March 26, 2013

1. DEBIT ACCOUNT NUMBER:                                   674001991

2. RECIPIENT/BENEFICIARY NAME (NOT BANK):   LIBERTY ASSET MANAGEMENET CORP

3. RECIPIENT/BENEFICIARY PHYSICAL ADDRESS: LEE WALGREENS 2013LLC

4. RECIPIENT/BENEFICIARY ACCOUNT NUMBER:  022001242

5. RECIPIENT/BENEFICIARY ABA NUMBER:           122244870

6. NAME OF BANK THAT WIRE IS GOING TO:
   CREDIT BANK NAME:                                            MEGA BANK

7. CREDIT BANK ADDRESS:

                                                                             1370 S. FULLERTON ROAD, SUITE 101
                                                                             ROWLAND HEIGHTS, CA 91748

8. TRANSFER AMOUNT:                                          $*1,800,000.00

9. ADDITIONAL INSTRUCTIONS:

---

Authorized Signature

---

Authorized Signature



CITIZENS
BUSINESS BANK

| | | | | | |
|---|---|---|---|---|---|
| Amount: | 1,800,000.00 | Ref. No.: | 20130850213900 | Status: | Cust Verify |
| Pay. Meth.: | FED | Msg. Type.: | 1000 | Trancode: | DOMESTIC |
| Value Date: | 03/26/2013 | Bus. Function: | CTR | Dept.: | 002 |

Sender ABA: 122234149
Previous IMAD:

Originating Party:　　Account No.: 674001991
　　　　　　　　　　　Name: SINCERE ESCROW
　　　　　　　　　　　Address:

　　　　　　　　　　　935 S. SAN GABRIEL BLVD.
　　　　　　　　　　　SAN GABRIEL CA 91776

Receiving Party:　　Name: MEGA BANK
　　　　　　　　　　ID: 122244870

Beneficiary Party (BNF):　Account No.: 022001242
　　　　　　　　　　　　　Name: LIBERTY ASSET MANAGEMENT COPR
　　　　　　　　　　　　　Address:

　　　　　　　　　　　　　3218 E. HOLT AVENUE
　　　　　　　　　　　　　WEST COVINA, CA 91791

Reference for Beneficiary (RFB):
Originator to Beneficiary Info (OBI):
Bank to Bank Information (BBI):　REFERENCE: WALGREENS 2013LLC
Debit Party:　　　　　　　　　　Originator



**CITIZENS**
**BUSINESS BANK**

## *Outgoing Wire-Advice of Debit*

**DATE:**            03/28/2013

**ACCOUNT #:**       *****1991

**AMOUNT:**          948,510.00

**BANK REF #:**      20130870158200

**IMAD #:**          20130328L1LFBU0C000379

*Additional payment details are shown below:*

**RECEIVING BANK:**         MEGA BANK
**RECEIVING BANK aba:**     122244870

**BENEFICIARY BANK:**
**bENEFICIARY bANK id:**

**Beneficiary:**        LIBERTY ASSET MANAGEMENT CORP
**Beneficiary Account:** *****1242
**Beneficiary ADDRESS:**
**3218 E. HOLT AVENUE**
**WEST COVINA, CA 91791**
**BNF Info:**

**Beneficiary Info (OBI):**

**Bank to Bank Info (BBI):**

Legal Disclaimer: The information transmitted may contain confidential material and is intended only for the person or entity to which it is addressed. Any review, retransmission, dissemination or other use of, or taking of any action by persons or entities other than the intended recipient is prohibited. If you are not the intended recipient, please delete the information from your system and contact the sender.

# SINCERE ESCROW

## REQUEST FOR OUTGOING BANK WIRE TRANSFER

Ref No.:      30659

## Escrow No.: 013665-MC

Date: March 28, 2013

1. DEBIT ACCOUNT NUMBER:      674001991

2. RECIPIENT/BENEFICIARY NAME (NOT BANK):      LIBERTY ASSET MANAGEMENT CORP

3. RECIPIENT/BENEFICIARY PHYSICAL ADDRESS:

4. RECIPIENT/BENEFICIARY ACCOUNT NUMBER:      022001242

5. RECIPIENT/BENEFICIARY ABA NUMBER:      122244870

6. NAME OF BANK THAT WIRE IS GOING TO:
   CREDIT BANK NAME:      MEGA BANK

7. CREDIT BANK ADDRESS:

   1370 S. FULLERTON ROAD
   ROWLAND HEIGHTS, CA 91748

8. TRANSFER AMOUNT:      $***948,510.00

9. ADDITIONAL INSTRUCTIONS:

_____

Authorized Signature

_____

Authorized Signature

 CITIZENS BUSINESS BANK

| | | | |
|---|---|---|---|
| Amount: 948,510.00 | Ref. No.: 20130870158200 | Status: | Cust Verify |
| Pay. Meth.: FED | Msg. Type.: 1000 | Trancode: | DOMESTIC |
| Value Date: 03/28/2013 | Bus. Function. CTR | Dept.: | 002 |
| Sender ABA: 122234149 | | | |
| Previous IMAD: | | | |

Originating Party:
Account No: 674001991
Name: SINCERE ESCROW
Address:
935 S. SAN GABRIEL BLVD.
SAN GABRIEL CA 91776

Receiving Party:
Name: MEGA BANK
ID: 122244870

Beneficiary Party (BNF):
Account No.: 022001242
Name: LIBERTY ASSET MANAGEMENT CORP
Address:
3218 E. HOLT AVENUE
WEST COVINA, CA 91791

Reference for Beneficiary (RFB):
Originator to Beneficiary Info (OBI):
Bank to Bank Information (BBI):
Debit Party:                    Originator

Page 1 of 1



**CITIZENS**
**BUSINESS BANK**

## *Outgoing Wire-Advice of Debit*

**DATE:**            03/29/2013

**ACCOUNT #:**       *****1991

**AMOUNT:**          200,516.13

**BANK REF #:**      20130880193300

**IMAD #:**          20130329L1LFBU0C000656

*Additional payment details are shown below:*

**RECEIVING BANK:**        BBCN BANK
**RECEIVING BANK aba:**    122041235

**BENEFICIARY BANK:**
**bENEFICIARY bANK id:**

**Beneficiary:**        444 EAST HUNTINGTON, LLC
**Beneficiary Account:** ******4390
**Bcneficiary ADDRESS:**
**3424 WILSHIRE BLVD, SUITE 1200**
**LOS ANGELES, CA 90010**
**BNF Info:**

**Beneficiary Info (OBI):**

**Bank to Bank Info (BBI):**
**PAYOFF FOR BONITA**

Legal Disclaimer: The Information transmitted may contain confidential material and is intended only for the person or entity to which it is addressed. Any review, retransmission, dissemination or other use of, or taking of any action by persons or entities other than the intended recipient is prohibited. If you are not the intended recipient, please delete the information from your system and contact the sender.

## REQUEST FOR OUTGOING BANK WIRE TRANSFER

Ref No.:          30660

### Escrow No.: 013665-MC

Date:  March 29, 2013

1. DEBIT ACCOUNT NUMBER:                      674001991

2. RECIPIENT/BENEFICIARY NAME (NOT BANK):     444 EAST HUNTINGTON LLC

3. RECIPIENT/BENEFICIARY PHYSICAL ADDRESS: Payoff on $200,000.00 for 500 W. Bonita

4. RECIPIENT/BENEFICIARY ACCOUNT NUMBER:  6400044390

5. RECIPIENT/BENEFICIARY ABA NUMBER:          122041235

6. NAME OF BANK THAT WIRE IS GOING TO:
   CREDIT BANK NAME:                          BBCN BANK

7. CREDIT BANK ADDRESS:

                                             3435 WILSHIRE BLVD., SUITE 150
                                             LOS ANGELES, CA 90010

8. TRANSFER AMOUNT:                           $***200,516.13

9. ADDITIONAL INSTRUCTIONS:

OLD REPUBLIC TITLE

Per Vanessa
add interest 516.13
to 444 East Huntington

_____

Authorized Signature

_____

Authorized Signature

394



CITIZENS BUSINESS BANK

| | | | | |
|---|---|---|---|---|
| Amount: 200,516.13 | Ref No.. | 20130880193300 | Status: | Cust Verify |
| Pay. Meth.: FED | Msg Type.: | 1000 | Trancode: | DOMESTIC |
| Value Date: 03/29/2013 | Bus Function CTR | | Dept.: | 002 |
| Sender ABA:122234149 | | | | |
| Previous IMAD: | | | | |

Originating Party:      Account No.:   674001991
     Name:   SINCERE ESCROW
     Address:

     935 S. SAN GABRIEL BLVD.
     SAN GABRIEL CA 91776

Receiving Party:      Name:   BBCN BANK
     ID:   122041235

Beneficiary Party (BNF):      Account No.   5400044390
     Name.   444 EAST HUNTINGTON, LLC
     Address:

     3424 WILSHIRE BLVD, SUITE 1200
     LOS ANGELES, CA 90010

Reference for Beneficiary (RFB):
Originator to Beneficiary Info (OBI):
Bank to Bank Information (BBI):      PAYOFF FOR BONITA
Debit Party:      Originator

395

# RECEIPTS AND DISBURSEMENTS LISTING

Escrow No. 013665-MC                                    Date: August 9, 2014

By:  Margaret Chiu                                      Buyer/Borrower:  LEE WALGREENS 2013 LLC

## RECEIPTS:

| DATE | TYPE | BANK | RECEIPT NO. | PAYEE | AMOUNT |
|------|------|------|-------------|-------|--------|
| 3/26/2013 | R | 2 | 13830 | CITIZENS BUSINESS BANK/LEE WALGREENS 2013LLC | 3,000,000.00 |

TOTAL RECEIPTS    $ 3,000,000.00

## DISBURSEMENTS:

| DATE | TYPE | BANK | REF. NO. | PAYEE | AMOUNT |
|------|------|------|----------|-------|--------|
| 4/03/2013 | T | 2 | 1244 | * Canceled $2,973.87 04/04/2013 - SINCERE ESCROW | 0.00 |
| 4/03/2013 | T | 2 | 1245 | * SINCERE ESCROW | 48,000.00 |
| 4/04/2013 | T | 2 | 1246 | SINCERE ESCROW | 2,973.87 |
| 3/26/2013 | W | 2 | 30658 | MEGA BANK - LIBERTY ASSET MANAGEMENET CORP | 1,800,000.00 |
| 3/28/2013 | W | 2 | 30659 | MEGA BANK - LIBERTY ASSET MANAGEMENT CORP | 948,510.00 |
| 3/29/2013 | W | 2 | 30660 | BBCN BANK - 444 EAST HUNTINGTON LLC | 200,516.13 |

TOTAL CHECKS ISSUED    3,000,000.00
CHECKS NOT WRITTEN    0.00
TOTAL    3,000,000.00

BALANCED    0.00

**** END OF RECEIPTS AND DISBURSEMENTS LISTING ****

## SAVINGS INFORMATION:

TOTAL PRINCIPAL    0.00
TOTAL INTEREST    0.00
TOTAL WITHDRAWALS    0.00

REMAINING BALANCE    0.00

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**10100 Santa Monica Boulevard, 13ᵗʰ Floor, Los Angeles, California 90067**

A true and correct copy of the foregoing document entitled (*specify*): ***DECLARATION OF JEREMY V. RICHARDS IN SUPPORT OF THE COMMITTEE'S MOTION FOR SUMMARY ADJUDICATION OF DEFENDANTS' LIABILITY FOR BREACH OF FIDUCIARY DUTIES AND ACCOUNTING*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **November 3, 2016**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- *Alexandre I Cornelius    aicornelius@costell-law.com, ssaad@costell-law.com;mharris@costell-law.com;jstambaugh@costell-law.com;ladelson@costell-law.com;jlcostell@costell-law.com*
- *William Crockett    wec@weclaw.com, ksa@weclaw.com*
- *Gail S Greenwood    ggreenwood@pszjlaw.com, efitzgerald@pszjlaw.com*
- *Jeremy V Richards    jrichards@pszjlaw.com, bdassa@pszjlaw.com;imorris@pszjlaw.com*
- *United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov*
- *James S Yan    jsyan@msn.com*

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
_____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **November 3, 2016**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**PERSONAL DELIVERY**
Honorable Thomas B. Donovan
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1352
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| November 3, 2016 | Myra Kulick | */s/ Myra Kulick* |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.