

FILED & ENTERED

DEC 29 2017

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| In re:    Liberty Asset Management Corporation, Debtor | Case No.:    2:16-bk-13575-ER<br>Adv. No.:    2:16-ap-01337-ER |
| Official Unsecured Creditors Committee for Liberty Asset Management Corporation,<br><br>Plaintiff<br><br>v.<br><br>Lucy Gao and Benjamin Kirk,<br><br>Defendants | **MEMORANDUM OF DECISION FINDING THAT PLAINTIFF IS ENTITLED TO JUDGMENT AGAINST DEFENDANTS IN THE AMOUNT OF $74,140,695.29**<br><br>Date:    August 2, 2017<br>Time:    9:00 a.m.<br>Location:    Ctrm. 1568<br>    Roybal Federal Building<br>    255 East Temple Street<br>    Los Angeles, CA 90012 |

## I. Introduction

The Plaintiff in this matter is the Official Committee of Unsecured Creditors for Chapter 11 Debtor Liberty Asset Management Corporation.[1] On August 10, 2016, the Court approved a stipulation between Liberty Asset Management Corporation ("Liberty") and Plaintiff which granted Plaintiff derivative standing to pursue this action on behalf of Liberty's estate. Bankr.

---

[1] The Hon. Thomas B. Donovan presided over this adversary proceeding, as well as the main bankruptcy case of Liberty Asset Management Corporation ("Liberty"), from March 21, 2016 to January 29, 2017. On January 30, 2017, Liberty's main bankruptcy case and this adversary proceeding were reassigned to the undersigned judge. Bankr. Doc. No. 325.

Doc. No. 177.[2] Based on an assertion that Lucy Gao and Benjamin Kirk (collectively, the "Defendants") breached their fiduciary duties to Liberty by failing to account for the assets of Liberty that were under their control, Plaintiff seeks a judgment against Ms. Gao and Mr. Kirk, jointly and severally, in the amount of $74.3 million. For the reasons set forth below, the Court finds that Defendants breached their fiduciary duties to Liberty and have failed to account for Liberty's assets. In connection with these breaches and this failure to account, Liberty has been damaged in the amount of $74,140,695.29. The Court will enter judgment against the Defendants, jointly and severally, in the amount of $74,140,695.29.

## II. Procedural History

On January 25, 2017, the Court entered "Findings of Fact and Conclusions of Law Regarding Motion by the Official Committee of Unsecured Creditors for Summary Adjudication of Defendants' Liability for Breach of Fiduciary Duties and Accounting" (the "Jan. 25 Findings"). Adv. Doc. No. 57. As set forth in greater detail below, the Court found that Defendants breached their fiduciary duties to Liberty by failing to account for Liberty's assets; that Defendants lacked the ability to account for Liberty's assets; and that Liberty's available books and records were insufficient to permit a proper accounting.

On August 2, 2017, the Court conducted a trial to determine the amount of damages suffered by Liberty as a result of Defendants' failure to account. Plaintiff filed a Motion *In Limine* seeking to preclude Ms. Gao from introducing any exhibits into evidence or offering any testimony with respect to the proposed exhibits. Adv. Doc. No. 113. Prior to the trial, the Court made available to the parties its tentative ruling, which was to grant Plaintiff's Motion *In Limine*. At the beginning of the trial, the Court gave Ms. Gao's counsel an opportunity to present any arguments in opposition to the Court's tentative ruling. Ms. Gao's counsel rested on the papers filed in opposition to the Motion *in Limine* and made no oral presentation in opposition to the Court's tentative ruling. The Court adopted the tentative ruling as its final ruling and found that Ms. Gao was precluded from offering any evidence or testimony at trial. The Court's ruling is attached hereto as Exhibit A and is incorporated herein by reference.

The Court ordered the parties to file closing briefs by no later than October 31, 2017. Plaintiff and Ms. Gao submitted closing briefs by the October 31 deadline, Adv. Doc. Nos. 138–39; Mr. Kirk filed an untimely closing brief on November 15, 2017, Adv. Doc. No. 140. Although Mr. Kirk's closing brief was not filed timely, the Court will still consider the arguments presented therein.

Subsequent to the August 2 trial on damages, Plaintiff advised the Court that it did not intend to pursue any of the claims that were not adjudicated in connection with the Jan. 25 Findings or the August 2 trial (such claims, the "Remaining Claims"). On August 16, 2017, the Court entered an order advising Defendants that it intended to dismiss the Remaining Claims without prejudice unless Defendants objected. Adv. Doc. No. 131. On September 14, 2017, having received no objection from Defendants, the Court entered an order dismissing the Remaining Claims without prejudice. Adv. Doc. No. 136.

---

[2] Unless otherwise indicated, all "Bankr. Doc. No." citations are to the CM/ECF docket in Liberty's main bankruptcy case, Case. No. 2:16-bk-13575-ER; all "Adv. Doc. No." citations are to the CM/ECF docket in this adversary proceeding, Adv. No. 2:17-ap-01337-ER.

### III. Findings of Fact and Conclusions of Law Previously Entered by the Court[3]

The following findings of fact and conclusions of law have been previously entered by the Court by way of the Jan. 25 Findings and the "Order on Joint Pretrial Stipulation" [Adv. Doc. No. 107]:

Liberty was a real estate investment company that bought and sold real property using a combination of its own cash, cash from investors, and bank loans. Joint Pretrial Stipulation (the "Pretrial Stip.") [Adv. Doc. No. 104] at ¶A.5. Real property acquired by Liberty was not titled in the name of Liberty or its investors, but instead was purchased in the name of various limited liability companies. *Id.* At all times since its formation, Benjamin Kirk was Liberty's President, CEO, CFO, and sole shareholder. *Id.* at ¶A.6. Mr. Kirk's primary role was soliciting investors for Liberty and identifying real properties for purchase and sale. *Id.* at ¶A.7.

Lucy Gao has held an equitable interest in Liberty since its inception. Jan. 25 Findings at ¶II.2. Ms. Gao's equitable interest is based upon Mr. Kirk's oral promises that Ms. Gao would receive a 20–50% profit share from Liberty's investments. *Id.* at ¶II.3. Ms. Gao met Mr. Kirk in 2000 and they share a child, Joyce Kirk, who was born on April 22, 2004. Pretrial Stip. at ¶A.4. Ms. Gao and Mr. Kirk terminated their personal relationship by at least May 2014. *Id.* Ms. Gao was in charge of overseeing Liberty's accounting functions; ensuring that timely tax returns were prepared; maintaining records pertaining to the purchase, sale, and financing of assets; maintaining records pertaining to the flow of funds from investors; and maintaining Quickbooks records. Jan. 25 Findings at ¶II.7.

In connection with contemplated real estate transactions, Liberty typically entered into a contract with an investor (each, an "Investment Contract") to purchase a specific parcel of real estate. Pretrial Stip. at ¶A.8. The investor would then wire money to a designated escrow account. *Id.* Pursuant to the Investment Contract, the investor was obligated to wire a sum of money and Liberty was obligated to purchase the designated real property. *Id.* If Liberty could not complete the purchase of the designated real property, Liberty and the investor would cancel the Investment Contract by way of a Cancellation Agreement, and Liberty would agree to either (1) refund the investor's deposit or (2) maintain the investor's funds on deposit as a credit for future investments by the investor. *Id.* at ¶A.10.

In the course of its business, Liberty formed limited liability companies (the "Investment Entities") to acquire and hold assets, including real properties, for the benefit of Liberty and/or its investors. *Id.* at ¶A.15. The membership interests in certain of the Investment Entities were vested in Ms. Gao's name, purportedly so that Ms. Gao could qualify for loans sought in connection with contemplated investments based upon her "good credit." *Id.* at ¶A.16. Ms. Gao was the sole and/or managing member of the following Investment Entities at various times prior to Liberty's bankruptcy:

1) HK Grace Building LLC ("HK Grace");
2) Strong Water Capital Management LLC ("Strong Water");
3) Coastline Investments LLC ("Coastline");
4) Diamond Waterfalls LLC ("Diamond Waterfalls");

---

[3] This summary of the material findings previously entered by the Court is provided as background and context for the findings that the Court makes herein in connection with the August 2 trial. The complete findings are set forth in Adv. Doc. Nos. 57 and 104, and are incorporated herein by reference.

    5)  Atherton Financial Building LLC ("Atherton Financial");
    6)  Pacific View REO Management LLC ("Pacific View");
    7)  FACDC Azusa LLC ("FACDC");
    8)  1595 17th Street LLC ("1595 17th Street"); and
    9)  544 San Antonio Road LLC ("544 San Antonio").

*Id.* at ¶A.17.

With the exception of property held by Bridgestream Management LLC ("Bridgestream") and East Heights LLC ("East Heights"), all of the property held by each of the Investment Entities is actually owned by Liberty. Jan. 25 Findings at ¶II.16. Ms. Gao was a signatory on the Investment Entities' accounts, typically without Mr. Kirk. *Id.* at ¶II.19. Both Ms. Gao and Mr. Kirk had signing authority on Liberty's accounts. *Id.* at ¶II.13.

Ms. Gao knew that the funds provided by Mr. Kirk for the purchase of real estate belonged to Liberty, because she handled the transfer of those funds. *Id.* at ¶II.18. Ms. Gao executed certain personal financial statements, under penalty of perjury, in which she represented that certain of the assets of the Investment Entities belonged to her. Pretrial Stip. at ¶A.18.

In the course of its business, Liberty formed certain escrow companies so that Liberty could handle the closing of certain transactions. Liberty's internal escrow companies include the following:

    1)  American Heritage Escrow Services Corporation;
    2)  Diamond Point Real Estate Corporation d/b/a Skyline Escrow Services;
    3)  Gold View Horizon LLC d/b/a Horizon Escrow Services; and
    4)  New Life Real Estate Corporation d/b/a Vista Escrow Services and d/b/a Shoreline Escrow Services.

*Id.* at ¶A.20. Liberty also used the services of a single outside escrow company, Sincere Escrow. *Id.* at ¶A.21. Sincere Escrow is owned by Margaret Chiu. *Id.*

## A. Liberty's Investment Losses

### 1. Forfeited Deposits

In an attempt to acquire real properties, Liberty made nonrefundable deposits to escrow accounts, typically in consideration for an extension of time to close the real estate transaction. *Id.* at ¶¶A.23–27. At the end of 2011, Liberty forfeited approximately $7 million that it had deposited in an attempt to purchase property located at 10 United Nations Plaza, San Francisco, CA (the "U.N. Plaza Property"). Liberty did not succeed in purchasing the U.N. Plaza Property. *Id.* at ¶A.26.

In 2013, Liberty forfeited $2 million that it had deposited in an attempt to purchase an office building located at 540–550 Montgomery Street, San Francisco, CA (the "Montgomery Street Property"). *Id.* at ¶A.27. Liberty did not succeed in purchasing the Montgomery Street Property. *Id.*

### 2. Hedge Fund Investment

On June 21, 2013, Liberty invested $5 million to purchase an 11% interest in the hedge fund Foundation Managing Member LLC ("Foundation"). *Id.* at ¶A.28. Liberty made the investment through Strong Water. *Id.* The $5 million that Liberty invested in Foundation was wired from an escrow account maintained at Sincere Escrow (Account No. 013778-MC) at the direction of Ms. Gao. *Id.* at ¶A.30. The funds on deposit in Escrow No. 013778-MC came from Anson Well

International Ltd. ("Anson Well"), an investor, and had been earmarked for the purchase of the Montgomery Street Property. *Id.* at ¶A.32. Foundation subsequently failed and Liberty lost its entire investment. *Id.* at ¶A.34.

### 3. Payments to Ms. Gao from the Sale of 166 Geary

HK Grace held title to real property located at 166 Geary Street, San Francisco, CA (the "Geary Property"). *Id.* at ¶A.41. Under the terms of an Operating Agreement dated November 2011, Ms. Gao was the sole manager and member of HK Grace. *Id.* On November 17, 2014, HK Grace sold the Geary Property for $60 million. *Id.* at ¶A.43. Net proceeds of approximately $26 million from the sale were deposited in an account in HK Grace's name (the "HK Grace Account"). *Id.* On November 17, 2014, Ms. Gao caused Huntington Giant Capital Corporation ("Huntington Capital") to submit an invoice for payment of $1.8 million to HK Grace, which was paid from the sale proceeds of the Geary Property to an account in Huntington Capital's name. *Id.* at ¶A.44. On November 18, 2014, one day after the sale of the Geary Property, Ms. Gao paid a check to herself in the amount of $8.5 million from the HK Grace Account. *Id.* at ¶A.45.

## B. Mr. Kirk and Ms. Gao Breached Their Fiduciary Duties to Liberty

As the sole officer and director of Liberty, at all relevant times Mr. Kirk owed a fiduciary duty of care, loyalty, and good faith to Liberty. Jan. 25 Findings at ¶III.2. As a fiduciary of Liberty, Mr. Kirk bears the burden of accounting for funds entrusted to Liberty. *Id.* at ¶III.3.

While she may not have been formally designated as an officer of Liberty, by, among other things, exercising dominion and control over Liberty's assets as both an agent of Liberty and trustee of its assets, Ms. Gao assumed a fiduciary obligation to Liberty to account for those assets. *Id.* at ¶III.6.

Mr. Kirk breached his fiduciary duties to Liberty by, among other things, failing to supervise Ms. Gao, failing to establish controls to prevent Ms. Gao's diversion of assets, failing to disclose the diversion of assets, and failing to account for Liberty's assets. *Id.* at ¶III.12. Ms. Gao breached her fiduciary duties to Liberty by, among other things, diverting Liberty's assets to herself and entities under her control, and failing to account for Liberty's assets. *Id.* at ¶III.13.

Mr. Kirk and Ms. Gao each bear the burden of proof to account to Liberty. *Id.* at ¶III.14. Mr. Kirk and Ms. Gao must demonstrate that all monies entrusted to Liberty through them were properly managed by rendering an account of all receipts and disbursements, showing when, to who, and for what purpose payments were made. *Id.*

Mr. Kirk and Ms. Gao can neither account for Liberty's funds that were controlled by them, nor have they demonstrated that any such accounting is possible. *Id.* at ¶III.15. All of Liberty's books and records have been turned over to Liberty's Chief Restructuring Officer (the "CRO"). *Id.* at ¶II.24. The records that have been turned over are incomplete and insufficient to permit a proper accounting for funds that Liberty received and disbursed over the last four years. *Id.* at ¶II.25.

## IV. Findings of Fact Based on Testimony and Evidence Presented at the August 2 Trial

The findings of fact set forth in this section are based upon the testimony and evidence presented at the August 2 trial.[4]

### A. Liberty's Failure to Use Investor Funds in Accordance with Investment Contracts

Based upon the testimony offered by Mr. Kirk, the Court finds that although the funds contributed to Liberty by investors were earmarked for investments in specific properties, Liberty did not use the funds in accordance with the Investment Contracts to purchase the properties for which the funds had been earmarked. Rather than segregating the funds contributed by each investor to insure that such funds were used for their intended purpose, Liberty treated all investor funds as a single capital pool. Liberty used this capital pool to attempt to acquire whatever property it was pursuing at the time, regardless of whether that property was the one specified by the investor.

Mr. Kirk initially denied that Liberty's funds were used in this manner. However, Mr. Kirk's deposition testimony, which the Plaintiff introduced at trial, clearly established that Liberty frequently did not use investor funds for their intended purpose. The relevant deposition testimony is as follows:

> **Question by Plaintiff's Counsel:** So if I understand your answer correctly, the answer is, yes, there were times when you took investors' money earmarked for property A and used it for a different purpose?
>
> **Answer:** For different acquisition.
>
> **Question:** Not necessarily the one that the investor had identified, correct?
>
> **Answer:** Correct.
>
> **Question:** Okay. And you were aware that was going on?
>
> **Answer:** Yes.
>
> **Question:** And when did that start happening?
>
> **Answer:** That always happening, but it is—it is the operation, the acquisition.

Trial Transcript ("Tr.") [Adv. Doc. No. 127] at 24:4–19 (quoting Mr. Kirk's May 25, 2017 deposition testimony).[5]

When confronted with this deposition testimony, Mr. Kirk had no explanation or clarification to support his initial contention that Liberty's funds were used for the purposes for which they had been earmarked. Instead, Mr. Kirk acknowledged that the funds were not spent as the investors had intended:

> **Question by Plaintiff's Counsel:** So the funds were rarely, if ever, used for the intended purposes that the investors had earmarked, is that correct?
>
> **Answer:** Not really. It's all in the operation to acquisition in the property, all the property.
>
> **Question:** All the properties?
>
> **Answer:** Yes.
>
> **Question:** And operations, what else does that word entail?

---

[4] To the extent any findings of fact should more properly be considered conclusions of law, they shall be deemed as such. To the extent any conclusions of law should more properly be considered findings of fact, they shall be deemed as such.

[5] All instances in which deposition testimony was introduced at trial are specifically noted.

**Answer:** It's all acquisitions related, deposit, closing. These relate to all the property acquisitions issues in all the property we need to acquire, not just one specific property. Tr. at 25:15–25.

Consistent with the pattern set forth above, when asked whether Liberty's business of acquiring commercial properties remained profitable subsequent to 2012, Mr. Kirk initially offered testimony at trial inconsistent with his deposition testimony. Tr. at 26:5–17. Once again, when presented with the inconsistent deposition testimony, Mr. Kirk lacked any plausible explanation for the inconsistencies. With respect to Liberty's profitability, the Court finds that Mr. Kirk's trial testimony lacks credibility, to the extent that it is inconsistent with his deposition testimony. Based upon Mr. Kirk's deposition testimony, the Court finds that the profit margin in connection with Liberty's sale of commercial properties disappeared in 2012. Tr. at 26:11–15 (deposition testimony of Mr. Kirk).

Based upon Mr. Kirk's testimony, the Court finds that Liberty received approximately $36.26 million for the purchase of specified real properties from various investors, but failed to purchase any of the properties in question and failed to return any of the investors' funds. Mr. Kirk was the primary contact with investors on Liberty's behalf and was the most knowledgeable person regarding the identity of investors. Tr. at 49:15–20 (testimony of Mr. Kirk).[6] Liberty's bankruptcy schedules (the "Schedules") reflect that Liberty owed investors at least $36.26 million on account of deposits made for the purchase of real properties where the transaction did not close and the investors' funds were not returned. Mr. Kirk prepared Liberty's Schedules based upon his review of the Investment Contracts that Liberty entered into with each investor. Tr. at 48:21–49:1. This review enabled Mr. Kirk to determine how much money Liberty had received from each investor as well as how much money Liberty had failed to return to each investor. Tr. at 49:1–14. Aside from the Investment Contracts, Mr. Kirk did not have any other documents from which to prepare the Schedules. Tr. at 49:21–24. When Mr. Kirk prepared the Schedules, he did not indicate that any of the amounts owed to the investors were disputed. Tr. at 50:3–6. In failing to so indicate, Mr. Kirk understood that he was acknowledging that Liberty owed each investor the amounts that were scheduled. Tr. at 50:7–9.

Based upon his recollection as refreshed by a review of the Schedules, Mr. Kirk testified that Liberty owed the following investors the amounts set forth in the table below as of the date of the petition.[7] The debts arose on account of investor deposits earmarked for the purchase of specific

---

[6] Unless otherwise indicated, all citations to the trial transcript in Sections IV.A are to testimony of Mr. Kirk.

[7] Plaintiff did not move the Schedules into evidence. Ms. Gao argues that Mr. Kirk's testimony regarding the amounts Liberty owed to investors is not admissible because Plaintiff did not ask Mr. Kirk whether Exhibit 22 refreshed his recollection. According to Ms. Gao, Mr. Kirk was testifying based upon the figures set forth in Exhibit 22, not based upon his refreshed recollection. Ms. Gao's evidentiary objection is overruled. Mr. Kirk offered detailed testimony as to how he prepared the Schedules, including an explanation that Shelby Ho's address was used as the address for one creditor because that creditor was an offshore company. Tr. at 52:10–16. Mr. Kirk's testimony showed that he is intimately familiar with Liberty's business operations. For example, Mr. Kirk testified that Liberty did not purchase property located at 3931 Alemany Boulevard in San Francisco as a result of a structural issue. Tr. at 55:20–56:3. Throughout the trial there were numerous instances in which Mr. Kirk recalled detailed information regarding properties that Liberty attempted to purchase or business transactions that Liberty entered into.

real properties. In each case, Liberty failed to purchase the specified property as required by the Investment Contract, and failed to return the investors' money as required by the Cancellation Contract:

| Investor Name | Property | Amount of Deposit | Citation to Mr. Kirk's Trial Testimony |
|---|---|---|---|
| Faith Hope International Ltd. | 540–550 Montgomery Street, San Francisco, CA | $12,000,000 | 50:25–51:25 |
| Good Special International Ltd. | 1122 Tenth Street, Santa Monica, CA | $1,375,000 | 52:1–53:5 |
| HCL 2011 LLC | 338 Green Oaks Drive, Atherton, CA | $950,000 | 53:6–20 |
| HCL 2011 LLC | 1444 Edgewood Drive, Palo Alto, CA | $1,750,000 | 53:21–54:9 |
| Lee Walgreens 2013 LLC | 3931 Alemany Boulevard, San Francisco, CA | $3,000,000 | 55:16–56:6 |
| PA One LLC | 99 Irving Avenue, Atherton, CA | $1,650,000 | 56:7–19 |
| PA One LLC | 27840 Via Feliz, Los Altos Hills, CA | $1,650,000 | 56:20–57:6 |
| Remy Associates, Inc. | 175 Stone Pine Lane, Menlo Park, CA | $208,000 | 57:7–16 |
| Remy Associates, Inc. | 60 and 68 Colorado Boulevard, and First Floor 10 South Delacy Street, Pasadena, CA | $7,683,939 | 57:17–58:3 |
| Smart Gear Development Ltd. | 39 Stockton Street, San Francisco, CA | $6,000,000 | 58:4–23 |
| **TOTAL** | | **$36,266,939** | |

## B. Liberty's Loss of Investor Funds

Liberty lost the investor funds discussed above, as well as funds contributed by other investors, in a variety of ways, as set forth below.

### 1. Loss of Nonrefundable Deposits

Liberty lost approximately $21 million by making non-refundable deposits in connection with failed property acquisitions. Tr. at 29:18–22 (testimony of Mr. Kirk).[8] Liberty lost $7 million in connection with its failed attempt to purchase the U.N. Plaza Property in San Francisco; lost $2 million in its failed attempt to purchase 39 Stockton Street in San Francisco;

The Court is satisfied that Mr. Kirk's testimony regarding the amounts Liberty owed investors was based upon his personal recollection, as refreshed by a review of the Schedules.

[8] Unless otherwise indicated, all citations to the trial transcript in Sections IV.B.1–3 are to testimony of Mr. Kirk.

lost $2.5 million in its failed attempt to purchase 540–550 Montgomery Street in San Francisco; and lost $6 million in its failed attempt to purchase 600 Wilshire Boulevard in Los Angeles. Tr. at 27:1–25.

## 2. Loss of the Sales Proceeds of the Geary Property

On November 17, 2014, one of Liberty's Investment Entities sold real property located at 166 Geary Street, San Francisco, CA (the "Geary Property") for $60 million, generating net sales proceeds of approximately $26 million. Pretrial Stip. at ¶¶41 and 43. Liberty did not receive any of the net sales proceeds of the Geary Property. Tr. at 82:22–83:6. Instead, Ms. Gao took control of the net sales proceeds. Jan. 25 Findings at ¶I.23. J.D. Brothers, an entity which had invested in the Geary Property, did not receive any of the sales proceeds. Tr. at 54:24–55:1.

## 3. Loss of the Proceeds of a Loan from Huesing Holdings LLC

After Liberty began pursuing larger investments in commercial properties, it borrowed approximately $6 million from Huesing Holdings LLC ("Huesing"). Tr. at 30:2–7. Mr. Kirk expected that Liberty would repay the initial Huesing loan from the sales proceeds of a condominium jointly owed by Huesing and Liberty. However, the sales proceeds from the condominium building were not sufficient to repay Huesing's indebtedness. Tr. at 32:25–33:9. As a result, Liberty obtained multiple short term loans from Huesing, which were repeatedly extended and never fully repaid, as follows:

1) On September 9, 2013, Liberty borrowed $2 million from Huesing, due on November 18, 2013. Ex. 6, Tr. at 32:13–33:9.
2) On October 30, 2013, Liberty borrowed an additional $1 million from Huesing, due on January 9, 2014. Ex. 6, Tr. at 33:18–34:13.
3) On November 6, 2013, Liberty borrowed $1.15 million from Huesing, due on January 15, 2014. Ex. 6, Tr. at 34:14–35:4.
4) On November 19, 2014, Liberty borrowed $500,000 from Huesing, due on December 20, 2014. Ex. 6, Tr. at 34:5-18.
5) On February 25, 2014, Liberty borrowed $300,000 from Huesing, due on March 12, 2014. Ex. 6, Tr. at 35:19–36:7.
6) On September 9, 2014, Liberty borrowed $500,000 from Huesing, due on October 24, 2014. Ex. 6, Tr. at 36:8–21.
7) On April 17, 2014, Liberty borrowed $200,000 from Huesing, due on April 25, 2014. Ex. 6, Tr. at 37:10–22.
8) On April 29, 2014, Liberty borrowed $200,000 from Huesing, due on May 13, 2014. Ex. 6, Tr. at 38:1–6.
9) On October 25, 2014, Liberty borrowed $575,000 from Huesing, due on December 8, 2014, which Mr. Kirk personally guaranteed. Ex. 6, Tr. at 39:14–40:12.
10) On October 17, 2014, Liberty borrowed an additional $518,420 from Huesing, repayable on November 17, 2014. Ex. 6, Tr. at 41:17–42:6.

The short term loans from Huesing each bear interest at the rate of 15% for the specified loan period, such that in some instances the annualized rate of interest was in excess of 150%. Ex. 6, Tr. at 38:1–20. As discussed previously, Mr. Kirk's deposition testimony established that Liberty's operations were not profitable subsequent to 2012. Accordingly, the Court finds that at the time Liberty obtained the initial $6 million loan from Huesing and at the time Liberty

obtained the additional short term loans, Mr. Kirk lacked any reasonable expectation that those loans could be repaid, except from additional investor deposits. The Court finds that Mr. Kirk's belief that the original $6 million Huesing loan could be repaid from the condominium sale was not reasonable.

Mr. Kirk personally guaranteed Liberty's obligations to Huesing pursuant to a final agreement that was entered into on October 9, 2014 (the "Oct. 9 Agreement"). Ex. 6, Tr. at 40:4–9. Huesing's principal did not ask Mr. Kirk for a personal financial statement in connection with Mr. Kirk's personal guarantee, and did not ask for a financial statement from Liberty. Tr. at 41:11–16. Pursuant to the Oct. 9 Agreement, Liberty owed Huesing $10,710,477.02 as of October 9, 2014. Ex. 6 (final page) and Tr. at 42:10–25. Mr. Kirk does not know how much of the $10.7 million is attributable to principal and how much is attributable to interest, and has no way of calculating such amounts because the relevant documents no longer exist. Tr. at 44:19–45:8.

### 4. Equity Payments from the Bankruptcies of Investment Entities

David Golubchik testified regarding the bankruptcies of two of Liberty's Investment Entities, Diamond Waterfalls LLC ("Diamond") and Coastline Investments LLC ("Coastline"). Mr. Golubchik was the principal attorney representing Diamond and Coastline in their bankruptcy proceedings. Tr. at 7:2–3.[9] Diamond and Coastline's principal assets were two hotels which were adjacent to each other. Tr. at 6:13–17. During Diamond and Coastline's bankruptcies, the two hotels were sold to a single buyer for $19.5 million, generating net proceeds of approximately $3.25 million. Tr. at 6:18–22 and 7:17–8:5.

The $3.25 million in net sales proceeds were transferred to the client trust account of Mr. Golubchik's law firm, Levene Neale Bender Yoo & Brill LLP ("LNBYB"). Tr. at 8:2–8. LNBYB issued a wire transfer, pursuant to which $2.6 million of the sales proceeds were transferred to an account at Mega Bank in Ms. Gao's name. Tr. at 12:11–21. By way of another wire transfer, LNBYB transferred an additional $150,000 of the sales proceeds to an account at Mega Bank in Ms. Gao's name. Tr. at 13:2–18.

The foregoing testimony of Mr. Golubchick was based upon his recollection, as refreshed by two documents reflecting wire transfers, a document reflecting wiring instructions, and the final closing statement issue in connection with the sale of the hotels. Ms. Gao contends that Mr. Golubchick's testimony is inadmissible, on the grounds that Plaintiff failed to demonstrate that Mr. Golubchick was testifying based upon his refreshed recollection, as opposed to testifying based upon the contents of the documents.[10] Ms. Gao's evidentiary objection is overruled. Mr. Golubchick testified that he was the principal attorney at LNBYB who worked on the Diamond and Coastline bankruptcies. Tr. at 7:2–7. He further testified that he was familiar with the facts and the circumstances surrounding the sale of the hotels in those bankruptcies. *Id*. The Court

---

[9] Unless otherwise indicated, all citations to the trial transcript in Section IV.B.4 are to testimony of Mr. Golubchick.

[10] The Court admitted into evidence two documents reflecting wire transfers and a document containing wiring instructions, but only for the purpose of refreshing Mr. Golubchick's recollection. Tr. at 18:23–25 (evidentiary ruling by the Court). The Court admitted into evidence the seller's final settlement statement issued in connection with the sale of the hotels, for the purpose of establishing that LNBYB's client trust account received a payment of $3.25 million from the hotel's net sales proceeds. Tr. at 18:10–18 (evidentiary ruling by the Court).

finds that Mr. Golubchick's testimony was based upon his personal recollection, as refreshed by a review of the documents.

In 2014, Mr. Kirk caused Atherton Financial Building LLC ("Atherton") to commence bankruptcy proceedings. Pretrial Stip. at ¶A.50. Atherton was another of Liberty's Investment Entities, and Ms. Gao was its sole and/or managing member. *Id.* at ¶A.17. In or after May 2015, $1.5 million in net proceeds from the sale of real property in Atherton's bankruptcy was wired to Bank SinoPac. *Id.* at ¶A.53. The purpose of the $1.5 million wire was to satisfy a judgment that Bank SinoPac held against Ms. Gao personally. Tr. at 85:17–20 (testimony of Mr. Kirk).

On June 12, 2015, counsel wired $1,623,756.29 in remaining net proceeds from the sale in Atherton's bankruptcy to an account in Liberty's name maintained at Cathay Bank. Pretrial Stip. at ¶A.54. Ms. Gao controlled the account at Cathay Bank to which the funds were wired. Tr. at 85:24–25 (testimony of Mr. Kirk). Mr. Kirk has no knowledge of what happened to the funds after they were wired into the Cathay Bank account. Tr. at 86:1–3 (testimony of Mr. Kirk).

## V. Conclusions of Law Based on Testimony and Evidence Presented at the August 2 Trial

The Court has previously determined that the Defendants breached their fiduciary duties to Liberty by failing to properly account for its assets. As fiduciaries of Liberty, Defendants are "under an obligation to render to [Liberty's] beneficiaries a full account of all [their] dealings with [Liberty's] property, and where there has been a negligent failure to keep true accounts all presumptions are against" them. *Blackmon v. Hale*, 1 Cal. 3d 548, 560, 463 P.2d 418, 425 (1970). As the Ninth Circuit has explained:

> The obligation to render an accounting is triggered by proof that the plaintiff entrusted property to the defendant in a fiduciary relationship. Once the fiduciary relationship is established, the burden is on the defendant to show that he has performed his duties properly …. The defendant thus could not escape liability simply by remaining silent or by testifying generally that funds were not misappropriated. Instead, the fiduciary was under a duty to render an account that "should show in detail the items expended and show when, to whom, and for what purposes the payments were made so the beneficiaries can make a reasonable test of the accuracy of the accounts. The accounts should be clear and accurate and if they are not, all presumptions are against the trustee and all obscurities and doubts are to be taken adversely to him."

*Otto v. Niles (In re Niles)*, 106 F.3d 1456, 1461 n.4 (9th Cir. 1997).

Damages arising from a breach of fiduciary duty are assessed based on the damages proximately flowing from the breach. *Hasso v. Hapke*, 227 Cal. App. 4th 107, 140, 173 Cal. Rptr. 3d 356, 383 (2014). Where the breach of fiduciary duty involves a failure to account, the damages consist of the amount of funds or assets that the fiduciary received and failed to properly safeguard. In *Niles*, the Ninth Circuit held that a fiduciary is obligated to fully account for all funds entrusted to her. *Niles*, 106 F.3d at 1462. The *Niles* court reasoned that this accounting obligation arose from "[b]asic principles of the law of fiduciaries," as well as the policy considerations given that the "evidence of what funds were received by the fiduciary and how they were applied is likely to be more accessible to the fiduciary than to the principal." *Id.* The court concluded that if the fiduciary had engaged in transactions inconsistent with her fiduciary duties, she would be liable for funds lost in connection with those transactions. *Id.*

The Court finds that Defendants are liable to Liberty, jointly and severally, in the amount of $74,140,695.29, for breaching their fiduciary duties to Liberty and for failing to account for

Liberty's assets. To fulfill their obligation to account for Liberty's assets, Defendants have the burden of showing that they safeguarded the funds entrusted to them consistent with their fiduciary obligations. *Niles*, 106 F.3d at 1461 n.4. Defendants have failed to meet that burden.

Ms. Gao cannot satisfy her duty to account because her conduct prior to the trial required the Court to preclude her from introducing any evidence at trial. In connection with Plaintiff's Motion *In Limine*, the Court found that Ms. Gao could not present testimony pertaining to matters as to which she had previously invoked the Fifth Amendment:

> At a hearing conducted in Liberty's main bankruptcy case on June 22, 2016, Ms. Gao took the Fifth Amendment when questioned by counsel for the Committee [Plaintiff]. The hearing was on Liberty's emergency motion to obtain an order requiring Ms. Gao to immediately turnover Liberty's books and records. Liberty filed the emergency motion after its private investigator observed a document shredding truck at 3218 East Holt Avenue, West Covina, CA 91791 (the "Holt Property"), where certain of Liberty's books and records were stored. At the time, the Holt Property was under Ms. Gao's control.

At the hearing, Ms. Gao invoked the Fifth Amendment in response to the following questions posed by counsel for the Committee [Plaintiff]:

1) So Mr. Kirk has testified that Liberty Asset Management was formed in about 2007, is that correct?
2) Ms. Gao, were you employed with Liberty Asset Management from and after 2007?
3) Ms. Gao, can you describe your job functions on behalf of Liberty Asset Management?
4) Ms. Gao, as part of your responsibilities at Liberty Asset Management, were you in charge of accounting functions?
5) Ms. Gao, is it true that all or substantially all of the assets that were purchased with investors' funds on behalf of Liberty were taken in—the title was taken in LLCs that name you as the sole member?
6) Ms. Gao, would you mind telling the Court what happened with the proceeds from the sale of 166 Geary?

*See* Bankruptcy Doc. No. 152 at 65–69.

The Court reiterates its finding, made in connection with the Committee's [Plaintiff's] motion for partial summary adjudication, that Ms. Gao is precluded from offering testimony pertaining to the subjects as to which she previously invoked the Fifth Amendment. As the Ninth Circuit has explained:

> Trial courts generally will not permit a party to invoke the privilege against self-incrimination with respect to deposition questions and then later testify about the same subject matter at trial. The Federal Rules of Civil Procedure "contemplate ... 'full and equal discovery' ... so as to prevent surprise, prejudice and perjury" during trial. *Id.* "[B]ecause the privilege may be initially invoked and later waived at a time when an adverse party can no longer secure the benefits of discovery, the potential for exploitation is apparent."

*Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 909–11 (9th Cir. 2008) (internal citations omitted).

Here, Ms. Gao invoked the Fifth Amendment at a hearing intended to elicit information regarding (1) the location and content of Liberty's books and records and (2)

Ms. Gao's role in creating, maintaining, and preserving those books and records. This refusal to testify occurred at a critical juncture in the case, as it is possible that at the time of the hearing certain of Liberty's key records might not yet have been destroyed. Now that a complete set of records no longer exists, the Committee [Plaintiff] cannot secure the benefits of any information that may have been contained in those records. Having invoked the Fifth Amendment as a shield at a time when her testimony may have elucidated relevant information and may have assisted the Committee's [Plaintiff's] efforts to preserve Liberty's records, Ms. Gao cannot now decide to testify as to the same subjects now that most of the corresponding records, which would either corroborate or disprove her testimony, are no longer available.

Final Ruling Granting Plaintiff's Motion *In Limine* at 12–13.

The Court refused to permit Ms. Gao to introduce into evidence or to offer any testimony with respect to the few remaining books and records that had not disappeared, because the piecemeal selection of exhibits that Ms. Gao sought to introduce presented an incomplete and misleading picture of Liberty's finances:

The Court has already determined that Ms. Gao cannot account for the funds which she controlled at Liberty, that Ms. Gao has not demonstrated that such an accounting is possible, and that the remaining books and records that have been turned over to Liberty's CRO are not sufficient to permit a proper accounting of the funds that Liberty received and disbursed over the past four years. Jan. 25 Findings at ¶¶III.15 and II.24–25. Now, in an attempt to mitigate the damages for which she is liable based upon her failure to account, Ms. Gao seeks to introduce only those records which support her contention that she used funds entrusted to Liberty to pay its debts. This piecemeal selection of records sheds light only on a sliver of Liberty's financial history and is meaningless because the Court has no way of knowing what the missing records would show. For example, although the exhibits Ms. Gao seeks to introduce appear to show that Ms. Gao used some of the funds entrusted to Liberty to pay its debts, the missing records might show additional transactions increasing Liberty's indebtedness. In terms of enabling the Court to determine Ms. Gao's liability for failure to account, the fragmentary and incomplete record presented by Ms. Gao is worse than no record at all….

The snippets of financial information that Ms. Gao seeks to introduce fall far short of showing in detail either Liberty's expenditures or when, to whom, and for what purposes those expenditures were made. As such, Ms. Gao's proposed fragmentary accounting does not enable the Court to evaluate the extent to which Liberty was damaged as a result of Ms. Gao's failure to account. As set forth above, such a misleading and partial accounting is even less revealing than no accounting at all. Ms. Gao owed Liberty a fiduciary obligation to maintain and preserve accurate and thorough business records. Having failed to fulfill that duty, she may not now present only the few exculpatory records that have not disappeared.

Final Ruling Granting Plaintiff's Motion *In Limine* at 10–11.

In addition, the Court found that Ms. Gao's proposed exhibits were not admissible because she had failed to timely produce them:

> Ms. Gao did not produce the exhibits to the Committee [Plaintiff] until July 5, 2017—more than a month after the discovery cutoff date of May 31, 2017. *See* Greenwood Decl. at ¶¶5–6. Civil Rule 26(a)(1)(A)(ii) requires parties to produce all documents that they may use to support their claims and defenses. Civil Rule 37(c) provides that a party who fails to timely produce the information required by Rule 26 may not rely upon that information at trial, "unless the failure was substantially justified or is harmless." The burden is on the non-compliant party to "demonstrate that failure to comply with Rule 26(a) is substantially justified or harmless." *Torres v. City of Los Angeles*, 548 F.3d 1197, 1213 (9th Cir. 2008). Exclusion of evidence under Rule 37(c) does not require the Court "to make a finding of willfulness or bad faith," and the "implementation of the sanction is appropriate 'even when a litigant's entire cause of action … [will be] precluded.'" *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1180 (9th Cir. 2008).
>
> Here, Ms. Gao did not produce any exhibits until more than a month after the discovery cutoff date. Ms. Gao has not shown that her failure to timely produce the exhibits was either substantially justified or harmless. Indeed, the Committee [Plaintiff] would be prejudiced if the Court were to admit the untimely exhibits, as the Committee [Plaintiff] has not had sufficient time to review those exhibits.

Final Ruling Granting Plaintiff's Motion *In Limine* at 11.

Mr. Kirk did not meet his burden of accounting for the funds entrusted to Liberty. Mr. Kirk asserts that he has accounted for a portion of the funds—specifically, the funds that Liberty lost by making nonrefundable deposits in connection with its failed attempts to purchase various real properties.[11] Mr. Kirk's theory is that he has satisfied his duty to account by explaining what happened to the funds. Mr. Kirk's theory misconceives the obligations encompassed in the duty to account. As the Ninth Circuit explained in *Niles*, a fiduciary satisfies his burden to account "by persuading the trier of fact that [he] complied with [his] fiduciary duties with respect to all questioned transactions." *Niles*, 106 F.3d 1462. Here, Mr. Kirk has not shown compliance with his fiduciary obligations. When Liberty received investor funds earmarked for the purchase of specific properties, Mr. Kirk had a fiduciary obligation to ensure that Liberty used those funds to purchase the specified properties, in accordance with the terms of the Investment Contract and Cancellation Agreement. Mr. Kirk's testimony established that the investor funds were not used to purchase the properties for which the funds were earmarked, but were instead used in connection with whatever acquisition Liberty happened to be pursuing at the time. Worse, approximately $21 million of the funds were squandered on nonrefundable deposits made in connection with acquisitions that Liberty lacked the ability to complete. In another instance, $5 million of the funds earmarked for the purchase of the Montgomery Street Property were lost because Liberty invested the money in Foundation, a hedge fund that failed.

---

[11] Certain of Mr. Kirk's arguments in opposition to entry of judgment were also made by Ms. Gao. The Court's reasoning in connection with the arguments made by Mr. Kirk is also applicable to the identical arguments made by Ms. Gao.

Next, Mr. Kirk argues that his failure to account was not the proximate cause of any damages suffered by Liberty. Mr. Kirk contends that Liberty's damages resulted from Ms. Gao's intentional diversion of assets. This argument lacks merit. The Court has already found that Mr. Kirk breached his fiduciary duties to Liberty "by, among other matters, failing to supervise [Ms.] Gao or otherwise establish controls to prevent her diversion of assets …." Jan. 25 Findings at ¶III.12. In view of this finding, Mr. Kirk cannot escape liability by attempting to place the blame upon Ms. Gao.

Along similar lines, Mr. Kirk argues that he cannot be held liable for the loss of the $26 million in net sales proceeds from the sale of the Geary Property, because those sales proceeds did not pass through Liberty's accounts but were instead deposited into an entity under Ms. Gao's control. Once again, this argument neglects the Court's prior finding that Mr. Kirk's liability derives in part from his failure to adequately supervise Ms. Gao.

With respect to the funds diverted in the bankruptcies of Diamond, Coastline, and Atherton, Mr. Kirk reasserts his contention that he cannot be held liable on the grounds that the funds were transferred to entities under Ms. Gao's control and did not pass through Liberty's accounts. The argument is unavailing.

Mr. Kirk contends that he has accounted for the approximately $10.7 million that Liberty owes Huesing. Without citing to the trial transcript, Mr. Kirk represents in his post-trial brief that he testified that the principal investment was returned to Huesing and that $10.7 million owed represents interest. Benjamin Kirk Post-Trial Brief [Doc. No. 140] at 5. Mr. Kirk argues that his trial testimony constitutes an accounting of the Huesing funds. However, Mr. Kirk's characterization of his trial testimony omits the full picture. On cross examination, Mr. Kirk testified that the $10.7 million owed to Huesing was interest. But when questioned about this testimony by Plaintiff's counsel, Mr. Kirk admitted that he did not know how much of the $10.7 million was for principal and how much was for interest. Tr. at 88:9–20.

As discussed previously, at the time Liberty borrowed funds from Huesing, Mr. Kirk lacked any reasonable expectation that the funds could be repaid, because Liberty's operations were not profitable. At trial, Mr. Kirk could not explain the disposition of the Huesing loan proceeds, and as discussed above, Mr. Kirk does not even know how much of the $10.7 million owed Huesing represents principal versus interest. The Court finds that Mr. Kirk has failed to account for the funds Liberty borrowed from Huesing.

Finally, Mr. Kirk argues that Plaintiff has fallen short in demonstrating that there was a failure in accounting, because Plaintiff did not introduce into evidence the remaining books and records of Liberty that are currently in the possession of Liberty's Chief Restructuring Officer (the "CRO"). According to Mr. Kirk, Plaintiff has strategically withheld such books and records. Mr. Kirk argues that Plaintiff should be required to introduce into evidence the remaining books and records if it wishes to obtain a judgment against him.

Mr. Kirk's argument disregards the findings previously made by the Court. In its Jan. 25 Findings, the Court stated that the books and records that have been turned over to Liberty's CRO are incomplete and insufficient to permit a proper accounting of the funds that Liberty received and disbursed over the previous four years. Jan. 25 Findings at ¶II.25.

## VI. Conclusion

Based upon the foregoing, the Court finds that Ms. Gao and Mr. Kirk are jointly and severally liable to Liberty in the amount of $74,140,695.29 for breaching their fiduciary duties to

Liberty and for failing to account for the funds entrusted to Liberty. The funds which Ms. Gao and Mr. Kirk have failed to account for are as follows:

1) $36,266,939 in investor deposits earmarked for the purchase of specific real properties;
2) $26,000,000 in net proceeds from the sale of the Geary Property;
3) $6,000,000 on account of the principal amount Liberty originally borrowed from Huesing;
4) $2,750,000 in net proceeds from the sale of the hotels in the Coastline and Diamond bankruptcies (consisting of $2,600,000 wired to an account controlled by Ms. Gao at Mega Bank, plus an additional $150,000 subsequently wired to the same account); and
5) $3,123,756.29 in proceeds distributed in Atherton's bankruptcy (consisting of $1,500,000 wired to Bank SinoPac in May 2015 and $1,623,756.29 wired to Cathay Bank in June 2015).

The Court will enter judgment consistent with this Memorandum of Decision.

###

Date: December 29, 2017

Ernest M. Robles
United States Bankruptcy Judge

# Exhibit A—Final Ruling Granting Plaintiff's Motion *In Limine*

**United States Bankruptcy Court**
**Central District of California**
**Los Angeles**
**Judge Ernest Robles, Presiding**
**Courtroom 1568 Calendar**

---

**Wednesday, August 02, 2017**                                      **Hearing Room    1568**

---

<u>9:00 AM</u>
**2:16-13575    Liberty Asset Management Corporation**                          **Chapter 11**
Adv#: 2:16-01337     LIBERTY ASSET MANAGEMENT CORPORATION et al v. Gao et al

   **#2.00**      HearingRE: [112] Motion in Limine to Exclude Evidence  (Greenwood, Gail)

                              Docket       112

   **Matter Notes:**

      8/2/2017


      <span style="color:red">The tentative ruling will be the order.</span>
      <span style="color:red">Party to lodge order: Committee counsel</span>

      <span style="color:red">**POST PDF OF TENTATIVE RULING TO CIAO**</span>


   **Tentative Ruling:**

      **8/1/2017**

         For the reasons set forth below, the Committee's Motion *In Limine* is GRANTED
      and Ms. Gao will not be permitted to introduce Exhibits A through P into evidence or
      offer testimony with repect to them.

      **Pleadings Filed and Reviewed:**
      1)  The Official Committee of Unsecured Creditors' [Amended] Motion *In Limine* to
          Exclude Evidence (the "Motion") [Doc. No. 113]
      2)  Opposition of Defendant Lucy Gao to Plaintiff's Amended Motion *In Limine* to
          Exclude Evidence (the "Opposition") [Doc. No. 118]
      3)  Findings of Fact and Conclusions of Law Regarding Motion by the Official
          Committee of Unsecured Creditors for Summary Adjudication of Defendants'
          Liability for Breach of Fiduciary Duties and Accounting (the "Jan. 25 Findings")
          [Doc. No. 57]
      4)  Joint Pretrial Stipulation [Doc. No. 104]
          a)  Order on Joint Pretrial Stipulation [Doc. No. 107]

---

**United States Bankruptcy Court**
**Central District of California**
Los Angeles
**Judge Ernest Robles, Presiding**
**Courtroom 1568 Calendar**

Wednesday, August 02, 2017                                          Hearing Room      1568

9:00 AM
CONT...        Liberty Asset Management Corporation                            Chapter 11

### I. Findings of Fact and Conclusions of Law That Have Been Established

The following facts and conclusions of law have been established by the Joint Pretrial Stipulation (the "Pretrial Stip.") [Doc. No. 104], the Court's "Findings of Fact and Conclusions of Law Regarding Motion by the Official Committee of Unsecured Creditors for Summary Adjudication of Defendants' Liability for Breach of Fiduciary Duties and Accounting" (the "Jan. 25 Findings") [Doc. No. 57], declarations submitted in connection with the motion for partial summary adjudication filed by the Official Committee of Unsecured Creditors (the "Committee") of Liberty Asset Management Corporation ("Liberty"), and the judgments issued in the adversary proceedings *Liberty Asset Management Corporation v. Green Oak Asset Management LLC and Lucy Gao* [Adv. No. 2:16-ap-01140-ER] and *Liberty Asset Management Corporation v. East Heights LLC and Lucy Gao* [Adv. No. 2:16-ap-01141-ER]:

Liberty Asset Management Corporation ("Liberty") was a real estate investment company that bought and sold real property using a combination of its own cash, cash from investors, and bank loans. Pretrial Stip. at ¶5. Real property acquired by Liberty was not titled in the name of Liberty or its investors, but instead was purchased in the name of various limited liability companies. *Id.* At all times since its formation, Benjamin Kirk was Liberty's President, CEO, CFO, and sole shareholder. *Id.* at ¶6. Mr. Kirk's primary role was soliciting investors for Liberty and identifying real properties for purchase and sale. *Id.* at ¶7.

Lucy Gao has held an equitable interest in Liberty since its inception. Jan. 25 Findings at ¶II.2. Ms. Gao's equitable interest is based upon Mr. Kirk's oral promises that Ms. Gao would receive a 20–50% profit share from Liberty's investments. *Id.* at ¶II.3. Ms. Gao met Mr. Kirk romantically around the end of 2000, and Ms. Gao and Mr. Kirk had a daughter together. Declaration of Lucy Gao in Support of Gao's Opposition to the Motion by the Official Committee of Unsecured Creditors for Summary Adjudication of Defendants' Liability for Breach of Fiduciary Duties and Accounting (the "Gao Decl.") [Doc. No. 34] at ¶4. Ms. Gao was in charge of overseeing Liberty's accounting functions; ensuring that timely tax returns were prepared; maintaining records pertaining to the purchase, sale, and financing of assets; maintaining records pertaining to the flow of funds from investors; and maintaining Quickbooks records. Jan. 25 Findings at ¶II.7.

Typically, Liberty entered into a contract with an investor (each, an "Investment

**United States Bankruptcy Court**
**Central District of California**
Los Angeles
Judge Ernest Robles, Presiding
Courtroom 1568 Calendar

Wednesday, August 02, 2017                                    Hearing Room      1568

9:00 AM
CONT...        Liberty Asset Management Corporation                        Chapter 11

Contract") to purchase a specific parcel of real estate, and the investor would wire
money to a designated escrow account. Pretrial Stip. at ¶8. Pursuant to the Investment
Contract, the investor was obligated to wire a sum of money and Liberty was
obligated to purchase the designated real property. *Id.* If Liberty could not complete
the purchase of the designated real property, Liberty and the investor would cancel the
Investment Contract, and Liberty would agree to either (1) refund the investor's
deposit or (2) maintain the investor's funds on deposit as a credit for future
investments. *Id.* at ¶10.

In the course of its business, Liberty formed limited liability companies (the
"Investment Entities") to acquire and hold assets, including real properties, for the
benefit of Liberty and/or its investors. *Id.* at ¶15. Ms. Gao was the sole and/or
managing member of the following Investment Entities at various times prior to
Liberty's bankruptcy:

1) HK Grace Building LLC ("HK Grace");
2) Strong Water Capital Management LLC ("Strong Water");
3) Coastline Investments LLC ("Coastline");
4) Diamond Waterfalls LLC ("Diamond Waterfalls");
5) Atherton Financial Building LLC ("Atherton Financial");
6) Pacific View REO Management LLC ("Pacific View");
7) FACDC Azusa LLC ("FACDC");
8) 1595 17th Street LLC ("1595 17th Street"); and
9) 544 San Antonio Road LLC ("544 San Antonio").

*Id.* at ¶17. With the exception of property held by Bridgestream Management LLC
("Bridgestream"), all of the property held by each of the Investment Entities is actually
owned by Liberty. **[Note 1]** Jan. 25 Findings at ¶II.16. Ms. Gao was a signatory on the
Investment Entities' account, typically without Mr. Kirk. *Id.* at ¶II.19. Both Ms. Gao
and Mr. Kirk had signing authority on Liberty's accounts. *Id.* at ¶II.13.

Ms. Gao knew that the funds provided by Mr. Kirk for the purchase of real estate
belonged to Liberty, because she handled the transfer of those funds. *Id.* at ¶II.18. Ms.
Gao executed certain personal financial statements, under penalty of perjury, in which
she represented that certain of the assets of the Investment Entities belonged to her.
Pretrial Stip. at ¶18.

In the course of its business, Liberty formed certain escrow companies so that
Liberty could handle the closing of certain transactions. Liberty's internal escrow
companies include the following:

1) American Heritage Escrow Services Corporation;

**United States Bankruptcy Court**
**Central District of California**
Los Angeles
Judge Ernest Robles, Presiding
Courtroom 1568 Calendar

Wednesday, August 02, 2017                                    **Hearing Room    1568**

9:00 AM
CONT...          **Liberty Asset Management Corporation**                    **Chapter 11**
     2) Diamond Point Real Estate Corporation d/b/a Skyline Escrow Services;
     3) Gold View Horizon LLC d/b/a Horizon Escrow Services; and
     4) New Life Real Estate Corporation d/b/a Vista Escrow Services and d/b/a
        Shoreline Escrow Services.
*Id.* at ¶20. Liberty also used the services of a single outside escrow company, Sincere
Escrow. *Id.* at ¶21. Sincere Escrow is owned by Margaret Chiu. *Id.*

**Liberty's Investment Losses**
*Forfeited Deposits*
   In an attempt to acquire real properties, Liberty made nonrefundable deposits to
escrow accounts. At the end of 2011, Liberty forfeited approximately $7 million that it
had deposited in an attempt to purchase property located at 10 United Nations Plaza,
San Francisco, CA (the "U.N. Plaza Property"). Liberty did not succeed in purchasing
the U.N. Plaza Property. *Id.* at ¶26.
   In 2013, Liberty forfeited $2 million that it had deposited in an attempt to
purchase an office building located at 540–550 Montgomery Street, San Francisco,
CA (the "Montgomery Street Property"). Liberty did not succeed in purchasing the
Montgomery Street Property. *Id.* at ¶27.

*Hedge Fund Investment*
   On June 21, 2013, Liberty invested $5 million to purchase an 11% interest in the
hedge fund Foundation Managing Member LLC ("Foundation"). *Id.* at ¶28. Liberty
made the investment through Strong Water. *Id.* Foundation subsequently failed and
Liberty lost its entirety investment. *Id.* at ¶34.

*Pledge of Liberty's Properties for Ms. Gao's Benefit*
   On October 2, 2012, Ms. Gao on behalf of East Heights LLC ("East Heights") and
Green Oak Asset Management LLC ("Green Oak") encumbered four real properties as
security for a loan in the principal amount of $2.88 million made by Shanghai
Commercial Bank to Ms. Gao. *Id.* at ¶35. The encumbered properties are located at
(1) 1001 East Road, La Habra, CA; (2) 3808 Hollins Avenue, Claremont, CA; (3) 409
Avenida Santa Barbara #D, San Clemente, CA; and (4) 413 Avenida Santa Barbara
#B, San Clemente, CA. *Id.* On October 22, 2015, Ms. Gao on behalf of Green Oak
entered into a modification agreement with Shanghai Commercial Bank, which
provided that the deed of trust against the property at 409 Avenida Santa Barbara #D,
San Clemente, CA secures the principal amount of $1.68 million. *Id.* The loan from

**United States Bankruptcy Court**
**Central District of California**
Los Angeles
Judge Ernest Robles, Presiding
Courtroom 1568 Calendar

---

**Wednesday, August 02, 2017**                                    **Hearing Room    1568**

---

9:00 AM
**CONT...        Liberty Asset Management Corporation**                              **Chapter 11**

Shanghai Commercial Bank to Ms. Gao remains outstanding and continues to encumber the four real properties. *Id.* at ¶40.

*Payments to Ms. Gao from the Sale of 166 Geary*
    HK Grace held title to real property located at 166 Geary Street, San Francisco, CA (the "Geary Property"). *Id.* at ¶41. Under the terms of an Operating Agreement dated November 2011, Ms. Gao was the sole manager and member of HK Grace. *Id.* On November 17, 2014, HK Grace sold the Geary Property for $60 million. *Id.* at ¶43. Net proceeds of approximately $26 million from the sale were deposited in an account in HK Grace's name. *Id.* On November 17, 2014, Ms. Gao caused Huntington Giant Capital Corporation ("Huntington Capital") to submit an invoice for payment of $1.8 million to HK Grace, which was paid from the sale proceeds of the Geary Property to an account in Huntington Capital's name. *Id.* at ¶44. On November 18, 2014, one day after the sale of the Geary Property, Ms. Gao paid a check to herself in the amount of $8.5 million. *Id.* at ¶45.

*Payments to Ms. Gao from Liberty and Its Investment Entities*
    Between December 2012 and May 2014, Mr. Kirk wrote checks payable to Ms. Gao from the accounts of Liberty and one of its Investment Entities in the amount of $60,000. *Id.* at ¶II.47.

**Mr. Kirk and Ms. Gao Breached Their Fiduciary Duties to Liberty**
    As the sole officer and director of Liberty, at all relevant times Mr. Kirk owed a fiduciary duty of care, loyalty, and good faith to Liberty. Jan. 25 Findings at ¶III.2. As a fiduciary of Liberty, Mr. Kirk bears the burden of accounting for funds entrusted to Liberty. *Id.* at ¶III.3.
    While she may not have been formally designated as an officer of Liberty, by, among other things, exercising dominion and control over Liberty's assets as both an agent of Liberty and trustee of its assets, Ms. Gao assumed a fiduciary obligation to Liberty to account for those assets. *Id.* at ¶III.6.
    Mr. Kirk breached his fiduciary duties to Liberty by, among other things, failing to supervise Ms. Gao, failing to establish controls to prevent Ms. Gao's diversion of assets, failing to disclose the diversion of assets, and failing to account for Liberty's assets. *Id.* at ¶III.12. Ms. Gao breached her fiduciary duties to Liberty by, among other things, diverting Liberty's assets to herself and entities under her control, and failing to account for Liberty's assets. *Id.* at ¶III.13.

**United States Bankruptcy Court**
**Central District of California**
**Los Angeles**
**Judge Ernest Robles, Presiding**
**Courtroom 1568 Calendar**

**Wednesday, August 02, 2017**                                   **Hearing Room    1568**

9:00 AM
**CONT...      Liberty Asset Management Corporation**                              **Chapter 11**

Mr. Kirk and Ms. Gao each bear the burden of proof to account to Liberty. *Id.* at ¶III.14. Mr. Kirk and Ms. Gao must demonstrate that all monies entrusted to Liberty through them were properly managed by rendering an account of all receipts and disbursements, showing when, to who, and for what purpose payments were made. *Id.*

Mr. Kirk and Ms. Gao can neither account for Liberty's funds that were controlled by them, nor have they demonstrated that any such accounting is possible. *Id.* at ¶III.15. All of Liberty's books and records have been turned over to Liberty's Chief Restructuring Officer (the "CRO"). *Id.* at ¶II.24. The records that have been turned over are incomplete and insufficient to permit a proper accounting for funds that Liberty received and disbursed over the last four years. *Id.* at ¶II.25.

At issue in the present trial is the amount of damages sustained by Liberty as a result of Mr. Kirk and Ms. Gao's breach of their fiduciary duties.

## II. The Committee's Motion *In Limine* and Ms. Gao's Opposition

The Committee moves to exclude all exhibits that Ms. Gao intends to offer into evidence at trial. The exhibits in question consist of personal bank statements, checks, wire transfers, a promissory note, and a prepared summary of transactions. The Committee argues that the exhibits should be excluded for the following reasons:

1) The Court has already determined that Liberty's records, which Ms. Gao was charged with maintaining, are incomplete and insufficient to permit a proper accounting of funds received and disbursed by Liberty over the last four years. Any attempt by Ms. Gao to account at this time is barred by the law of the case.

2) The partial accounting that Ms. Gao seeks to introduce into evidence is based only on a selective set of monthly statements from Ms. Gao's personal checking account. The piecemeal set of records that Ms. Gao offers does not amount to a proper accounting of Liberty's funds. Ms. Gao is required to present an accounting of *all* receipts and disbursements of Liberty, showing when, to whom, and for what purpose the payments were made. The evidence Ms. Gao seeks to introduce falls far short of that standard.

3) The exhibits are intended to show that in certain instances, Ms. Gao used funds diverted to her personal accounts to pay Liberty's expenses or return funds to Liberty or its Investment Entities. But Ms. Gao offers only a sliver of the picture of what happened to Liberty's assets, and the exhibits she offers do not address what happened immediately before or after the transactions at issue. The proposed exhibits are not probative of an accounting based on

**United States Bankruptcy Court**
**Central District of California**
**Los Angeles**
**Judge Ernest Robles, Presiding**
**Courtroom 1568 Calendar**

**Wednesday, August 02, 2017**                                    **Hearing Room    1568**

<u>9:00 AM</u>
**CONT...**        **Liberty Asset Management Corporation**                     **Chapter 11**

"satisfactory evidence"—that is, evidence that supports the accuracy of every
item of account, *Burwell v. McCabe*, 98 Cal. App. 2d 503, 505 (Cal. Ct. App.
1950)—and should be excluded because introduction of such evidence will
cause delay and waste the Court's time. Consideration of the exhibits is also
prejudicial to the Committee, because most of the exhibits were not produced
until the parties met to prepare the Pretrial Stipulation.

4)    Exhibits L and P appear to relate to the proceeds of the sale of the Geary
Property. The Court has previously found that Ms. Gao is precluded from
testifying on such issues based upon her previous invocation of the Fifth
Amendment.

Ms. Gao makes the following arguments in opposition to the Committee's Motion *In
Limine*:

1)    The Pretrial Stipulation provides that the issue of fact to be determined is the
amount of damages cause by Ms. Gao as a result of (a) her diversion of
Liberty's assets and (b) her failure to account for Liberty's assets. While Ms.
Gao's exhibits may not be relevant to the amount of damages caused by Ms.
Gao's failure to account, the exhibits are relevant to determining damages
caused by Ms. Gao's diversion of Liberty's funds.

2)    The Committee argues that Ms. Gao is barred from presenting evidence as to
the disposition of the sale proceeds of the Geary Property as a result of her
previous invocation of the Fifth Amendment. While Ms. Gao's invocation of
the Fifth Amendment may prevent her from testifying on this issue, it does not
prevent her from introducing documentary evidence as to the issue.

### III. Findings and Conclusions

The Court has already determined that Ms. Gao cannot account for the funds
which she controlled at Liberty, that Ms. Gao has not demonstrated that such an
accounting is possible, and that the remaining books and records that have been turned
over to Liberty's CRO are not sufficient to permit a proper accounting of the funds
that Liberty received and disbursed over the past four years. Jan. 25 Findings at
¶¶III.15 and II.24–25. Now, in an attempt to mitigate the damages for which she is
liable based upon her failure to account, Ms. Gao seeks to introduce only those
records which support her contention that she used funds entrusted to Liberty to pay
its debts. This piecemeal selection of records sheds light only on a sliver of Liberty's
financial history and is meaningless because the Court has no way of knowing what

**United States Bankruptcy Court**
**Central District of California**
**Los Angeles**
**Judge Ernest Robles, Presiding**
**Courtroom 1568 Calendar**

**Wednesday, August 02, 2017**                                                      **Hearing Room    1568**

9:00 AM
**CONT...        Liberty Asset Management Corporation**                                          **Chapter 11**
the missing records would show. For example, although the exhibits Ms. Gao seeks to
introduce appear to show that Ms. Gao used some of the funds entrusted to Liberty to
pay its debts, the missing records might show additional transactions increasing
Liberty's indebtedness. In terms of enabling the Court to determine Ms. Gao's liability
for failure to account, the fragmentary and incomplete record presented by Ms. Gao is
worse than no record at all.

The Court has previously determined that Ms. Gao owes a fiduciary duty to
account to Liberty. As a fiduciary of Liberty, Ms. Gao was "under an obligation to
render to [Liberty's] beneficiaries a full account of all [her] dealings with [Liberty's]
property, and where there has been a negligent failure to keep true accounts all
presumptions are against" Ms. Gao. *Blackmon v. Hale*, 1 Cal. 3d 548, 560, 463 P.2d
418, 425 (1970). As the Ninth Circuit has explained:

> The obligation to render an accounting is triggered by proof that the plaintiff
> entrusted property to the defendant in a fiduciary relationship. Once the
> fiduciary relationship is established, the burden is on the defendant to show
> that he has performed his duties properly …. The defendant thus could not
> escape liability simply by remaining silent or by testifying generally that funds
> were not misappropriated. Instead, the fiduciary was under a duty to render an
> account that "should show in detail the items expended and show when, to
> whom, and for what purposes the payments were made so the beneficiaries can
> make a reasonable test of the accuracy of the accounts. The accounts should be
> clear and accurate and if they are not, all presumptions are against the trustee
> and all obscurities and doubts are to be taken adversely to him."

*Otto v. Niles (In re Niles)*, 106 F.3d 1456, 1461 n.4 (9th Cir. 1997).

The snippets of financial information that Ms. Gao seeks to introduce fall far short
of showing in detail either Liberty's expenditures or when, to whom, and for what
purposes those expenditures were made. As such, Ms. Gao's proposed fragmentary
accounting does not enable the Court to evaluate the extent to which Liberty was
damaged as a result of Ms. Gao's failure to account. As set forth above, such a
misleading and partial accounting is even less revealing than no accounting at all. Ms.
Gao owed Liberty a fiduciary obligation to maintain and preserve accurate and
thorough business records. Having failed to fulfill that duty, she may not now present
only the few exculpatory records that have not disappeared.

Ms. Gao concedes that her exhibits may not be relevant to determining the
damages caused by her failure to account, but argues that they are relevant to
determining the "amount of damages caused by [Ms.] Gao arising from her diversion

**United States Bankruptcy Court**
**Central District of California**
Los Angeles
Judge Ernest Robles, Presiding
Courtroom 1568 Calendar

Wednesday, August 02, 2017                                        Hearing Room        1568

9:00 AM
CONT...        Liberty Asset Management Corporation                              Chapter 11

of assets of" Liberty. Pretrial Stip. at ¶B.2. The Court finds that the exhibits are not
probative as to damages caused by diversion of assets for the same reasons that they
are not probative as to damages caused by failure to account. The exhibits show only a
small number of a myriad of Liberty-related transactions; records showing what
happened immediately before or after those transactions are missing. As such, the
exhibits shed no light on whether Ms. Gao diverted assets from Liberty. For example,
Ms. Gao presents checks showing substantial payments from bank accounts which she
controlled to entities that may have been creditors of Liberty. But without a complete
record, there is no way of knowing whether those payments were offset by additional
diversions of Liberty's assets. It is as though Ms. Gao were seeking to establish the
balance of her checking account by presenting records only of deposits to the account
while omitting all records of withdrawals from the account.

The exhibits are also inadmissible because they were not timely produced. Ms.
Gao did not produce the exhibits to the Committee until July 5, 2017—more than a
month after the discovery cutoff date of May 31, 2017. *See* Greenwood Decl. at ¶¶5–
6. Civil Rule 26(a)(1)(A)(ii) requires parties to produce all documents that they may
use to support their claims and defenses. Civil Rule 37(c) provides that a party who
fails to timely produce the information required by Rule 26 may not rely upon that
information at trial, "unless the failure was substantially justified or is harmless." The
burden is on the non-compliant party to "demonstrate that failure to comply with Rule
26(a) is substantially justified or harmless." *Torres v. City of Los Angeles*, 548 F.3d
1197, 1213 (9th Cir. 2008). Exclusion of evidence under Rule 37(c) does not require
the Court "to make a finding of willfulness or bad faith," and the "implementation of
the sanction is appropriate 'even when a litigant's entire cause of action … [will be]
precluded.'" *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1180 (9th Cir.
2008).

Here, Ms. Gao did not produce any exhibits until more than a month after the
discovery cutoff date. Ms. Gao has not shown that her failure to timely produce the
exhibits was either substantially justified or harmless. Indeed, the Committee would
be prejudiced if the Court were to admit the untimely exhibits, as the Committee has
not had sufficient time to review those exhibits.

For these reasons, Ms. Gao may not rely upon Exhibits A through P at trial. Nor
may Ms. Gao testify as to the contents of Exhibits A through P or the transactions
documented by those exhibits.

**Ms. Gao May Not Offer Testimony Pertaining to Matters as to Which She**

**United States Bankruptcy Court**
**Central District of California**
Los Angeles
**Judge Ernest Robles, Presiding**
**Courtroom 1568 Calendar**

Wednesday, August 02, 2017                                             Hearing Room      1568

9:00 AM
CONT...        Liberty Asset Management Corporation                                        Chapter 11
Previously Invoked the Fifth Amendment

At a hearing conducted in Liberty's main bankruptcy case on June 22, 2016, Ms. Gao took the Fifth Amendment when questioned by counsel for the Committee. The hearing was on Liberty's emergency motion to obtain an order requiring Ms. Gao to immediately turnover Liberty's books and records. Liberty filed the emergency motion after its private investigator observed a document shredding truck at 3218 East Holt Avenue, West Covina, CA 91791 (the "Holt Property"), where certain of Liberty's books and records were stored. At the time, the Holt Property was under Ms. Gao's control.

At the hearing, Ms. Gao invoked the Fifth Amendment in response to the following questions posed by counsel for the Committee:

  1)  So Mr. Kirk has testified that Liberty Asset Management was formed in about 2007, is that correct?
  2)  Ms. Gao, were you employed with Liberty Asset Management from and after 2007?
  3)  Ms. Gao, can you describe your job functions on behalf of Liberty Asset Management?
  4)  Ms. Gao, as part of your responsibilities at Liberty Asset Management, were you in charge of accounting functions?
  5)  Ms. Gao, is it true that all or substantially all of the assets that were purchased with investors' funds on behalf of Liberty were taken in—the title was taken in LLCs that name you as the sole member?
  6)  Ms. Gao, would you mind telling the Court what happened with the proceeds from the sale of 166 Geary?

See Bankruptcy Doc. No. 152 at 65–69.

The Court reiterates its finding, made in connection with the Committee's motion for partial summary adjudication, that Ms. Gao is precluded from offering testimony pertaining to the subjects as to which she previously invoked the Fifth Amendment. As the Ninth Circuit has explained:

> Trial courts generally will not permit a party to invoke the privilege against self-incrimination with respect to deposition questions and then later testify about the same subject matter at trial. The Federal Rules of Civil Procedure "contemplate ... 'full and equal discovery' ... so as to prevent surprise, prejudice and perjury" during trial. *Id.* "[B]ecause the privilege may be initially invoked and later waived at a time when an adverse party can no longer secure the benefits of discovery, the potential for exploitation is

**United States Bankruptcy Court**
**Central District of California**
Los Angeles
Judge Ernest Robles, Presiding
Courtroom 1568 Calendar

---

**Wednesday, August 02, 2017**                                    **Hearing Room    1568**

---

<u>9:00 AM</u>
**CONT...        Liberty Asset Management Corporation                          Chapter 11**
          apparent."
*Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 909–11 (9th Cir. 2008) (internal citations omitted).
     Here, Ms. Gao invoked the Fifth Amendment at a hearing intended to elicit information regarding (1) the location and content of Liberty's books and records and (2) Ms. Gao's role in creating, maintaining, and preserving those books and records. This refusal to testify occurred at a critical juncture in the case, as it is possible that at the time of the hearing certain of Liberty's key records might not yet have been destroyed. Now that a complete set of records no longer exists, the Committee cannot secure the benefits of any information that may have been contained in those records. Having invoked the Fifth Amendment as a shield at a time when her testimony may have elucidated relevant information and may have assisted the Committee's efforts to preserve Liberty's records, Ms. Gao cannot now decide to testify as to the same subjects now that most of the corresponding records, which would either corroborate or disprove her testimony, are no longer available.

     Note 1
         As a result of the automatic stay arising from Bridgestream's Chapter 11 petition, the Court has not entered judgment in the action being prosecuted against Bridgestream by the Committee seeking a determination that Bridgestream holds its property in trust for Liberty.

| Party Information |
| --- |

**Debtor(s):**

Liberty Asset Management                  Represented By
                                          David B Golubchik
                                          Jeffrey S Kwong
                                          John-Patrick M Fritz
                                          Eve H Karasik
                                          Sandford L. Frey

**Defendant(s):**

Benjamin  Kirk                            Represented By
                                          William  Crockett

Lucy  Gao                                 Represented By
                                          Stephen R Wade

**United States Bankruptcy Court**
**Central District of California**
**Los Angeles**
**Judge Ernest Robles, Presiding**
**Courtroom 1568 Calendar**

**Wednesday, August 02, 2017**                                      **Hearing Room    1568**

9:00 AM
**CONT...        Liberty Asset Management Corporation**                              **Chapter 11**
     Plaintiff(s):

        Official Committee of Unsecured              Represented By
                                                                            Gail S Greenwood
                                                                            Jeremy V Richards

        LIBERTY ASSET                                    Represented By
                                                                            Jeremy V Richards
                                                                            Gail S Greenwood